SCANNED PDF FORMAT ATTACHMENTS ARE INCLUDED

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

**RADIO COMMUNICATIONS CORPORATION,**
**Petitioner**

**v.**                                      **Case No. 24-1004**

**FEDERAL COMMUNICATIONS COMMISSION,**
**Respondent**

### Petition For Review

Radio Communications Corporation (RCC)[1] hereby petitions the Court for review of the Federal Communications Commission's *Report and Order*, *Implementation of the Low Power Protection Act*, 89 Fed. Reg. 1466 (January 10, 2024), FCC 23-112, MB Docket No. 23-126, released December 12, 2023 which adopted rules to implement the Low Power Protection Act (LPPA).[2] A copy of FCC 23-112 is attached. The Federal Register indicates that the LPPA rules become effective as of February 9, 2024.

---

[1] Rule 26.1 Corporate Disclosure: RCC is a closely held, family-owned telecommunications company with a principal business office located in West Haven, Connecticut. RCC has no publicly held owners or parent. RCC and its principals do not own or control, nor are they owned or controlled by, any publicly owned company. All principals are U.S. Citizens.

[2] Low Power Protection Act, Pub. L. 117-344, 136 Stat. 6193 (2023).

1

Generally stated, review is required because FCC 23-112 fails to protect, in a very substantial manner, Low Power Television stations and licenses (LPTV), and the newly created Class A stations, as required by Congress in the LPPA. FCC 23-112 denies protection to LPTV licenses and LPTV broadcast stations covering more than 98% of America's population because "elevating LPTV stations from secondary to primary Class A status 'comes at the cost of effectively block[ing] coverage and service improvements by full-service stations,'" FCC 23-112 at 21-22 ¶ 38, Attachment 000021-22, notwithstanding the fact that the LPPA is the "Low Power Protection Act" and not the "Large Power Protection Act." RCC Comments, MB Docket 23-126, at ii, 1, 6, 12, 17, filed May 4, 2023.

List of Respondents to be served:

| | |
|---|---|
| Michele Ellison | Adam D. Chandler |
| Jacob Lewis | Robert B. Nicholson |
| Karen Onyeije | Daniel E. Haar |
| Sarah Citrin | Antitrust Division |
| General Counsel's Office | U.S. Department of Justice |
| Federal Communications Commission | 950 Pennsylvania Avenue, N.W. |
| 445 12ᵗʰ Street, S.W. | Room 3224 |
| Washington, D.C.  20554 | Washington, DC 20530-0001 |

**Requested Relief**

RCC's relief should include determinations that: 1) expedited review and summary judgment, alternatively a stay, are warranted; 2) the Commission's actions are unlawful; 3) a Class A licensee's Section 307(b) community of license is controlling

for LPPA licensing purposes; 4) RCC is not precluded from applying for the LPPA's economic benefits based upon DMA market size because RCC's § 307(b) community of license has fewer than 95,000 TV households, 5) program content cannot be used to deny Class A licenses, and 6) Class A stations can assert must-carry rights in their DMAs as co-primary broadcast licensees because the LPPA grants them primary licensing status and the same license terms as full power licensees.

Respectfully submitted,

January 10, 2024                    /S/_____

Timothy E. Welch, Esq.
Attorney for Petitioner
Hill and Welch
1116 Heartfields Drive
Silver Spring, MD 20904
welchlaw@earthlink.net
(202) 321-1448
(301) 622-2864 (FAX)

**Certificate of Compliance**

  I certify that this Petition For Review is proportionally spaced using 14 point Times New Roman typeface.  I certify that the information on this form is true and correct to the best of my knowledge and belief.

/S/ _____

  Timothy E. Welch
  Counsel to Radio Communications Corporation

January 10, 2024

4

### Certificate of Digital Submission and Privacy Redactions

The Petition For Review and the Attachments have been scanned for viruses with the most recent version of a commercial virus scanning program (McAfee Antivirus Version 1.1.2332.0, last updated January 9, 2024) and is free of viruses. In addition, I certify that all required privacy redactions have been made.

/S/ _Timothy E. Welch_ _____

   Timothy E. Welch
   Counsel to Radio Communications Corporation


January 10, 2024

## CERTIFICATE OF SERVICE

I hereby certify that pursuant to F.R.A.P. 15(c) the Clerk of the Court will serve a copy of the foregoing Petition For Review by email using the CM/ECF System, or otherwise, upon the following:

Michele Ellison
Jacob Lewis
Karen Onyeije
Sarah Citrin
General Counsel's Office
Federal Communications Commission
445 12th Street, S.W.
Washington, D.C.  20554

Adam D. Chandler
Robert B. Nicholson
Daniel E. Haar
Antitrust Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W., Room 3224
Washington, DC 20530-0001

There are no other parties which require service in this proceeding.  Pursuant to Local Rule 15 I hereby certify that I have this date served the above listed Respondents via email and First Class United States Mail, postage prepaid.

/S/ _____
    Timothy E. Welch
    January 10, 2024

**FCC Order On Review**

1) *Report and* Order FCC 23-112, released December 12, 2023
   89 Fed. Reg. 1466 (January 10, 2024) . . . . . . . . . . . . . . . . . . . . . . . . 000001

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | **)** | |
| | **)** | |
| Implementation of the Low Power Protection Act | **)** | MB Docket No. 23-126 |
| | **)** | |

**REPORT AND ORDER**

**Adopted: December 11, 2023**                    **Released: December 12, 2023**

By the Commission:

**TABLE OF CONTENTS**

Heading                                                                 Paragraph #

I.  INTRODUCTION ........................................................................................................... 1
II. BACKGROUND ............................................................................................................. 2
   A.  Low Power Television Service ................................................................................ 2
   B.  Class A Television Stations .................................................................................... 4
   C.  Low Power Protection Act ...................................................................................... 7
III. DISCUSSION ................................................................................................................ 10
   A.  Application Period ................................................................................................... 11
   B.  Eligibility Requirements ......................................................................................... 13
       1.  Definition of Low Power TV Station ............................................................... 13
       2.  Eligibility Criteria ............................................................................................ 18
       3.  Interference Requirements ................................................................................ 29
       4.  Designated Market Area .................................................................................... 33
       5.  License Standards (Ongoing Eligibility Requirements) ................................... 41
   C.  Application Process ................................................................................................. 46
   D.  TV Broadcast Incentive Auction, Post-Auction Transition, and Reimbursement ....................... 49
   E.  Digital Equity and Inclusion .................................................................................. 50
   F.  Other Issues ............................................................................................................ 52
IV. PROCEDURAL MATTERS .......................................................................................... 57
V.  ORDERING CLAUSES ................................................................................................. 60
Appendix A – List of Commenters
Appendix B – Final Rules
Appendix C – Final Regulatory Flexibility Act Analysis

# I.     INTRODUCTION

1.      In this *Report and Order*, we adopt rules to implement the Low Power Protection Act (LPPA or Act),[1] which was enacted on January 5, 2023.  The LPPA provides certain low power television (LPTV) stations with a limited window of opportunity to apply for primary spectrum use status as Class A television stations.[2]  With limited exceptions, the rules adopted herein are consistent with the

---

[1] Low Power Protection Act, Pub. L. 117-344, 136 Stat. 6193 (2023).

[2] LPPA Sec.2(b).

Commission's proposals in the *Notice of Proposed Rulemaking* (*NPRM*)[3] in this proceeding.  In this Order, we further the implementation of the LPPA by establishing the period during which eligible stations may file applications for Class A status, eligibility and interference requirements, and the process for submitting applications.

## II.    BACKGROUND

### A.    Low Power Television Service

2.      The Commission created the LPTV service in 1982 to bring television service, including local service, to viewers "otherwise unserved or underserved" by existing full power service providers.[4] From its creation, the LPTV service has been a secondary service, meaning LPTV stations may not cause interference to, and must accept interference from, full power television stations as well as certain land mobile radio operations and other primary services.[5]

3.      Currently, there are 1,889 licensed LPTV stations.[6]  These stations operate in all states and territories, and serve both rural and urban audiences.[7]  LPTV stations were required to complete a transition from analog to digital operation in 2021, and all such stations must now operate in digital format.[8]  As the name suggests, LPTV stations have lower authorized power levels than full power television stations.[9]  Because they operate at reduced power levels, LPTV stations serve a much smaller geographic region than full power stations and can be fit into areas where a higher power station cannot be accommodated in the Table of TV Allotments.[10]

---

[3] *See Implementation of the Low Power Protection Act*, MB Docket No. 23-126, Notice of Proposed Rulemaking, FCC 23-23 (rel. March 30, 2023) (*NPRM*).

[4] *Inquiry Into the Future Role of Low Power Television Broadcasting and Television Translators in the National Telecommunications System*, BC Docket No. 78-253, Notice of Proposed Rulemaking, 82 F.C.C.2d 47, para. 1 (1980) (*LPTV NPRM*); *Low Power Television Service*, Report and Order, 51 R.R.2d 476 (1982) (*LPTV Order*), *recon. granted in part*, 48 Fed. Reg. 21478 (1983).  The low power television service consists of LPTV and TV translator stations.  LPTV and TV translator stations differ only in the amount of programming they may originate. LPTV stations are not limited in the amount of programming they may originate.  TV translators may originate only emergency warnings of imminent danger no longer or more frequent than necessary to protect life and property and, in addition, not more than thirty seconds per hour of public service announcements and material seeking and acknowledging financial support necessary to the continued operation of the station.  *See* 47 CFR § 74.790 (Permissible service of TV translator and LPTV stations).

[5] *LPTV Order*, 51 R.R.2d at para. 17.  As a result of their secondary status, LPTV stations can also be displaced by full power stations that seek to expand their service area, or by new full power stations seeking to enter the same area as an LPTV station.

[6] *See Broadcast Station Totals as of September 30, 2023*, Public Notice, DA 23-921 (rel. Oct. 3, 2023), available at https://docs.fcc.gov/public/attachments/DA-23-921A1.pdf (http://fcc.gov).

[7] *See Establishment of a Class A Television Service*, MM Docket No. 00-10, Report and Order, 15 FCC Rcd 6355, 6357-58, para. 2 (2000) (*Class A Order*), *recon. granted in part*, 16 FCC Rcd 8244 (2001) (*Class A MO&O*).

[8] LPTV stations were required to complete their digital transition as of July 13, 2021.  *See Media Bureau Reminds Low Power Television and Television Translator Stations of July 13, 2021, Digital Transition Date*, Public Notice, 36 FCC Rcd 4771 (MB 2021).

[9] *See* 47 CFR §§ 74.735(a), 73.622(a)(1); *Class A Order*, 15 FCC Rcd at 6357, n.4; *NPRM* at n.8 (noting that LPTV signals typically extend approximately 20 to 40 miles from a station's transmission site, while the signals of full power stations can reach as far as 60 to 80 miles).

[10] Unlike full power stations, LPTV stations are not restricted to operating on a channel specified in a table of allotments.

000002
Petition for Review--RCC
FCC 23-112

B.    **Class A Television Stations**

4.       In 2000, the Commission established a Class A television service[11] to implement the Community Broadcasters Protection Act of 1999 (CBPA).[12]  The CBPA allowed certain qualifying LPTV stations to become Class A stations, which provided those television stations primary status, and thereby a measure of interference protection from full service television stations.[13]

5.       Congress sought in the CBPA to provide certain LPTV stations a limited window of opportunity to apply for primary status.  Among other matters, the CBPA set out certain certification and application procedures for LPTV licensees seeking Class A designation and prescribed the criteria for eligibility for a Class A license.  Specifically, under the CBPA, an LPTV station could qualify for Class A status if, during the 90 days preceding the date of enactment of the statute, the station: (1) broadcast a minimum of 18 hours per day; (2) broadcast an average of at least 3 hours per week of programming produced within the market area served by the station, or the market area served by a group of commonly controlled low-power stations that carry common local programming produced within the market area served by such group; and (3) was in compliance with the Commission's requirements for LPTV stations.[14]  In addition, the CBPA required that, from and after the date of its application for a Class A license, the station must be in compliance with the Commission's operating rules for full power television stations.[15]  As directed by the CBPA, within 60 days of the date of enactment of the CBPA, stations seeking Class A status were required to submit to the Commission a certification of eligibility based on the applicable qualification requirements.[16]

6.       In addition to these qualifying requirements, the CBPA gave the Commission discretion to determine that the public interest, convenience, and necessity would be served by treating a station as a qualifying LPTV station under the CBPA, or that a station should be considered to qualify for such status for other reasons determined by the Commission, even if it did not meet the qualifying requirements in the statute discussed above.[17]  In implementing the CBPA, the Commission concluded, however, that it would not accept applications under the CBPA from LPTV stations that did not meet the statutory criteria and that did not file a certification of eligibility by the statutory deadline, absent compelling circumstances.[18]

C.    **Low Power Protection Act**

7.       Like the CBPA, the LPPA is intended "to provide low power TV stations with a limited window of opportunity" to apply for primary status as a Class A television licensee.[19]  The Act gives

---

[11] *See Class A Order*, 15 FCC Rcd 6355.

[12] Community Broadcasters Protection Act of 1999, Pub. L. No. 106-113, 113 Stat. Appendix I at pp. 1501A-594 - 1501A-598 (1999), *codified at* 47 U.S.C. § 336(f).

[13] *See Class A Order*, 15 FCC Rcd 6355, para. 1.

[14] 47 U.S.C. § 336(f)(2)(A)(i).

[15] 47 U.S.C. § 336(f)(2)(A)(ii).

[16] 47 U.S.C. § 336(f)(1)(B).  In addition, the Commission required LPTV licensees seeking Class A designation to submit an application to the Commission within 6 months after the effective date of the rules adopted in the Class A proceeding.  *See Class A Order*, 15 FCC Rcd at 6362, paras. 13-14.

[17] 47 U.S.C. § 336(f)(2)(B).

[18] *See Class A Order*, 15 FCC Rcd at 6361, para. 11.

[19] LPPA Sec.2(b).

000003
Petition for Review--RCC
FCC 23-112

LPTV stations one year to apply for a Class A license, from the date that the Commission's rules implementing the LPPA become effective.[20]

8.      The LPPA sets forth eligibility criteria for stations seeking Class A designation that are similar to the eligibility criteria under the CBPA, as discussed above.  Specifically, the LPPA provides that the Commission "may approve" an application submitted by an LPTV station if the station meets the following eligibility criteria:

- during the 90-day period preceding the date of enactment of the LPPA (i.e., between October 7, 2022 and January 5, 2023), the station satisfied the same requirements applicable to stations that qualified for Class A status under the CBPA, "including the requirements…with respect to locally produced programming;"[21]

- the station satisfies the Class A service requirements in 47 CFR § 73.6001(b)-(d) or any successor regulation;[22]

- the station demonstrates that it will not cause any interference as described in the CBPA;[23]

- during that same 90-day period, the station complied with the Commission's requirements for LPTV stations;[24] and

- as of January 5, 2023, the station operated in a Designated Market Area with not more than 95,000 television households.[25]

Finally, the LPPA requires that a station accorded Class A status must (1) be subject to the same license terms and renewal standards as a license for a full power television broadcast station (except as otherwise expressly provided in the LPPA) and (2) remain in compliance with the LPPA's eligibility criteria during the term of the station's license.[26]

---

[20] LPPA Sec.2(c)(2)(A).  That provision states: "The rule with respect to which the Commission is required to issue notice under paragraph (1) shall provide that, during the 1-year period beginning on the date on which that rule takes effect, a low power TV station may apply to the Commission to be accorded primary status as a Class A television licensee under section 73.6001 of title 47, Code of Federal Regulations, or any successor regulation."  LPPA Sec.2(c)(2)(A).

[21] Section 2(c)(2)(B) provides: "(B) Considerations. – The Commission may approve an application submitted under subparagraph (A) if the low power TV station submitting the application (i) satisfies – (I) section 336(f)(2) of the Communications Act of 1934…and the rules issued under that section, including the requirements under such section 336(f)(2) with respect to locally produced programming…."  LPPA Sec.2(c)(2)(B)(i)(I) (citing 47 U.S.C. § 336(f)(2) of the CBPA).

[22] LPPA Sec.2(c)(2)(B)(i)(II).  Sections 73.6001(b)-(d) of our rules set forth service requirements and other rules for Class A stations.

[23] LPPA Sec.2(c)(2)(B)(ii); 47 U.S.C. § 336(f)(7).  *See also* Section III.B.3 *infra* (Eligibility Requirements - Interference Requirements).

[24] LPPA Sec.2(c)(2)(B)(ii).  *See also* 47 U.S.C. § 336(f)(2)(A)(i)(III).

[25] LPPA Sec.2(c)(2)(B)(iii).  The LPPA also requires the Commission "[n]ot later than 1 year after the date of enactment" of the LPPA to "submit to the Committee on Commerce, Science and Transportation of the Senate and the Committee on Energy and Commerce of the House of Representatives a report regarding the implementation" of the LPPA including: "(1) a list of the current, as of the date on which the report is submitted, licensees that have been accorded primary status as Class A television licensees; and (2) of the licensees described in paragraph (1), an identification of each such licensee that has been accorded the status described in that paragraph because of the implementation" of the LPPA.  LPPA Sec.2(d).

[26] LPPA Sec.2(c)(3).  Section 2(c)(3) in its entirety provides: "Applicability of License – A license that accords primary status as a Class A television licensee to a low power TV station as a result of the [rules adopted to

(continued….)

000004
Petition for Review--RCC
FCC 23-112

**Federal Communications Commission**                    **FCC 23-112**

9.    On March 29, 2023, the Commission adopted the *NPRM*, which sought comment on how to implement the window for LPTV stations to apply for primary spectrum use status as Class A television stations, consistent with Congressional direction in the LPPA.[27]  We received over thirty comments in response to the *NPRM*.[28]

## III.    DISCUSSION

10.    The rules and policies we adopt herein to implement the LPPA are largely consistent with the Commission's proposals in the *NPRM*, with one exception.  We adopt the proposals regarding the application period, the definition of a low power TV station and eligibility criteria, applicable interference requirements, and use of the Nielsen Local TV Station Information Report (Local TV Report) to determine the DMA where the LPTV station's transmission facilities are located for purposes of eligibility.  We do not, however, adopt in full the proposal to require that all licensees that convert to Class A status pursuant to the LPPA remain in compliance with the LPPA's DMA eligibility requirement for the term of their Class A license.  Instead, we conclude that LPPA Class A stations will not be required to continue to comply with the 95,000 TV household threshold if the population in the station's DMA later exceeds the threshold amount for specific reasons beyond the station's control.  Finally, we adopt the *NPRM* proposals regarding the process for applying for Class A status pursuant to the LPPA, decline to amend our rules, as requested, to give LPPA Class A stations must carry rights equivalent to full service stations, and decline to adopt a requested *de minimis* exception to the LPPA's DMA eligibility requirement.

### A.    Application Period

11.    For the reasons discussed in the *NPRM* and described below, we adopt the *NPRM's* proposals regarding the application period.  In the *NPRM*, the Commission proposed to provide LPTV stations a period of one year to apply for Class A status under the LPPA.[29]  The Commission also tentatively concluded that the public interest would not be served by providing for conversion to Class A status beyond the one year period contemplated by the LPPA.[30]  The Commission proposed, however, that, similar to its approach in implementing the CPBA, if a potential applicant faces circumstances beyond its control that prevents it from filing by the application deadline, the Commission would examine

---

(Continued from previous page) ─────────────────────────

implement the LPPA] shall (A) be subject to the same license terms and renewal standards as a license for a full power television broadcast station, except as otherwise expressly provided in this subsection; and (B) require the low power TV station to remain in compliance with paragraph (2)(B) during the term of the license."

[27] *See generally NPRM*.

[28] A list of the comments and reply comments is attached as Appendix A.  The Identical Comments (identified in Appendix A) support the adoption of Metropolitan Statistical Areas (MSAs) and Rural Statistical Areas (RSAs), as defined by the Office of Management and Budget, as an alternative to Designated Market Areas (DMAs), as defined by Nielsen Media Research, for determining eligibility pursuant to the LPPA.  *See infra* Section III.B.4. (Eligibility Requirements- Designated Market Area).  RCC argues that we should discount the Identical Comments on the ground that they do not provide information "regarding the person or persons directing the filing of [the] common comments."  RCC Reply Comments at 1.  We reject RCC's request.  Each of the identical comments includes the name of the individual signing the comment, and the fact that the comments are identical is not grounds for the Commission to ignore them.  We also reject RCC's argument that we should discount NAB's comments on the ground that "NAB does not claim to represent any LPTV licensees" and its comments "do not protect LPTV interests."  RCC Reply Comments at 3.  A party need not "represent" or seek to "protect" LPTV licensees in order to file comments in this proceeding.  Moreover, NAB's comments set forth its interests in this proceeding.  NAB Comments at 2-4.  We therefore have considered all the comments filed in the docket.

[29] *NPRM* at para. 10.

[30] *Id*. at para. 11.

000005
Petition for Review--RCC
FCC 23-112

those instances on a case-by-case basis to determine the potential applicant's eligibility for filing.[31]  No commenter addressed these issues.

12.    The LPPA provides LPTV stations a period of one year to apply for Class A status.[32]  The LPPA also provides that the Commission may approve an application for Class A status if the application satisfies section 336(f)(2) of the Communications Act of 1934, as amended (which codifies the CBPA).[33]  This provision sets forth the eligibility criteria for stations qualifying for Class A status,[34] and gives the Commission discretion to determine whether a station that does not satisfy such criteria should otherwise qualify.[35]  In the *Class A Order*, the Commission declined either to expand these eligibility criteria or to allow ongoing conversion to Class A status beyond the 6 month window contemplated in the CBPA.[36]  The Commission reasoned that the basic purpose of the CBPA was to afford existing LPTV stations a window of opportunity to convert to Class A status.[37]  The Commission also determined that the intent of Congress in enacting the CBPA was to establish the rights of a specific, already-existing group of LPTV stations, and that the public interest would not be served by the ongoing conversion of LPTV stations to Class A status under the CBPA in the future.[38]  Absent comment on this issue, we find no reason to deviate from these prior determinations and the tentative conclusions in the *NPRM* that the application window will be limited to the one-year application window specified in the LPPA, but that we will examine on a case-by-case basis a potential applicant's claim that it was prevented from filing by the application deadline due to circumstances beyond its control.

### B.    Eligibility Requirements

#### 1.    Definition of Low Power TV Station

13.    As proposed in the *NPRM*, we apply the Commission's recently updated definition of a "low power TV station" for purposes of determining which stations are eligible for Class A status under the LPPA.[39]  The LPPA provides that the term "low power TV station" has the meaning given the term "digital low power TV station" in section 74.701 of our rules, or any successor regulation.[40]  At the time the LPPA was enacted, section 74.701 contained a definition of the term "digital lower power TV"

---

[31] *Id*.

[32] LPPA Sec.2(c)(2)(A).

[33] LPPA Sec.2(c)(2)(B).

[34] 47 U.S.C. § 336(f)(2)(A) (providing that an LPTV station qualifies for Class A status pursuant to the CBPA if "(A)(i) during the 90 days preceding (the date of enactment of the CBPA) – (I) such station broadcast a minimum of 18 hours per day; (II) such station broadcast an average of at least 3 hours per week of programming that was produced within the market area served by such station, or the market area served by a group of commonly-controlled low-power stations that carry common local programming produced within the market area served by such group; and (III) such station was in compliance with the Commission's requirements applicable to low-power television stations; and (ii) from and after the date of its application for a class A license, the station is in compliance with the Commission's operating rules for full-power television stations…").

[35] 47 U.S.C. § 336(f)(2)(B) (providing that a station is a qualifying low-power television station if "(B) the Commission determines that the public interest, convenience, and necessity would be served by treating the station as a qualifying low-power television station for purposes of this section, or for other reasons determined by the Commission").

[36] *See Class A Order*, 15 FCC Rcd at 6361, para. 11.  *See also Class A MO&O*, 16 FCC Rcd at 8250-52, paras. 15-18.

[37] *See Class A Order*, 15 FCC Rcd at 6361, para. 11; *Class A MO&O*, 16 FCC Rcd at 8251-52, para. 18.

[38] *Class A MO&O*, 16 FCC Rcd at 8251-52, para. 18.  *See also NPRM* at para. 11.

[39] *NPRM* at para. 12.

[40] LPPA Sec.2(a)(3).

000006
Petition for Review--RCC
FCC 23-112

station." As noted in the *NPRM*, after enactment of the LPPA, the Commission revised that rule to remove references to digital and analog television service, as all LPTV stations have ceased analog operations and there is no longer any need to differentiate between digital and analog in the rules.[41] In place of the prior section 74.701 definition, section 74.701(k) of our current rules defines a low power TV station as: "[a] station…that may retransmit the programs and signals of a television broadcast station, may originate programming in any amount greater than 30 seconds per hour… and, subject to a minimum video program service requirement, may offer services of an ancillary or supplementary nature, including subscription-based services."[42] No commenter addressed this proposal. We will apply this recently updated definition of an LPTV station for purposes of determining which stations are eligible for Class A status under the LPPA.

14.    We adopt the tentative conclusion in the *NPRM* that television translator stations are unlikely to satisfy the eligibility requirements of the LPPA.[43] As explained in the *NPRM*,[44] translator stations "operate for the purpose of retransmitting the programs and signals of a television broadcast station, without significantly altering any characteristic of the original signal other than its frequency and amplitude,"[45] and thus, are not permitted to "originate programming" as defined in the rules.[46] While the LPPA does not expressly require that the locally produced content aired by a low power station be produced by that station itself, we noted that translators would be unlikely to qualify under the locally produced programming provisions of the LPPA due to the manner in which translators operate. Translator stations are generally located outside their primary station's noise limited contour in order to bring service to remote areas.[47] Thus, while a translator's primary station(s) may be airing programming produced in the primary station's noise limited contour, it is unlikely that programming was locally produced within the noise limited contour of the translator. In addition, as explained in the *NPRM*, under the CBPA the Commission specifically found that TV translator stations were not eligible for Class A status, and there is no indication that Congress intended to be more inclusive under the LPPA.[48] The sole

---

[41] The Commission recently revised its rules in Parts 73 and 74, *inter alia*, to eliminate rules that no longer have any practical effect given the completion of the DTV transition as well as the post-incentive auction transition to a smaller television band with fewer channels. *See Amendment of Part 73 of the Commission's Rules to Update Television and Class A Television Broadcast Station Rules, and Rules Applicable to All Broadcast Stations*, MB Docket No, 22-227, Report and Order, FCC 23-72 (rel. Sept. 19, 2023) (*Part 73 Amendment R&O*); *Amendment of Parts 73 and 74 of the Commission's Rules to Establish Rules for Digital Low Power Television and Television Translator Stations, Update of Parts 74 of the Commission's Rules Related to Low Power Television and Television Translator Stations*, MB Docket Nos. 03-185 and 22-261, Report and Order, FCC 23-25 (rel. Apr. 17, 2023) (*Parts 73 and 74 Amendment Report and Order*). Among other revisions, the Commission eliminated all analog rules and references to analog and to out-of-core channels; updated information such as filing dates, locations, and form numbers; and reorganized and modified technical rules to make them more accessible to licensees and other users. *See id.* Any additional rule changes that are relevant to Class A stations will apply to stations that converted to Class A status pursuant to the CBPA and to stations that convert to Class A status pursuant to the LPPA.

[42] 47 CFR § 74.701(k).

[43] *NPRM* at para. 13.

[44] *Id.*

[45] 47 CFR § 74.701(a).

[46] *See* 47 CFR § 74.701(h) ("*Local origination.* Program origination if [sic] the parameters of the program source signal, as it reaches the transmitter site, are under the control of the low power TV station licensee. *Transmission of TV program signals generated at the transmitter site constitutes local origination.* Local origination also includes transmission of programs reaching the transmitter site via TV STL stations, but does not include transmission of signals obtained from either terrestrial or satellite microwave feeds or low power TV stations.") (emphasis added).

[47] 47 CFR § 74.787(a)(5).

[48] *NPRM* at para. 13.

000007
Petition for Review--RCC
FCC 23-112

commenter to address this issue, News-Press & Gazette Broadcasting (NPG), agrees that excluding television translator stations from eligibility under the LPPA "is a practical approach for most translators" but argues that "additional flexibility is warranted" for TV translator stations such as NPG's translator.

15.      KXPI-LD, Pocatello, Idaho, retransmits the signal of full power station KIDK, (Fox), Idaho Falls, Idaho.[49]  According to NPG, "KXPI-LD is classified in the Commission's records as a digital TV translator station, but it functions more like an originator of programming than a translator; it is a primary Fox Network affiliate providing local news, weather, and information to the Pocatello community. . . ."[50]  NPG argues that KXPI-LD meets all of the LPPA's eligibility requirements, "except its ministerial technical classification as a digital TV translator."[51]  NPG also argues that "the FCC's 'low power TV station' definition, Rule 74.701(k), encompasses stations like KXPI-LD that retransmit the signal of a TV broadcast station, and does not require program origination."[52]  NPG urges that the Commission permit stations like KXPI-LD to be eligible for the Class A filing opportunity afforded by the LPPA.[53]

16.      We affirm our tentative conclusion that translator stations are unlikely to satisfy the eligibility requirements of the LPPA.  NPG's argument that the Commission's definition of a low power TV station encompasses stations like KXPI-LD that retransmit the signal of a TV broadcast station, and does not require program origination, is misplaced.  LPAA section 2(c)(2)(B)(i)(I) requires that, during the 90-day eligibility period, an LPTV station must broadcast an average of at least three hours per week of programming produced within the market area served by the station.[54]  As a translator station, KXPI-LD retransmits the programming feed it obtains from full-power station KIDK.  NPG does not demonstrate that the KIDK programming that KXPI-LD is retransmitting was produced in KXPI-LD's own noise limited contour.  Thus, NPG has failed to demonstrate how a translator station like KXPI-LD can satisfy the requirement of LPAA section 2(c)(2)(B)(i)(I) to broadcast an average of at least three hours per week of programming produced within the market area served by the translator station. [55]

17.      Finally, consistent with the tentative conclusion in the *NPRM*, we confirm that LPTV stations that had not completed their digital transitions prior to the beginning of the eligibility period are not eligible to apply for Class A designation.[56]  No commenter addressed this issue.  Since analog

---

[49] NPG Comments at 8-9.

[50] *Id*. at 9.

[51] *Id*.  NPG's argument is incorrect.  While stations can convert between the TV translator classification or the LPTV classification by notifying Commission staff of the station's intended status, each station must ensure that it properly informs the staff of the designation and can be designated only as either a TV translator or an LPTV station, not both.

[52] *Id*.

[53] *Id*.

[54] LPPA Sec.2(c)(2)(B)(i)(I).

[55] While we do not preclude a translator station from attempting to demonstrate how it satisfies the eligibility requirements of the LPPA, we also note that KXPI-LD is in the Idaho Falls-Pocatello-Jackson DMA (*see* https://ustvdb.com/seasons/2022-23/markets/) which had more than 95,000 TV households at the time the LPPA was enacted (*see* http://web.archive.org/web/20230605234252/https://ustvdb.com/seasons/2022-23/markets/). Therefore, the station is also not eligible for Class A status under the LPPA on that basis.

[56] A small number of analog LPTV stations had not yet completed construction of their digital facilities by July 13, 2021, the analog termination deadline, and were granted additional time to do so.  *See Amendment of Parts 73 and 74 of the Commission's Rules to Establish Rules for Digital Low Power Television and Television Translator Stations, Update of Parts 74 of the Commission's Rules Related to Low Power Television and Television Translator Stations*, MB Docket No. 03-185, Order and Sixth Notice of Proposed Rulemaking, 37 FCC Rcd 8173, 8174-45 at para. 4 and n.17 (2022).  They have all either completed construction or are no longer licensees of the stations that went silent on or before the analog termination date.

000008
Petition for Review--RCC
FCC 23-112

television operations are no longer permitted, any LPTV station that has not converted to digital operation is silent and must remain silent until such time as it completes construction of its digital facilities.[57] The LPPA requires that, to be eligible to convert to Class A status, an LPTV station must meet the statutory programming requirements for the 90-day period preceding the date of enactment of the LPPA.[58] As any LPTV station that was silent during this period would not meet these requirements, such stations are not eligible to apply for Class A designation under the LPPA.

### 2.    Eligibility Criteria

18.    As noted above,[59] the LPPA sets forth eligibility criteria for stations seeking Class A designation that are similar to the eligibility criteria under the CBPA.  Specifically, the LPPA provides that the Commission "may approve" an application submitted by an LPTV station if the station, during the 90-day period preceding the date of enactment of the LPPA, meets the same requirements in section 336(f)(2) of the Communications Act applicable to stations that qualified for Class A status under the CBPA, "including the requirements…with respect to locally produced programming."[60] Thus, to qualify for Class A status, in the 90 days preceding the LPPA's January 5, 2023 effective date (between October 7, 2022 and January 5, 2023) an LPTV station must have met the following requirements: (1) the station must have broadcast a minimum of 18 hours per day;[61] (2) the station must have broadcast an average of at least 3 hours per week of programming that was produced within the market area served by such station, or the market area served by a group of commonly controlled LPTV stations that carry common local programming produced within the market area served by such group;[62] and (3) the station must have been in compliance with the Commission's requirements applicable to LPTV stations.[63] In addition, from and after the date of its application for a Class A license, the station must be in compliance with the Commission's operating rules for full power television stations.[64]

19.    <u>Locally Produced Programming</u>.  We will define locally produced programming for purposes of the LPPA as that "produced within the predicted noise-limited contour (*see* § 73.619(c)) of a Class A station broadcasting the program or within the contiguous predicted noise-limited contours of any of the Class A stations in a commonly owned group."  The *NPRM* proposed to define "locally produced programming" for purposes of the LPPA in the same manner as our rules that apply to stations that converted to Class A status pursuant to the CBPA.[65] As noted above, the LPPA requires that, during the 90-day eligibility period, LPTV stations must have broadcast an average of at least 3 hours per week of programming produced within the market area served by the station.[66] The *NPRM* noted that the Commission was in the process of updating its rules.[67] Since that time, in the *Part 73 Amendment R&O*, the Commission did update the definition of locally produced programming for Class A stations as that "produced within the predicted noise-limited contour (*see* § 73.619(c)) of a Class A station broadcasting the program or within the contiguous predicted noise-limited contours of any of the Class A stations in a

---

[57] *Id*.  *See also* 47 CFR § 74.790(m).

[58] *See* LPPA Sec.2(c)(2)(B)(i)(I).

[59] *See supra* para. 8.

[60] LPPA Sec.2(c)(2)(B)(i)(I).

[61] 47 U.S.C. § 336(f)(2)(A)(i)(I).

[62] 47 U.S.C. § 336(f)(2)(A)(i)(II).

[63] 47 U.S.C. § 336(f)(2)(A)(i)(III).  *See also supra* para. 8.

[64] LPPA Sec.2(c)(2)(B)(i)(I); 47 U.S.C. § 336(f)(2)(A)(ii).

[65] *See NPRM* at para. 16.

[66] LPPA Sec.2(c)(2)(B)(i)(I); 47 U.S.C. § 336(f)(2)(A)(i)(II).

[67] *See NPRM* at para. 16.

000009
Petition for Review--RCC
FCC 23-112

commonly owned group."[68]  Block supports this proposed definition of "locally produced programming,"[69] and with the exception of REC's request for clarification addressed below, no other commenter addressed this issue.  As proposed in the *NPRM*, we will apply this definition to define "programming produced within the market area served by the station" for purposes of determining eligibility for Class A status under section 2(c)(2)(B)(i)(I) of the LPPA.

20.     We decline at this time to adopt REC's proposal that we clarify the definition of "locally produced programming" for purposes of the LPPA.[70]  REC advocates that the Commission (1) clarify that local programming may not be repeated within the same week to satisfy the weekly locally produced programming requirement; (2) require that local programming be aired on the same programming stream and not aggregated among multiple streams to meet the minimum requirement; (3) clarify that the local programming requirement need only be satisfied on one programming stream of simultaneous video and related audio programming; and (4) require that the programming must be simultaneous video and audio programming where the audio portion of the programming directly relates to the video portion of the programming.[71]  We note that the concerns underlying REC's proposed clarifications are equally applicable to existing Class A stations under the CBPA.  Any change to the definition of "locally produced programming" to address such concerns should be considered with respect to all Class A stations, not just those stations that convert to Class A status pursuant to the LPPA.  Because the Commission did not propose to revise the definition of locally produced programming for purposes of Class A stations generally, we find REC's proposals to be outside the scope of this proceeding.  Accordingly, we decline to pursue REC's proposals at this time.

21.     <u>Operating Requirements.</u>  For the reasons contained in the *NPRM* and discussed below, we adopt the *NPRM's* proposals related to operating requirements.  The *NPRM* tentatively concluded that all applicants seeking to convert to Class A status under the LPPA must certify that they have complied with the Commission's requirements for LPTV stations during the 90-day eligibility period.[72]  The *NPRM* also proposed that a station applying to convert to Class A status must comply, beginning on the date of its application for a Class A license and thereafter, with the same Commission Part 73 operating rules that apply to Class A stations that converted pursuant to the CBPA.[73]  This includes the requirement that existing Class A stations comply with children's programming and online public inspection file (OPIF) regulations.[74]  No commenter opposed this approach.  Absent objection, we adopt these proposals.

---

[68] *See Part 73 Amendment R&O*, at n.19 & Appx. A (Final Regulations) at section 73.6000.

[69] *See* Block Comments at 2.

[70] *See* REC Comments at 3.

[71] *Id*.

[72] *See NPRM* at para. 17.  As noted in para. 8 above, to qualify for Class A status under the LPPA, an LPTV station must have been in compliance with the Commission's requirements for LPTV stations during the 90-day eligibility period.  The LPTV requirements are set forth in Title 47, Part 74, Subpart G of our rules.

[73] *See NPRM* at para. 18.  *See also* LPPA Sec.2(c)(2)(B)(i)(I); 47 U.S.C. § 336(f)(2)(A)(ii).

[74] *See* 47 CFR § 73.6026 (listing broadcast regulations applicable to Class A television stations).  This rule includes cross references to 47 CFR §§ 73.670 (Commercial limits in children's programming) and 73.671 (Educational and informational programming for children) as applying to Class A stations.  *See also* 47 CFR § 73.3526 (Online public inspection file of commercial stations) which requires Class A licensees to maintain an online public file, including a political file.  In the *Class A Order* that implemented the CBPA, the Commission determined certain Part 73 rules would apply to applicants for Class A status and to stations awarded Class A licenses.  *See Class A Order*, 15 FCC Rcd at 6365, para. 23; 47 CFR § 73.6026 (listing Part 73 rules that do apply to Class A stations).  Class A stations are not required to comply with certain other regulations that could not apply for technical reasons, such as the full power principal city coverage requirement currently set forth in 47 CFR § 73.625(a).  Instead, Class A stations must comply with maximum power levels applicable to LPTV stations.  *Class A Order*, 15 FCC Rcd at 6367-68, paras. 28-29.  Some other examples of rules that cannot apply to Class A stations for technical reasons include, 47 CFR §§ 73.622(f)(5) (the so-called "largest station in the market" rule); 73.616 (Post-transition DTV station interference

(continued….)

000010
Petition for Review--RCC
FCC 23-112

Regarding our requirement that Class A TV applicants and licensees maintain an OPIF,[75] NPG notes that LPTV stations have no OPIF and are therefore unable to upload records to the system.[76] The Commission will activate an OPIF for LPTV stations that apply to convert to Class A status pursuant to the LPPA and inform applicants when that station's OPIF is ready for the applicant to upload documents required to be maintained in OPIF.[77]

22.    We also require that all stations that receive a Class A license under the LPPA comply with all Class A regulations, as proposed in the *NPRM*.[78]  As discussed in the *NPRM*, the LPPA requires that LPPA Class A stations "remain in compliance" with the Act's eligibility criteria[79] "during the term of the license."[80]  This includes, among other things, the requirements to broadcast a minimum of 18 hours per day and to broadcast an average of at least three hours per week of locally produced programming each quarter.[81]  In addition, the station must continue to comply with the interference requirements adopted herein.[82]  Further, we adopt the tentative conclusion in the *NPRM*[83] that there is no reason to exempt LPTV stations converting to Class A status under the LPPA from other rules applicable to LPTV stations that converted to Class A status under the CBPA,[84] given that the service requirements in the LPPA closely track those in the CBPA and thus it makes sense for Class A rules generally to apply.[85]  No commenter addressed these issues.

23.    Finally, we conclude that the requirement to comply with the Class A eligibility requirements begins when an LPTV station's Class A application is submitted.  The LPPA states that the "Commission may approve an application [for Class A status] if the low power TV station *submitting the application—satisfies—* paragraphs (b), (c), and (d) of 73.6001,"[86] which contains the requirements that

_____

(Continued from previous page)

protection); and 73.622(f)(6)-(8) (allowable antenna heights and power levels for full power stations).  The Commission recently amended its rules to relocate the text from certain Part 73 rules to new section and subsection numbers.  *See Amendment of Part 73 of the Commission's Rules to Update Television and Class A Television Broadcast Station Rules, and Rules Applicable to All Broadcast Stations*, MB Docket No. 22-227, Report and Order, FCC 23-72 (rel. Sept. 19, 2023) (*Part 73 Amendment R&O*).  The amended rules are not yet effective and, as such, we continue to make reference to the rule numbers as of the date of release of this *Report and Order*.

[75] *See* 47 CFR § 73.3526.

[76] NPG Comments at n.24.

[77] Consistent with current practice for other stations with OPIF obligations, the Commission will upload to the applicant's OPIF those documents that the Commission is responsible for uploading to OPIF.  Broadcasters and other media entities must upload only those items required to be in the public file but not otherwise filed with the Commission or available on the Commission's website.  Any document or information required to be kept in the public file and that is required to be filed with the Commission electronically is imported to the online public file and updated by the Commission.  *See Standardized and Enhanced Disclosure Requirements for Television Broadcast Licensee Public Interest Obligations*, Second Report and Order, 27 FCC Rcd 4535, 4540-41, para. 11 (2012); *Expansion of Online Public File Obligations to Cable and Satellite TV Operators and Broadcast Satellite Radio Licensees*, Report and Order, 31 FCC Rcd 526, 534, para. 17 (2016).

[78] *See NPRM* at para. 19.

[79] LPPA Sec.(2)(c)(2)(B).

[80] LPPA Sec.2(c)(3)(B).

[81] LPPA Sec.2(c)(2)(B).  *See also* 47 CFR § 73.6001(b)-(c).

[82] *See NPRM* at para. 37.  *See infra* Section III.B.3.

[83] *See NPRM* at para. 19.

[84] *See* 47 CFR §§ 73.6000-6029.

[85] *See NPRM* at para. 19; *supra* para. 8.

[86] LPPA Sec.2(c)(2)(B)(i)(II).

000011
Petition for Review--RCC
FCC 23-112

Class A stations broadcast a minimum of 18 hours per day and broadcast an average of at least three hours per week of locally produced programming each quarter. This requirement is distinct from the separate statutory obligation to meet the eligibility requirements during the 90-day eligibility period of October 7, 2022 to January 5, 2023.[87] In the *NPRM*, the Commission sought comment on how to interpret the statutory language, and specifically on whether the language should be interpreted to require an applicant for a Class A license to satisfy the requirements from the time it submits its application.[88] No commenter addressed this issue. As discussed above, the LPPA requires that applicants continue to broadcast a minimum of 18 hours per day and to broadcast an average of at least three hours per week of locally produced programming each quarter after a Class A license is granted.[89] We conclude that the language quoted above[90] would be rendered superfluous if we did not interpret it to apply these requirements from the time the Class A application is submitted.[91] Thus, the requirement to broadcast a minimum of 18 hours per day and broadcast an average of at least three hours per week of locally produced programming each quarter begins when a station submits an application to convert to Class A status pursuant to the LPPA and continues for the term of the Class A license.

24.      <u>License Application and Documentation</u>. As proposed in the *NPRM*,[92] we will require an applicant to certify in its application that its station meets the operating and programming requirements of the LPPA. Specifically, the *NPRM* proposed, with respect to the statutory requirement that stations air 18 hours of programming each day during the 90-day eligibility period, that applicants must certify that the station was fully operational for at least 18 hours on each day during the 90-day eligibility period.[93] In addition, the *NPRM* proposed, with respect to the requirement that stations air three hours of locally produced programming, that an applicant must certify that it was broadcasting an average of at least three hours per week of programming that was produced within the market area served by such station, or the market area served by a group of commonly controlled LPTV stations that carry common local programming produced within the market area served by such group, on each day during the 90-day eligibility period.[94] No commenter objected to these proposals. We believe these certification requirements will assist us with the orderly processing of applications received under the LPPA, and thus we adopt the proposals. Finally, we also require that an applicant certify that it was in compliance with the Commission's requirements applicable to LPTV stations.[95]

25.      Consistent with the tentative conclusion in the *NPRM*, we require an applicant to submit, as part of its application, documents to support its certification that it meets the operating and programming requirements of the LPPA.[96] As noted in the *NPRM*,[97] the Commission staff may later determine that additional documentation is needed to evaluate an application and may at that time require

---

[87] LPPA Sec.2(c)(2)(B)(i)(I).

[88] *See NPRM* at para. 20.

[89] LPPA Sec.2(c)(3)(B). *See supra* para. 8.

[90] *See supra* n. 89 and accompanying text.

[91] *Clark v. Rameker*, 134 S. Ct. 2242, 2248 (2014) ("'a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous'") (*quoting Corley v. United States*, 556 U.S. 303, 314 (2009)).

[92] *See NPRM* at para. 21.

[93] *Id*.

[94] *Id*.

[95] 47 U.S.C. § 336(f)(2)(A)(i)(III).

[96] *See NPRM* at para. 22.

[97] *Id*.

000012
Petition for Review--RCC
FCC 23-112

an applicant to submit additional, specific documentation during consideration of the application.[98]  We believe this approach will ensure eligibility while preserving flexibility for applicants.  We decline to permit applicants to certify that they meet operating and programming requirements without submission of supporting documentation, as Block suggests.[99]  We believe such an approach would lack the information necessary for the Commission staff to undertake a sufficient review of the application in these circumstances.  NAB suggests that we require stations to provide "a statement concerning the station's operating schedule and a list of locally produced programs" at the application stage.[100]  We will adopt NAB's suggestion and require applicants to provide with their application a statement concerning the station's operating schedule during the 90 days preceding January 5, 2023 as well as a list of locally produced programs aired during that time period.  We believe that requiring applicants to submit this basic information in support of their certification that they meet the LPPA's eligibility criteria will assist us in processing applications.  In addition, an applicant should submit whatever additional documents available to the applicant that it believes best support its certification that it meets the operating and programming requirements of the Act.  For example, to support its certification that the station was on the air at least 18 hours each day during the eligibility period, a station could provide electric power bills from a third party vendor that specify the station's broadcast facility location for the designated period,[101] and/or copies of any program guides, EAS logs, or agreements to purchase and air programming on the specified station during the times of operation in an amount sufficient to satisfy this operating requirement.[102]  If the station was silent during any portion of the eligibility period, the station must identify any silent periods and the reasons why the station was silent.[103]  To support its certification that a

---

[98] *See* 47 U.S.C. § 308(b).

[99] *See* Block Comments at 3.

[100] *See* NAB Comments at 5.  NAB also suggests that LPPA Class A stations include a list of locally produced programs as part of the station's issues/programs list.  *Id*.  *But see* RCC Reply Comments at 12 (arguing that NAB's suggestion "contravenes basic First Amendment principles and Congress's explicitly stated goal of fostering diverse voices through use of the Internet") and LPTVBA Reply Comments at 8 (arguing that existing requirements are sufficient to ensure compliance).  We decline to require LPPA Class A stations to provide information regarding local programming as part of their issues/programs list, but note that all Class A stations must comply with the requirement that they place in their online public inspection file "documentation sufficient to demonstrate that the Class A television station is continuing to meet the eligibility requirements set forth" in section 73.6001 of the Commission's rules.  47 CFR § 73.3526(e)(17).  Section 73.6001(b) requires all Class A stations to broadcast a minimum of 18 hours per day and to broadcast an average of at least three hours per week of locally produced programming each quarter.  47 CFR § 73.6001(b).  Thus, LPPA Class A stations must include in their public inspection file documentation sufficient to show that the station is continuing to meet these requirements.  In light of this existing public inspection file requirement, we decline to require LPPA Class A stations to include a "specific statement detailing hours of operation" as part of the continuing eligibility documentation, as NAB suggests.  *See* NAB Comments at 5.

[101] A significant fluctuation in the amount of power used on a monthly basis during the 90-day eligibility period could indicate that the station reduced its hours of operation for one or more months.  In addition, for example, we would expect that a station operating at 15 kW, the maximum operating power for a UHF LPTV station, for 18 hours seven days a week, would be operating with a substantial amount of power, as opposed to an LPTV station that was airing programming sporadically.

[102] For example, if a station had contracts for at least 18 hours of programming from various program suppliers during the 90-day eligibility period, this would strongly indicate that the station was operating at least 18 hours per day during that time period.

[103] Section 74.735(b) of our rules provides that, in the event that causes beyond the control of a licensee make it impossible to continue operating, the station may limit or discontinue operation for a period of not more than 30 days without further authority from the Commission.  Notification must be sent to the Commission no later than the 10th day of discontinued operation and, during such period, the licensee shall continue to adhere to the requirements in the station license pertaining to the lighting of antenna structures.  If the causes beyond the control of the licensee

(continued….)

000013
Petition for Review--RCC
FCC 23-112

station aired an average of at least three hours of locally produced programming each week, the station could, for example, submit copies of any agreements to purchase and air such programming and/or identify the producer of any programming it claims is locally produced, the location where the programming was produced, and records of advertisements aired during locally produced programming showing that the programming was in fact aired.

26.     Apart from a statement regarding the station's operating schedule and a list of locally produced programming aired during the 90 days preceding January 5, 2023, we decline to mandate the form of the additional documents that applicants submit to support their applications.[104] We recognize that some applicants may not have specific types of documentation, or that a specific document may not be in a form that supports the applicant's certification.[105] In light of that, we permit each applicant to provide with the station's application, documents that it has that best support its certification that it met the operational and programming requirements of the LPPA during the eligibility period. The Commission staff will review the documentation on a case-by-case basis and determine if it will need to request additional documentation before it can make a determination whether to grant a Class A license application.

27.     <u>Alternative Eligibility Criteria</u>. As proposed in the *NPRM*, we will allow deviation from the strict statutory eligibility criteria under the LPPA only where deviations are insignificant or where there are compelling circumstances such that equity mandates a deviation. No commenter disagreed with this approach.[106] As discussed above,[107] similar to the CBPA, the LPPA provides the Commission with additional discretion in evaluating applicants for Class A status if "the Commission determines that the public interest, convenience, and necessity would be served by" or "for other reasons determined by the Commission" for treating the station as eligible for conversion to Class A pursuant to the LPPA.[108] In the *Class A Order*, the Commission determined that it would allow deviation from the strict statutory eligibility criteria in the CBPA "only where such deviations are insignificant or when we determine that there are compelling circumstances, and that in light of those compelling circumstances, equity mandates such a deviation."[109] The Commission gave as an example of such compelling circumstances "a natural

---

(Continued from previous page) ─────────────────────

make it impossible to comply within the allowed period, an informal written request should be made to the Commission no later than the 30th day for such additional time as may be deemed necessary. 47 CFR § 74.735(b).

[104] REC argues that, to demonstrate that a station is on the air for 18 hours/day, applicants should be required to include utility bills, photos of the transmitting facility (including a powered-on transmitter), copies of any leases, and any programming grids and programming contracts. *See* REC Comments at 4-5. To demonstrate that the station met the local programming eligibility requirement, REC argues that applicants should be required to submit program logs including the name of the program, the air date, time and length of the program, the location where the program was produced, and a description of the program. *Id.* While we agree that such documents may be useful to support an application, for the reasons described herein we decline to mandate that all of these specific documents are required for every application and permit applicants to submit the documents they have that they believe best support their application.

[105] For example, Block notes that utility costs are often "baked into" a tower lease and that the tower owner may not be able to apportion electricity costs among different tower tenants. Block Comments at 3.

[106] Lockwood proposed that we adopt a *de minimis* exception to the LPPA's 95,000 TV household eligibility requirement. As discussed below, we reject that proposal. *See infra* paras. 54-56.

[107] *See supra* para. 12.

[108] 47 U.S.C. § 336(f)(2)(B).

[109] *Class A Order*, 15 FCC Rcd at 6369, para. 33.

000014
Petition for Review--RCC
FCC 23-112

disaster or interference conflict which forced the station off the air during the 90-day period before enactment of the CBPA."[110]

28.    We conclude that, similar to the Commission's approach in implementing the CBPA, we will allow deviation from the strict statutory eligibility criteria in the LPPA only where such deviations are insignificant or where there are compelling circumstances such that equity mandates a deviation.[111] We will consider any such requests on a case-by-case basis.  As the Commission tentatively concluded in the *NPRM*,[112] we believe that the LPPA provides precise and limited eligibility criteria and, except in very limited circumstances, we are not inclined to expand the specific qualifying criteria beyond that identified in the statute.

### 3.    Interference Requirements

29.    We adopt the tentative conclusions in the *NPRM* that our interference rules applicable to existing Class A stations, including requirements that were adopted subsequent to enactment of the CBPA in 1999,[113] will apply to stations that convert to Class A status pursuant to the LPPA.[114]  The LPPA provides that the Commission may approve an application by an LPTV station if it demonstrates that "the Class A station for which the license is sought will not cause any interference described in section 336(f)(7) of the Communications Act . . . ."[115]  Section 336(f)(7) describes the interference protection requirements for LPTV stations that sought Class A status under the CBPA with respect to full power television, LPTV, TV translator, and land mobile stations.  As noted in the *NPRM*, LPTV stations that converted to Class A status pursuant to the CBPA in 2000 began their primary status as analog stations, and therefore, that section related to analog operations.[116]  All television broadcast stations are now operating digital facilities.[117]  While the LPPA specifically references the interference requirements "described in section 336(f)(7)," we affirm the tentative conclusion in the *NPRM* that inclusion of this language does not evince an intent by Congress to compel LPTV stations applying for Class A licenses under the LPPA to demonstrate compliance with outdated and superseded interference rules.[118]  Rather, we affirm the *NPRM*'s tentative conclusion that requiring applicants to demonstrate compliance with current interference requirements relevant to digital facilities would guarantee the purpose of the statutory provision.  This approach will ensure that LPTV stations converting to Class A status under the LPPA will not cause interference to the licensed or previously proposed facilities of digital broadcast stations, including full power, Class A, LPTV and TV translator stations.[119]

---

[110] *Id*.  The Commission also concluded that foreign language stations should have the same eligibility requirements as any other potential Class A station under the CBPA.  *Id*. at paras. 33-35.

[111] *Class A Order*, 15 FCC Rcd at 6369, para. 33.

[112] *NPRM* at para. 24.

[113] The digital-to-digital interference protection standards for LPTV stations converting to Class A status vis-à-vis LPTV and TV translator stations pursuant to the LPPA are now found in sections 74.792 and 74.793 of the rules. *NPRM* at para. 29.

[114] *NPRM* at paras. 27-29.

[115] LPPA Sec. 2(c)(2)(B)(ii).

[116] *NPRM* at para. 26.

[117] *See supra* para. 3 and n.8; DTV Delay Act, Pub. L. No. 111-4, 123 Stat. 112 (2009) (Full power stations largely completed their digital transition by June 12, 2009); *NPRM* at para 26.

[118] *NPRM* at para. 26, citing *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 452-55 (1989) (noting that statutes are to be read in a manner that avoids absurd results); *City of Lincoln, Neb. v. Ricketts*, 297 U.S. 373, 376 (1936) (noting duty to give words their natural significance unless that leads to an unreasonable result plainly at variance with the evident purpose of the legislation).

[119] *NPRM* at para. 26.

000015
Petition for Review--RCC
FCC 23-112

30.     NPG generally supports that the current interference rule rather than the old analog rule should be applied.  However, NPG would have us provide flexibility to permit interference beyond what is permitted in our current rules.  NPG states that the Commission should adopt a "flexible approach" granting applications that would violate the rule "if the applicant is able to demonstrate no actual interference, acceptance by the licensee subject to such interference, or other showing that the public interest is served by the applicant obtaining Class A status."[120]  We are not persuaded to grant this request.  First, we do not anticipate any scenarios where interference is predicted, but the applicant is able to demonstrate a lack of actual interference.[121]  The *TVStudy* software used to prepare and process applications already considers the elements likely to cause actual interference.  Specifically, *TVStudy* makes full use of terrain shielding and Longley-Rice terrain propagation methods to determine whether a proposed facility is predicted to cause impermissible interference consistent with OET Bulletin No. 69,[122] accounting for unique characteristics such as terrain.[123]  For this reason, we do not believe there would be merit in accepting other methods of determining interference.  Second, the Commission's rules already allow applicants and licensees to accept interference subject to Commission approval,[124] and the Media Bureau will continue to consider and accept interference agreements in processing Class A license applications filed pursuant to the LPPA without the need to adopt additional flexibility.  Finally, we reject NPG's suggestion that waiver of television broadcast interference protection rules should be considered upon undefined public interest arguments.[125]  NPG provides no example – and we can imagine none – where we have granted an LPTV station primary status that caused interference to a licensed (or previously proposed) broadcast facility entitled to protection.  Congress clearly intended the LPPA to apply to a discrete number of LPTV stations that satisfy specific eligibility requirements and protect existing stations and previously proposed facilities.  We decline to adopt an exception that would contravene this careful balance.

31.     Protection of Land Mobile Stations.  The LPPA provides that the Commission may approve an application by an LPTV station if it "demonstrates to the Commission that the Class A station for which the license is sought will not cause any interference described in section 336(f)(7) of the Communications Act of 1934. . . ."[126]  Section 336(f)(7)(C) of the CBPA provides that the Commission may not grant a Class A license or modification of license where the Class A station will cause interference within the protected contour of land mobile stations.[127]  We adopt the proposal in the *NPRM*

---

[120] NPG Comments at 9-10.  Class A and LPTV stations are permitted to cause interference to no more than 0.5 percent of the population served by full-power and Class A television stations, and no more than 2 percent of the population served by LPTV and TV translator stations.  *See* 47 CFR §§ 73.6017, 73.6018, 73.6019, and 74.793.

[121] NPG Comments at 9-10.

[122] *See Office of Engineering and Technology Releases and Seeks Comment on Updated OET-69 Software,* ET Docket No. 13-26, GN Docket No. 12-268, Public Notice, 28 FCC Rcd 950 (OET 2013) at 1.  OET Bulletin No. 69 can be found at https://transition.fcc.gov/oet/info/documents/bulletins/oet69/oet69.pdf (OET Bulletin No. 69).

[123] *See* OET Bulletin No. 69 at 1.  47 CFR §§ 73.6018, 73.616(d)(1), 73.619(c)(2).

[124] *See, e.g.*, 47 CFR § 73.620(e) (Full power stations may operate with facilities that would result in more than 0.5 percent additional interference to another full power station if that station agrees, in writing, to accept the additional interference, and the Commission finds such action is in the public interest), 73.6022(a) (same with respect to Class A stations vis-à-vis full power, Class A, LPTV and TV translation stations, notwithstanding the interference standards set forth in the rules, if the Commission finds such action is in the public interest), 74.703(a) ("Except where there is a written agreement between the affected parties to accept interference," an application for a new LPTV station or modification of facilities must comply with interference rules).

[125]  NPG Comments at 9-10.

[126] LPPA Sec. 2(c)(2)(B)(ii).

[127] 47 U.S.C. § 336(f)(7).  Specifically, section 74.709 of our rules (47 CFR § 74.709) requires that, in order to protect land mobile stations, a low power TV or TV translator station cannot specify a site that is located within the protected contour of a co-channel or first adjacent land mobile assignment.  Generally, the protected contour is 80

(continued....)

000016
Petition for Review--RCC
FCC 23-112

that Class A applications will not be grantable where the Class A station will cause interference within the protected contour of land mobile stations which have been allocated the use of TV channels 14-20 in certain urban areas of the country, as well as channel 16 in the New York City metropolitan area.[128]  We received no specific objection to this proposal.  We note that in implementing the CBPA, the Commission implemented the same interference protections and procedures which are prescribed in section 74.709 of the rules, and these rules have not changed.[129]

32.     We decline to adopt as both unnecessary and outside the scope of this proceeding, the County of Los Angeles, California's request that we incorporate by reference comments in a proceeding requested by the Land Mobile Communications Council regarding rules governing separation between land mobile stations and television stations located in the T-Band.[130]  Unless and until there is a change in the applicable rules, we will apply our existing land mobile protection requirements in considering applications to convert to Class A status pursuant to the LPPA.  We note that in limiting eligibility to LPTV stations operating in a DMA or an equivalent with not more than 95,000 television households, Congress intended to convey the benefits of Class A status under the LPPA to LPTV stations operating in smaller DMAs.  T-band radio systems, which are used for public safety and industrial/business land mobile communications, operate on 470-512 MHz (television channels 14 through 20) in 13 large cities,[131] located in the largest DMAs with more than 1,000,000 television households.  LPTV stations operating in larger DMAs or an equivalent television market are not eligible for Class A status under the LPPA and thus, it is unlikely that land mobile operations in the T-band will be affected by the LPPA..

### 4.     Designated Market Area

33.     The LPPA requires that an LPTV station must demonstrate that as of January 5, 2023, the station "*operates* in a Designated Market Area with not more than 95,000 television households."[132]  The LPPA further states that DMA means "(A) a [DMA] determined by Nielsen Media Research or any successor entity; or (B) a [DMA] under a system of dividing television broadcast station licensees into local markets using a system that the Commission determines is equivalent to the system established by Nielsen Media Research . . ."[133]  The Commission sought comment in the *NPRM* [134] on (1) the meaning of the word "operates" in the LPPA,[135] and (2) whether to adopt the Nielsen Local TV Station Information Report (Local TV Report) for determining DMAs or an equivalent alternative local market

---

(Continued from previous page) ————————————

miles from the geographic center of the areas listed in 47 CFR §§ 22.625(b)(1), 90.303(b); for frequencies in the 470-512 megahertz band identified in 47 CFR §§ 22.621, 90.303(b), or in the 482-488 megahertz band in New York. In addition, a low power TV or TV translator station application cannot be granted where its proposed field strength limit calculated at the land mobile boundary exceeds the limits set forth in 47 CFR § 74.709(d).

[128] *NPRM* at para. 30.

[129] 47 CFR § 74.709; *NPRM* at para. 30.

[130] County of Los Angeles, California Comments at n.5, citing Public Notice, RM-11915, Report No. 3186 (rel. Jan. 12, 2022).  The nearest DMA to Los Angeles County, CA impacted by implementation of the LPPA is more than 800 km away in Eureka, CA (*see infra* n 169), and could not result in interference in Los Angeles County.

[131] 47 CFR § 90.303.

[132] LPPA Sec.2(c)(2)(B)(iii) (emphasis added).

[133] LPPA Sec.2(a)(2)(A) and (B).  The Nielsen Company (Nielsen) describes a DMA region as "a group of counties and zip codes that form an exclusive geographic area in which the home market television stations hold a dominance of total hours viewed.  There are 210 DMA regions, covering the entire continental U.S., Hawaii, and parts of Alaska."  *See* Nielsen, DMA Regions, https://markets.nielsen.com/us/en/contact-us/intl-campaigns/dma-maps/ (rel. Oct. 24, 2022).

[134] *NPRM* at para. 32.

[135] LPPA Sec.2(c)(2)(B)(iii).

000017

Petition for Review--RCC

FCC 23-112

system.[136]  We address each of these issues below.

34.     "Operates" in the DMA.  As proposed in the *NPRM*,[137] we conclude that "operates" means that the LPTV station applying for Class A status under the LPPA must demonstrate that its transmission facilities, which include the structure on which its antenna is mounted, are located within the qualifying DMA.  No commenters addressed this issue.  We find that this requirement is consistent with Congress's intent to limit Class A stations to stations located in small DMAs, as evidenced by its limiting eligibility for Class A status under the LPPA to LPTV stations operating in a DMA or an equivalent with not more than 95,000 television households.[138]  To make the necessary demonstration, we will require applicants to provide the following information as it existed on January 5, 2023, as proposed in the *NPRM*: (1) the coordinates of the station's transmission facilities (*i.e.*, the structure on which its antenna is mounted); (2) the city/town/village/or other municipality and county in which the transmission facilities are located; and (3) the qualifying DMA in which the station's transmission facilities are located.[139]

35.     Use of Nielsen to Determine DMAs.  We also adopt the proposal in the *NPRM* to use the Nielsen Local TV Report in determining the DMA where the LPTV station's transmission facilities were located as of January 5, 2023.[140]  First, the decision is fully consistent with the LPPA which contemplates the use of Nielsen.[141]  Furthermore, as explained in the *NPRM*, use of the Nielsen Local TV Report is consistent with the Commission's *Nielsen DMA Determination Update Order*,[142] which adopted Nielsen's monthly Local TV Report as the successor publication to Nielsen's Annual Station Index and Household Estimates and determined that the Local TV Report should be used to define "local market" as stated in other statutory provisions and rules relating to carriage, including retransmission consent, distant signals, significantly viewed, and field strength contour.[143]  When the Commission sought comment on what publication to use for DMA determinations in that proceeding, commenters unanimously supported use the Local TV Report.[144]  Thus, we note that the record in that proceeding indicated that the Local TV Report was the sole source of information regarding DMA determinations and that there was no company

---

[136] *See* LPPA Sec.2(a)(2)(B).

[137] *NPRM* at para 31-34.

[138] *Id*. at para. 32.

[139] *Id*.  Starting in 2022, Nielsen began including broadband only (BBO) households, households that receive video programming on a TV/monitor only through a broadband connection, in its local market measurement.  *See* Nielsen, Nielsen Announces "Impressions First Initiative" and the Integration of Broadband Only Homes Into Local Measurement in January 2022, *at* https://www.nielsen.com/news-center/2021/nielsen-announces-impressions-first-initiative-and-the-integration-of-broadband-only-homes-into-local-measurement-in-january-2022/ (Sept. 2021).  Nielsen publishes annually, in the fall, an estimate of the number of TV households in each DMA.  For purposes of implementing the LPPA, we will look at Nielsen's estimates of DMA TV households published in the fall of 2022 to determine the number of DMA TV households as of January 5, 2023 and therefore the estimates include BBO households.

[140] *NPRM* at para 33.

[141] LPPA Sec.2(a)(2)(A).

[142] *See* Update to Publication for Television Broadcast DMA Determination for Cable and Satellite Penetration, MB Docket No. 22-239, Report and Order, FCC 22-89 (rel. Nov. 16, 2022) at para. 1 (*Nielsen DMA Determination Update Order*).  *See also id*. at para. 6 (reiterating Nielsen's clarification that it has "always told stations the DMAs to which they have been assigned upon request and free of charge").

[143] *Id*. at para. 4.

[144] *See Nielsen DMA Determination Update Order* at para. 1.

000018
Petition for Review--RCC
FCC 23-112

currently accredited to determine the local market area of broadcast television stations.[145]  In addition, some commenters in this proceeding support our decision to use the Nielsen Local TV Report for purposes of implementing the LPPA.  As NAB points out, the Commission and the television industry have long relied on Nielsen DMA data to define television markets.[146]  REC notes that the Nielsen Local TV Report provides a "cut-and-dry" determination of a station's DMA, and that the "debate and development of any alternative system would further delay the process."[147]

36.      While the LPPA defines a DMA as "a [DMA] determined by Nielsen Media Research or any successor entity," it also provides that a DMA may be "a [DMA] under a system of dividing television broadcast station licensees into local markets using a system that the Commission determines is equivalent to the system established by Nielsen Media Research. . . ."[148]  The *NPRM* sought comment on alternatives to the Nielsen Local TV Report that would be "equivalent to the system established by Nielsen Media Research."[149]  For the reasons discussed below, we decline to adopt any of the alternatives proposed.  The *NPRM* specifically sought comment on the LPTV Broadcasters' Association (LPTVBA) requests that the Commission use Metropolitan Statistical Areas (MSAs) and Rural Service Areas (RSAs) as defined by the Office of Management and Budget (OMB) using census data to implement the LPPA.[150]  Some commenters support the suggestion.[151]  Flood contends that MSA market definitions "more accurately reflect the characteristics of the LPTV station's service area that are pertinent to determining eligibility" under the LPPA.[152]  Flood also argues that the Nielsen DMAs are "geographically overbroad" and group some of the most rural areas in the U.S. with distant major cities, rendering some stations in rural areas ineligible for Class A status.[153]  Flood also notes that, under a DMA approach, similarly situated LPTV stations in immediately adjacent counties would receive inconsistent eligibility

---

[145] *Id*.  The Commission also noted that in the LPPA, which was enacted after release of the *Nielsen DMA Determination Update Order*, Congress chose to define DMA as determined by Nielsen Media Research.  *NPRM* at n.112.

[146] NAB Comments at 3.

[147] REC Comments at 5.  *But see* REC Reply Comments at 4 (stating that Comscore should be considered an alternative to Nielsen).

[148] LPPA Sec.2(a)(2)(A) and (B).

[149] LPPA Sec.2(a)(2)(B); *NPRM* at para 34.  The Commission asked that any commenter suggesting an alternative publication to the Nielsen Local TV Report to identify the publication as well as the similarities and differences in assigning stations to television markets, and explain why the alternative publication is preferable.  *Id*.

[150] *NPRM* at para. 34.  *See id*. (citing E-mail from Frank Copsidas, President and Founder, LPTV Broadcasters' Association, to Holly Saurer, Chief, Media Bureau, FCC (Feb. 27, 2023) (Copsidas Feb. 27 Letter)).  Among other things, the LPTVBA makes a number of accusations regarding the character and business dealings of Nielsen Media Research.  As we explain above and as we explained in the *NPRM*, Congress chose to define DMA as determined by Nielsen Media Research in the LPPA, and despite its lack of accreditation, the Commission found based on the record of the *Nielsen DMA Determination Update* proceeding that Nielsen is the sole source of information regarding DMA determinations.  *See NPRM* at para. 33.

[151] *See* Flood Comments at 1-12; Identical Comments at 1-3; Communications Technologies Comments at 1-2; LPTVBA Reply Comments at 1-6; Flood Reply Comments at 1-4.  Flood uses the term MSA to refer to both Metropolitan and Micropolitan Statistical Areas (mSA).  *See* Flood Comments at 1, n. 2.  LPTVBA argues that Metropolitan and Micropolitan Statistical Areas are two types of core based statistical areas (CBSAs) and urges the Commission to use CBSAs as an alternative local market system for purposes of the LPPA.  *See* LPTVBA Reply Comments at 2-3.

[152] Flood Comments at 1.  *See also* LPTVBA Reply Comments at 2.  LPTVBA argues that any area not designated an MSA or a mSA should automatically be considered an RSA, and a station located in an RSA should be eligible under the LPPA population limit.  LPTVBA Reply Comments at 2.

[153] Flood Comments at 5-7.  *See also* LPTVBA Reply Comments at 3, n. 9.

000019
Petition for Review--RCC
FCC 23-112

determinations, and, in some situations, stations in densely populated, larger counties would be eligible while those in adjacent, smaller, less densely populated counties would be ineligible.[154] The Identical Commenters urge the Commission to "create a TV market definition system that relies on … MSAs as the primary criteria for determining a set of geographic areas equivalent to the Nielsen DMA metric of 95,000 households or fewer."[155] They also note that the Nielsen DMA system does not include LPTV stations in its assessments and that "Nielsen's data is private and requires costly fees for access."[156]

37.    We decline to use market classifications based on Census data, such as MSAs or RSAs, for purposes of implementing the LPPA. The LPPA specifically directs that the Commission use either Nielsen DMAs or a "system of dividing television broadcast station licensees into local markets" that is "equivalent" to the system established by Nielsen.[157] Census classifications are not a "system of dividing television broadcast station licensees into local markets," and thus cannot be considered "equivalent" to the system established by Nielsen. Such classifications do not reflect television stations in the market, the reach of those local stations, the location of the populations they serve, or local viewing patterns.[158] On the other hand, a Nielsen DMA is an "exclusive geographic area in which the home market television stations hold a dominance of total hours viewed" and ties specifically to television viewing markets.[159] Thus, we conclude census-based categories are not "equivalent" to the system established by Nielsen.[160] In addition, we note that classifications based on Census data are based on population and group urban areas (the population "nucleus") with outlying counties "that have a high degree of integration" with the population nucleus based on commuting trends.[161] OMB itself warns that such classifications do not themselves adequately differentiate between urban and rural areas.[162] Thus, these census classifications do not address the concerns raised by those commenters who argue that Nielsen DMAs are

---

[154] Flood Comments at 5-7. Flood provides examples of stations in adjoining DMAs that would receive different eligibility treatment under the LPPA. *Id.* at 5-7. *See also* LPTVBA Reply Comments at 3, n. 9.

[155] Identical Comments at 2 (citing the Copsidas Feb. 27 Letter).

[156] *Id.* at 2-3 (citing the Copsidas Feb. 27 Letter). *See also* Communications Technology Comments at 2.

[157] LPPA Sec.2(a)(2)(A) and (B).

[158] For this reason, we disagree with LPTVBA that classifications based on Census data are preferable because they reflect "economic markets based on actual population behavior." LPTVBA Reply Comments at 3.

[159] *See supra* n. 133. NAB agrees that Census definitions like MSAs and RSAs have nothing to do with market assignment information or determining television broadcast markets, unlike Nielsen. *See* NAB Comments at 3. REC notes that Census data does not reflect "television households," the term used in the LPPA's DMA eligibility requirement ("not more than 95,000 television households"). *See* REC Reply Comments at 3; LPPA Sec.2(c)(2)(B)(iii). RCC opposes the use of MSAs because "they represent huge populations and areas" and would exclude many LPTV stations from converting to Class A. RCC Reply Comments at 5.

[160] NAB agrees that using MSA or RSA definitions would be "establishing alternative market definitions that are wildly different from those established by Nielsen and are not 'equivalent to' Nielsen DMAs as the LPPA requires." NAB Comments at 3. While we agree with LPTVBA that the Act permits us to consider local market definitions that differ from Nielsen DMAs, *see* LPTVBA Reply Comments at 4-5, we believe that the Act's requirement that any alternative system be "equivalent" the system established by Nielsen requires such alternative system to relate in some fashion to television markets and viewing patterns.

[161] *NPRM* at para. 34. *See generally* OMB, *2020 Standards for Delineating Core Based Statistical Areas,* 86 FR 37770, 37771 (July 16, 2021) (*2020 CBSA Standards*), available at https://www.federalregister.gov/documents/2021/07/16/2021-15159/2020-standards-for-delineating-core-based-statistical-areas.

[162] *2020 CBSA Standards*, 86 FR at 37772 (warning MSA "delineations do not produce an urban-rural classification, and confusion of these concepts has the potential to affect the ability of a program to effectively target either urban or rural areas, if that is the program goal").

000020
Petition for Review--RCC
FCC 23-112

geographically overbroad.[163]  We also note that the kind of inconsistent eligibility results that some commenters argue would occur using Nielsen DMAs are inevitable with any system that divides the country into geographic markets, and are not unique to Nielsen.[164]  Furthermore, we decline Identical Commenters' invitation that the Commission fabricate a new classification system based on Census data[165] because we find that such an exercise is unnecessary due to the availability of Nielsen data which is appropriate for this purpose.  We also believe that such an exercise would significantly delay our ability to implement the LPPA.  We also do not believe the failure of Nielsen to assign LPTV stations to DMAs is relevant[166] because the eligibility requirement is that the station "operate" in the DMA (that is, its transmission facilities are located within the qualifying DMA, not that it be assigned to the DMA.  Finally, reference to the fact that Nielsen is a private company that charges for some of its materials[167] is not a barrier to our decision here.  Nielsen has represented that it will provide to stations at no charge information about the DMA to which the station is assigned,[168] and information about the number of TV households in each DMA is publicly available.[169]

38.     We also reject RCC's argument that our proposed adoption of an approach that limits eligibility under the LPPA to LPTV stations in DMAs with no more than 95,000 TV households is "nonsensical."[170]  This commenter points out that, under this approach, only thirty-three Nielsen DMAs would qualify under the LPPA (in other words, only 33 out of 210 DMAs),[171] amounting to only 1.6% of TV households.[172]  As a result, RCC argues that Congress could not have intended for use of Nielsen DMAs.[173]  We disagree.  Congress clearly intended that eligibility under the LPPA be limited, as the Act expressly provides that eligibility is limited to DMAs with no more than 95,000 TV households.  As NAB notes, elevating LPTV stations from secondary to primary Class A status comes at the cost of "effectively

---

[163] *See supra* para. 36.

[164] Flood Comments at 5-7.

[165] Identical Comments at 2 (citing the Copsidas Feb. 27 Letter).

[166] *Id*. at 2-3 (citing the Copsidas Feb. 27 Letter).  *See also* Communications Technology Comments at 2.

[167] *Id*. at 2-3 (citing the Copsidas Feb. 27 Letter).  *See also* Communications Technology Comments at 2.

[168] *See supra* n. 142 (citing *Nielsen DMA Determination Update Order* at paras. 1, 6 (reiterating Nielsen's clarification that it has "always told stations the DMAs to which they have been assigned upon request and free of charge")).  We interpret Nielsen's commitment in this regard to mean it will inform LPTV stations seeking to convert to Class A status pursuant to the LPPA, at no charge, the DMA in which the station's transmission facilities are located.  *See supra* para. 34.  Any LPTV station seeking to file an application pursuant to the LPPA that needs further information in this regard may contact the Commission staff.

[169] *See* http://web.archive.org/web/20230605234252/https://ustvdb.com/seasons/2022-23/markets/.  Thirty-three Nielsen DMAs had fewer than 95,000 TV households as of January 5, 2023.  These DMAs are: Elmira-Corning, Watertown, Bend, Alexandria, Marquette, Jonesboro, Bowling Green, Laredo, Butte-Bozeman, Lafayette, IN, Grand Junction-Montrose, Twin Falls, Lima, Great Falls, Meridian, Parkersburg, Greenwood-Greenville, Eureka, Cheyenne-Scottsbluff, San Angelo, Casper-Riverton, Mankato, Ottumwa-Kirksville, Saint Joseph, Fairbanks, Zanesville, Victoria, Helena, Presque Isle, Juneau, Alpena, North Platte, and Glendive.  Commission staff will review and confirm DMA information in all applications filed pursuant to the LPPA.

[170] RCC Comments at 6.

[171] RCC Comments at 5.  *See also* REC Comments at 5 (noting that only LPTV stations in DMAs ranked 178 (Elmira-Corning, New York) through 210 (Glendive, Montana) would qualify for Class A status under the LPPA).

[172] *See* RCC Comments at ii.

[173] *Id*. at 4 (stating that Congress "would [not] waste its time for the purpose of affecting such a marginal impact"). *See also* Flood Comments at 2 (urging use of MSAs to "maximize eligibility for stations" to elevate to Class A status).

000021
Petition for Review--RCC
FCC 23-112

block[ing] coverage and service improvements by full-service stations."[174]  In turn, Congress sought to allow certain LPTV stations in only smaller DMAs (not all small LPTV stations or all LPTV stations in rural areas) to elevate to primary status.  We decline to read the LPPA as promoting maximum elevation of LPTV stations to primary status; rather, Congress adopted a much more balanced approach.

      39.    We also decline to use Comscore data as an alternative to the Nielsen Local TV Report for purposes of the LPPA, as advocated by several commenters.[175]  Like Nielsen, Comscore is a media analytics company that produces a list of television market areas and a calculation of the number of television households in each market.[176]  Because Comscore, like Nielsen, has a proprietary market system and requires payment for access, LPTVBA opposes adoption of Comscore data as an alternative local market system.[177]  REC comments that "the debate and development of any alternate system" to Nielsen "would further delay the process and could defeat the purpose of limiting Class A conversions to rural areas,[178] but also noted that Comscore markets "could be" comparable to Nielsen DMAs and should be considered.[179]  While it is possible that Comscore could qualify as a "system of dividing television broadcast station licensees into local markets" that is "equivalent" to the system established by Nielsen,[180] we find that the record here does not establish any material benefits from use of Comscore either in addition to or in place of Nielsen for purposes of the LPPA, nor that any such benefits would outweigh the uncertainty and delay that use of Comscore would have in issuing Class A licenses.  In particular, we are concerned about introducing uncertainty into the application review process, in the instance where Comscore's market classifications may differ from Nielsen.  The lack of a compelling reason to select a different classification system instead of Nielsen weighs in favor of our decision to use Nielsen Local TV Report for purposes of implementing the LPPA.

      40.    Finally, we decline the requests of three other commenters who argue in favor of other alternatives to Nielsen DMAs.  One Ministries advocates that the Commission should allow LPTV stations to demonstrate that the geographic area covered by the station is a subset of a larger DMA, such as when the station is in a hyphenated DMA, *i.e.* Chico-Redding.[181]  One Ministries argues that Nielsen identifies Chico and Redding separately for purposes of radio markets, that LPTV stations cover roughly the same area as radio stations, and that no LPTV station in Chico-Redding covers both of those cities.[182]

---

[174] NAB Comments at 4.

[175] *See* Lockwood Comments at 1-3; NPG Comments at 4-6; REC Reply Comments at 3-4.

[176] Comscore uses its own proprietary system for geographic market definitions and number of TV households. Comscore, Local Market Definitions, *at* https://www.comscore.com/Products/Television/Local-Market-Definitions (last visited Oct. 2, 2023).  For instance, we note that Nielsen defines a TV household as follows: TV households must have at least one operable TV/monitor with the ability to deliver video via traditional means of antennae, cable set-top-box or satellite receiver and/or with a broadband connection.  *See* Nielsen, Nielsen Estimates 120.6 Million TV Homes in the U.S. for the 2019-2020 TV Season (Aug,. 2019), *at* https://www.nielsen.com/insights/2019/nielsen-estimates-120-6-million-tv-homes-in-the-u-s-for-the-2019-202-tv-season/#:~:text=Nielsen's%20national%20definition%20of%20a,Audience%20measurement%20TV.  Comscore states that it has "the largest and most representative TV viewing measurement footprint covering 1-in-3 homes across 75 million TV screens in over 30M households."  Comscore, National TV Measurement, *at* https://www.comscore.com/Products/Television/National-TV-Measurement (last visited Oct. 2, 2023).

[177] *See* LPTVBA Reply Comments at 4.  Apart from that issue, LPTVBA notes that it has "no reason to question the veracity of Comscore data."  *Id*.

[178] REC Comments at 5.

[179] REC Reply Comments at 3 (explaining that Comscore, like Nielsen, has 210 market areas, and that only Comscore markets 164 through 210 would meet the 95,000 television household criteria).

[180] LPPA Sec.2(a)(2)(B).

[181] *See* One Ministries Comments at 2.

[182] *Id*.

000022
Petition for Review--RCC
FCC 23-112

The LPPA directs that the Commission define DMA using Nielsen or an "equivalent" system of local TV markets, and dividing Nielsen hyphenated markets into separate markets for purposes of the LPPA would not be "equivalent" to the system established by Nielsen. As NAB notes,[183] more than 40 percent of Nielsen markets are hyphenated, and allowing these markets to be treated as separate markets would create a system that is dramatically different from the current Nielsen DMA market definitions.[184] JB Media Group argues that Nielsen DMAs do not account for variables such as interference that "can significantly impact viewership" and urges "an alternative approach that takes into account interference, actual households, and signal power under different weather conditions."[185] We find that it would be impractical and lead to delay in implementing the LPPA for Commission staff to define markets based on factors such as weather and actual viewership, and JB Media Group does not offer an existing alternative market definition based on these factors. Finally, RCC argues that the Commission should allow all LPTV stations whose "Section 307(b) community of license has fewer than 95,000 TV households" to convert to Class A status.[186] We conclude that such a system of defining local TV markets would be very different than the one required by the LPPA to be "equivalent" to the system established by Nielsen, which defines larger geographic regions than community of license.[187]

### 5.      License Standards (Ongoing Eligibility Requirements)

41.      We will not require LPPA Class A stations to continue to comply with the 95,000 TV household threshold if the population in the station's DMA later exceeds the threshold amount as a result of changes beyond the station's control. In the *NPRM*, the Commission stated its belief that the LPPA requirement that stations remain in compliance with the Act's eligibility requirements for the term of the Class A license[188] means that stations that convert to Class A status must continue to operate in DMAs

---

[183] *See* NAB Comments at 3. *See also* https://ustvdb.com/seasons/2022-23/markets/.

[184] NAB agrees that allowing some or all of the hyphenated DMAs to become separate television markets for purposes of the LPPA would create a set of alternative markets that are "radically different" from Nielsen DMAs. NAB Comments at 3. NAB also argues that authorization of new Class A stations could impede the transition to ATSC 3.0. *See* NAB Comments at 4. We agree with LPTVBA and Flood that we should not consider the impact of the LPPA on the ATSC 3.0 transition. *See* LPTVBA Reply Comments at 5-6, Flood Reply Comments at 5-6. We conclude that Congress did not intend that we consider the impact of the LPPA on the transition to ATSC 3.0. In the LPPA, Congress created specific, limited eligibility requirements that created a balanced approach to elevate certain LPTV stations in smaller DMAs to primary status. We do not believe Congress intended that we further limit eligibility under the Act by considering hypothetical limitations potentially imposed on stations in the future in connection with the transition to ATSC 3.0.

[185] JB Media Group Comments at 1-2.

[186] RCC Comments at 6. RCC further argues that the Commission's reliance on a privately created DMA definition renders the LPPA unconstitutional as it adopts an "unconstitutional industrial code … to license protected Class A TV broadcast stations." *Id.* at 18. We reject this argument. Congress does not run afoul of subdelegation principles because it permits an agency to use an outside entity's market definition for a particular purpose specified in the statute. There is no assignment of unguided or unchecked authority here. Finally, we also reject RCC's argument that the LPPA "prohibits the Commission from displacing any LPTV licensee, regardless of whether the license contains a Class A designation, for the purpose of selling that LPTV spectrum at auction." RCC Comments at 17. The LPPA is silent with respect to the issue of auctioning broadcast spectrum, and there is no evidence that Congress intended that we consider this issue as part of our implementation of the LPPA.

[187] RCC also argues that "the Commission's proposed licensing rules improperly removes LPTV stations from their 47 U.S.C. § 307(b) communities of license and reassigns them to much larger DMA markets in the name of 'protecting' those small LPTV stations." RCC Comments at 3. We disagree with this characterization of our decision to use Nielsen DMAs for purpose of the LPPA. Our decision is consistent with the LPPA, relates only to implementation of the LPPA, and does not affect the communities LPTV stations are licensed to serve.

[188] *See* LPPA Sec.2(c)(3)(A)-(B).

000023
Petition for Review--RCC
FCC 23-112

with not more than 95,000 television households in order to maintain their Class A status.[189]  The Commission noted that, under this interpretation of the Act, a station that converted to Class A status pursuant to the LPPA would no longer be eligible to retain Class A status if the population in its DMA later grows to more than 95,000 television households.[190]

42.     All of the commenters that addressed this interpretation of the Act oppose requiring LPPA Class A stations to remain in DMAs that meet the threshold population restriction, at least without some exceptions.  Commenters argue that if the Commission were to require continued compliance with this restriction, licensees would lack regulatory certainty to pursue Class A status, which would undermine the economic viability of Class A stations, and thus fewer stations would likely apply.[191]  Commenters also contend that it would be unfair to mandate that a station lose rights through no fault of its own if the population rose above the 95,000 threshold,[192] that the proposal would limit a licensee's ability to modify its facilities in the future (*e.g*., by relocating),[193] and that the proposal would impose different license terms for LPPA Class A stations than for existing Class A stations, which face no similar possible loss of their Class A status.[194]

43.     Commenters also argue that the Commission proposal is not required by the statute.[195]  Section 2(c)(2)(B)(iii) of the LPPA states that the Commission may approve conversion to Class A status for a station that "as of the date of enactment of this Act, operates in a Designated Market Area with not more than 95,000 television households."[196]  While Section 2(c)(3)(B) directs that a converted station is to remain in compliance with paragraph (2)(B)'s eligibility requirements during the term of the license, commenters argue that this language is properly interpreted to require only that a station be in compliance with the DMA requirement "as of" the date of enactment of the LPPA (January 5, 2023), not that it remain in compliance going forward.[197]

44.     We are persuaded by commenters who argue that a station, once it converts to Class A status pursuant to the LPPA, should not later lose eligibility and therefore be required to revert back to an LPTV station with secondary spectrum use status as a result of changes beyond the station's control.[198]  We conclude that Congress did not intend for LPPA Class A stations to subsequently lose Class A status through DMA changes that are not under the control of the station because Congress intended that the communities served by these stations should be able to rely on uninterrupted service from the stations.[199]

---

[189] *See NPRM* at para. 38.

[190] *Id*.

[191] *See* Flood Comments at 12-14; Identical Comments at 3-5; Lockwood Comments at 4-6; NAB Comments at 5; NPG Comments at 7-8.  *See also* Flood Reply Comments at 4; LPTVBA Reply Comments at 6-7.

[192] *Id*.

[193] *See* Identical Comments at 4.

[194] *See* Flood Comments at 13-14.

[195] *See* Lockwood Comments at 4-5; Identical Comments at 4-5; NPG Comments at 7.

[196] LPPA Sec.2(c)(2)(B)(iii).

[197] Lockwood also notes that the FCC measures the number of TV households for purposes of its national TV, local TV, and local radio ownership cap "at the time of grant" of the application, and that divestiture is not required if a licensee later exceeds the threshold audience reach or market size/ranking.  *See* Lockwood Comments at 5-6.

[198] *See*, *e.g*., REC Comments at 6 (arguing that if Nielsen changes a DMA designation or the population of the DMA grows beyond the threshold amount, it should have no impact on the status of the Class A station if they remain in the same community).

[199] *See* Activity Report of the House Committee on Energy and Commerce, Low Power Protection Act, H.R.117-702 (Jan 2, 2023) (introduced as S. 3405) (stating the statute "would afford [low power television stations] with

(continued....)

000024
Petition for Review--RCC
FCC 23-112

Accordingly, we will not require LPPA Class A stations to continue to comply with the 95,000 TV household threshold if the population in the station's DMA later exceeds the threshold amount as a result of changes beyond the station's control. We find that the reasons that a station may no longer comply with the 95,000 TV household threshold that are beyond the station's control are a change in the market size through (1) population growth, (2) a change in the boundaries of a qualifying DMA such that the population of the DMA exceeds 95,000 television households, or (3) the merger of a qualifying DMA into another DMA such that the combined DMA exceeds the threshold amount.

45.    We will not, however, permit an LPPA Class A station to maintain its Class A status if the size of the market it serves increases beyond 95,000 television households due to a change within the control of the station. For instance, we will not permit an LPPA Class A station to initiate a move to a different DMA that does not meet the LPPA population threshold at the time of the move and still retain the station's Class A status. We interpret the LPPA's continuing compliance mandate to preclude changes under the station's control that would result in the station's failure to continue to comply with the Act's eligibility requirements. We disagree with those commenters who argue that the Act requires only that the station be in compliance with the DMA requirement as of January 5, 2023.[200] This reading of section 2(c)(2)(B)(iii) of the Act is contrary to the language of section 2(c)(3)(B), which does not carve out the 95,000 TV household threshold requirement from the continuing compliance mandate. Such an interpretation would also undercut the purpose of the LPPA to strengthen protections for TV stations located in smaller DMAs,[201] as it would allow LPPA Class A stations to move to DMAs with larger populations, depriving smaller DMAs of the service these stations provide. We also disagree with those commenters who argue that stations that convert to Class A status pursuant to the LPPA should be able to initiate later site changes that would move the station to a non-qualifying DMA.[202] The language of the Act requires that LPPA Class A licensees remain in compliance with the LPPA's eligibility requirements for the term of their Class A license, including the requirement that they operate in a DMA with no more than 95,000 TV households. Apart from changes to a DMA that are beyond the station's control, we will require that LPPA Class A licensees remain in compliance with the 95,000 TV household threshold DMA requirement for the term of the Class A license. Stations that choose to pursue a non-compliant modification may do so, but will have to surrender their Class A status.

**C.    Application Process**

46.    As proposed in the *NPRM*, we will evaluate applications to convert to Class A status pursuant to the LPPA as a modification of the LPTV station's existing license. No commenters addressed this issue. For purposes of the LPPA, applications to convert to Class A status will be limited to the conversion of existing LPTV facilities as they exist at the time of application, without consideration of

(Continued from previous page) ——————————
protections against harmful interference and ensure the communities served by such stations can receive news, emergency information, and other broadcasts without disruption").

[200] *See supra* para. 43.

[201] LPPA Sec.2(c)(2)(B)(iii) (limiting eligibility for Class A status to stations operating in a DMA with not more than 95,000 TV households).

[202] *See, e.g.*, Communications Technologies Comments at 2-3 (arguing that it would be more equitable to require that stations operate for a fixed period of time (*e.g.*, one year) before proposing a site change to a non-qualifying DMA and adopt other criteria that would evaluate the public interest in terms of the number of other services available in the area currently served by the station versus the proposed new area); REC Comments at 6 (arguing that an LPPA Class A station should be permitted to retain its Class A status if a modification proposed by the station, and any subsequent modifications, "still result in the station providing a noise limited contour within at least 50 percent of the noise limited contour the station had at the time the station it was granted a conversion to Class A status." This would "prevent the station from making multiple 'hops' to move the station to a more desirable market while still affording stations the flexibility to adapt to changing situations" regarding tower siting, etc.).

000025
Petition for Review--RCC
FCC 23-112

any pending modifications to those facilities or unbuilt construction permits.[203]  This approach will allow for expeditious consideration of all applications, and will eliminate delays that could arise from the possibility of mutual exclusivity between a Class A conversion application and other licensed full power or Class A facilities, were we to entertain license modifications during the application window.  A licensed LPTV station holding a construction permit to modify its facilities will either need to license those permitted facilities before applying to convert to Class A status, or may apply for a new modification after the Commission has processed the applications from the window.[204]

47.  When implementing the CBPA, the Commission required stations applying for Class A status to provide local public notice of applications for Class A status "since the nature of the underlying service is changing from secondary to primary service."[205]  We adopt the tentative conclusion in the *NPRM*, that for the same reason we will require an applicant seeking Class A status pursuant to the LPPA to provide local public notice of the application.  No commenters addressed this issue.

48.  <u>Application Form</u>.  As proposed in the *NPRM*, we will require that applications for modification of an LPTV station's existing license to convert to Class A status pursuant to the LPPA be filed using FCC Form 2100, Schedule F.[206]  Such applications must be filed electronically and must include the required filing fee.[207]  No commenters addressed these issues.[208]

### D.    TV Broadcast Incentive Auction, Post-Auction Transition, and Reimbursement

49.  We affirm the tentative conclusion in the *NPRM* that nothing in the LPPA or in our implementation of the Act can or will affect the Commission's work related to the Broadcast Incentive Auction.[209]  No commenters addressed this issue.

### E.    Digital Equity and Inclusion

50.  The Commission sought comment in the *NPRM* on how its proposals may promote or inhibit advances in diversity, equity, inclusion, and accessibility.  Only one commenter, REC, addressed this issue.  In REC's view, the overall impact to digital equity and inclusion of the LPPA "is slightly negative" as some LPTV stations on channels 5 and 6 could obtain primary status, thus limiting the ability in some areas to implement full-service FM broadcasting as a part of REC's WIDE-FM proposal, which REC asserts would increase the number of radio voices.[210]  While REC notes that the language of the Act is outside the Commission's control,[211] REC asserts that its proposals in response to the *NPRM* will help ensure that rural LPTV stations that provide a minimal level of locally originated programming

---

[203] In other words, stations will not be permitted to seek technical modification of their facilities in conjunction with their Class A conversion application.  This avoids potential confusion regarding the facilities to be protected as a Class A station.

[204] This ensures that any later-filed modification is properly flagged in our database as a Class A record.

[205] *Class A R&O*, 15 FCC Rcd at 6398, para. 108.

[206] The Commission will add to its Licensing Management System database (LMS) as part of FCC Form 2100, Schedule F, portions of the existing FCC Form 302-CA (Application for Class A Television Broadcast Station Construction Permit or License).  That form was developed for use by LPTV stations applying to convert to Class A status under the CBPA.  Once an LPTV station obtains Class A status, it can file for minor modification of license using FCC Form 2100, Schedule E.

[207] The filing fee for an application for a "new license" for a Class A station is $ 425.00.  *See* 47 CFR § 1.1104.

[208] We direct the Media Bureau to implement necessary updates to the form and issue a Public Notice announcing availability at the appropriate time.

[209] *See NPRM* at para. 43.

[210] REC Comments at 6.

[211] *Id.*

000026
Petition for Review--RCC
FCC 23-112

will be given "a level of expectation of longevity" as a result of changing from secondary to primary status, which "could help persons who live in rural or Tribal areas" to continue to receive local TV service.[212]  In addition, REC comments that requiring LPPA Class A stations to comply with full service rules will allow the Commission to better measure diversity in broadcast ownership and, through the public file process, require stations to be more accountable to their local audiences.[213]

51.      We appreciate receiving REC's views and have considered them fully in reaching our conclusions herein regarding implementation of the LPPA.  We acknowledge the importance of advancing diversity, equity, inclusion, and accessibility, and we believe that the LPPA itself, and the rules we adopt herein implementing the Act, will advance those aims.

**F.    Other Issues**

52.      <u>Must Carry Rights</u>.  Two commenters, RCC and Dockins, argue that the Commission should amend its rules to give Class A stations must carry status.[214]  RCC argues that the Commission should "clarify" that Class A stations are incorrectly classified as "low power stations," whose carriage is limited as provided in section 76.55(d)[215] of our rules, but should instead be classified as "local commercial television stations" which are entitled to more expansive carriage rights as provided in section 76.555(c).[216]  Dockins asserts that "there is no logical reason why the Commission cannot amend the rules to allow must-carry status for Class A stations" and that the "historic failure" of the Commission to give Class A stations must-carry rights "appears to be an oversight" that should be corrected.[217]

53.      Consistent with the Commission's conclusion in the *Class A MO&O* with respect to LPTV stations that converted to Class A status pursuant to the CBPA, we conclude that LPPA Class A stations have the same limited must carry rights as LPTV stations, and do not have the same must carry rights as full service commercial television stations under section 76.55(c) of our rules.[218]  In the *Class A MO&O*, the Commission noted that both the language of the CBPA and the accompanying legislative history were silent with respect to the issue of must carry rights for Class A stations, and concluded that it is unlikely that Congress intended to grant Class A stations full must carry rights, equivalent to those of full-service stations, without addressing the issue directly.[219]  The LPPA is also silent with respect to the

---

[212] *Id*. at 7.

[213] *Id*.

[214] *See* RCC Comments at 15-16; Dockins Comments at 3-4.  *See also* RCC Reply Comments at 8.

[215] 47 CFR § 76.55(d).

[216] 47 CFR § 76.55(c).  *See* RCC Comments at 15.

[217] Dockins Comments at 4.

[218] *See Class A MO&O*, 16 FCC Rcd at 8259-60, paras. 39-43.  Section 614 of the Communications Act of 1934, as amended, establishes different sets of must carry eligibility requirements for local commercial television stations and for "qualified low power stations."  47 U.S.C. § 534.  Under very narrow circumstances, low power stations can become "qualified" and eligible for must carry.  47 U.S.C. § 534(h)(2).  For example, if a full power station is located in the same county or other political subdivision (of a State) as an otherwise qualified low power station, then the low power station will not be eligible for cable must-carry status.  *See* 47 U.S.C. § 534(h)(2)(F).  *See also Implementation of the Cable Television Consumer Protection and Competition Act of 1992, Broadcast Signal Carriage Issues*, MM Docket No. 92-259, Report and Order, 8 FCC Rcd 2965, 2983, para. 67 & n.211 (1993) (*Must Carry Order*).  Moreover, an otherwise qualified LPTV station qualifies for cable carriage only if the community of license of that station and the franchise area of the cable system on which it seeks carriage are both located outside of the largest 160 Metropolitan Statistical Areas, ranked by population, as determined by the Office of Management and Budget on June 30, 1990, and the population of the community of license on that date did not exceed 35,000.  *See* 47 U.S.C. § 534(h)(2)(E).

[219] The Commission noted in the *Class A MO&O* that its conclusion with respect to Class A must carry rights was consistent with the view expressed by the Commission in its Report and Order implementing the Satellite Home

(continued....)

000027
Petition for Review--RCC
FCC 23-112

issue of must carry rights, and we similarly conclude therefore that Congress did not intend to confer full must carry rights on LPPA Class A stations equivalent to full-service stations, and different from the rights of CBPA Class A stations, without addressing the issue in the statute.  Instead, we find that Congress intended LPPA Class A stations to have the same limited must carry rights as LPTV stations and existing Class A stations.  We thus decline to revise our rules as RCC and Dockins request.

54.      _De Minimis_ Exception to the 95,000 TV Household Requirement.  We also decline to adopt a _de minimis_ exception to the LPPA's 95,000 TV household eligibility requirement, as proposed by Lockwood.[220]  Lockwood argues that the Commission should adopt an exception of up to 5 percent to the 95,000 TV household amount to "further the underlying purpose" of the LPPA to afford eligibility for Class A protection to LPTV stations serving smaller DMAs.[221]  Lockwood also argues that such an exception would afford flexibility in the case of fluctuations in the number of TV households in the DMA due to the methodology used to make the calculation or changes related to seasonal tourism or college/university populations.[222]  Finally, Lockwood argues that the Commission has implemented _de minimis_ exceptions to other of its regulatory requirements and has discretion to do so with respect to the LPPA as the Act expressly permits the Commission to select the appropriate system for determining DMAs.[223]

55.      The language of the Act clearly requires that, to be eligible for Class A status, a station must operate in a DMA with no more than 95,000 TV households.[224]  The Act also requires that LPPA Class A licensees remain in compliance with the LPPA's eligibility requirements for the term of their Class A license.[225]  With respect to the Act's DMA limit, as discussed above we interpret this continuing compliance mandate to preclude changes under the station's control that would result in the station's failure to continue to comply with the 95,000 TV household threshold.[226]

56.      As discussed above, while the LPPA provides the Commission with additional discretion in evaluating applicants for Class A status to treat a station as qualifying for Class A status if "the Commission determines that the public interest, convenience, and necessity would be served" or "for other reasons determined by the Commission,"[227] we are not inclined to expand the specific qualifying criteria beyond that identified in the statute.[228]  The LPPA provides precise and limited eligibility criteria and, except in very limited circumstances, we are not inclined to expand the specific qualifying criteria beyond that identified in the statute.  Accordingly, we decline to adopt a blanket _de minimis_ exception to the DMA eligibility requirement.  As discussed above, we will allow deviation from the strict statutory

---

(Continued from previous page) ────────────────

Viewer Improvement Act of 1999.  *In the Matter of Implementation of the Satellite Home Viewer Improvement Act of 1999, Broadcast Signal Carriage Issues, Retransmission Consent Issues*, Report and Order, 16 FCC Rcd 1918 (2000).  In that Order, the Commission concluded that Class A stations are low power stations for mandatory carriage purposes, and are therefore not entitled to mandatory satellite carriage.

[220] *See* Lockwood Comments at 6.

[221] *Id*.

[222] *Id*. at 7-8.

[223] *Id*.

[224] LPPA Sec.2(c)(2)(B)(iii).

[225] LPPA Sec.2(c)(3)(B).

[226] *See supra* paras. 44-45.

[227] *See supra* para. 27.  *See also* 47 U.S.C. § 336(f)(2)(B).

[228] *See supra* para. 28.

000028
Petition for Review--RCC
FCC 23-112

eligibility criteria in the LPPA only on a case-by-case basis where such deviations are insignificant or where there are compelling circumstances such that equity mandates a deviation.[229]

## IV.    PROCEDURAL MATTERS

57.    *Regulatory Flexibility Act Analysis.*  The Regulatory Flexibility Act of 1980, as amended (RFA),[230] requires that an agency prepare a regulatory flexibility analysis for notice and comment rulemakings, unless the agency certifies that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities."[231]  Accordingly, we have prepared a Final Regulatory Flexibility Analysis (FRFA) concerning the possible impact of rule changes contained in this *Report and Order* on small entities.  The FRFA is set forth in Appendix C.

58.    *Final Paperwork Reduction Act Analysis*.  This document contains new information collection requirements subject to the Paperwork Reduction Act of 1995 (PRA).[232]  The requirements will be submitted to the Office of Management and Budget (OMB) for review under Section 3507(d) of the PRA.  OMB, the general public, and other Federal agencies will be invited to comment on the information collection requirements contained in this proceeding.  The Commission will publish a separate document in the *Federal Register* at a later date seeking these comments.  In addition, we note that, pursuant to the Small Business Paperwork Relief Act of 2002 (SBPRA),[233] we will seek specific comment on how the Commission might further reduce the information collection burden for small business concerns with fewer than 25 employees.

59.    *Congressional Review Act*.  The Commission has determined, and the Administrator of the Office of Information and Regulatory Affairs, Office of Management and Budget, concurs, that these rules are non-major under the Congressional Review Act, 5 U.S.C. § 804(2).  The Commission will send a copy of the *Report and Order* to Congress and the Government Accountability Office pursuant to 5 U.S.C. § 801(a)(1)(A).

## V.    ORDERING CLAUSES

60.    Accordingly, **IT IS ORDERED** that, pursuant to the authority found in sections 1, 2, 4(i), 4(j), 303, 307, 309, 311, and 336(f) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152, 154(i), 154(j), 303, 307, 309, 311, 336(f), and the Low Power Protection Act, Pub. L. 117-344, 136 Stat. 6193 (2023), this *Report and Order* **IS ADOPTED**, effective thirty (30) days after the date of publication in the *Federal Register*.

61.    **IT IS FURTHER ORDERED** that the Commission's rules **ARE HEREBY AMENDED** as set forth in Appendix B and such amendments will be effective 30 days after publication in the Federal Register, except for 47 C.F.R. §§ 73.6030(c) and 73.6030(d) which contain new or modified information collection requirements that require review by OMB under the PRA. The Commission directs the Media Bureau to announce the effective date of that information collection in a document published in the Federal Register after the Commission receives OMB approval.

---

[229] *Id*.

[230] *See* 5 U.S.C. §§ 601–612. The RFA has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[231] *See* 5 U.S.C. § 605(b).

[232] The Paperwork Reduction Act of 1995 (PRA), Pub. L. No. 104-13, 109 Stat. 163 (1995) (codified in Chapter 35 of title 44 U.S.C.).

[233] The Small Business Paperwork Relief Act of 2002 (SBPRA), Pub. L. No. 107-198, 116 Stat. 729 (2002) (codified in Chapter 35 of title 44 U.S.C.).  *See* 44 U.S.C. § 3506(c)(4).

000029
Petition for Review--RCC
FCC 23-112

62.    **IT IS FURTHER ORDERED** that, pursuant to 47 U.S.C. 155(c), the Media Bureau is granted delegated authority for the purpose of amending FCC Form 2100 as necessary to implement the licensing process adopted herein and to establish the one-year application filing window once the revised form is available for use by applicants, and for the purpose of submitting the report to Congress required pursuant to the Low Power Protection Act, Pub. L. 117-344, 136 Stat. 6193, Sec. 2(d) (2023).

63.    **IT IS FURTHER ORDERED** that the Media Bureau is granted delegated authority for the purpose of activating an OPIF for LPTV stations that apply to convert to Class A status pursuant to the LPPA and of informing applicants when their OPIF is ready for the applicant to upload documents required to be maintained in OPIF.

64.    **IT IS FURTHER ORDERED** that the Commission's Office of the Secretary **SHALL SEND** a copy of this *Report and Order*, including the Final Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

65.    **IT IS FURTHER ORDERED** that Office of the Managing Director, Performance Program Management, **SHALL SEND** a copy of this *Report and Order* in a report to be sent to Congress and the Government Accountability Office pursuant to the Congressional Review Act, 5 U.S.C. § 801(a)(1)(A).

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

000030
Petition for Review--RCC
FCC 23-112

**APPENDIX A**

**List of Commenters**

<u>Comments</u>

Block Communications, Inc. (Block)

Communications Technologies

County of Los Angeles, California

Dockins Communications, Inc. (Dockins)

Flood Communications (Flood)

Channel 23 WXWZ, JB Media Group, Jose Berrios Diaz (JB Media Group)

Lockwood Broadcasting, Inc. (Lockwood)

LPTV Broadcasters Association (LPTVBA)

National Association of Broadcasters (NAB)

News-Press & Gazette Broadcasting (NPG)

One Ministries, Inc.

Radio Communications Corporation, LPTV Station W24EZ-D Formerly Class A Station W28AJ (RCC)

REC Networks (REC)

KFLA-LD; Data Wave, LLC; M&C Broadcasting Corporation – WCEA-LD; The Videohouse Inc.; ATV Holdings, Inc.; G.I.G., Inc.; Michael Karr; Caribevision Holdings; Tycke Media, LLC; America CV Station Group, Inc.; Viper Communications, Inc.; Lowcountry 34 Media, LLC; Paramount Broadcasting Communication LLC; Look Media; Lawrence F. Loesch; Agape Broadcasters Inc; Richardson Broadcasting; King Forward Inc; KADO/Word of Life Ministries, Inc; Dockins Broadcast Group (collectively referred to herein as "Identical Comments")

<u>Reply Comments</u>

Flood Communications

LPTV Broadcasters Association

Radio Communications Corp.

REC Networks

000031
Petition for Review--RCC
FCC 23-112

**APPENDIX B**

**Final Rules**

Part 73 of Title 47 of the U.S. Code of Federal Regulations is amended to read as follows:

PART 73 – RADIO BROADCAST SERVICES

1.        The Authority citation for Part 73 continues to read as follows:

AUTHORITY: 47 U.S.C. 154, 155, 301, 303, 307, 309, 310, 334, 336, 339.

2.        Amend Section 73.3580 by revising paragraph (c) to add new paragraph (c)(7) to read as follows:

§ 73.3580 Local public notice of filing of broadcast applications.

…

(c) Applications requiring local public notice.  The following applications filed by licensees or permittees of the following types of stations must provide public notice in the manner set forth in paragraphs (c)(1) through (7) of this section:

…

(7) Applications by LPTV stations to convert to Class A status pursuant to the Low Power Protection Act.  The applicant shall both broadcast on-air announcements and give online notice.

…

2.        Section 73.6030 is adopted as follows.

§ 73.6030  Low Power Protection Act

(a) Definitions.  For purposes of the Low Power Protection Act, a low power television station's Designated Market Area (DMA) shall be defined as the DMA where its transmission facilities (i.e., the structure on which its antenna is mounted) are located.  DMAs are determined by Nielsen Media Research.  A low power television station shall be defined in accordance with § 74.701(k).

(b) Eligibility Requirements.  In order to be eligible for Class A status under the Low Power Television Protection Act, low power television licensees must:
(1) have been operating in a DMA with not more than 95,000 television households as of January 5, 2023;
(2) have been broadcasting a minimum of 18 hours per day between October 7, 2022 and January 5, 2023;
(3) have been broadcasting a minimum of at least three hours per week of locally produced programming between October 7, 2022 and January 5, 2023;
(4) have been operating in compliance with the Commission's requirements applicable to low power television stations between October 7, 2022 and January 5, 2023;
(5) be in compliance with the Commission's operating rules for full-power television stations from and after the date of its application for a Class A license; and

000032
Petition for Review--RCC
FCC 23-112

(6) demonstrate that the Class A station for which the license is sought will not cause any interference described in 47 U.S.C. 336(f)(7).

(c) Application Requirements.  Applications for conversion to Class A status must be submitted using FCC Form 2100, Schedule F within one year beginning on the date on which the Commission issues notice that the rules implementing the Low Power Protection Act takes effect. The licensee will be required to submit, as part of its application, a statement concerning the station's operating schedule during the 90 days preceding January 5, 2023 and a list of locally produced programs aired during that time period.  The applicant may also submit other documentation, or may be requested by Commission staff to submit other documentation, to support its certification that the licensee meets the eligibility requirements for a Class A license under the Low Power Protection Act.

(d) Licensing Requirements.  A Class A television broadcast license will only be issued under the Low Power Protection Act to a low power television licensee that files an application for a Class A Television license (FCC Form 2100, Schedule F), which is granted by the Commission.

(e) Service Requirements.  Stations that convert to Class A status pursuant to the Low Power Protection Act are required to meet the service requirements specified in § 73.6001(b)-(d) of this chapter for the term of their Class A license.  In addition, such stations must remain in compliance with the programming and operational standards set forth in the Low Power Protection Act for the term of their Class A license.  In addition, such stations must continue to operate in DMAs with not more than 95,000 television households in order to maintain their Class A status unless the population in the station's DMA later exceeds 95,000 television households through (1) population growth, (2) a change in the boundaries of a qualifying DMA such that the population of the DMA exceeds 95,000 television households, or (3) the merger of a qualifying DMA into another DMA such that the combined DMA exceeds 95,000 television households.  LPPA Class A stations will not be permitted to initiate a move to a different DMA with more than 95,000 television households at the time of the move and still retain their Class A status.

(f) Other regulations.  From and after the date of applying for Class A status under the Low Power Protection Act, stations must comply with the requirements applicable to Class A stations specified in subpart J of this part (§§ 73.6000 through 73.6029) and must continue to comply with such requirements for the term of their Class A license.

000033
Petition for Review--RCC
FCC 23-112

## APPENDIX C

### Final Regulatory Flexibility Analysis

1.        As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[1] an Initial Regulatory Flexibility Act Analysis (IRFA) was incorporated into the *Notice of Proposed Rulemaking* (*NPRM*) released March 30, 2023.[2]  The Federal Communications Commission (Commission) sought written public comment on the proposals in the *NPRM*, including comment on the IRFA.  No comments were filed addressing the IRFA.  This Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA.[3]

**A.        Need for, and Objectives of, the Report and Order**

2.        The *Report and Order* adopts rules to implement the Low Power Protection Act (LPPA or Act),[4] which was enacted on January 5, 2023.  The LPPA provides certain low power television (LPTV) stations with a "limited window of opportunity" to apply for primary spectrum use status as Class A television stations.[5]  The rules adopted herein reflect most of the Commission's proposals in the *Implementation of the Low Power Protection Act*, *Notice of Proposed Rulemaking* (*NPRM*)[6] in this proceeding, with limited exceptions.[7]  We establish herein the period during which eligible stations may file applications for Class A status pursuant to the LPPA, clarify eligibility and interference requirements, and establish the process for submitting applications for Class A status pursuant to the Act.  Our rules provide eligible LPTV stations with a limited opportunity to apply for primary spectrum use status as Class A television stations, consistent with Congress's directive in the LPPA.

3.        We conclude that the application window will be limited to the one year application window contemplated by the Act, and that an application filed for Class A status must demonstrate that the LPTV station operated in a Designated Market Area (DMA) with not more than 95,000 television households on January 5, 2023.  We also conclude that LPTV stations that convert to Class A status under the LPPA must comply with the interference protection standards set forth in section 336(f)(7) of the Communications Act of 1934, with the exception of those provisions that are now obsolete given the transition of all television stations from analog to digital operations.  We apply the Commission's recently updated definition of an LPTV station for purposes of determining which stations are eligible for Class A status under the LPPA and codify in our rules the eligibility criteria set forth in the LPPA.  We also implement provisions of the LPPA which provide that licenses issued to stations that convert to Class A status are subject to full power television station license terms and renewal standards, with certain exceptions.  We conclude that LPPA Class A licensees are required to remain in compliance with the LPPA's eligibility requirements for the term of their Class A license, except for changes to the station's DMA that are beyond the control of the station.  We conclude that we will evaluate Class A status to

---

[1] 5 U.S.C. § 603.  The RFA, 5 U.S.C. §§ 601-612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[2] *See Implementation of the Low Power Protection Act*, MB Docket No. 23-126, Notice of Proposed Rulemaking, FCC 23-23 (rel. March 30, 2023) (*NPRM*).

[3] 5 U.S.C. § 604.

[4] Low Power Protection Act, Pub. L. 117-344, 136 Stat. 6193 (2023).

[5] LPPA Sec.2(b).

[6] *See Implementation of the Low Power Protection Act*, MB Docket No. 23-126, Notice of Proposed Rulemaking, FCC 23-23 (rel. March 30, 2023) (*NPRM*).

[7] We received over thirty comments in response to the *NPRM*.  Twenty of these commenters filed identical comments supporting the adopting of MSAs as an alternative local market methodology for determining eligibility under the LPPA

000034
Petition for Review--RCC
FCC 23-112

eligible LPTV stations as a modification of the station's existing license, and that nothing in the LPPA, or our rules implementing the Act, affects the Commission's work related to the Broadcast Incentive Auction. We address how our actions implementing the LPPA advance diversity, equity, inclusion, and accessibility and, lastly, decline to amend our rules to afford Class A stations must carry rights equivalent to full service stations and decline to adopt a de minimis exception to the LPPA's DMA eligibility requirement.

**B.      Summary of Significant Issues Raised by Public Comments in Response to the IRFA**

4.      There were no comments filed that specifically addressed the rules and policies proposed in the IRFA.

**C.      Response to Comments by the Chief Counsel for Advocacy of the Small Business Administration**

5.      Pursuant to the Small Business Jobs Act of 2010, which amended the RFA, the Commission is required to respond to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration (SBA), and to provide a detailed statement of any change made to the proposed rules as a result of those comments.[8]

6.      The Chief Counsel did not file any comments in response to the proposed rules in this proceeding.

**D.      Description and Estimate of the Number of Small Entities To Which the Proposed Rules will Apply**

7.      The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the proposed rules, if adopted.[9]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[10]  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[11]  A small business concern is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[12]  Below, we provide a description of such small entities, as well as an estimate of the number of such small entities, where feasible.

8.      *Television Broadcasting*.  This industry is comprised of "establishments primarily engaged in broadcasting images together with sound."[13]  These establishments operate television broadcast studios and facilities for the programming and transmission of programs to the public.[14]  These establishments also produce or transmit visual programming to affiliated broadcast television stations,

---

[8] 5 U.S.C. § 604(a)(3).

[9] 5 U.S.C. § 603(b)(3).

[10] *Id*. § 601(6).

[11] *Id*. § 601(3) (incorporating by reference the definition of "small-business concern" in 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."  5 U.S.C. § 601(3).

[12] 15 U.S.C. § 632.

[13] *See* U.S. Census Bureau, *2017 NAICS Definition, "515120 Television Broadcasting,"* https://www.census.gov/naics/?input=515120&year=2017&details=515120.

[14] *Id.*

000035
Petition for Review--RCC
FCC 23-112

which in turn broadcast the programs to the public on a predetermined schedule.  Programming may originate in their own studio, from an affiliated network, or from external sources.  The SBA small business size standard for this industry classifies businesses having $41.5 million or less in annual receipts as small.[15]  2017 U.S. Census Bureau data indicate that 744 firms in this industry operated for the entire year.[16]  Of that number, 657 firms had revenue of less than $25,000,000.[17]  Based on this data we estimate that the majority of television broadcasters are small entities under the SBA small business size standard.

9.      As of September 30, 2023, there were 1,377 licensed commercial television stations.[18]  Of this total, 1,258 stations (or 91.4%) had revenues of $41.5 million or less in 2022, according to Commission staff review of the BIA Kelsey Inc. Media Access Pro Television Database (BIA) on October 4, 2023, and therefore these licensees qualify as small entities under the SBA definition.  In addition, the Commission estimates as of September 30, 2023, there were 383 licensed noncommercial educational (NCE) television stations, 380 Class A TV stations, 1,889 LPTV stations and 3,127 TV translator stations.[19]  The Commission, however, does not compile and otherwise does not have access to financial information for these television broadcast stations that would permit it to determine how many of these stations qualify as small entities under the SBA small business size standard.  Nevertheless, given the SBA's large annual receipts threshold for this industry and the nature of these television station licensees, we presume that all of these entities qualify as small entities under the above SBA small business size standard.

**E.      Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities**

10.      In implementing the LPPA, the *Report and Order* adopts new or additional reporting, recordkeeping or other compliance requirements for small and other entities.  For example, the LPPA requires that, to be eligible for Class A status, during the 90 days preceding the date of enactment of the LPPA an LPTV station must have broadcast a minimum of 18 hours/day and an average of at least 3 hours per week of programming produced within the "market area" served by the station[20] and have been in compliance with the Commission's requirements for LPTV stations.[21]  The rules also require that small and other applicants seeking to convert to Class A status under the LPPA certify in their application for Class A status that they have complied with these eligibility requirements during the 90 days preceding the January 5, 2023 enactment of the statute.  An applicant must submit, as part of its application, a statement concerning the station's operating schedule during the 90 days preceding January 5, 2023 and a list of locally produced programs aired during that time period.  The applicant may also submit other documentation to support its certification that the licensee meets the eligibility requirements for a Class A

---

[15] *See* 13 CFR § 121.201, NAICS Code 515120 (as of 10/1/22 NAICS Code 516120).

[16] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017*, Table ID: EC1700SIZEREVFIRM, NAICS Code 515120, https://data.census.gov/cedsci/table?y=2017&n=515120&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.

[17] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

[18] *Broadcast Station Totals as of September 30, 2023*, Public Notice, DA 23-921 (rel. Oct. 3, 2023) (*October 2023 Broadcast Station Totals PN*), https://docs.fcc.gov/public/attachments/DA-23-921A1.pdf.

[19] *Id.*

[20] LPPA Sec.2(c)(2)(B)(i)(I), 47 U.S.C. § 336(f)(2)(A)(i)(II).

[21] LPPA Sec.2(c)(2)(B)(i)(I), 47 U.S.C. § 336(f)(2)(A)(i)(III).

000036
Petition for Review--RCC
FCC 23-112

license under the Low Power Protection Act.  In addition, the Commission staff may also request additional documentation if necessary during consideration of the application.

11.      Beginning on the date of its application for a Class A license and thereafter, a station "must be in compliance with the Commission's operating rules for full-power stations."[22]  We will apply to small and other applicants for Class A status under the LPPA, and to stations that are awarded Class A licenses under that statute, all Part 73 regulations except for those that cannot apply for technical or other reasons.  For example, Class A stations must comply with the requirements for informational and educational children's programming, the political programming and political file rules, and the public inspection file rule.

12.      The LPPA requires that a station that converts to Class A status pursuant to the statute continue to meet the eligibility requirements of the LPPA during the term of the station's Class A license.  To be eligible under the LPPA, in addition to other eligibility requirements, section 2(c)(2)(B)(iii) of the Act requires an LPTV station must "as of the date of enactment" of the LPPA operate in a DMA with not more than 95,000 television households.[23]  Section 2(c)(3)(B) of the Act, however, requires that stations that convert to Class A status under the LPPA "remain in compliance" with paragraph (2)(B) "during the term of the license."[24]  We interpret section 2(c)(3)(B) to require that stations that convert to Class A status, including small entities, remain in DMAs with not more than 95,000 television households in order to maintain their Class A status except for situations in which the population in the station's DMA later exceeds the threshold amount through (1) population growth, (2) a change in the boundaries of a qualifying DMA such that the population of the DMA exceeds 95,000 television households, or (3) the merger of a qualifying DMA into another DMA such that the combined DMA exceeds the threshold amount.  LPPA Class A stations will not be permitted to initiate a move to a different DMA with more than 95,000 television households at the time of the move and still retain their Class A status.  In addition, licensed Class A stations must also continue to meet the minimum operating requirements for Class A stations.[25]  Licensees unable to continue to meet the minimum operating requirements for Class A television stations, or that elect to revert to low power television status, must promptly notify the Commission, in writing, and request a change in status.[26]  The *Report and Order* also requires that stations that convert to Class A status pursuant to the LPPA comply with all rules applicable to existing Class A stations, including interference requirements.

13.      The *Report and Order* requires small and other stations seeking to convert to Class A designation pursuant to the LPPA to submit an application to the Commission within one year of the effective date of the rules adopted in this proceeding.  The *Report and Order* concludes that the Commission will not continue to accept applications to convert to Class A status under the LPPA beyond the one-year application period set forth in the statute.  In addition, we will allow deviation from the strict statutory eligibility criteria under the LPPA only where deviations are insignificant or where there are compelling circumstances such that equity mandates a deviation.[27]  In the *NPRM*, we noted that one

---

[22] LPPA Sec.2(c)(2)(B)(i)(I); 47 U.S.C. § 336(f)(2)(A)(ii).

[23] LPPA Sec.2(c)(2)(B)(iii).

[24] LPPA Sec.2(c)(3)(B).

[25] 47 CFR § 73.6001(c).

[26] *Id.* § 73.6001(d).

[27] The LPPA provides that the Commission may approve an application for Class A status if the application satisfies section 336(f)(2) of the Communications Act of 1934, codified as part of the CBPA.  LPPA Sec.2(c)(2)(B)(i)(I); 47 U.S.C. § 336(f)(2)(A).  The CBPA provided the Commission with additional discretion in evaluating applicants for Class A status if "the Commission determines that the public, interest, convenience, and necessity would be served by treating the station as a qualifying low-power television station for purposes of this section, or for other reasons determined by the Commission."  47 U.S.C. § 336(f)(2)(B).  In the *Class A Order*, the Commission determined that it would allow deviation from the strict statutory eligibility criteria in the CBPA "only where such deviations are

(continued ...)

000037
Petition for Review--RCC
FCC 23-112

example of such compelling circumstances might be "a natural disaster or interference conflict which forced the station off the air" during the 90-day period preceding enactment of the statute.

14.     We expect the actions we have taken in the *Report and Order* achieve the goals of implementing the LPPA without placing significant additional costs and burdens on small entities.  At present, there is not sufficient information on the record to quantify the cost of compliance for small entities, or to determine whether it will be necessary for small entities to hire professionals to comply with the adopted rules.  However, we anticipate that the compliance obligations for small stations will be outweighed by the benefits provided through the LPPA's granting of a limited opportunity for LPTV stations to apply for primary status as a Class A television licensee.

### F.     Steps Taken to Minimize the Significant Economic Impact on Small Entities and Significant Alternatives Considered

15.  The RFA requires an agency to provide, "a description of the steps the agency has taken to minimize the significant economic impact on small entities…including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected."[28]

16.     Through comments provided by interested parties during the rulemaking proceeding, the Commission considered various proposals from small and other entities.  The adopted rules reflect the Commission's efforts to implement the LPPA by balancing the Commission's proposals in the *NPRM* with alternative proposals provided by the commenters and weighing their benefits against their potential costs to small and other entities.  As discussed above, the LPPA provides a limited window of opportunity for an LPTV station to attain primary status as a Class A TV station, if the LPTV station meets the eligibility criteria set forth in the LPPA.  The *Report and Order* adopts most of the Commission's proposals in the *NPRM*, with one significant exception.  We do not adopt the proposal to require that all licensees that convert to Class A status pursuant to the LPPA remain in compliance with the LPPA's requirement that the station be in a DMA with no more than 95,000 TV households for the term of their Class A license.  Instead, we conclude that LPPA Class A stations will not be required to continue to comply with the 95,000 TV household threshold if the population in the station's DMA later exceeds the threshold amount either through (1) population growth, (2) a change in the boundaries of a qualifying DMA such that the population of the DMA exceeds 95,000 television households, or (3) the merger of a qualifying DMA into another DMA such that the combined DMA exceeds the threshold amount.  This one change to our approach in implementing the LPPA may minimize a potentially significant impact on a small entity in circumstances where the station is in a DMA that later exceeds the threshold TV household eligibility amount for reasons beyond the station's control.  We also considered but did not, however, permit an LPPA Class A station to initiate a move to a DMA that does not meet the 95,000 TV household eligibility requirement and still retain its status as a Class A station.

17.     Additionally, in the *Report and Order* the Commission adopted a simplified license application approach regarding the documentation stations are required to submit as part of their application for a Class A license.  Rather than mandating that an applicant provide specific additional documents to support its application, the Report and *Order* permits an applicant to provide whatever additional documentation the applicant has that best support its certification that it met the operational and programming requirements of the LPPA during the eligibility period.  This flexibility minimizes the impact on small LPTV stations, some of which may have difficulty providing specific mandated documents because they do not have the necessary documents or lack the resources necessary to provide

---

(Continued from previous page) ———————————————
insignificant or when we determine that there are compelling circumstances, and that in light of those compelling circumstances, equity mandates such a deviation."  *Class A Order*, 15 FCC Rcd at 6369, para. 33.

[28] 5 U.S.C. § 604(a)(6).

000038
Petition for Review--RCC
FCC 23-112

the document in a form that supports their certification.  We also took the step of reducing a potential economic burden to small LPTV stations by adopting the proposal to use data from the Nielsen Local TV Station Information Report (Nielsen Local TV Report) in order to determine the DMA where the LPTV station's transmission facilities are located for purposes of eligibility.  The Commission considered proposed alternatives such as using census data for Metropolitan Statistical Areas (MSAs) and Rural Service Areas (RSAs), or Comscore data.  However, we have determined that using the Nielsen Local TV Report would be less burdensome to small and other LPTV stations based on current industry practices and because certain data, such as DMA station assignment information, can be provided to stations at no cost.

### G.    Report to Congress

18.    The Commission will send a copy of the *Report and Order*, including this FRFA, in a report to Congress pursuant to the Congressional Review Act.[29]  In addition, the Commission will send a copy of the *Report and Order*, including this FRFA, to the Chief Counsel for Advocacy of the SBA.  A copy of the *Report and Order*, and FRFA (or summaries thereof) will also be published in the *Federal Register*.[30]

---

[29] *See Id.*. § 801(a)(1)(A).

[30] *See Id.*  § 604(b).

000039
Petition for Review--RCC
FCC 23-112