SCANNED PDF FORMAT ATTACHMENTS ARE INCLUDED

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

**RADIO COMMUNICATIONS CORPORATION,**
**Petitioner**

**v.**                                              **Case No. 24-1004**

**FEDERAL COMMUNICATIONS COMMISSION,**
**Respondent**

**Petitioner's Opposed Emergency Motion For Stay, Expedited Review, And Summary Reversal**

**ORAL ARGUMENT NOT REQUESTED**

_____
_____

**For Review Of FCC 23-112**
**Adopting Implementing Rules For The**
**Low Power Protection Act**

_____
_____

**Radio Communications Corporation**
**Timothy E. Welch, Esq.**
**Hill and Welch**
**1116 Heartfields Drive**
**Silver Spring, MD 20904**
**(202) 321-1448 (cell)**
**(301) 622-2864 (FAX)**
**welchlaw@earthlink.net**
**January 23, 2024**

# Table of Contents

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Jurisdictional Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Stay, Expedited Review, and Summary Reversal Are Warranted . . . . . . . . . . . . . 8
    1. Standard Of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    2. Unique Statutory Timing Warrants Expedited Review And Stay . . . . . . 9
    3. The Commission Denied Interim Relief . . . . . . . . . . . . . . . . . . . . . . . 10
    4. RCC Will Suffer Irreparable Injury Absent Relief . . . . . . . . . . . . . . . . 11
    5. No Harm To Others – The Public Interest . . . . . . . . . . . . . . . . . . . . . . 11
    6. Likelihood Of Success On The Merits And Summary Reversal . . . . . . 11
        A. Unlawful Full Power TV Protection At LPTV's Expense . . . . . . 12
            i. FCC 23-112 Adopts NAB's Anti-Competitive Position . . . 12
            ii. LPPA Protects Small Community TV . . . . . . . . . . . . . . . 13
            iii. § 307(b) Requires Nationwide Class A Licensing, Not
                LPPA Defeating License Reassignment . . . . . . . . . . . 13
            iv. LPPA Is Unconcerned With "Spectrum Scarcity" . . . . . . . 15
        B. Unconstitutional Regulation Of Local Economic Activity . . . . . . 17
            i. Insubstantial Effect Upon Interstate Commerce . . . . . . . . . 17
            ii. Constitutional LPPA Reading And § 307(b)'s
                Nationwide Class A Licensing Mandate . . . . . . . . . . . 21
        C. Unconstitutional Delegation Of Governmental Authority . . . . . . 23
        D. Unconstitutional Class A Program Content Eligibility Rule . . . . . 25
        E. Unlawful Denial Of Primary Class A Must-Carry . . . . . . . . . . . 27
    7. Reopening Doctrine: The CBPA And Must-Carry Rulemakings . . . . . . 30

In The Event Another Party Seeks Commission Reconsideration . . . . . . . . . . . . 31

Requested Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Certificate of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Certificate of Digital Submission and Privacy Redactions . . . . . . . . . . . . . . . . . . . [35](#)

Circuit Rule 28(a)(1) Certificate as to Parties, Rulings, and Related Cases . . . . . . [36](#)

Circuit Rule 26.1 Disclosure Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [37](#)

Certificate Of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [38](#)

Attachments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [39](#)
1) *Report and* Order FCC 23-112, Released December 12, 2023 . . . . . . . . . 000001
2) Low Power Protection Act, Pub. L. 117-344, 136 Stat. 6193 (2023) . . . . 000040
3) RCC Comments MB Docket No. 23-126 Filed May 4, 2023 . . . . . . . . . . 000043
4) RCC Reply MB Docket No. 23-126 Filed June 13, 2023 . . . . . . . . . . . . 000065
5) 47 C.F.R. § 76.55 Definitions Applicable To The Must-Carry Rules . . . . 000082
6) 47 C.F.R. § 74.701(h) Definitions – Local Origination . . . . . . . . . . . . . . 000085
7) *Public Notice*, DA 24-26, MB Docket 23-126, January 10, 2024 . . . . . . . 000087
8) 47 U.S.C. § 307 Licenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 000089

## Introduction

Petitioner Radio Communications Corporation (RCC), pursuant to F.R.A.P. 18, Circuit Rule 18(a),(b), F.R.A.P. 27, and Circuit Rule 27(f),(g), petitions the Court for expeditious consideration of, and summary Reversal regarding, RCC's January 10, 2024 Petition for Review seeking review of the Federal Communications Commission's *Report and Order*, FCC 23-112, MB Docket No. 23-126, released December 12, 2023, 89 Fed. Reg. 1466 (January 10, 2024). FCC 23-112 implements the Low Power Protection Act (LPPA).[1] A copy of FCC 23-112 is Attachment 000001-39. RCC requests that a stay be entered against FCC 23-112 and expedited case processing in the event a stay is entered.

Respondent FCC opposes the Motion. Respondent USA/DOJ stated that it takes no position on the Motion.

## Jurisdictional Statement

RCC's Petition for Review is authorized by 5 U.S.C. §§ 551, 702, 704, 705, 706(1),(2), 47 U.S.C. § 402(a), 28 U.S.C. §§ 2342(1), 2343,[2] 2344, 2347(b)(2), 2348. These statutory provisions grant RCC the right to appellate review as an entity

---

[1] Low Power Protection Act, Pub. L. 117-344, 136 Stat. 6193 (2023).

[2] RCC's principal office and transmitter have been located in Allingtown, Connecticut since 1986; venue is proper in the Second Circuit or the D.C. Circuit.

1

aggrieved by the Commission's unlawful actions in FCC 23-112.[3]  The instant Petition for Review was timely filed within sixty (60) days after Federal Register publication.

## Standing

FCC 23-112, *inter alia*, adopted rules which prohibit RCC from filing an LPPA authorized application to upgrade its low power TV (LPTV) license W24EZ-D to a Primary Class A TV license. That upgrade would allow RCC to obtain substantial economic benefits such as protection from involuntary license displacement and the right to assert must-carry on cable TV systems.  The economic injuries which FCC 23-112 inflict upon RCC can be remedied by this court's review of the FCC's actions in MB Docket No. 23-126.  Accordingly, RCC has standing to maintain this action.[4]

## Background

In 1982 the Commission created the LPTV service as a secondary service which must accept interference, and possible license displacement, to compete against full power TV service because full power TV had reached maturity.  FCC 23-112 at 2 ¶ 2, Attachment 000002; RCC Comments at 3-4, 6-7, 10 n.15, 11, 13-14, Attachment

---

[3] *See generally*, *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 63 (2004).

[4] RCC's standing is demonstrated by the record on review which establishes that RCC is the holder of a LPTV broadcast license which is "directly and adversely affected" by the Commission's licensing decisions in FCC 23-112.  *Viasat, Inc. v. FCC*, 47 F.4th 769, 780-81 (CADC 2022); *Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004, 1024 (CADC 2022) (standing exists where the petitioner is "'directly regulated by the challenged [order]'").

000048-49, 000051-52, 000055, 000056, 000058-59; RCC Reply at 4, Attachment 000071, citing *Report and Order, In the Matter of The Suburban Community Policy, the Berwick Doctrine, and the De Facto Reallocation Policy*, 93 F.C.C.2d 436 (1983). RCC licensed its first LPTV station, W28AJ, to serve Allingtown, Connecticut and began operating on December 23, 1986.

In 1993 the Commission adopted the "must-carry" rule found at 47 C.F.R. § 76.55, Attachment 000082, by which commercial TV stations can require cable TV systems to carry their signals. Except for a very limited subset of LPTV stations, "qualified low power" TV stations in small markets, LPTV stations were explicitly excluded from the class of stations which could assert must carry rights. 47 U.S.C. § 534; *Implementation of the Cable Television Consumer Protection and Competition Act of 1992, Broadcast Signal Carriage Issues*, MM Docket No. 92-259, *Report and Order*, 8 FCC Rcd 2965, 2983, para. 67 & n.211 (1993) (defining "qualified low power" TV stations).

The Section 76.55 must-carry rule adopted in 1993 is substantially unchanged today for purposes of this review proceeding and does not preclude Class A from asserting must-carry.

> For more than thirty years the Section 307(b) community of license has been the critical determinant of must carry rights under 47 C.F.R. §§ 76.55(c),(d), 58 FR 17350 (April 2, 1993), but FCC [23-112] changes course without a word of justification or explanation. Class A stations have been authorized to assert must carry and retransmission consent rights from the moment Congress authorized

them in 1999, years after the FCC adopted the § 76.55(c)(1) must carry services exclusion list in 1993.

RCC Comments at 8 n.12, Attachment 000053.

In 1999 Congress enacted legislation to protect LPTV stations by creating a new "primary" Class A TV station class which were subject to the "same license terms and renewal standards as the licenses for full-power television stations except as provided in this subsection." Community Broadcasters Protection Act of 1999 (CBPA), Pub. L. No. 106-113, 113 Stat. Appendix I at pp. 1501A-594 - 1501A-598 (1999), 47 U.S.C. § 336(f); FCC 23-112 at 3 ¶ 4, Attachment 000003. The CBPA did not limit Class A eligibility to LPTV stations which were previously classified by the Commission as "qualified low power" TV stations, and the CBPA does not preclude Class A stations from asserting must-carry.

The Commission adopted CBPA Class A implementing regulations in 2000. *Establishment of a Class A Television Service*, *Report and Order*, 15 FCC Rcd 6355, 6357-58 ¶ 2 (2000), recon. granted in part, 16 FCC Rcd. 8244 (2001). The Commission did not amend the must-carry rule at Section 76.55(c)(1) to include "Class A" TV stations as a station class which is precluded from asserting must-carry rights. RCC Comments at 2-3, 14-16, Attachment 000047-48, 000059-61 (LPTV stations are "upgraded and reclassified as 'Class A' protected stations"). FCC 23-112 does not discuss this aspect of must-carry regulatory history.

4

In 2001 RCC upgraded W28AJ to primary Class A status within the terms of the CBPA. W28AJ was not ever classified as a "qualified low power" TV station under the Commission's 1993 must-carry rulemaking – being a "qualified low power" was not a CBPA Class A licensing requirement. Even though W28AJ was a primary Class A station, it was denied must-carry by cable TV systems "based upon an erroneous reading of 47 C.F.R. § 76.55(d)(5)." RCC eventually downgraded Station W28AJ from primary Class A to unprotected LPTV status because it was "burdened with the obligations of full power TV stations, but . . . denied the significant economic benefit of being able to assert a must carry right on cable TV systems." RCC Comments, at 2-3, Attachment 000047-48.

RCC's LPTV station W28AJ was eventually displaced during the TV industry's transition to digital transmission technology "after many years of service to the public and investments in equipment, programming, and audience building." In 2021, after digital TV repacking was completed, RCC discovered a new digital channel and W28AJ now operates as W24EZ-D.[5] RCC Comments at 2-3, Attachment 000047-48.

On January 5, 2023 Congress enacted the LPPA to create new Class A stations and provided them "with the same license terms" as full power TV stations. FCC 23-112 at 4 ¶ 8, Attachment 000004. FCC 23-112 establishes Class A license upgrade

---

[5]   RCC lost another LPTV channel to mobile radio displacement in 2012, W65DZ, Bridgeport, Connecticut, but that channel could not be replaced.

eligibility rules which preclude RCC from filing a Class A license upgrade application to obtain the LPPA's various benefits.

While nothing in the LPPA requires community of license reassignment as part of the Class A upgrade process, FCC 23-112 effectively reassigns LPTV licenses, collectively covering more than 98% of the country's population, from their small 47 U.S.C. § 307(b) communities of license to much larger, Nielsen controlled, Designated Market Areas (DMA). As a consequence, LPTV licensees, covering more than 98% of the country's population, including RCC, are disqualified from the LPPA's benefits.[6]

FCC 23-112 at 23 n.187, Attachment 000023, denies that community of license reassignment is occurring. However, FCC 23-112 determines that RCC, licensed to serve Allingtown, CT with fewer than 15,000 TV households, does not qualify for Class A upgrade licensing because RCC's LPTV station is located in the Hartford-New Haven DMA which has nearly one million TV households, thereby effectively changing W24EZ-D's community of license for Class A licensing exclusion purposes. RCC Comments at 7-9, Attachment 000052-54.[7]

---

[6]  The population of RCC's Section 307(b) community of license, Allingtown, CT, is approximately 15,000 – if every person were a "TV household," Allingtown would still be well under LPPA's 95,000 limit. RCC Comments at 9-11, Attachment 000054-56. FCC 23-112 reassigns RCC's LPTV license to a "non-qualifying" DMA to disqualify RCC from the LPPA's Class A licensing benefits. RCC Comments at 4-5, 7-8, 11-12, Attachment 000046-47, 000049-50, 000052-53, 000056-57.

[7]  FCC 23-112 uses the phrase "qualifying DMA" thirteen times, and "non-
(continued...)

FCC 23-112 also 1) unconstitutionally restricts program content for Class A eligibility purposes, RCC Reply at 10-14, Attachment 000077-81, and 2) unlawfully precludes Class A licensees from asserting cable TV must-carry rights, but Section 76.55 has never been amended to codify such preclusion.  RCC Comments at 14-16, Attachment 000059-61.

FCC 23-112 fails to follow the LPPA's direction to protect LPTV stations.  FCC 23-112 adopts the National Association of Broadcasters' (NAB) lobbying position that nationwide LPTV protection cannot arise under the LPPA because "elevating LPTV stations from secondary to primary Class A status 'comes at the cost of effectively block[ing] coverage and service improvements by full-service stations,'" FCC 23-112 at 21-22 ¶ 38, Attachment 000021-22, notwithstanding the fact that the LPPA is the "Low Power Protection Act" and not the "Large Power Protection Act."  RCC Comments at ii, 1, 6, 12, 17, Attachment 000045, 000046, 000051, 000057, 000062.

The LPPA establishes a one-year Class A license upgrade filing window.  The opening of the Class A upgrade filing window is imminent pending Media Bureau publication of OMB information approval collections, but is not expected within the next seven (7) days.  *Public Notice*, DA 24-26, MB Docket 23-126, (January 10, 2024). Attachment 000087;  FCC 23-112 at 3-4 ¶ 7, Attachment 000003-04.

---

[7](...continued)
qualifying DMA" twice, but those phrases are not found in the LPPA or the CBPA.  Those phrases exist to eliminate Class A licenses.

## Stay, Expedited Review, and Summary Reversal Are Warranted
## 1. Standard Of Review

5 U.S.C. § 706(2)(A) "requires federal courts to set aside agency action which is 'not in accordance with the law'." *FCC v. Nextwave Personal Communications, Inc.,* 537 U.S. 293, 300 (2003), affirming, *Nextwave Personal Communications, Inc. v. FCC*, 254 F.3d 130, 133 (CADC 2001) (agency compliance with all Federal law is "fundamental"). It is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Petroleum Communications, Inc. v. FCC*, 22 F.3d 1164, 1172 (CADC 1994) (reversal when agency fails to provide a reasoned explanation and when the record is contrary to the agency's conclusion). "An agency changing its course must supply a reasoned analysis." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 57.

An agency's failure to compile a supporting record is a critical legal defect because FCC conclusions must be supported by the record on review. *DOC v. New York*, 139 S. Ct. 2551, 2573 (2019) (Roberts, C.J.) ("a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing

administrative record"); *Petroleum Communications, Inc. v. FCC*, 22 F.3d 1164, 1172 (CADC 1994) (record must support agency conclusions). RCC Comments at 6-9, Attachment 000051-54. The lack of agency discussion cannot be corrected by the agency during appellate review nor supplied by a reviewing court. *Motor Vehicle Mfrs. Assoc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43; *Burlington Truck Lines v. United States*, 371 U.S. 156, 168-69 (1962) (a "fundamental rule of administrative law" is that the agency order, not appellate counsel, must justify the action taken).

### 2. Unique Statutory Timing Warrants Expedited Review And Stay

Expeditious consideration is required because the Commission announced the imminent commencement of the one-year LPTV license upgrade filing window to change station class from LPTV to Primary Class A with the same license terms as full power TV stations. *Public Notice*, DA 24-26, MB Docket 23-126 (January 10, 2024), Attachment 000087;[8] FCC 23-112 at 3-4 ¶ 7, Attachment 000003-04. However, as discussed below, FCC 23-112 precludes RCC from filing an LPPA Class A upgrade application. Absent expedited consideration of this Petition, it appears unlikely that RCC would be able to fully litigate this case, come into compliance with full power TV rules, and then timely file a Class A license upgrade application within the LPPA's one year LPTV upgrade application filing window.

---

[8] Media Bureau notice of the opening of the one year filing window is not expected within the next seven (7) days.

Congress enacted the LPPA on January 5, 2023 and instructed the Commission to initiate a rulemaking within "90 days" and submit an "implementation" report to Congress "not later than 1 year after the date of enactment."   LPPA Sections 2(c)(1),(d), Attachment 000040-41.   Congress clearly intends that LPPA issues be addressed promptly.

### 3.  The Commission Denied Interim Relief

Another timing factor favoring stay is the Commission's rejection of RCC's request for protection from displacement during the pendency of this litigation.  FCC 23-112 at 23 n.186, Attachment 000023; RCC Comments at 12-13, 16-18, Attachment 000057-58, 000061-63 (displacement by spectrum auction); RCC Reply at 8-10, Attachment 000075-000077 ("The LPPA's necessarily implied full-power modification filing freeze remains effective until after final resolution of the instant rulemaking proceeding and the associated LPTV license upgrade proceedings").  FCC 23-112 actively promotes LPTV license displacement because LPTV protection "comes at the cost of 'effectively block[ing] coverage and service improvements by full-service stations.'"  FCC 23-112 at 21-22 ¶ 38, Attachment 000021-22.

Stay is appropriate to protect RCC's spectrum and Class A filing opportunity while the LPPA issues are litigated.  To protect RCC's interests, FCC 23-112 should be stayed pending completion of appellate review and any remand proceeding, even if expedited review is granted.

#### 4. RCC Will Suffer Irreparable Injury Absent Relief

RCC's loss of its Class A license upgrade filing right causes irreparable injury because the only opportunity to file for the economic benefits afforded during the LPPA's one-year Class A license upgrade period will be lost forever. Moreover, loss of license by displacement will also cause irreparable injury because RCC would lose revenue, viewers, and viewer relationships would be damaged. Lost viewers would necessarily move on to other program content providers and that lost good will could never be recaptured even if RCC were somehow able to locate new spectrum.

#### 5. No Harm To Others – The Public Interest

RCC is not seeking to deny the LPPA's benefits to any party and no party would be harmed by judicial relief which recognizes RCC's right to seek the LPPA's various benefits such as the right to file a Class A license upgrade application and the right to assert must-carry rights. Congress created these statutory benefits in the public interest. Grant of RCC's request for relief would further benefit the public interest by enhancing the likelihood that RCC's LPTV station will survive, ensuring competition and viewpoint diversity mandated by 47 U.S.C. § 307(b) (nationwide licensing).

#### 6. Likelihood Of Success On The Merits And Summary Reversal

No questions of material fact will be addressed in this review proceeding, only settled questions of law are at issue. Moreover, the Commission either failed to respond to RCC's arguments, or where the Commission did respond, the response was

11

terse and insubstantial. In both instances, the Commission waived its opportunity to argue in this review proceeding because the lack of agency discussion cannot be corrected by the agency or the reviewing court during appellate review. *Motor Vehicle Mfrs. Assoc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43; *Burlington Truck Lines v. United States*, 371 U.S. 156, 168-69 (1962) (a "fundamental rule of administrative law" is that the agency order, not appellate counsel, must justify the action taken).

RCC respectfully submits that this Motion carries "the heavy burden of demonstrating that the record and the motions papers comprise a basis adequate to allow the 'fullest consideration necessary to a just determination.'" *Cascade Broadcasting Group, Ltd. v. FCC*, 822 F.2d 1172, 1174 (CADC 1987) (per curiam); *Sills v. Federal Bureau of Prisons*, 761 F.2d 792, 793-94 (CADC 1985) (summary reversal appropriate where "briefing, oral argument, and the traditional collegiality of the decisional process would not affect [the Court's] decision"); Handbook of Practice and Internal Procedures, As Amended Through March 16, 2021, at 36. Accordingly, summary Reversal is warranted and this case can be decided on motion practice without oral argument. F.R.A.P. 32(a)(2)(C); Circuit Rule 34(j).

### A. Unlawful Full Power TV Protection At LPTV's Expense
#### i. FCC 23-112 Adopts NAB's Anti-Competitive Position

The Commission "declined to read the LPPA as promoting maximum elevation of LPTV stations to primary status; rather, Congress adopted a much more balanced

approach."  FCC 23-112 implements NAB's anti-competitive lobbying point that "elevating LPTV stations from secondary to primary Class A status 'comes at the cost of effectively block[ing] coverage and service improvements by full-service stations,'" FCC 23-112 at 21-22 ¶ 38, Attachment 000021-22 (quoting NAB).  Nothing in the LPPA requires the NAB's competition stifling statutory construction.  FCC 23-112's adoption of NAB's anti-competitive position, under LPPA's protective banner, is as explicit as it is jaw-droppingly brazen.

### ii.  LPPA Protects Small Community TV

The Commission reads the LPPA "as if Congress intended to protect full-power TV from competition across substantially all of the United States," even though "the plain language and express purpose of the LPPA, on its face, protects LPTV stations such as [RCC's LPTV station] which are licensed to serve small communities."  FCC 23-112 denies LPPA's benefits to LPTV stations collectively covering more than 98% of the country's population notwithstanding the lack of explicit language in the LPPA which protects full power TV across substantially all of the United States.  RCC Comments at 5-7, Attachment 000050-52.

### iii.  § 307(b) Requires Nationwide Class A Licensing, Not LPPA Defeating License Reassignment

FCC 23-112 transforms the "Low Power Protection Act" into the "Large Power Protection Act" by unreasonably limiting, at every critical determination, LPPA's

economic protection of LPTV stations.  RCC Comments at 1, 9, Attachment 000046, 000054.  For instance, FCC 23-112 fails to extend the LPPA's economic benefits to LPTV stations across the nation as required by 47 U.S.C. § 307(b).  Instead, for Class A licensing purposes, FCC 23-112 reassigns LPTV licenses from their very small § 307(b) communities of license to much larger "non-qualifying DMAs" to eliminate Class A licenses, completely ignoring § 307(b)'s mandate to issue Class A licenses nationwide to achieve a national goal.  RCC Comments at 6-11, Attachment 000051-000056; RCC Reply at 4-6, Attachment 000071-73.[9]

> Whether or not the FCC physically alters LPTV licenses to reflect their new communities of license is irrelevant because the practical effect of the FCC's proposed action would do that very thing.  The Commission's illegal proposal cannot be saved by a ministerial "failure to act" fig leaf.

RCC Comments at 11 n.16, Attachment 000056.  *De facto* reallocation of LPTV licenses from small communities to much larger "non-qualifying DMAs" limits LPPA's economic benefits to a smattering of LPTV stations covering less than 2% of the nation's population.[10]  RCC Comments at 5-6, Attachment 000050-51.

---

[9]  "Section 307" is generally referenced in FCC 23-112's ordering clauses as authorizing Commission action, but without discussing how the very limited Class A licensing rule promotes nationwide Class A licensing.

[10]  *De facto* reallocation is defined as "[a]n attempt to utilize a channel assigned to one community in order to establish a broadcast service in another community . . .." *In the Matter of The Suburban Community Policy, the Berwick Doctrine, and the De Facto Reallocation Policy*, 93 F.C.C.2d at 438-440; RCC Reply at 4, Attachment 000071.  FCC 23-112 revives, without discussion, a long ago discarded community (continued...)

FCC 23-112 at 23 n.187, Attachment 000023, tersely denies that any community of license reassignment is occurring by rejecting, without substantive comment, RCC's argument that

> "the Commission's proposed licensing rules improperly removes LPTV stations from their 47 U.S.C. § 307(b) communities of license and reassigns them to much larger DMA markets in the name of 'protecting' those small LPTV stations." RCC Comments at 3.

However, RCC is licensed to serve Allingtown, CT, with fewer than 15,000 TV households. For purposes of Class A licensing, FCC 23-112 disqualifies RCC's LPTV station from Class A upgrade licensing by reassigning RCC's LPTV station to the Hartford-New Haven DMA which has more than 95,000 TV households. RCC Comments at 7-9, Attachment 000052-54. FCC 23-112 suggests that Congress intended nationwide Class A licensing denials, but fails to explain how reassigning the nation's LPTV licenses from small communities to much larger "non-qualifying DMAs," for the purpose of denying Class A status, serves LPPA's purpose of protecting LPTV licenses.

### iv. LPPA Is Unconcerned With "Spectrum Scarcity"

FCC 23-112 protects speculative, future full power TV expansion plans at the expense of LPTV stations based upon NAB's "spectrum scarcity" concern, a concern

---

[10](...continued)
reallocation prohibition rule to deny LPPA benefits by imputing a disqualifying *de facto* LPTV license reassignment to a larger "non-qualifying DMA."

which is contrary to the purpose and text of the LPPA. First, incumbent LPTV licenses exist because they have already demonstrated non-interference to full power stations, and already occupy the spectrum, and "spectrum scarcity" is not an issue for Class A license upgrade applications. RCC Reply at 4, 7 n.11, 8-10, Attachment 000071, 000074, 000075-77.

Second, four decades ago the Commission found that "the goals of the Table [of Assignments for full power TV stations] have been largely achieved" and LPTV was created to compete against full power stations. *Report and Order, In the Matter of The Suburban Community Policy, the Berwick Doctrine, and the De Facto Reallocation Policy*, 93 F.C.C.2d at 452 n.29 citing *Inquiry Into The Future Role of Low-Power Television Broadcasting*, 45 Fed. Reg. 69178, 69179 (Oct. 17, 1980). Suburban licensing policies were eliminated because full power stations used them to stifle small station competition. *Id.* at 454 ("the policy [of prohibiting service to large communities] places a burden on the establishment and improvement of service in small communities that is not in keeping with the objectives of § 307(b)").

Despite Section 307(b)'s nationwide licensing goal, FCC 23-112 fails to respond to RCC's argument that the Commission has failed for "40+ years . . . to protect the diversity of marketplace voices" and as a result has created dangerous "information bubbles" which adversely affect millions of Americans. RCC Comments at 13-14, Attachment 000058-59. FCC 23-112 completely ignores the fact that "the purpose of

the Communications Act and the LPPA is the promotion of broadcast outlets, not the elimination of them."  RCC Reply at 4, Attachment 000071.

Third, FCC 23-112 fails to explain how limiting the LPPA's economic benefits to LPTV stations covering less than 2% of the country's population, while denying those economic benefits to the remaining 98% of the population, is "balanced."  FCC 23-112 at 22 ¶ 38, Attachment 000022.  In any event, the LPPA has an explicit 95,000 TV household service standard and does not authorize an NAB promoted, massively uneven, 98-to-2 balance.

### B.  Unconstitutional Regulation Of Local Economic Activity
#### i.  Insubstantial Effect Upon Interstate Commerce

The Commission misinterprets the LPPA in an unconstitutional manner, assuming a grant of it authority to regulate local economic activity in a "smattering of rural, local areas" covering less than 2% of the nation's population without any demonstration of a substantial effect upon interstate commerce. "Nothing in the Communications Act or the LPPA authorizes the Commission to regulate local economies."  RCC Comments at 6-8 & n.11, Attachment 000073-75.  The Commission's function under Section 307(b) and the LPPA is licensing radio stations across the nation, not regulating economic activity in several local communities.

The LPPA is the second statute enacted to protect the LPTV industry, the CBPA being the first, but which the Commission interprets to eliminate competition to full

power TV stations.  RCC Comments at 3-4 & n.5, 6-7, 11, 13-14, Attachment 000048-49, 000051-52, 000056, 000058-59.  FCC 23-112 at 21-22 ¶ 38, Attachment 000021-22, explicitly acknowledges a competition limiting purpose:  "elevating LPTV stations from secondary to primary Class A status 'comes at the cost of effectively block[ing] coverage and service improvements by full-service stations.'"

FCC 23-112's unreasonably limited LPPA reading causes FCC 23-112 to fail as a matter of settled constitutional law.

> The Commerce Clause authorizes Congress to regulate commerce "among" the states, i.e., interstate commerce.  U.S. Const. Art. 1 Sec. 8 Cl. 3.  Congress is not authorized to regulate local economic activity unless Congress makes a finding that regulation of that local economic activity has a "substantial" effect upon interstate commerce.

RCC Reply at 6-7, Attachment 000073-74, citing *United States v. Lopez*, 514 U.S. 549, 557 (1995) (invalidating the Gun-Free School Zones Act of 1990 for lack of a substantial effect upon interstate commerce); *Wickard v. Filburn*, 317 U.S. 111, 127-28 (1942) (Congressional finding that an aggregation of local activity substantially affects interstate commerce authorizes federal regulation of same); *Miss. Comm'n on Envtl. Quality v. EPA*, 790 F.3d 138, 180 (CADC 2015)  ("The question for a court is whether there was a 'rational basis' for the Congress' conclusion that a regulated activity substantially affects interstate commerce.").  The Commission asserts that its reading of the LPPA is neither unconstitutional nor "nonsensical," FCC 23-112 at 21 ¶ 38, Attachment 000021 (citing RCC's Comments), but *Lopez* or *Wickard* are not

18

even cited in FCC 23-112, much less discussed.  FCC 23-112's LPPA reading is unreasoned and unconstitutional.[11]

FCC 23-112 denies the LPPA's economic and program content benefits to more than 98% of the country's population, but fails to explain how that limited approach serves a national purpose or substantially affects interstate commerce.  FCC 23-112's limited extension of the LPPA's economic benefits to several scattered, small communities, affecting less than 2% of the population, is not supported by Congressional findings that the restriction of benefits rises to a "substantial effect" upon interstate commerce.  Even if FCC 23-112 could fill that fact-finding void, doubtful because the fact-finding needs to be done prior to statutory enactment, FCC 23-112 is utterly silent on the subject.[12]

---

[11]  47 U.S.C. § 307(b) mandates broadcast licensing for specific communities based upon need and "equitably" distributed across the nation.  RCC Comments at 6-9, Attachment 000051-54.

[12]  FCC 23-112 completely ignores RCC's discussion of this issue.  For instance,

The Commission's proposal to apply the LPPA, a national act, in a manner which protects LPTV stations covering only 1.6% of the nation's TV households, is ridiculous on its face. There is nothing in FCC [23-112] which even remotely explains why Congress would waste its time for the purpose of affecting such a marginal impact.

RCC Comments at ii, 5-6, Attachment 000045, 000050-51; RCC Reply at 6-8, Attachment 000073-75.

The FCC's LPPA reading "violates the plain language and express purpose of the LPPA which, on its face, protects LPTV stations such as W24EZ-D which are licensed to serve small communities."  RCC Comments at ii, 6 & n.8, 7, Attachment 000045, 000051, 000052.  FCC 23-112 fails to address the fact that "the LPPA is 'Low Power Protection Act,' not the 'Large Power Protection Act,' [] FCC [23-112] reads as if Congress intended to protect full-power TV from competition across substantially all of the United States." RCC Comments at 6, Attachment 000051.

"Reducing competition and increasing media concentration is contrary to the LPPA's expressly stated LPTV protection purpose."  RCC Comments at 14, Attachment 000059.  "FCC 23-23 represents the Commission's second effort to eliminate LPTV stations as competitors to full-power TV stations across the country." RCC Comments at 4, 6, 10 n.5, 11, 13-14, Attachment 000049, 000051, 000055, 000056, 000058-59, RCC Reply at 12-13, Attachment 000079-80.  RCC lost **two** LPTV stations because the Commission did not protect them under the CBPA.

Instead of protecting LPTV stations, FCC 23-112 adopts NAB's anti-competitive position that LPTV protection "comes at the cost of 'effectively block[ing] coverage and service improvements by full-service stations.'"  FCC 23-112 at 21-22 ¶ 38, Attachment 000021-22.  "By interpreting the LPPA as it does, FCC [23-112] reaches an absurd and irrational conclusion:  that the purpose of the Low Power Protection Act is to protect full-power TV stations covering 98% of the TV households

from competition at the expense of LPTV stations." RCC Comments at 1 ("irrational"), 6 ("nonsensical"), 11 ("absurd and irrational"), Attachment 000046, 000051, 000056. FCC 23-112 fails to apply an elementary rule of statutory construction, "statutes are to be read in a manner that avoids absurd results."  FCC 23-112 at 15 n.118, Attachment 000015.  The Commission's failure to foster broadcast competition and the diversity of voices across the United States violates LPPA and Section 307(b) mandates to allocate frequencies "among the several States and communities as to provide a fair, efficient, and equitable distribution of radio service to each of the same."

### ii. Constitutional LPPA Reading And § 307(b)'s Nationwide Class A Licensing Mandate

Neither the LPPA nor the CBPA direct the Commission to ignore Section 307(b)'s nationwide license distribution requirement.  LPPA Section 2(a)(2) authorizes nationwide Class A licensing through the use of Nielsen's Designated Market Area (DMA) system or through an equivalent nationwide "local markets" system which the Commission might develop.  The DMA definition at Section (2)(a)(2) of the LPPA, Attachment 000040, does not contain any limitation regarding size and plainly includes all DMAs regardless of the number of DMA TV households, thus mandating nationwide Class A licensing.  RCC Comments at 9-11, Attachment 000054-56.

Instead of following that clear direction, FCC 23-112 creates a non-nationwide Class A licensing system which affects LPTV stations covering less than 2% of the

country's population.  FCC 23-112 completely fails to discuss the fact that broadcast licenses are allocated on a nationwide basis under Section 307(b).  RCC Reply at 4, Attachment 000071.[13]

RCC's LPPA reading, on the other hand, is reasonable and accounts for all statutory requirements.  LPPA's § 2(c)(2)(B) Class A qualifying text, Attachment 000041, provides:

> The Commission may approve an application submitted under subparagraph (A) if the low power TV station submitting the application *** as of the date of enactment of this Act, operates in a Designated Market Area with not more than 95,000 television households.

The subject of § 2(c)(2)(B)'s Class A qualifying language is "the low power TV station submitting the" Class A license application while the "95,000 television households" standard at § 2(c)(2)(B)(iii) refers to the number of TV households served in the qualifying LPTV station's § 307(b) community of license.  RCC literally operates in a DMA and is licensed to serve an area of "not more than 95,000 television households."  The "95,000 television household" standard is "not a disconnected appendage of the 'Designated Market Area' definition found at Section (2)(a)(2)."  RCC Comments at 11, Attachment 000056.

_____

[13] Citing *Report and Order, In the Matter of The Suburban Community Policy, the Berwick Doctrine, and the De Facto Reallocation Policy*, 93 F.C.C.2d 436, 438-39 (1983) (eliminating a community's urban proximity as a licensing consideration to enable small community LPTV licensees to "compete in the larger metropolitan area." 93 F.C.C.2d at 451 ¶ 31, 452 n.29.

If FCC 23-112's LPPA reading were the only one possible, then the LPPA would be facially unconstitutional.  *Lopez*; *Wickard*; RCC Comments at 18-19, Attachment 000063-64; RCC Reply at 6-8, Attachment 000073-75.  RCC's reading of the 95,000 TV household standard as defining the number of TV households in Section 307(b) communities of license:  1) avoids constitutional issues; 2) serves the LPPA's purpose of protecting LPTV stations nationwide; 3) serves Section 307(b)'s nationwide licensing mandate; 4) complies with the elimination of the *de facto* reallocation policy to promote competition against full power TV stations; and 5) follows the longstanding combined use of Section 307(b) community of license and DMA to determine where must-carry rights can be asserted.  RCC Comments at 3-4, 6, 8 n.12, 9-11, 18-19, Attachment 000048-49, 000051, 000053, 000054-56, 000063-64; RCC Reply at 6-7 & n.11, Attachment 000073-74. The Commission's LPPA reading does not serve any of these statutory purposes.

## C.  Unconstitutional Delegation Of Governmental Authority

"There is nothing in the LPPA which indicates that Congress intended to alter the longstanding Section 307(b) community of license allocation system." RCC Comments at 8, Attachment 000053.  "Congress did not order the Commission to cede its Section 307(b) licensing authority to a private company which creates artificial economic regions designed to serve its own profit motive."  RCC Comments at  18, Attachment 000063; RCC Reply at 4, Attachment 000071.

23

Nevertheless, FCC 23-112 ignores Section 307(b) and "adopts a DMA market structure which is unconstitutional under *Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) because the rule improperly delegates legislative authority to a private, non-governmental entity."  RCC Comments at 4 n.6, Attachment 000049.

> The Commission's proposed regulatory scheme, spawned in the name of protecting the LPTV industry, ignores the plain language of the LPPA, conflicts with Section 307(b) of the Communications Act, 47 U.S.C. § 307(b), and runs afoul of the Constitution by adopting an industrial code, the Nielsen DMA market structure, thereby improperly delegating legislative power to private industry.

RCC Comments at 4, Attachment 000049.[14]

FCC 23-112 at 23 n.186 rejects this constitutional, government structure question with a terse, non-substantive response which reads in its entirety as follows:

> We reject this argument. Congress does not run afoul of subdelegation principles because it permits an agency to use an outside entity's market definition for a particular purpose specified in the statute. There is no assignment of unguided or unchecked authority here.

FCC 23-112 fails to discuss *Schechter*, tries to insulate FCC 23-112 by blaming Congress for the non-nationwide Class A licensing rules the Commission adopted, and

> completely fails to explain why Allingtown, CT is not considered a qualified DMA for licensing under the LPPA, or what the underlying rules are for determining the composition of DMA areas, or how Allingtown or any LPTV

---

[14]  FCC 23-112 touts the fact that Nielsen "has 'always told stations the DMAs to which they have been assigned upon request and free of charge,'" FCC 23-112 at 21 n.168, Attachment 000021, but everyone must subscribe to the Commission-Nielsen subscription scheme to ascertain the DMA market structure.  FCC 23-112 at 17 n.133, Attachment 000017 (directing interested persons to Nielsen's subscription service).

licensee in a Section 307(b) community might seek to qualify for protection under the LPPA, or what circumstances might exist in a Section 307(b) community of license which would warrant a waiver, or whether and how the Commission should regulate Nielsen Media Research's decision making regarding DMA composition. *Schechter Poultry Corp. v. U.S.*, 295 U.S. 495, 537-38 (1935) (Congress cannot delegate unfettered legislative power and private parties cannot exercise any legislative power).

RCC Comments at 5, Attachment 000050. FCC 23-112 misuses Nielsen's unregulated, monopoly DMA market structure to deny Class A licensing.

### D. Unconstitutional Class A Program Content Eligibility Rule

FCC 23-112 unreasonably limits the LPPA's economic and viewpoint diversity benefits by imposing Class A eligibility rules which violate the First Amendment. FCC 23-112 applies a disqualifying program importation rule which on its face violates the First Amendment by restricting a Class A applicant's program content and editorial choices. The restrictive rule can lead to absurd results such as news and political programming is unqualified, but broadcasting bird feeder programs for cats from the LPTV studio's backdoor is qualifying. The net result of the Commission's content restriction is a loss of public affairs and news programming, although the broadcaster properly remains free to program for cats. RCC Reply at 10-14, Attachment 000077-81. *Syracuse Peace Council v. FCC*, 867 F.2d 654, 684 (CADC 1989), *cert. denied*, 493 U.S. 1019 (1990) ("regulatory schemes that tread unnecessarily on the editorial discretion of broadcasters contravene the First Amendment").

FCC 23-112 also violates the First Amendment by unevenly applying the program importation restriction where some imported programs are considered "local," but only for multiple LPTV station owners.  FCC 23-112 at 9 ¶ 19, Attachment 000009.  "Control over program selection is a core First Amendment right of broadcasters" and "other interpretations intrude upon Class A licensee's protected First Amendment content and editorial rights." RCC Reply at 10-13, Attachment 000077-80.  By selecting programming, and preparing it for broadcast, a LPTV licensee produces programming for its § 307(b) community of license: if not for the LPTV's program production, the programming would not be available in the community of license.

A program created in California, but aired in Connecticut, cannot be considered local to Connecticut merely because the LPTV licensee has LPTV licenses in both California and Connecticut.  The critical First Amendment factor is the licensee's determination that the programming meets the needs of its § 307(b) community of license.  The Commission's determination that RCC's programming selection does not qualify as locally produced ignores RCC's constitutionally protected right to select programming, ignores the fact that RCC produces the selected programming locally within its Section 307(b) community of license because it controls "the program source,

as it reaches the transmitter site,"[15] and unreasonably discriminates among Class A applicants based upon the number and location of their LPTV licenses.

### E.  Unlawful Denial Of Primary Class A Must-Carry

Another example of the Commission's unreasonable minimization of the LPPA's economic benefits to LPTV stations is the denial of Class A must-carry rights.  FCC 23-112 at 27-28 ¶ 53, Attachment 000027-28.  FCC 23-112 finds that "it is unlikely that Congress intended to grant Class A stations full must carry rights, equivalent to those of full-service stations, without addressing the issue directly."  However, FCC 23-112 completely ignores the facts that 1) LPPA Sections 2(b) and 2(c)(3)(A) explicitly classify Class A as "primary" broadcast stations; 2) Class A stations are "subject to the same license terms and renewal standards as a license for a full power television station" unless expressly limited by the LPPA; and 3) the 47 C.F.R. § 76.55 must-carry rule does not include Class A licenses in the list of station classes which cannot assert must-carry rights.  FCC 23-112 at 3 ¶ 8, 4-5 n.26, Attachment 000003-05; RCC Comments at ii, 2 n.4, 4 n.5, 6 n.8, 8, 15, 17 n.22, Attachment 000045, 000047, 000049, 000051, 000053, 000060, 000062; RCC Reply at 3-5, 8-10, Attachment 000070-72, 000075-77.

---

[15]  RCC Comments at 2 n.3, Attachment 000047; RCC Reply at 10-12, Attachment 000077-79, citing FCC 23-23 n.44 (the underlying Notice of Proposed Rulemaking); 47 C.F.R. § 74.701(h), Attachment 000085.

FCC 23-112 treats primary Class A differently compared full power licenses for must-carry purposes in violation of the LPPA's plain text. The LPPA does not contain any explicit limitation on Class A must-carry rights.

Longstanding Commission rule classifies LPTV stations which are upgraded to Class A status as "local commercial television stations," a station class which has must-carry rights, rather than as LPTV stations which cannot assert must-carry rights. 47 C.F.R. §§ 76.55(c)(1),(d)(5); RCC Comments at ii, 2 n.4, 8-9 & n.12, 14-16 & n.21, Attachment 000045, 000047, 000053-54, 000059-61 ("A Class A television station is a different class of station compared to a LPTV station."); RCC Reply at 10, Attachment 000077. FCC 23-112 also ignores the fact that "for more than thirty years the Section 307(b) community of license has been the critical determinant of must-carry rights under 47 C.F.R. §§ 76.55(c),(d), * * * but FCC [23-112] changes course in direct contradiction of Section 76.55 without discussion." RCC Comments at 8 n.12, Attachment 000053.

Further, Class A stations are "subject to the same license terms and renewal standards as a license for a full power television broadcast station, except as otherwise **expressly** provided in this subsection." RCC Reply at 10, Attachment 000077, citing LPPA Section 2(c)(3)(A) (emphasis in RCC's original comments). The LPPA has no express limitation preventing Class A licensees from asserting the same must-carry

right asserted by the full power TV licensees.  RCC Comments at 14-16, Attachment 000059-61; RCC Reply at 8, Attachment 000075.

Contrary to what FCC 23-112 at 28 ¶ 53, Attachment 000028, asserts, RCC did not ask the Commission "to revise" its must-carry rule.  Rather, RCC pointed out that the Commission's **existing** must-carry rule authorizes Class A TV stations to assert must-carry, but the rule was misapplied by the cable TV industry which ignored the fact that qualifying LPTV stations are "upgraded and reclassified as 'Class A' protected stations" and are no longer classified as LPTV stations which cannot assert must-carry.  RCC Comments at 2-3, 14-16, Attachment 000047-48, 000059-61.  RCC sought clarification in MB Docket 23-126 that the Commission's existing rules plainly authorize Class A stations to assert must-carry rights.  FCC 23-112 fails to address RCC's must-carry argument.

It has been nearly 25 years after the passage of the CBPA and Section 76.55 has never been amended to include primary Class A stations in the list of TV stations which are unable to assert must-carry rights.[16]  Indeed, the Commission failed to amend the Section 76.55 must-carry rule in FCC 23-112 even after RCC brought to the Commission's attention that its existing rule does not include Class A stations in the

---

[16]  The Commission adopted Section 76.55 in 1993, *Implementation of the Cable Television Consumer Protection and Competition Act of 1992, Broadcast Signal Carriage Issues*, *Report and Order*, 8 FCC Rcd 2965, 2983 (1993), six years before the CBPA created Class A TV licenses.

barred station class list.  Decades old Section 76.55 directly contradicts FCC 23-112's assertion that primary Class A stations cannot assert must-carry rights.  The Commission completely ignored this information.  RCC Comments at ii, 2 & n.4, 8 n.12, 14-16, 17 n.22, Attachment 000045, 000047, 000053, 000059-61, 000062; RCC Reply at 8, Attachment 000075.[17]

### 7.  Reopening Doctrine:  The CBPA And Must-Carry Rulemakings

The Commission relies heavily upon the reasoning of the 2000 CBPA rulemaking to support its actions in FCC 23-112, referring to the "CBPA" at least fifty-two times.  *See e.g.* FCC 23-112 at 6 ¶ 12, Attachment 000006 ("we find no reason to deviate from these prior determinations"), 7 ¶ 14, Attachment 000007 ("the LPPA does not expressly require that the locally produced content aired by a low power station be produced by that station itself  *** under the CBPA the Commission specifically found that TV translator stations were not eligible for Class A status"), 9 ¶ 18, Attachment 000009 ("the LPPA sets forth eligibility criteria for stations seeking Class A designation that are similar to the eligibility criteria under the CBPA").  Moreover, FCC 23-112 references "must-carry" or "must carry" at least twenty-one times.  *See e.g.* FCC 23-112 at 5 ¶ 10, Attachment 000005 (declining "to amend our rules . . .  to give LPPA Class A stations must carry rights equivalent to full service stations").

---

[17]   The Commission cannot prohibit something which is permitted by its rules.  *Reuters, Ltd. v. FCC*, 781 F.2d 946, 950 (CADC 1986) ("it is elementary that an agency must adhere to its own rules and regulations").

FCC 23-112 substantially justifies its existence based upon the Commission's prior adjudication of the CBPA Class A and "must-carry" issues, therefore, examination of those rulemakings is appropriate in this review proceeding under the "reopening doctrine." *CTIA - The Wireless Ass'n v. FCC*, 466 F.3d 105, 110-11 (CADC 2006) (reopening is appropriate "when the later proceeding explicitly or implicitly shows that the agency actually reconsidered the rule, the matter has been reopened and the time period for seeking judicial review begins anew").

**In The Event Another Party Seeks Commission Reconsideration**

RCC cannot file a Class A upgrade application per the terms of FCC 23-112, but the one year Class A upgrade application filing period will soon commence. In the event that another party seeks Commission reconsideration of FCC 23-112, the Court should not hold this case in abeyance should the Commission seek such relief and this case should proceed on an expedited basis. RCC Comments at 12-13, 16-18, Attachment 000057-58, 000061-63 (RCC would be injured by license displacement); RCC Reply at 8-10, Attachment 000075-77 ("The LPPA's necessarily implied full-power modification filing freeze remains effective until after final resolution of the instant rulemaking proceeding and the associated LPTV license upgrade proceedings"). To the best of undersigned counsel's knowledge, no rulemaking participant made legal arguments similar to RCC's and resources are not wasted by proceeding with this review. *MCI Telecomms. Corp. v. FCC*, 143 F.3d 606, 608 (D.C. Cir. 1998)

(prudential considerations govern whether appellate review is halted where another party seeks Commission reconsideration).

Should this review proceeding be halted because another party timely seeks Commission reconsideration, FCC 23-112 should be stayed so that RCC is not injured by full power licensing action taken before conclusion of appellate review. Undersigned counsel's experience is that reconsideration can take years to conclude and stay is essential to protect the status quo of the licensing environment.

## Requested Relief

FCC 23-112 is grounded in NAB's anti-competitive lobbying point that the LPPA does not protect LPTV licenses or primary Class A licenses because protection "comes at the cost of 'effectively block[ing] coverage and service improvements by full-service stations.'" RCC seeks determinations that: 1) stay, expedited review and summary Reversal, are warranted; 2) FCC 23-112 is unlawful; 3) RCC's Section 307(b) community of license, not its current DMA, controls for LPPA Class A licensing purposes; 4) RCC qualifies for the LPPA's economic benefits because RCC's § 307(b) community of license has fewer than 95,000 TV households, 5) RCC's program content cannot be used to deny Class A licensing; and 6) primary Class A licenses have the same license terms as full power licenses and upon Class A licensing RCC may assert must-carry.

Respectfully submitted,

January 23, 2024                    /S/ _____

Timothy E. Welch, Esq.
Attorney for Petitioner
Hill and Welch
1116 Heartfields Drive
Silver Spring, MD 20904
welchlaw@earthlink.net
(202) 321-1448
(301) 622-2864 (FAX)

## Certificate of Compliance

I certify that this Petitioner's Opposed Emergency Motion For Stay, Expedited Review, And Summary Reversal is proportionally spaced using 14 point Times New Roman typeface and, in compliance with the 7,800 combined dispositive and procedural motion word limit found at Circuit Rule 18(b) and Appendix of Forms for the Federal Rules of Appellate Procedure, contains 7,682 words, excluding those items listed at F.R.A.P. 32(f) and Circuit Rule 32(e)(1), as counted by WordPerfect 2021 Ver. 21.0.0.194. I certify that the information on this form is true and correct to the best of my knowledge and belief.

/S/ _____

Timothy E. Welch
Counsel to Radio Communications Corporation

January 23, 2024

**Certificate of Digital Submission and Privacy Redactions**


Petitioner's Opposed Emergency Motion For Stay, Expedited Review, And Summary Reversal and the Attachments have been scanned for viruses with the most recent version of a commercial virus scanning program (McAfee Antivirus Version 1.1.2569, last updated January 23, 2024) and is free of viruses.  In addition,  I certify that all required privacy redactions have been made.


/S/ _____

Timothy E. Welch
Counsel to Radio Communications Corporation


January 23, 2024

**Circuit Rule 28(a)(1) Certificate as to Parties, Rulings, and Related Cases**

**Parties and Amici:** The following parties entered comments in the rulemaking underlying FCC 23-112:

Block Communications, Inc. (Block) Communications Technologies
County of Los Angeles, California
Dockins Communications, Inc. (Dockins)
Flood Communications (Flood)
Channel 23 WXWZ, JB Media Group
Jose Berrios Diaz (JB Media Group)
Lockwood Broadcasting, Inc. (Lockwood)
LPTV Broadcasters Association (LPTVBA)

National Association of Broadcasters (NAB)
News-Press & Gazette Broadcasting (NPG)
One Ministries, Inc.
Radio Communications Corporation LPTV Station W24EZ-D Formerly Class A Station W28AJ (RCC)
REC Networks (REC)

KFLA-LD; Data Wave, LLC; M&C Broadcasting Corporation – WCEA-LD; The Videohouse Inc.; ATV Holdings, Inc.; G.I.G., Inc.; Michael Karr; Caribevision Holdings; Tycke Media, LLC; America CV Station Group, Inc.; Viper Communications, Inc.; Lowcountry 34 Media, LLC; Paramount Broadcasting Communication LLC; Look Media; Lawrence F. Loesch; Agape Broadcasters Inc; Richardson Broadcasting; King Forward Inc; KADO/Word of Life Ministries, Inc; Dockins Broadcast Group (collectively referred to as "Identical Comments" in FCC 23-112)

**Rulings Under Review:** FCC 23-112 released December 12, 2023, 89 Fed. Reg. 1466 (January 10, 2024), Attachment 000001.

**Related Cases:** There are no related cases.

/S/ _Timothy E. Welch_

Timothy E. Welch
Counsel to Radio Communications Corporation

January 23, 2024

**Circuit Rule 26.1 Disclosure Statement**


      RCC is a closely held, family-owned telecommunications and media company with a principal business office located in West Haven, Connecticut.  RCC has no publicly held owners or parent. RCC and its principals do not own or control, nor are they owned or controlled by, any publicly owned company.  All principals are U.S. Citizens.

/S/_____

    Timothy E. Welch
    Counsel to Radio Communications Corporation


January 23, 2024

### Certificate Of Service

I hereby certify that pursuant to F.R.A.P. 25(d) and Circuit Rule 25(f) and 27(a) the Clerk of the Court will serve a copy of the foregoing Petitioner's Opposed Emergency Motion For Stay, Expedited Review, And Summary Reversal by email using the CM/ECF System upon the following:

\*Adam Sorensen
Sarah E. Citrin
General Counsel's Office
Federal Communications Commission
445 12th Street, S.W.
Washington, D.C.  20554

\*Robert B. Nicholson
Alice A. Wang
Antitrust Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W., Room 3224
Washington, DC 20530-0001

There are no other parties which require service in this proceeding.  Pursuant to F.R.A.P. 25 and Circuit Rule 25 undersigned counsel certifies that he has served the above listed Respondents via email.

\*\*Rick Kaplan, Patrick McFadden
Alison Neplokh, Robert Weller
National Association of Broadcasters
1 M Street SE
Washington, DC 20003

\*Courtesy service by undersigned counsel's email.
\*\*Courtesy service by First Class United States Mail, postage prepaid.

/S/ _Timothy E. Welch_

Timothy E. Welch
January 23, 2024

# Attachments

1) *Report and* Order FCC 23-112, Released December 12, 2023 . . . . . . . . . 000001
2) Low Power Protection Act, Pub. L. 117-344, 136 Stat. 6193 (2023) . . . . 000040
3) RCC Comments MB Docket No. 23-126 Filed May 4, 2023 . . . . . . . . . . 000043
4) RCC Reply MB Docket No. 23-126 Filed June 13, 2023 . . . . . . . . . . . . 000065
5) 47 C.F.R. § 76.55 Definitions Applicable To The Must-Carry Rules . . . . 000082
6) 47 C.F.R. § 74.701(h) Definitions – Local Origination . . . . . . . . . . . . . . 000085
7) *Public Notice*, DA 24-26, MB Docket 23-126, January 10, 2024 . . . . . . 000087
8) 47 U.S.C. § 307 Licenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 000089

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Implementation of the Low Power Protection Act | ) | MB Docket No. 23-126 |
| | ) | |

**REPORT AND ORDER**

**Adopted: December 11, 2023**                    **Released: December 12, 2023**

By the Commission:

**TABLE OF CONTENTS**

Heading                                                                                   Paragraph #

I.   INTRODUCTION ................................................................................................................ 1
II.  BACKGROUND .................................................................................................................. 2
     A.  Low Power Television Service .................................................................................... 2
     B.  Class A Television Stations ......................................................................................... 4
     C.  Low Power Protection Act ........................................................................................... 7
III. DISCUSSION ..................................................................................................................... 10
     A.  Application Period ....................................................................................................... 11
     B.  Eligibility Requirements ............................................................................................. 13
         1.  Definition of Low Power TV Station ................................................................... 13
         2.  Eligibility Criteria ................................................................................................ 18
         3.  Interference Requirements ................................................................................... 29
         4.  Designated Market Area ...................................................................................... 33
         5.  License Standards (Ongoing Eligibility Requirements) ...................................... 41
     C.  Application Process ..................................................................................................... 46
     D.  TV Broadcast Incentive Auction, Post-Auction Transition, and Reimbursement ...... 49
     E.  Digital Equity and Inclusion ....................................................................................... 50
     F.  Other Issues ................................................................................................................ 52
IV.  PROCEDURAL MATTERS .............................................................................................. 57
V.   ORDERING CLAUSES ..................................................................................................... 60
Appendix A – List of Commenters
Appendix B – Final Rules
Appendix C – Final Regulatory Flexibility Act Analysis

## I.    INTRODUCTION

1.      In this *Report and Order*, we adopt rules to implement the Low Power Protection Act (LPPA or Act),[1] which was enacted on January 5, 2023.  The LPPA provides certain low power television (LPTV) stations with a limited window of opportunity to apply for primary spectrum use status as Class A television stations.[2]  With limited exceptions, the rules adopted herein are consistent with the

---

[1] Low Power Protection Act, Pub. L. 117-344, 136 Stat. 6193 (2023).

[2] LPPA Sec.2(b).

Commission's proposals in the *Notice of Proposed Rulemaking* (*NPRM*)[3] in this proceeding.  In this Order, we further the implementation of the LPPA by establishing the period during which eligible stations may file applications for Class A status, eligibility and interference requirements, and the process for submitting applications.

## II.    BACKGROUND

### A.    Low Power Television Service

2.          The Commission created the LPTV service in 1982 to bring television service, including local service, to viewers "otherwise unserved or underserved" by existing full power service providers.[4] From its creation, the LPTV service has been a secondary service, meaning LPTV stations may not cause interference to, and must accept interference from, full power television stations as well as certain land mobile radio operations and other primary services.[5]

3.          Currently, there are 1,889 licensed LPTV stations.[6]  These stations operate in all states and territories, and serve both rural and urban audiences.[7]  LPTV stations were required to complete a transition from analog to digital operation in 2021, and all such stations must now operate in digital format.[8]  As the name suggests, LPTV stations have lower authorized power levels than full power television stations.[9]  Because they operate at reduced power levels, LPTV stations serve a much smaller geographic region than full power stations and can be fit into areas where a higher power station cannot be accommodated in the Table of TV Allotments.[10]

---

[3] *See Implementation of the Low Power Protection Act*, MB Docket No. 23-126, Notice of Proposed Rulemaking, FCC 23-23 (rel. March 30, 2023) (*NPRM*).

[4] *Inquiry Into the Future Role of Low Power Television Broadcasting and Television Translators in the National Telecommunications System*, BC Docket No. 78-253, Notice of Proposed Rulemaking, 82 F.C.C.2d 47, para. 1 (1980) (*LPTV NPRM*); *Low Power Television Service*, Report and Order, 51 R.R.2d 476 (1982) (*LPTV Order*), *recon. granted in part*, 48 Fed. Reg. 21478 (1983).  The low power television service consists of LPTV and TV translator stations.  LPTV and TV translator stations differ only in the amount of programming they may originate. LPTV stations are not limited in the amount of programming they may originate.  TV translators may originate only emergency warnings of imminent danger no longer or more frequent than necessary to protect life and property and, in addition, not more than thirty seconds per hour of public service announcements and material seeking and acknowledging financial support necessary to the continued operation of the station.  *See* 47 CFR § 74.790 (Permissible service of TV translator and LPTV stations).

[5] *LPTV Order*, 51 R.R.2d at para. 17.  As a result of their secondary status, LPTV stations can also be displaced by full power stations that seek to expand their service area, or by new full power stations seeking to enter the same area as an LPTV station.

[6] *See Broadcast Station Totals as of September 30, 2023*, Public Notice, DA 23-921 (rel. Oct. 3, 2023), available at https://docs.fcc.gov/public/attachments/DA-23-921A1.pdf (http://fcc.gov).

[7] *See Establishment of a Class A Television Service*, MM Docket No. 00-10, Report and Order, 15 FCC Rcd 6355, 6357-58, para. 2 (2000) (*Class A Order*), *recon. granted in part*, 16 FCC Rcd 8244 (2001) (*Class A MO&O*).

[8] LPTV stations were required to complete their digital transition as of July 13, 2021.  *See Media Bureau Reminds Low Power Television and Television Translator Stations of July 13, 2021, Digital Transition Date*, Public Notice, 36 FCC Rcd 4771 (MB 2021).

[9] *See* 47 CFR §§ 74.735(a), 73.622(a)(1); *Class A Order*, 15 FCC Rcd at 6357, n.4; *NPRM* at n.8 (noting that LPTV signals typically extend approximately 20 to 40 miles from a station's transmission site, while the signals of full power stations can reach as far as 60 to 80 miles).

[10] Unlike full power stations, LPTV stations are not restricted to operating on a channel specified in a table of allotments.

000002
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

### B.    Class A Television Stations

4.      In 2000, the Commission established a Class A television service[11] to implement the Community Broadcasters Protection Act of 1999 (CBPA).[12]  The CBPA allowed certain qualifying LPTV stations to become Class A stations, which provided those television stations primary status, and thereby a measure of interference protection from full service television stations.[13]

5.      Congress sought in the CBPA to provide certain LPTV stations a limited window of opportunity to apply for primary status.  Among other matters, the CBPA set out certain certification and application procedures for LPTV licensees seeking Class A designation and prescribed the criteria for eligibility for a Class A license.  Specifically, under the CBPA, an LPTV station could qualify for Class A status if, during the 90 days preceding the date of enactment of the statute, the station: (1) broadcast a minimum of 18 hours per day; (2) broadcast an average of at least 3 hours per week of programming produced within the market area served by the station, or the market area served by a group of commonly controlled low-power stations that carry common local programming produced within the market area served by such group; and (3) was in compliance with the Commission's requirements for LPTV stations.[14]  In addition, the CBPA required that, from and after the date of its application for a Class A license, the station must be in compliance with the Commission's operating rules for full power television stations.[15]  As directed by the CBPA, within 60 days of the date of enactment of the CBPA, stations seeking Class A status were required to submit to the Commission a certification of eligibility based on the applicable qualification requirements.[16]

6.      In addition to these qualifying requirements, the CBPA gave the Commission discretion to determine that the public interest, convenience, and necessity would be served by treating a station as a qualifying LPTV station under the CBPA, or that a station should be considered to qualify for such status for other reasons determined by the Commission, even if it did not meet the qualifying requirements in the statute discussed above.[17]  In implementing the CBPA, the Commission concluded, however, that it would not accept applications under the CBPA from LPTV stations that did not meet the statutory criteria and that did not file a certification of eligibility by the statutory deadline, absent compelling circumstances.[18]

### C.    Low Power Protection Act

7.      Like the CBPA, the LPPA is intended "to provide low power TV stations with a limited window of opportunity" to apply for primary status as a Class A television licensee.[19]  The Act gives

---

[11] *See Class A Order*, 15 FCC Rcd 6355.

[12] Community Broadcasters Protection Act of 1999, Pub. L. No. 106-113, 113 Stat. Appendix I at pp. 1501A-594 - 1501A-598 (1999), *codified at* 47 U.S.C. § 336(f).

[13] *See Class A Order*, 15 FCC Rcd 6355, para. 1.

[14] 47 U.S.C. § 336(f)(2)(A)(i).

[15] 47 U.S.C. § 336(f)(2)(A)(ii).

[16] 47 U.S.C. § 336(f)(1)(B).  In addition, the Commission required LPTV licensees seeking Class A designation to submit an application to the Commission within 6 months after the effective date of the rules adopted in the Class A proceeding.  *See Class A Order*, 15 FCC Rcd at 6362, paras. 13-14.

[17] 47 U.S.C. § 336(f)(2)(B).

[18] *See Class A Order*, 15 FCC Rcd at 6361, para. 11.

[19] LPPA Sec.2(b).

000003
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

LPTV stations one year to apply for a Class A license, from the date that the Commission's rules implementing the LPPA become effective.[20]

8.    The LPPA sets forth eligibility criteria for stations seeking Class A designation that are similar to the eligibility criteria under the CBPA, as discussed above.  Specifically, the LPPA provides that the Commission "may approve" an application submitted by an LPTV station if the station meets the following eligibility criteria:

- during the 90-day period preceding the date of enactment of the LPPA (i.e., between October 7, 2022 and January 5, 2023), the station satisfied the same requirements applicable to stations that qualified for Class A status under the CBPA, "including the requirements…with respect to locally produced programming;"[21]

- the station satisfies the Class A service requirements in 47 CFR § 73.6001(b)-(d) or any successor regulation;[22]

- the station demonstrates that it will not cause any interference as described in the CBPA;[23]

- during that same 90-day period, the station complied with the Commission's requirements for LPTV stations;[24] and

- as of January 5, 2023, the station operated in a Designated Market Area with not more than 95,000 television households.[25]

Finally, the LPPA requires that a station accorded Class A status must (1) be subject to the same license terms and renewal standards as a license for a full power television broadcast station (except as otherwise expressly provided in the LPPA) and (2) remain in compliance with the LPPA's eligibility criteria during the term of the station's license.[26]

---

[20] LPPA Sec.2(c)(2)(A).  That provision states: "The rule with respect to which the Commission is required to issue notice under paragraph (1) shall provide that, during the 1-year period beginning on the date on which that rule takes effect, a low power TV station may apply to the Commission to be accorded primary status as a Class A television licensee under section 73.6001 of title 47, Code of Federal Regulations, or any successor regulation."  LPPA Sec.2(c)(2)(A).

[21] Section 2(c)(2)(B) provides: "(B) Considerations. – The Commission may approve an application submitted under subparagraph (A) if the low power TV station submitting the application (i) satisfies – (I) section 336(f)(2) of the Communications Act of 1934…and the rules issued under that section, including the requirements under such section 336(f)(2) with respect to locally produced programming…."  LPPA Sec.2(c)(2)(B)(i)(I) (citing 47 U.S.C. § 336(f)(2) of the CBPA).

[22] LPPA Sec.2(c)(2)(B)(i)(II).  Sections 73.6001(b)-(d) of our rules set forth service requirements and other rules for Class A stations.

[23] LPPA Sec.2(c)(2)(B)(ii); 47 U.S.C. § 336(f)(7).  *See also* Section III.B.3 *infra* (Eligibility Requirements - Interference Requirements).

[24] LPPA Sec.2(c)(2)(B)(ii).  *See also* 47 U.S.C. § 336(f)(2)(A)(i)(III).

[25] LPPA Sec.2(c)(2)(B)(iii).  The LPPA also requires the Commission "[n]ot later than 1 year after the date of enactment" of the LPPA to "submit to the Committee on Commerce, Science and Transportation of the Senate and the Committee on Energy and Commerce of the House of Representatives a report regarding the implementation" of the LPPA including: "(1) a list of the current, as of the date on which the report is submitted, licensees that have been accorded primary status as Class A television licensees; and (2) of the licensees described in paragraph (1), an identification of each such licensee that has been accorded the status described in that paragraph because of the implementation" of the LPPA.  LPPA Sec.2(d).

[26] LPPA Sec.2(c)(3).  Section 2(c)(3) in its entirety provides: "Applicability of License – A license that accords primary status as a Class A television licensee to a low power TV station as a result of the [rules adopted to

(continued….)

000004
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

9.    On March 29, 2023, the Commission adopted the *NPRM*, which sought comment on how to implement the window for LPTV stations to apply for primary spectrum use status as Class A television stations, consistent with Congressional direction in the LPPA.[27]  We received over thirty comments in response to the *NPRM*.[28]

## III.    DISCUSSION

10.    The rules and policies we adopt herein to implement the LPPA are largely consistent with the Commission's proposals in the *NPRM*, with one exception.  We adopt the proposals regarding the application period, the definition of a low power TV station and eligibility criteria, applicable interference requirements, and use of the Nielsen Local TV Station Information Report (Local TV Report) to determine the DMA where the LPTV station's transmission facilities are located for purposes of eligibility.  We do not, however, adopt in full the proposal to require that all licensees that convert to Class A status pursuant to the LPPA remain in compliance with the LPPA's DMA eligibility requirement for the term of their Class A license.  Instead, we conclude that LPPA Class A stations will not be required to continue to comply with the 95,000 TV household threshold if the population in the station's DMA later exceeds the threshold amount for specific reasons beyond the station's control.  Finally, we adopt the *NPRM* proposals regarding the process for applying for Class A status pursuant to the LPPA, decline to amend our rules, as requested, to give LPPA Class A stations must carry rights equivalent to full service stations, and decline to adopt a requested *de minimis* exception to the LPPA's DMA eligibility requirement.

### A.    Application Period

11.    For the reasons discussed in the *NPRM* and described below, we adopt the *NPRM's* proposals regarding the application period.  In the *NPRM*, the Commission proposed to provide LPTV stations a period of one year to apply for Class A status under the LPPA.[29]  The Commission also tentatively concluded that the public interest would not be served by providing for conversion to Class A status beyond the one year period contemplated by the LPPA.[30]  The Commission proposed, however, that, similar to its approach in implementing the CPBA, if a potential applicant faces circumstances beyond its control that prevents it from filing by the application deadline, the Commission would examine

---

(Continued from previous page) ————————————

implement the LPPA] shall (A) be subject to the same license terms and renewal standards as a license for a full power television broadcast station, except as otherwise expressly provided in this subsection; and (B) require the low power TV station to remain in compliance with paragraph (2)(B) during the term of the license."

[27] *See generally NPRM*.

[28] A list of the comments and reply comments is attached as Appendix A.  The Identical Comments (identified in Appendix A) support the adoption of Metropolitan Statistical Areas (MSAs) and Rural Statistical Areas (RSAs), as defined by the Office of Management and Budget, as an alternative to Designated Market Areas (DMAs), as defined by Nielsen Media Research, for determining eligibility pursuant to the LPPA.  *See infra* Section III.B.4. (Eligibility Requirements- Designated Market Area).  RCC argues that we should discount the Identical Comments on the ground that they do not provide information "regarding the person or persons directing the filing of [the] common comments."  RCC Reply Comments at 1.  We reject RCC's request.  Each of the identical comments includes the name of the individual signing the comment, and the fact that the comments are identical is not grounds for the Commission to ignore them.  We also reject RCC's argument that we should discount NAB's comments on the ground that "NAB does not claim to represent any LPTV licensees" and its comments "do not protect LPTV interests."  RCC Reply Comments at 3.  A party need not "represent" or seek to "protect" LPTV licensees in order to file comments in this proceeding.  Moreover, NAB's comments set forth its interests in this proceeding.  NAB Comments at 2-4.  We therefore have considered all the comments filed in the docket.

[29] *NPRM* at para. 10.

[30] *Id*. at para. 11.

000005
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

those instances on a case-by-case basis to determine the potential applicant's eligibility for filing.[31]  No commenter addressed these issues.

12.    The LPPA provides LPTV stations a period of one year to apply for Class A status.[32]  The LPPA also provides that the Commission may approve an application for Class A status if the application satisfies section 336(f)(2) of the Communications Act of 1934, as amended (which codifies the CBPA).[33]  This provision sets forth the eligibility criteria for stations qualifying for Class A status,[34] and gives the Commission discretion to determine whether a station that does not satisfy such criteria should otherwise qualify.[35]  In the *Class A Order*, the Commission declined either to expand these eligibility criteria or to allow ongoing conversion to Class A status beyond the 6 month window contemplated in the CBPA.[36]  The Commission reasoned that the basic purpose of the CBPA was to afford existing LPTV stations a window of opportunity to convert to Class A status.[37]  The Commission also determined that the intent of Congress in enacting the CBPA was to establish the rights of a specific, already-existing group of LPTV stations, and that the public interest would not be served by the ongoing conversion of LPTV stations to Class A status under the CBPA in the future.[38]  Absent comment on this issue, we find no reason to deviate from these prior determinations and the tentative conclusions in the *NPRM* that the application window will be limited to the one-year application window specified in the LPPA, but that we will examine on a case-by-case basis a potential applicant's claim that it was prevented from filing by the application deadline due to circumstances beyond its control.

B.    **Eligibility Requirements**

1.    **Definition of Low Power TV Station**

13.    As proposed in the *NPRM*, we apply the Commission's recently updated definition of a "low power TV station" for purposes of determining which stations are eligible for Class A status under the LPPA.[39]  The LPPA provides that the term "low power TV station" has the meaning given the term "digital low power TV station" in section 74.701 of our rules, or any successor regulation.[40]  At the time the LPPA was enacted, section 74.701 contained a definition of the term "digital lower power TV

---

[31] *Id.*

[32] LPPA Sec.2(c)(2)(A).

[33] LPPA Sec.2(c)(2)(B).

[34] 47 U.S.C. § 336(f)(2)(A) (providing that an LPTV station qualifies for Class A status pursuant to the CBPA if "(A)(i) during the 90 days preceding (the date of enactment of the CBPA) – (I) such station broadcast a minimum of 18 hours per day; (II) such station broadcast an average of at least 3 hours per week of programming that was produced within the market area served by such station, or the market area served by a group of commonly-controlled low-power stations that carry common local programming produced within the market area served by such group; and (III) such station was in compliance with the Commission's requirements applicable to low-power television stations; and (ii) from and after the date of its application for a class A license, the station is in compliance with the Commission's operating rules for full-power television stations…").

[35] 47 U.S.C. § 336(f)(2)(B) (providing that a station is a qualifying low-power television station if "(B) the Commission determines that the public interest, convenience, and necessity would be served by treating the station as a qualifying low-power television station for purposes of this section, or for other reasons determined by the Commission").

[36] *See Class A Order*, 15 FCC Rcd at 6361, para. 11.  *See also Class A MO&O*, 16 FCC Rcd at 8250-52, paras. 15-18.

[37] *See Class A Order*, 15 FCC Rcd at 6361, para. 11; *Class A MO&O*, 16 FCC Rcd at 8251-52, para. 18.

[38] *Class A MO&O*, 16 FCC Rcd at 8251-52, para. 18.  *See also NPRM* at para. 11.

[39] *NPRM* at para. 12.

[40] LPPA Sec.2(a)(3).

000006
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

station."  As noted in the *NPRM*, after enactment of the LPPA, the Commission revised that rule to remove references to digital and analog television service, as all LPTV stations have ceased analog operations and there is no longer any need to differentiate between digital and analog in the rules.[41]  In place of the prior section 74.701 definition, section 74.701(k) of our current rules defines a low power TV station as: "[a] station…that may retransmit the programs and signals of a television broadcast station, may originate programming in any amount greater than 30 seconds per hour… and, subject to a minimum video program service requirement, may offer services of an ancillary or supplementary nature, including subscription-based services."[42]  No commenter addressed this proposal.  We will apply this recently updated definition of an LPTV station for purposes of determining which stations are eligible for Class A status under the LPPA.

14.      We adopt the tentative conclusion in the *NPRM* that television translator stations are unlikely to satisfy the eligibility requirements of the LPPA.[43]  As explained in the *NPRM*,[44] translator stations "operate for the purpose of retransmitting the programs and signals of a television broadcast station, without significantly altering any characteristic of the original signal other than its frequency and amplitude,"[45] and thus, are not permitted to "originate programming" as defined in the rules.[46]  While the LPPA does not expressly require that the locally produced content aired by a low power station be produced by that station itself, we noted that translators would be unlikely to qualify under the locally produced programming provisions of the LPPA due to the manner in which translators operate.  Translator stations are generally located outside their primary station's noise limited contour in order to bring service to remote areas.[47]  Thus, while a translator's primary station(s) may be airing programming produced in the primary station's noise limited contour, it is unlikely that programming was locally produced within the noise limited contour of the translator.  In addition, as explained in the *NPRM*, under the CBPA the Commission specifically found that TV translator stations were not eligible for Class A status, and there is no indication that Congress intended to be more inclusive under the LPPA.[48]  The sole

---

[41] The Commission recently revised its rules in Parts 73 and 74, *inter alia*, to eliminate rules that no longer have any practical effect given the completion of the DTV transition as well as the post-incentive auction transition to a smaller television band with fewer channels.  *See Amendment of Part 73 of the Commission's Rules to Update Television and Class A Television Broadcast Station Rules, and Rules Applicable to All Broadcast Stations*, MB Docket No, 22-227, Report and Order, FCC 23-72 (rel. Sept. 19, 2023) (*Part 73 Amendment R&O*); *Amendment of Parts 73 and 74 of the Commission's Rules to Establish Rules for Digital Low Power Television and Television Translator Stations, Update of Parts 74 of the Commission's Rules Related to Low Power Television and Television Translator Stations*, MB Docket Nos. 03-185 and 22-261, Report and Order, FCC 23-25 (rel. Apr. 17, 2023) (*Parts 73 and 74 Amendment Report and Order*).  Among other revisions, the Commission eliminated all analog rules and references to analog and to out-of-core channels; updated information such as filing dates, locations, and form numbers; and reorganized and modified technical rules to make them more accessible to licensees and other users.  *See id*.  Any additional rule changes that are relevant to Class A stations will apply to stations that converted to Class A status pursuant to the CBPA and to stations that convert to Class A status pursuant to the LPPA.

[42] 47 CFR § 74.701(k).

[43] *NPRM*  at para. 13.

[44] *Id*.

[45] 47 CFR § 74.701(a).

[46] *See* 47 CFR § 74.701(h) ("*Local origination*.  Program origination if [sic] the parameters of the program source signal, as it reaches the transmitter site, are under the control of the low power TV station licensee.  *Transmission of TV program signals generated at the transmitter site constitutes local origination*.  Local origination also includes transmission of programs reaching the transmitter site via TV STL stations, but does not include transmission of signals obtained from either terrestrial or satellite microwave feeds or low power TV stations.") (emphasis added).

[47] 47 CFR § 74.787(a)(5).

[48] *NPRM*  at para. 13.

000007
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

**Federal Communications Commission**                              **FCC 23-112**

commenter to address this issue, News-Press & Gazette Broadcasting (NPG), agrees that excluding television translator stations from eligibility under the LPPA "is a practical approach for most translators" but argues that "additional flexibility is warranted" for TV translator stations such as NPG's translator.

15.        KPI-LD, Pocatello, Idaho, retransmits the signal of full power station KIDK, (Fox), Idaho Falls, Idaho.[49]  According to NPG, "KXPI-LD is classified in the Commission's records as a digital TV translator, but it functions more like an originator of programming than a translator; it is a primary Fox Network affiliate providing local news, weather, and information to the Pocatello community. . . ."[50]  NPG argues that KXPI-LD meets all of the LPPA's eligibility requirements, "except its ministerial technical classification as a digital TV translator."[51]  NPG also argues that "the FCC's 'low power TV station' definition, Rule 74.701(k), encompasses stations like KXPI-LD that retransmit the signal of a TV broadcast station, and does not require program origination."[52]  NPG urges that the Commission permit stations like KXPI-LD to be eligible for the Class A filing opportunity afforded by the LPPA.[53]

16.        We affirm our tentative conclusion that translator stations are unlikely to satisfy the eligibility requirements of the LPPA.  NPG's argument that the Commission's definition of a low power TV station encompasses stations like KXPI-LD that retransmit the signal of a TV broadcast station, and does not require program origination, is misplaced.  LPAA section 2(c)(2)(B)(i)(I) requires that, during the 90-day eligibility period, an LPTV station must broadcast an average of at least three hours per week of programming produced within the market area served by the station.[54]  As a translator station, KXPI-LD retransmits the programming feed it obtains from full-power station KIDK.  NPG does not demonstrate that the KIDK programming that KXPI-LD is retransmitting was produced in KXPI-LD's own noise limited contour.  Thus, NPG has failed to demonstrate how a translator station like KXPI-LD can satisfy the requirement of LPAA section 2(c)(2)(B)(i)(I) to broadcast an average of at least three hours per week of programming produced within the market area served by the translator station. [55]

17.        Finally, consistent with the tentative conclusion in the *NPRM*, we confirm that LPTV stations that had not completed their digital transitions prior to the beginning of the eligibility period are not eligible to apply for Class A designation.[56]  No commenter addressed this issue.  Since analog

---

[49] NPG Comments at 8-9.

[50] *Id*. at 9.

[51] *Id*.  NPG's argument is incorrect.  While stations can convert between the TV translator classification or the LPTV classification by notifying Commission staff of the station's intended status, each station must ensure that it properly informs the staff of the designation and can be designated only as either a TV translator or an LPTV station, not both.

[52] *Id*.

[53] *Id*.

[54] LPPA Sec.2(c)(2)(B)(i)(I).

[55] While we do not preclude a translator station from attempting to demonstrate how it satisfies the eligibility requirements of the LPPA, we also note that KXPI-LD is in the Idaho Falls-Pocatello-Jackson DMA (*see* https://ustvdb.com/seasons/2022-23/markets/) which had more than 95,000 TV households at the time the LPPA was enacted (*see* http://web.archive.org/web/20230605234252/https://ustvdb.com/seasons/2022-23/markets/).  Therefore, the station is also not eligible for Class A status under the LPPA on that basis.

[56] A small number of analog LPTV stations had not yet completed construction of their digital facilities by July 13, 2021, the analog termination deadline, and were granted additional time to do so.  *See Amendment of Parts 73 and 74 of the Commission's Rules to Establish Rules for Digital Low Power Television and Television Translator Stations, Update of Parts 74 of the Commission's Rules Related to Low Power Television and Television Translator Stations*, MB Docket No. 03-185, Order and Sixth Notice of Proposed Rulemaking, 37 FCC Rcd 8173, 8174-45 at para. 4 and n.17 (2022).  They have all either completed construction or are no longer licensees of the stations that went silent on or before the analog termination date.

000008
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

television operations are no longer permitted, any LPTV station that has not converted to digital operation is silent and must remain silent until such time as it completes construction of its digital facilities.[57] The LPPA requires that, to be eligible to convert to Class A status, an LPTV station must meet the statutory programming requirements for the 90-day period preceding the date of enactment of the LPPA.[58] As any LPTV station that was silent during this period would not meet these requirements, such stations are not eligible to apply for Class A designation under the LPPA.

### 2.    Eligibility Criteria

18.    As noted above,[59] the LPPA sets forth eligibility criteria for stations seeking Class A designation that are similar to the eligibility criteria under the CBPA. Specifically, the LPPA provides that the Commission "may approve" an application submitted by an LPTV station if the station, during the 90-day period preceding the date of enactment of the LPPA, meets the same requirements in section 336(f)(2) of the Communications Act applicable to stations that qualified for Class A status under the CBPA, "including the requirements…with respect to locally produced programming."[60] Thus, to qualify for Class A status, in the 90 days preceding the LPPA's January 5, 2023 effective date (between October 7, 2022 and January 5, 2023) an LPTV station must have met the following requirements: (1) the station must have broadcast a minimum of 18 hours per day;[61] (2) the station must have broadcast an average of at least 3 hours per week of programming that was produced within the market area served by such station, or the market area served by a group of commonly controlled LPTV stations that carry common local programming produced within the market area served by such group;[62] and (3) the station must have been in compliance with the Commission's requirements applicable to LPTV stations.[63] In addition, from and after the date of its application for a Class A license, the station must be in compliance with the Commission's operating rules for full power television stations.[64]

19.    <u>Locally Produced Programming</u>. We will define locally produced programming for purposes of the LPPA as that "produced within the predicted noise-limited contour (*see* § 73.619(c)) of a Class A station broadcasting the program or within the contiguous predicted noise-limited contours of any of the Class A stations in a commonly owned group." The *NPRM* proposed to define "locally produced programming" for purposes of the LPPA in the same manner as our rules that apply to stations that converted to Class A status pursuant to the CBPA.[65] As noted above, the LPPA requires that, during the 90-day eligibility period, LPTV stations must have broadcast an average of at least 3 hours per week of programming produced within the market area served by the station.[66] The *NPRM* noted that the Commission was in the process of updating its rules.[67] Since that time, in the *Part 73 Amendment R&O*, the Commission did update the definition of locally produced programming for Class A stations as that "produced within the predicted noise-limited contour (*see* § 73.619(c)) of a Class A station broadcasting the program or within the contiguous predicted noise-limited contours of any of the Class A stations in a

---

[57] *Id. See also* 47 CFR § 74.790(m).

[58] *See* LPPA Sec.2(c)(2)(B)(i)(I).

[59] *See supra* para. 8.

[60] LPPA Sec.2(c)(2)(B)(i)(I).

[61] 47 U.S.C. § 336(f)(2)(A)(i)(I).

[62] 47 U.S.C. § 336(f)(2)(A)(i)(II).

[63] 47 U.S.C. § 336(f)(2)(A)(i)(III). *See also supra* para. 8.

[64] LPPA Sec.2(c)(2)(B)(i)(I); 47 U.S.C. § 336(f)(2)(A)(ii).

[65] *See NPRM* at para. 16.

[66] LPPA Sec.2(c)(2)(B)(i)(I); 47 U.S.C. § 336(f)(2)(A)(i)(II).

[67] *See NPRM* at para. 16.

000009
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

commonly owned group."[68]  Block supports this proposed definition of "locally produced programming,"[69] and with the exception of REC's request for clarification addressed below, no other commenter addressed this issue.  As proposed in the *NPRM*, we will apply this definition to define "programming produced within the market area served by the station" for purposes of determining eligibility for Class A status under section 2(c)(2)(B)(i)(I) of the LPPA.

20.     We decline at this time to adopt REC's proposal that we clarify the definition of "locally produced programming" for purposes of the LPPA.[70]  REC advocates that the Commission (1) clarify that local programming may not be repeated within the same week to satisfy the weekly locally produced programming requirement; (2) require that local programming be aired on the same programming stream and not aggregated among multiple streams to meet the minimum requirement; (3) clarify that the local programming requirement need only be satisfied on one programming stream of simultaneous video and related audio programming; and (4) require that the programming must be simultaneous video and audio programming where the audio portion of the programming directly relates to the video portion of the programming.[71]  We note that the concerns underlying REC's proposed clarifications are equally applicable to existing Class A stations under the CBPA.  Any change to the definition of "locally produced programming" to address such concerns should be considered with respect to all Class A stations, not just those stations that convert to Class A status pursuant to the LPPA.  Because the Commission did not propose to revise the definition of locally produced programming for purposes of Class A stations generally, we find REC's proposals to be outside the scope of this proceeding.  Accordingly, we decline to pursue REC's proposals at this time.

21.     <u>Operating Requirements.</u>  For the reasons contained in the *NPRM* and discussed below, we adopt the *NPRM's* proposals related to operating requirements.  The *NPRM* tentatively concluded that all applicants seeking to convert to Class A status under the LPPA must certify that they have complied with the Commission's requirements for LPTV stations during the 90-day eligibility period.[72]  The *NPRM* also proposed that a station applying to convert to Class A status must comply, beginning on the date of its application for a Class A license and thereafter, with the same Commission Part 73 operating rules that apply to Class A stations that converted pursuant to the CBPA.[73]  This includes the requirement that existing Class A stations comply with children's programming and online public inspection file (OPIF) regulations.[74]  No commenter opposed this approach.  Absent objection, we adopt these proposals.

---

[68] *See Part 73 Amendment R&O*, at n.19 & Appx. A (Final Regulations) at section 73.6000.

[69] *See* Block Comments at 2.

[70] *See* REC Comments at 3.

[71] *Id*.

[72] *See NPRM* at para. 17.  As noted in para. 8 above, to qualify for Class A status under the LPPA, an LPTV station must have been in compliance with the Commission's requirements for LPTV stations during the 90-day eligibility period.  The LPTV requirements are set forth in Title 47, Part 74, Subpart G of our rules.

[73] *See NPRM* at para. 18.  *See also* LPPA Sec.2(c)(2)(B)(i)(I); 47 U.S.C. § 336(f)(2)(A)(ii).

[74] *See* 47 CFR § 73.6026 (listing broadcast regulations applicable to Class A television stations).  This rule includes cross references to 47 CFR §§ 73.670 (Commercial limits in children's programming) and 73.671 (Educational and informational programming for children) as applying to Class A stations.  *See also* 47 CFR § 73.3526 (Online public inspection file of commercial stations) which requires Class A licensees to maintain an online public file, including a political file.  In the *Class A Order* that implemented the CBPA, the Commission determined certain Part 73 rules would apply to applicants for Class A status and to stations awarded Class A licenses.  *See Class A Order*, 15 FCC Rcd at 6365, para. 23; 47 CFR § 73.6026 (listing Part 73 rules that do apply to Class A stations).  Class A stations are not required to comply with certain other regulations that could not apply for technical reasons, such as the full power principal city coverage requirement currently set forth in 47 CFR § 73.625(a).  Instead, Class A stations must comply with maximum power levels applicable to LPTV stations.  *Class A Order*, 15 FCC Rcd at 6367-68, paras. 28-29.  Some other examples of rules that cannot apply to Class A stations for technical reasons include, 47 CFR §§ 73.622(f)(5) (the so-called "largest station in the market" rule); 73.616 (Post-transition DTV station interference
(continued….)

000010
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

Regarding our requirement that Class A TV applicants and licensees maintain an OPIF,[75] NPG notes that LPTV stations have no OPIF and are therefore unable to upload records to the system.[76] The Commission will activate an OPIF for LPTV stations that apply to convert to Class A status pursuant to the LPPA and inform applicants when that station's OPIF is ready for the applicant to upload documents required to be maintained in OPIF.[77]

22.    We also require that all stations that receive a Class A license under the LPPA comply with all Class A regulations, as proposed in the *NPRM*.[78]  As discussed in the *NPRM*, the LPPA requires that LPPA Class A stations "remain in compliance" with the Act's eligibility criteria[79] "during the term of the license."[80]  This includes, among other things, the requirements to broadcast a minimum of 18 hours per day and to broadcast an average of at least three hours per week of locally produced programming each quarter.[81]  In addition, the station must continue to comply with the interference requirements adopted herein.[82]  Further, we adopt the tentative conclusion in the *NPRM*[83] that there is no reason to exempt LPTV stations converting to Class A status under the LPPA from other rules applicable to LPTV stations that converted to Class A status under the CBPA,[84] given that the service requirements in the LPPA closely track those in the CBPA and thus it makes sense for Class A rules generally to apply.[85]  No commenter addressed these issues.

23.    Finally, we conclude that the requirement to comply with the Class A eligibility requirements begins when an LPTV station's Class A application is submitted.  The LPPA states that the "Commission may approve an application [for Class A status] if the low power TV station *submitting the application—satisfies—* paragraphs (b), (c), and (d) of 73.6001,"[86] which contains the requirements that

_____

(Continued from previous page) ─────────────────

protection); and 73.622(f)(6)-(8) (allowable antenna heights and power levels for full power stations).  The Commission recently amended its rules to relocate the text from certain Part 73 rules to new section and subsection numbers.  *See Amendment of Part 73 of the Commission's Rules to Update Television and Class A Television Broadcast Station Rules, and Rules Applicable to All Broadcast Stations*, MB Docket No. 22-227, Report and Order, FCC 23-72 (rel. Sept. 19, 2023) (*Part 73 Amendment R&O*).  The amended rules are not yet effective and, as such, we continue to make reference to the rule numbers as of the date of release of this *Report and Order*.

[75] *See* 47 CFR § 73.3526.

[76] NPG Comments at n.24.

[77] Consistent with current practice for other stations with OPIF obligations, the Commission will upload to the applicant's OPIF those documents that the Commission is responsible for uploading to OPIF.  Broadcasters and other media entities must upload only those items required to be in the public file but not otherwise filed with the Commission or available on the Commission's website.  Any document or information required to be kept in the public file and that is required to be filed with the Commission electronically is imported to the online public file and updated by the Commission.  *See Standardized and Enhanced Disclosure Requirements for Television Broadcast Licensee Public Interest Obligations*, Second Report and Order, 27 FCC Rcd 4535, 4540-41, para. 11 (2012); *Expansion of Online Public File Obligations to Cable and Satellite TV Operators and Broadcast Satellite Radio Licensees*, Report and Order, 31 FCC Rcd 526, 534, para. 17 (2016).

[78] *See NPRM* at para. 19.

[79] LPPA Sec.(2)(c)(2)(B).

[80] LPPA Sec.2(c)(3)(B).

[81] LPPA Sec.2(c)(2)(B).  *See also* 47 CFR § 73.6001(b)-(c).

[82] *See NPRM* at para. 37.  *See infra* Section III.B.3.

[83] *See NPRM* at para. 19.

[84] *See* 47 CFR §§ 73.6000-6029.

[85] *See NPRM* at para. 19; *supra* para. 8.

[86] LPPA Sec.2(c)(2)(B)(i)(II).

000011
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

Class A stations broadcast a minimum of 18 hours per day and broadcast an average of at least three hours per week of locally produced programming each quarter. This requirement is distinct from the separate statutory obligation to meet the eligibility requirements during the 90-day eligibility period of October 7, 2022 to January 5, 2023.[87] In the *NPRM*, the Commission sought comment on how to interpret the statutory language, and specifically on whether the language should be interpreted to require an applicant for a Class A license to satisfy the requirements from the time it submits its application.[88] No commenter addressed this issue. As discussed above, the LPPA requires that applicants continue to broadcast a minimum of 18 hours per day and to broadcast an average of at least three hours per week of locally produced programming each quarter after a Class A license is granted.[89] We conclude that the language quoted above[90] would be rendered superfluous if we did not interpret it to apply these requirements from the time the Class A application is submitted.[91] Thus, the requirement to broadcast a minimum of 18 hours per day and broadcast an average of at least three hours per week of locally produced programming each quarter begins when a station submits an application to convert to Class A status pursuant to the LPPA and continues for the term of the Class A license.

24.    <u>License Application and Documentation</u>. As proposed in the *NPRM*,[92] we will require an applicant to certify in its application that its station meets the operating and programming requirements of the LPPA. Specifically, the *NPRM* proposed, with respect to the statutory requirement that stations air 18 hours of programming each day during the 90-day eligibility period, that applicants must certify that the station was fully operational for at least 18 hours on each day during the 90-day eligibility period.[93] In addition, the *NPRM* proposed, with respect to the requirement that stations air three hours of locally produced programming, that an applicant must certify that it was broadcasting an average of at least three hours per week of programming that was produced within the market area served by such station, or the market area served by a group of commonly controlled LPTV stations that carry common local programming produced within the market area served by such group, on each day during the 90-day eligibility period.[94] No commenter objected to these proposals. We believe these certification requirements will assist us with the orderly processing of applications received under the LPPA, and thus we adopt the proposals. Finally, we also require that an applicant certify that it was in compliance with the Commission's requirements applicable to LPTV stations.[95]

25.    Consistent with the tentative conclusion in the *NPRM*, we require an applicant to submit, as part of its application, documents to support its certification that it meets the operating and programming requirements of the LPPA.[96] As noted in the *NPRM*,[97] the Commission staff may later determine that additional documentation is needed to evaluate an application and may at that time require

---

[87] LPPA Sec.2(c)(2)(B)(i)(I).

[88] *See NPRM* at para. 20.

[89] LPPA Sec.2(c)(3)(B). *See supra* para. 8.

[90] *See supra* n. 89 and accompanying text.

[91] *Clark v. Rameker*, 134 S. Ct. 2242, 2248 (2014) ("'a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous'") (*quoting Corley v. United States*, 556 U.S. 303, 314 (2009)).

[92] *See NPRM* at para. 21.

[93] *Id*.

[94] *Id*.

[95] 47 U.S.C. § 336(f)(2)(A)(i)(III).

[96] *See NPRM* at para. 22.

[97] *Id*.

000012
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

an applicant to submit additional, specific documentation during consideration of the application.[98]  We believe this approach will ensure eligibility while preserving flexibility for applicants.  We decline to permit applicants to certify that they meet operating and programming requirements without submission of supporting documentation, as Block suggests.[99]  We believe such an approach would lack the information necessary for the Commission staff to undertake a sufficient review of the application in these circumstances.  NAB suggests that we require stations to provide "a statement concerning the station's operating schedule and a list of locally produced programs" at the application stage.[100]  We will adopt NAB's suggestion and require applicants to provide with their application a statement concerning the station's operating schedule during the 90 days preceding January 5, 2023 as well as a list of locally produced programs aired during that time period.  We believe that requiring applicants to submit this basic information in support of their certification that they meet the LPPA's eligibility criteria will assist us in processing applications.  In addition, an applicant should submit whatever additional documents available to the applicant that it believes best support its certification that it meets the operating and programming requirements of the Act.  For example, to support its certification that the station was on the air at least 18 hours each day during the eligibility period, a station could provide electric power bills from a third party vendor that specify the station's broadcast facility location for the designated period,[101] and/or copies of any program guides, EAS logs, or agreements to purchase and air programming on the specified station during the times of operation in an amount sufficient to satisfy this operating requirement.[102]  If the station was silent during any portion of the eligibility period, the station must identify any silent periods and the reasons why the station was silent.[103]  To support its certification that a

---

[98] *See* 47 U.S.C. § 308(b).

[99] *See* Block Comments at 3.

[100] *See* NAB Comments at 5.  NAB also suggests that LPPA Class A stations include a list of locally produced programs as part of the station's issues/programs list.  *Id*.  *But see* RCC Reply Comments at 12 (arguing that NAB's suggestion "contravenes basic First Amendment principles and Congress's explicitly stated goal of fostering diverse voices through use of the Internet") and LPTVBA Reply Comments at 8 (arguing that existing requirements are sufficient to ensure compliance).  We decline to require LPPA Class A stations to provide information regarding local programming as part of their issues/programs list, but note that all Class A stations must comply with the requirement that they place in their online public inspection file "documentation sufficient to demonstrate that the Class A television station is continuing to meet the eligibility requirements set forth" in section 73.6001 of the Commission's rules.  47 CFR § 73.3526(e)(17).  Section 73.6001(b) requires all Class A stations to broadcast a minimum of 18 hours per day and to broadcast an average of at least three hours per week of locally produced programming each quarter.  47 CFR § 73.6001(b).  Thus, LPPA Class A stations must include in their public inspection file documentation sufficient to show that the station is continuing to meet these requirements.  In light of this existing public inspection file requirement, we decline to require LPPA Class A stations to include a "specific statement detailing hours of operation" as part of the continuing eligibility documentation, as NAB suggests.  *See* NAB Comments at 5.

[101] A significant fluctuation in the amount of power used on a monthly basis during the 90-day eligibility period could indicate that the station reduced its hours of operation for one or more months.  In addition, for example, we would expect that a station operating at 15 kW, the maximum operating power for a UHF LPTV station, for 18 hours seven days a week, would be operating with a substantial amount of power, as opposed to an LPTV station that was airing programming sporadically.

[102] For example, if a station had contracts for at least 18 hours of programming from various program suppliers during the 90-day eligibility period, this would strongly indicate that the station was operating at least 18 hours per day during that time period.

[103] Section 74.735(b) of our rules provides that, in the event that causes beyond the control of a licensee make it impossible to continue operating, the station may limit or discontinue operation for a period of not more than 30 days without further authority from the Commission.  Notification must be sent to the Commission no later than the 10th day of discontinued operation and, during such period, the licensee shall continue to adhere to the requirements in the station license pertaining to the lighting of antenna structures.  If the causes beyond the control of the licensee

(continued….)

000013

RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal

Case No. 24-1004--FCC 23-112

station aired an average of at least three hours of locally produced programming each week, the station could, for example, submit copies of any agreements to purchase and air such programming and/or identify the producer of any programming it claims is locally produced, the location where the programming was produced, and records of advertisements aired during locally produced programming showing that the programming was in fact aired.

26.    Apart from a statement regarding the station's operating schedule and a list of locally produced programming aired during the 90 days preceding January 5, 2023, we decline to mandate the form of the additional documents that applicants submit to support their applications.[104] We recognize that some applicants may not have specific types of documentation, or that a specific document may not be in a form that supports the applicant's certification.[105] In light of that, we permit each applicant to provide with the station's application, documents that it has that best support its certification that it met the operational and programming requirements of the LPPA during the eligibility period. The Commission staff will review the documentation on a case-by-case basis and determine if it will need to request additional documentation before it can make a determination whether to grant a Class A license application.

27.    <u>Alternative Eligibility Criteria</u>.  As proposed in the *NPRM*, we will allow deviation from the strict statutory eligibility criteria under the LPPA only where deviations are insignificant or where there are compelling circumstances such that equity mandates a deviation.  No commenter disagreed with this approach.[106] As discussed above,[107] similar to the CBPA, the LPPA provides the Commission with additional discretion in evaluating applicants for Class A status if "the Commission determines that the public interest, convenience, and necessity would be served by" or "for other reasons determined by the Commission" for treating the station as eligible for conversion to Class A pursuant to the LPPA.[108] In the *Class A Order*, the Commission determined that it would allow deviation from the strict statutory eligibility criteria in the CBPA "only where such deviations are insignificant or when we determine that there are compelling circumstances, and that in light of those compelling circumstances, equity mandates such a deviation."[109] The Commission gave as an example of such compelling circumstances "a natural

(Continued from previous page) ────────────────────

make it impossible to comply within the allowed period, an informal written request should be made to the Commission no later than the 30th day for such additional time as may be deemed necessary.  47 CFR § 74.735(b).

[104] REC argues that, to demonstrate that a station is on the air for 18 hours/day, applicants should be required to include utility bills, photos of the transmitting facility (including a powered-on transmitter), copies of any leases, and any programming grids and programming contracts.  *See* REC Comments at 4-5.  To demonstrate that the station met the local programming eligibility requirement, REC argues that applicants should be required to submit program logs including the name of the program, the air date, time and length of the program, the location where the program was produced, and a description of the program.  *Id*.  While we agree that such documents may be useful to support an application, for the reasons described herein we decline to mandate that all of these specific documents are required for every application and permit applicants to submit the documents they have that they believe best support their application.

[105] For example, Block notes that utility costs are often "baked into" a tower lease and that the tower owner may not be able to apportion electricity costs among different tower tenants.  Block Comments at 3.

[106] Lockwood proposed that we adopt a *de minimis* exception to the LPPA's 95,000 TV household eligibility requirement.  As discussed below, we reject that proposal.  *See infra* paras. 54-56.

[107] *See supra* para. 12.

[108] 47 U.S.C. § 336(f)(2)(B).

[109] *Class A Order*, 15 FCC Rcd at 6369, para. 33.

000014
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

disaster or interference conflict which forced the station off the air during the 90-day period before enactment of the CBPA."[110]

28.     We conclude that, similar to the Commission's approach in implementing the CBPA, we will allow deviation from the strict statutory eligibility criteria in the LPPA only where such deviations are insignificant or where there are compelling circumstances such that equity mandates a deviation.[111] We will consider any such requests on a case-by-case basis.  As the Commission tentatively concluded in the *NPRM*,[112] we believe that the LPPA provides precise and limited eligibility criteria and, except in very limited circumstances, we are not inclined to expand the specific qualifying criteria beyond that identified in the statute.

### 3.     Interference Requirements

29.     We adopt the tentative conclusions in the *NPRM* that our interference rules applicable to existing Class A stations, including requirements that were adopted subsequent to enactment of the CBPA in 1999,[113] will apply to stations that convert to Class A status pursuant to the LPPA.[114]  The LPPA provides that the Commission may approve an application by an LPTV station if it demonstrates that "the Class A station for which the license is sought will not cause any interference described in section 336(f)(7) of the Communications Act . . . ."[115]  Section 336(f)(7) describes the interference protection requirements for LPTV stations that sought Class A status under the CBPA with respect to full power television, LPTV, TV translator, and land mobile stations.  As noted in the *NPRM*, LPTV stations that converted to Class A status pursuant to the CBPA in 2000 began their primary status as analog stations, and therefore, that section related to analog operations.[116]  All television broadcast stations are now operating digital facilities.[117]  While the LPPA specifically references the interference requirements "described in section 336(f)(7)," we affirm the tentative conclusion in the *NPRM* that inclusion of this language does not evince an intent by Congress to compel LPTV stations applying for Class A licenses under the LPPA to demonstrate compliance with outdated and superseded interference rules.[118]  Rather, we affirm the *NPRM*'s tentative conclusion that requiring applicants to demonstrate compliance with current interference requirements relevant to digital facilities would guarantee the purpose of the statutory provision.  This approach will ensure that LPTV stations converting to Class A status under the LPPA will not cause interference to the licensed or previously proposed facilities of digital broadcast stations, including full power, Class A, LPTV and TV translator stations.[119]

---

[110] *Id*.  The Commission also concluded that foreign language stations should have the same eligibility requirements as any other potential Class A station under the CBPA.  *Id*. at paras. 33-35.

[111] *Class A Order*, 15 FCC Rcd at 6369, para. 33.

[112] *NPRM* at para. 24.

[113] The digital-to-digital interference protection standards for LPTV stations converting to Class A status vis-à-vis LPTV and TV translator stations pursuant to the LPPA are now found in sections 74.792 and 74.793 of the rules. *NPRM* at para. 29.

[114] *NPRM* at paras. 27-29.

[115] LPPA Sec. 2(c)(2)(B)(ii).

[116] *NPRM* at para. 26.

[117] *See supra* para. 3 and n.8; DTV Delay Act, Pub. L. No. 111-4, 123 Stat. 112 (2009) (Full power stations largely completed their digital transition by June 12, 2009); *NPRM* at para 26.

[118] *NPRM* at para. 26, citing *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 452-55 (1989) (noting that statutes are to be read in a manner that avoids absurd results); *City of Lincoln, Neb. v. Ricketts*, 297 U.S. 373, 376 (1936) (noting duty to give words their natural significance unless that leads to an unreasonable result plainly at variance with the evident purpose of the legislation).

[119] *NPRM* at para. 26.

000015
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

30.     NPG generally supports that the current interference rule rather than the old analog rule should be applied.  However, NPG would have us provide flexibility to permit interference beyond what is permitted in our current rules.  NPG states that the Commission should adopt a "flexible approach" granting applications that would violate the rule "if the applicant is able to demonstrate no actual interference, acceptance by the licensee subject to such interference, or other showing that the public interest is served by the applicant obtaining Class A status."[120]  We are not persuaded to grant this request.  First, we do not anticipate any scenarios where interference is predicted, but the applicant is able to demonstrate a lack of actual interference.[121]  The *TVStudy* software used to prepare and process applications already considers the elements likely to cause actual interference.  Specifically, *TVStudy* makes full use of terrain shielding and Longley-Rice terrain propagation methods to determine whether a proposed facility is predicted to cause impermissible interference consistent with OET Bulletin No. 69,[122] accounting for unique characteristics such as terrain.[123]  For this reason, we do not believe there would be merit in accepting other methods of determining interference.  Second, the Commission's rules already allow applicants and licensees to accept interference subject to Commission approval,[124] and the Media Bureau will continue to consider and accept interference agreements in processing Class A license applications filed pursuant to the LPPA without the need to adopt additional flexibility.  Finally, we reject NPG's suggestion that waiver of television broadcast interference protection rules should be considered upon undefined public interest arguments.[125]  NPG provides no example – and we can imagine none – where we have granted an LPTV station primary status that caused interference to a licensed (or previously proposed) broadcast facility entitled to protection.  Congress clearly intended the LPPA to apply to a discrete number of LPTV stations that satisfy specific eligibility requirements and protect existing stations and previously proposed facilities.  We decline to adopt an exception that would contravene this careful balance.

31.     <u>Protection of Land Mobile Stations</u>.  The LPPA provides that the Commission may approve an application by an LPTV station if it "demonstrates to the Commission that the Class A station for which the license is sought will not cause any interference described in section 336(f)(7) of the Communications Act of 1934. . . ."[126]  Section 336(f)(7)(C) of the CBPA provides that the Commission may not grant a Class A license or modification of license where the Class A station will cause interference within the protected contour of land mobile stations.[127]  We adopt the proposal in the *NPRM*

---

[120] NPG Comments at 9-10.  Class A and LPTV stations are permitted to cause interference to no more than 0.5 percent of the population served by full-power and Class A television stations, and no more than 2 percent of the population served by LPTV and TV translator stations.  *See* 47 CFR §§ 73.6017, 73.6018, 73.6019, and 74.793.

[121] NPG Comments at 9-10.

[122] *See Office of Engineering and Technology Releases and Seeks Comment on Updated OET-69 Software,* ET Docket No. 13-26, GN Docket No. 12-268, Public Notice, 28 FCC Rcd 950 (OET 2013) at 1.  OET Bulletin No. 69 can be found at https://transition.fcc.gov/oet/info/documents/bulletins/oet69/oet69.pdf (OET Bulletin No. 69).

[123] *See* OET Bulletin No. 69 at 1.  47 CFR §§ 73.6018, 73.616(d)(1), 73.619(c)(2).

[124] *See, e.g.*, 47 CFR §§ 73.620(e) (Full power stations may operate with facilities that would result in more than 0.5 percent additional interference to another full power station if that station agrees, in writing, to accept the additional interference, and the Commission finds such action is in the public interest), 73.6022(a) (same with respect to Class A stations vis-à-vis full power, Class A, LPTV and TV translator stations, notwithstanding the interference standards set forth in the rules, if the Commission finds such action is in the public interest), 74.703(a) ("Except where there is a written agreement between the affected parties to accept interference," an application for a new LPTV station or modification of facilities must comply with interference rules).

[125]  NPG Comments at 9-10.

[126] LPPA Sec. 2(c)(2)(B)(ii).

[127] 47 U.S.C. § 336(f)(7).  Specifically, section 74.709 of our rules (47 CFR § 74.709) requires that, in order to protect land mobile stations, a low power TV or TV translator station cannot specify a site that is located within the protected contour of a co-channel or first adjacent land mobile assignment.  Generally, the protected contour is 80

(continued….)

RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

that Class A applications will not be grantable where the Class A station will cause interference within the protected contour of land mobile stations which have been allocated the use of TV channels 14-20 in certain urban areas of the country, as well as channel 16 in the New York City metropolitan area.[128]  We received no specific objection to this proposal.  We note that in implementing the CBPA, the Commission implemented the same interference protections and procedures which are prescribed in section 74.709 of the rules, and these rules have not changed.[129]

32.      We decline to adopt as both unnecessary and outside the scope of this proceeding, the County of Los Angeles, California's request that we incorporate by reference comments in a proceeding requested by the Land Mobile Communications Council regarding rules governing separation between land mobile stations and television stations located in the T-Band.[130]  Unless and until there is a change in the applicable rules, we will apply our existing land mobile protection requirements in considering applications to convert to Class A status pursuant to the LPPA.  We note that in limiting eligibility to LPTV stations operating in a DMA or an equivalent with not more than 95,000 television households, Congress intended to convey the benefits of Class A status under the LPPA to LPTV stations operating in smaller DMAs.  T-band radio systems, which are used for public safety and industrial/business land mobile communications, operate on 470-512 MHz (television channels 14 through 20) in 13 large cities,[131] located in the largest DMAs with more than 1,000,000 television households.  LPTV stations operating in larger DMAs or an equivalent television market are not eligible for Class A status under the LPPA and thus, it is unlikely that land mobile operations in the T-band will be affected by the LPPA..

### 4.    Designated Market Area

33.      The LPPA requires that an LPTV station must demonstrate that as of January 5, 2023, the station "*operates* in a Designated Market Area with not more than 95,000 television households."[132]  The LPPA further states that DMA means "(A) a [DMA] determined by Nielsen Media Research or any successor entity; or (B) a [DMA] under a system of dividing television broadcast station licensees into local markets using a system that the Commission determines is equivalent to the system established by Nielsen Media Research . . ."[133]  The Commission sought comment in the *NRPM* [134] on (1) the meaning of the word "operates" in the LPPA,[135] and (2) whether to adopt the Nielsen Local TV Station Information Report (Local TV Report) for determining DMAs or an equivalent alternative local market

---

(Continued from previous page) ─────────────────

miles from the geographic center of the areas listed in 47 CFR §§ 22.625(b)(1), 90.303(b); for frequencies in the 470-512 megahertz band identified in 47 CFR §§ 22.621, 90.303(b), or in the 482-488 megahertz band in New York. In addition, a low power TV or TV translator station application cannot be granted where its proposed field strength limit calculated at the land mobile boundary exceeds the limits set forth in 47 CFR § 74.709(d).

[128] *NPRM* at para. 30.

[129] 47 CFR § 74.709; *NPRM* at para. 30.

[130] County of Los Angeles, California Comments at n.5, citing Public Notice, RM-11915, Report No. 3186 (rel. Jan. 12, 2022).  The nearest DMA to Los Angeles County, CA impacted by implementation of the LPPA is more than 800 km away in Eureka, CA (*see infra* n 169), and could not result in interference in Los Angeles County.

[131] 47 CFR § 90.303.

[132] LPPA Sec.2(c)(2)(B)(iii) (emphasis added).

[133] LPPA Sec.2(a)(2)(A) and (B).  The Nielsen Company (Nielsen) describes a DMA region as "a group of counties and zip codes that form an exclusive geographic area in which the home market television stations hold a dominance of total hours viewed.  There are 210 DMA regions, covering the entire continental U.S., Hawaii, and parts of Alaska."  *See* Nielsen, DMA Regions, https://markets.nielsen.com/us/en/contact-us/intl-campaigns/dma-maps/ (rel. Oct. 24, 2022).

[134] *NPRM* at para. 32.

[135] LPPA Sec.2(c)(2)(B)(iii).

system.[136]  We address each of these issues below.

34.     "Operates" in the DMA.  As proposed in the *NPRM*,[137] we conclude that "operates" means that the LPTV station applying for Class A status under the LPPA must demonstrate that its transmission facilities, which include the structure on which its antenna is mounted, are located within the qualifying DMA.  No commenters addressed this issue.  We find that this requirement is consistent with Congress's intent to limit Class A status to stations located in small DMAs, as evidenced by its limiting eligibility for Class A status under the LPPA to LPTV stations operating in a DMA or an equivalent with not more than 95,000 television households.[138]  To make the necessary demonstration, we will require applicants to provide the following information as it existed on January 5, 2023, as proposed in the *NPRM*: (1) the coordinates of the station's transmission facilities (*i.e.*, the structure on which its antenna is mounted); (2) the city/town/village/or other municipality and county in which the transmission facilities are located; and (3) the qualifying DMA in which the station's transmission facilities are located.[139]

35.     Use of Nielsen to Determine DMAs.  We also adopt the proposal in the *NPRM* to use the Nielsen Local TV Report in determining the DMA where the LPTV station's transmission facilities were located as of January 5, 2023.[140]  First, the decision is fully consistent with the LPPA which contemplates the use of Nielsen.[141]  Furthermore, as explained in the *NPRM*, use of the Nielsen Local TV Report is consistent with the Commission's *Nielsen DMA Determination Update Order*,[142] which adopted Nielsen's monthly Local TV Report as the successor publication to Nielsen's Annual Station Index and Household Estimates and determined that the Local TV Report should be used to define "local market" as stated in other statutory provisions and rules relating to carriage, including retransmission consent, distant signals, significantly viewed, and field strength contour.[143]  When the Commission sought comment on what publication to use for DMA determinations in that proceeding, commenters unanimously supported use the Local TV Report.[144]  Thus, we note that the record in that proceeding indicated that the Local TV Report was the sole source of information regarding DMA determinations and that there was no company

---

[136] *See* LPPA Sec.2(a)(2)(B).

[137] *NPRM* at para 31-34.

[138] *Id*. at para. 32.

[139] *Id*.  Starting in 2022, Nielsen began including broadband only (BBO) households, households that receive video programming on a TV/monitor only through a broadband connection, in its local market measurement.  *See* Nielsen, Nielsen Announces "Impressions First Initiative" and the Integration of Broadband Only Homes Into Local Measurement in January 2022, *at* https://www.nielsen.com/news-center/2021/nielsen-announces-impressions-first-initiative-and-the-integration-of-broadband-only-homes-into-local-measurement-in-january-2022/ (Sept. 2021). Nielsen publishes annually, in the fall, an estimate of the number of TV households in each DMA.  For purposes of implementing the LPPA, we will look at Nielsen's estimates of DMA TV households published in the fall of 2022 to determine the number of DMA TV households as of January 5, 2023 and therefore the estimates include BBO households.

[140] *NPRM* at para 33.

[141] LPPA Sec.2(a)(2)(A).

[142] *See Update to Publication for Television Broadcast DMA Determination for Cable and Satellite Penetration*, MB Docket No. 22-239, Report and Order, FCC 22-89 (rel. Nov. 16, 2022) at para. 1 (*Nielsen DMA Determination Update Order*).  *See also id*. at para. 6 (reiterating Nielsen's clarification that it has "always told stations the DMAs to which they have been assigned upon request and free of charge").

[143] *Id*. at para. 4.

[144] *See Nielsen DMA Determination Update Order* at para. 1.

000018
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

currently accredited to determine the local market area of broadcast television stations.[145]  In addition, some commenters in this proceeding support our decision to use the Nielsen Local TV Report for purposes of implementing the LPPA.  As NAB points out, the Commission and the television industry have long relied on Nielsen DMA data to define television markets.[146]  REC notes that the Nielsen Local TV Report provides a "cut-and-dry" determination of a station's DMA, and that the "debate and development of any alternative system would further delay the process."[147]

    36.    While the LPPA defines a DMA as "a [DMA] determined by Nielsen Media Research or any successor entity," it also provides that a DMA may be "a [DMA] under a system of dividing television broadcast station licensees into local markets using a system that the Commission determines is equivalent to the system established by Nielsen Media Research. . . ."[148]  The *NPRM* sought comment on alternatives to the Nielsen Local TV Report that would be "equivalent to the system established by Nielsen Media Research."[149]  For the reasons discussed below, we decline to adopt any of the alternatives proposed.  The *NPRM* specifically sought comment on the LPTV Broadcasters' Association (LPTVBA) requests that the Commission use Metropolitan Statistical Areas (MSAs) and Rural Service Areas (RSAs) as defined by the Office of Management and Budget (OMB) using census data to implement the LPPA.[150]  Some commenters support the suggestion.[151]  Flood contends that MSA market definitions "more accurately reflect the characteristics of the LPTV station's service area that are pertinent to determining eligibility" under the LPPA.[152]  Flood also argues that the Nielsen DMAs are "geographically overbroad" and group some of the most rural areas in the U.S. with distant major cities, rendering some stations in rural areas ineligible for Class A status.[153]  Flood also notes that, under a DMA approach, similarly situated LPTV stations in immediately adjacent counties would receive inconsistent eligibility

---

[145] *Id*.  The Commission also noted that in the LPPA, which was enacted after release of the *Nielsen DMA Determination Update Order*, Congress chose to define DMA as determined by Nielsen Media Research.  *NPRM* at n.112.

[146] NAB Comments at 3.

[147] REC Comments at 5.  *But see* REC Reply Comments at 4 (stating that Comscore should be considered an alternative to Nielsen).

[148] LPPA Sec.2(a)(2)(A) and (B).

[149] LPPA Sec.2(a)(2)(B); *NPRM* at para 34.  The Commission asked that any commenter suggesting an alternative publication to the Nielsen Local TV Report to identify the publication as well as the similarities and differences in assigning stations to television markets, and explain why the alternative publication is preferable.  *Id*.

[150] *NPRM* at para. 34.  *See id*. (citing E-mail from Frank Copsidas, President and Founder, LPTV Broadcasters' Association, to Holly Saurer, Chief, Media Bureau, FCC (Feb. 27, 2023) (Copsidas Feb. 27 Letter)).  Among other things, the LPTVBA makes a number of accusations regarding the character and business dealings of Nielsen Media Research.  As we explain above and as we explained in the *NPRM*, Congress chose to define DMA as determined by Nielsen Media Research in the LPPA, and despite its lack of accreditation, the Commission found based on the record of the *Nielsen DMA Determination Update* proceeding that Nielsen is the sole source of information regarding DMA determinations.  *See NPRM* at para. 33.

[151] *See* Flood Comments at 1-12; Identical Comments at 1-3; Communications Technologies Comments at 1-2; LPTVBA Reply Comments at 1-6; Flood Reply Comments at 1-4.  Flood uses the term MSA to refer to both Metropolitan and Micropolitan Statistical Areas (mSA).  *See* Flood Comments at 1, n. 2.  LPTVBA argues that Metropolitan and Micropolitan Statistical Areas are two types of core based statistical areas (CBSAs) and urges the Commission to use CBSAs as an alternative local market system for purposes of the LPPA.  *See* LPTVBA Reply Comments at 2-3.

[152] Flood Comments at 1.  *See also* LPTVBA Reply Comments at 2.  LPTVBA argues that any area not designated an MSA or a mSA should automatically be considered an RSA, and a station located in an RSA should be eligible under the LPPA population limit.  LPTVBA Reply Comments at 2.

[153] Flood Comments at 5-7.  *See also* LPTVBA Reply Comments at 3, n. 9.

000019

RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

determinations, and, in some situations, stations in densely populated, larger counties would be eligible while those in adjacent, smaller, less densely populated counties would be ineligible.[154]  The Identical Commenters urge the Commission to "create a TV market definition system that relies on … MSAs as the primary criteria for determining a set of geographic areas equivalent to the Nielsen DMA metric of 95,000 households or fewer."[155]  They also note that the Nielsen DMA system does not include LPTV stations in its assessments and that "Nielsen's data is private and requires costly fees for access."[156]

37.    We decline to use market classifications based on Census data, such as MSAs or RSAs, for purposes of implementing the LPPA.  The LPPA specifically directs that the Commission use either Nielsen DMAs or a "system of dividing television broadcast station licensees into local markets" that is "equivalent" to the system established by Nielsen.[157]  Census classifications are not a "system of dividing television broadcast station licensees into local markets," and thus cannot be considered "equivalent" to the system established by Nielsen.  Such classifications do not reflect television stations in the market, the reach of those local stations, the location of the populations they serve, or local viewing patterns.[158]  On the other hand, a Nielsen DMA is an "exclusive geographic area in which the home market television stations hold a dominance of total hours viewed" and ties specifically to television viewing markets.[159]  Thus, we conclude census-based categories are not "equivalent" to the system established by Nielsen.[160]  In addition, we note that classifications based on Census data are based on population and group urban areas (the population "nucleus") with outlying counties "that have a high degree of integration" with the population nucleus based on commuting trends.[161]  OMB itself warns that such classifications do not themselves adequately differentiate between urban and rural areas.[162]  Thus, these census classifications do not address the concerns raised by those commenters who argue that Nielsen DMAs are

---

[154] Flood Comments at 5-7.  Flood provides examples of stations in adjoining DMAs that would receive different eligibility treatment under the LPPA.  *Id*. at 5-7.  *See also* LPTVBA Reply Comments at 3, n. 9.

[155] Identical Comments at 2 (citing the Copsidas Feb. 27 Letter).

[156] *Id*. at 2-3 (citing the Copsidas Feb. 27 Letter).  *See also* Communications Technology Comments at 2.

[157] LPPA Sec.2(a)(2)(A) and (B).

[158] For this reason, we disagree with LPTVBA that classifications based on Census data are preferable because they reflect "economic markets based on actual population behavior."  LPTVBA Reply Comments at 3.

[159] *See supra* n. 133.  NAB agrees that Census definitions like MSAs and RSAs have nothing to do with market assignment information or determining television broadcast markets, unlike Nielsen.  *See* NAB Comments at 3. REC notes that Census data does not reflect "television households," the term used in the LPPA's DMA eligibility requirement ("not more than 95,000 television households").  *See* REC Reply Comments at 3; LPPA Sec.2(c)(2)(B)(iii).  RCC opposes the use of MSAs because "they represent huge populations and areas" and would exclude many LPTV stations from converting to Class A.  RCC Reply Comments at 5.

[160] NAB agrees that using MSA or RSA definitions would be "establishing alternative market definitions that are wildly different from those established by Nielsen and are not 'equivalent to' Nielsen DMAs as the LPPA requires." NAB Comments at 3.  While we agree with LPTVBA that the Act permits us to consider local market definitions that differ from Nielsen DMAs, *see* LPTVBA Reply Comments at 4-5, we believe that the Act's requirement that any alternative system be "equivalent" the system established by Nielsen requires such alternative system to relate in some fashion to television markets and viewing patterns.

[161] *NPRM* at para. 34.  *See generally* OMB, *2020 Standards for Delineating Core Based Statistical Areas,* 86 FR 37770, 37771 (July 16, 2021) (*2020 CBSA Standards*), available at https://www.federalregister.gov/documents/2021/07/16/2021-15159/2020-standards-for-delineating-core-based-statistical-areas.

[162] *2020 CBSA Standards*, 86 FR at 37772 (warning MSA "delineations do not produce an urban-rural classification, and confusion of these concepts has the potential to affect the ability of a program to effectively target either urban or rural areas, if that is the program goal").

000020
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

geographically overbroad.[163]  We also note that the kind of inconsistent eligibility results that some commenters argue would occur using Nielsen DMAs are inevitable with any system that divides the country into geographic markets, and are not unique to Nielsen.[164]  Furthermore, we decline Identical Commenters' invitation that the Commission fabricate a new classification system based on Census data[165] because we find that such an exercise is unnecessary due to the availability of Nielsen data which is appropriate for this purpose.  We also believe that such an exercise would significantly delay our ability to implement the LPPA.  We also do not believe the failure of Nielsen to assign LPTV stations to DMAs is relevant[166] because the eligibility requirement is that the station "operate" in the DMA (that is, its transmission facilities are located within the qualifying DMA), not that it be assigned to the DMA.  Finally, reference to the fact that Nielsen is a private company that charges for some of its materials[167] is not a barrier to our decision here.  Nielsen has represented that it will provide to stations at no charge information about the DMA to which the station is assigned,[168] and information about the number of TV households in each DMA is publicly available.[169]

    38.    We also reject RCC's argument that our proposed adoption of an approach that limits eligibility under the LPPA to LPTV stations in DMAs with no more than 95,000 TV households is "nonsensical."[170]  This commenter points out that, under this approach, only thirty-three Nielsen DMAs would qualify under the LPPA (in other words, only 33 out of 210 DMAs),[171] amounting to only 1.6% of TV households.[172]  As a result, RCC argues that Congress could not have intended for use of Nielsen DMAs.[173]  We disagree.  Congress clearly intended that eligibility under the LPPA be limited, as the Act expressly provides that eligibility is limited to DMAs with no more than 95,000 TV households.  As NAB notes, elevating LPTV stations from secondary to primary Class A status comes at the cost of "effectively

---

[163] *See supra* para. 36.

[164] Flood Comments at 5-7.

[165] Identical Comments at 2 (citing the Copsidas Feb. 27 Letter).

[166] *Id*. at 2-3 (citing the Copsidas Feb. 27 Letter).  *See also* Communications Technology Comments at 2.

[167] *Id*. at 2-3 (citing the Copsidas Feb. 27 Letter).  *See also* Communications Technology Comments at 2.

[168] *See supra* n. 142 (citing *Nielsen DMA Determination Update Order* at paras. 1, 6 (reiterating Nielsen's clarification that it has "always told stations the DMAs to which they have been assigned upon request and free of charge")).  We interpret Nielsen's commitment in this regard to mean it will inform LPTV stations seeking to convert to Class A status pursuant to the LPPA, at no charge, the DMA in which the station's transmission facilities are located.  *See supra* para. 34.  Any LPTV station seeking to file an application pursuant to the LPPA that needs further information in this regard may contact the Commission staff.

[169] *See* http://web.archive.org/web/20230605234252/https://ustvdb.com/seasons/2022-23/markets/.  Thirty-three Nielsen DMAs had fewer than 95,000 TV households as of January 5, 2023.  These DMAs are: Elmira-Corning, Watertown, Bend, Alexandria, Marquette, Jonesboro, Bowling Green, Laredo, Butte-Bozeman, Lafayette, IN, Grand Junction-Montrose, Twin Falls, Lima, Great Falls, Meridian, Parkersburg, Greenwood-Greenville, Eureka, Cheyenne-Scottsbluff, San Angelo, Casper-Riverton, Mankato, Ottumwa-Kirksville, Saint Joseph, Fairbanks, Zanesville, Victoria, Helena, Presque Isle, Juneau, Alpena, North Platte, and Glendive.  Commission staff will review and confirm DMA information in all applications filed pursuant to the LPPA.

[170] RCC Comments at 6.

[171] RCC Comments at 5.  *See also* REC Comments at 5 (noting that only LPTV stations in DMAs ranked 178 (Elmira-Corning, New York) through 210 (Glendive, Montana) would qualify for Class A status under the LPPA).

[172] *See* RCC Comments at ii.

[173] *Id*. at 4 (stating that Congress "would [not] waste its time for the purpose of affecting such a marginal impact").  *See also* Flood Comments at 2 (urging use of MSAs to "maximize eligibility for stations" to elevate to Class A status).

000021
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

**Federal Communications Commission**                    FCC 23-112

block[ing] coverage and service improvements by full-service stations."[174]  In turn, Congress sought to allow certain LPTV stations in only smaller DMAs (not all small LPTV stations or all LPTV stations in rural areas) to elevate to primary status.  We decline to read the LPPA as promoting maximum elevation of LPTV stations to primary status; rather, Congress adopted a much more balanced approach.

39.    We also decline to use Comscore data as an alternative to the Nielsen Local TV Report for purposes of the LPPA, as advocated by several commenters.[175]  Like Nielsen, Comscore is a media analytics company that produces a list of television market areas and a calculation of the number of television households in each market.[176]  Because Comscore, like Nielsen, has a proprietary market system and requires payment for access, LPTVBA opposes adoption of Comscore data as an alternative local market system.[177]  REC comments that "the debate and development of any alternate system" to Nielsen "would further delay the process and could defeat the purpose of limiting Class A conversions to rural areas,[178] but also noted that Comscore markets "could be" comparable to Nielsen DMAs and should be considered.[179]  While it is possible that Comscore could qualify as a "system of dividing television broadcast station licensees into local markets" that is "equivalent" to the system established by Nielsen,[180] we find that the record here does not establish any material benefits from use of Comscore either in addition to or in place of Nielsen for purposes of the LPPA, nor that any such benefits would outweigh the uncertainty and delay that use of Comscore would have in issuing Class A licenses.  In particular, we are concerned about introducing uncertainty into the application review process, in the instance where Comscore's market classifications may differ from Nielsen.  The lack of a compelling reason to select a different classification system instead of Nielsen weighs in favor of our decision to use Nielsen Local TV Report for purposes of implementing the LPPA.

40.    Finally, we decline the requests of three other commenters who argue in favor of other alternatives to Nielsen DMAs.  One Ministries advocates that the Commission should allow LPTV stations to demonstrate that the geographic area covered by the station is a subset of a larger DMA, such as when the station is in a hyphenated DMA, *i.e.* Chico-Redding.[181]  One Ministries argues that Nielsen identifies Chico and Redding separately for purposes of radio markets, that LPTV stations cover roughly the same area as radio stations, and that no LPTV station in Chico-Redding covers both of those cities.[182]

---

[174] NAB Comments at 4.

[175] *See* Lockwood Comments at 1-3; NPG Comments at 4-6; REC Reply Comments at 3-4.

[176] Comscore uses its own proprietary system for geographic market definitions and number of TV households. Comscore, Local Market Definitions, *at* https://www.comscore.com/Products/Television/Local-Market-Definitions (last visited Oct. 2, 2023).  For instance, we note that Nielsen defines a TV household as follows: TV households must have at least one operable TV/monitor with the ability to deliver video via traditional means of antennae, cable set-top-box or satellite receiver and/or with a broadband connection.  *See* Nielsen, Nielsen Estimates 120.6 Million TV Homes in the U.S. for the 2019-2020 TV Season (Aug,. 2019), *at* https://www.nielsen.com/insights/2019/nielsen-estimates-120-6-million-tv-homes-in-the-u-s-for-the-2019-202-tv-season/#:~:text=Nielsen's%20national%20definition%20of%20a,Audience%20measurement%20TV.  Comscore states that it has "the largest and most representative TV viewing measurement footprint covering 1-in-3 homes across 75 million TV screens in over 30M households."  Comscore, National TV Measurement, *at* https://www.comscore.com/Products/Television/National-TV-Measurement (last visited Oct. 2, 2023).

[177] *See* LPTVBA Reply Comments at 4.  Apart from that issue, LPTVBA notes that it has "no reason to question the veracity of Comscore data." *Id*.

[178] REC Comments at 5.

[179] REC Reply Comments at 3 (explaining that Comscore, like Nielsen, has 210 market areas, and that only Comscore markets 164 through 210 would meet the 95,000 television household criteria).

[180] LPPA Sec.2(a)(2)(B).

[181] *See* One Ministries Comments at 2.

[182] *Id*.

RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

The LPPA directs that the Commission define DMA using Nielsen or an "equivalent" system of local TV markets, and dividing Nielsen hyphenated markets into separate markets for purposes of the LPPA would not be "equivalent" to the system established by Nielsen.  As NAB notes,[183] more than 40 percent of Nielsen markets are hyphenated, and allowing these markets to be treated as separate markets would create a system that is dramatically different from the current Nielsen DMA market definitions.[184]  JB Media Group argues that Nielsen DMAs do not account for variables such as interference that "can significantly impact viewership" and urges "an alternative approach that takes into account interference, actual households, and signal power under different weather conditions."[185]  We find that it would be impractical and lead to delay in implementing the LPPA for Commission staff to define markets based on factors such as weather and actual viewership, and JB Media Group does not offer an existing alternative market definition based on these factors.  Finally, RCC argues that the Commission should allow all LPTV stations whose "Section 307(b) community of license has fewer than 95,000 TV households" to convert to Class A status.[186]  We conclude that such a system of defining local TV markets would be very different than the one required by the LPPA to be "equivalent" to the system established by Nielsen, which defines larger geographic regions than community of license.[187]

## 5.    License Standards (Ongoing Eligibility Requirements)

41.    We will not require LPPA Class A stations to continue to comply with the 95,000 TV household threshold if the population in the station's DMA later exceeds the threshold amount as a result of changes beyond the station's control.  In the *NPRM*, the Commission stated its belief that the LPPA requirement that stations remain in compliance with the Act's eligibility requirements for the term of the Class A license[188] means that stations that convert to Class A status must continue to operate in DMAs

---

[183] *See* NAB Comments at 3. *See also* https://ustvdb.com/seasons/2022-23/markets/.

[184] NAB agrees that allowing some or all of the hyphenated DMAs to become separate television markets for purposes of the LPPA would create a set of alternative markets that are "radically different" from Nielsen DMAs. NAB Comments at 3.  NAB also argues that authorization of new Class A stations could impede the transition to ATSC 3.0.  *See* NAB Comments at 4.  We agree with LPTVBA and Flood that we should not consider the impact of the LPPA on the ATSC 3.0 transition.  *See* LPTVBA Reply Comments at 5-6; Flood Reply Comments at 5-6.  We conclude that Congress did not intend that we consider the impact of the LPPA on the transition to ATSC 3.0.  In the LPPA, Congress created specific, limited eligibility requirements that created a balanced approach to elevate certain LPTV stations in smaller DMAs to primary status.  We do not believe Congress intended that we further limit eligibility under the Act by considering  hypothetical limitations potentially imposed on stations in the future in connection with the transition to ATSC 3.0.

[185] JB Media Group Comments at 1-2.

[186] RCC Comments at 6.  RCC further argues that the Commission's reliance on a privately created DMA definition renders the LPPA unconstitutional as it adopts an "unconstitutional industrial code … to license protected Class A TV broadcast stations."  *Id.* at 18.  We reject this argument.  Congress does not run afoul of subdelegation principles because it permits an agency to use an outside entity's market definition for a particular purpose specified in the statute.  There is no assignment of unguided or unchecked authority here.  Finally, we also reject RCC's argument that the LPPA "prohibits the Commission from displacing any LPTV licensee, regardless of whether the license contains a Class A designation, for the purpose of selling that LPTV spectrum at auction."  RCC Comments at 17.  The LPPA is silent with respect to the issue of auctioning broadcast spectrum, and there is no evidence that Congress intended that we consider this issue as part of our implementation of the LPPA.

[187] RCC also argues that "the Commission's proposed licensing rules improperly removes LPTV stations from their 47 U.S.C. § 307(b) communities of license and reassigns them to much larger DMA markets in the name of 'protecting' those small LPTV stations."  RCC Comments at 3.  We disagree with this characterization of our decision to use Nielsen DMAs for purpose of the LPPA.  Our decision is consistent with the LPPA, relates only to implementation of the LPPA, and does not affect the communities LPTV stations are licensed to serve.

[188] *See* LPPA Sec.2(c)(3)(A)-(B).

RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

with not more than 95,000 television households in order to maintain their Class A status.[189]  The Commission noted that, under this interpretation of the Act, a station that converted to Class A status pursuant to the LPPA would no longer be eligible to retain Class A status if the population in its DMA later grows to more than 95,000 television households.[190]

42.    All of the commenters that addressed this interpretation of the Act oppose requiring LPPA Class A stations to remain in DMAs that meet the threshold population restriction, at least without some exceptions.  Commenters argue that if the Commission were to require continued compliance with this restriction, licensees would lack regulatory certainty to pursue Class A status, which would undermine the economic viability of Class A stations, and thus fewer stations would likely apply.[191]  Commenters also contend that it would be unfair to mandate that a station lose rights through no fault of its own if the population rose above the 95,000 threshold,[192] that the proposal would limit a licensee's ability to modify its facilities in the future (*e.g*., by relocating),[193] and that the proposal would impose different license terms for LPPA Class A stations than for existing Class A stations, which face no similar possible loss of their Class A status.[194]

43.    Commenters also argue that the Commission proposal is not required by the statute.[195]  Section 2(c)(2)(B)(iii) of the LPPA states that the Commission may approve conversion to Class A status for a station that "as of the date of enactment of this Act, operates in a Designated Market Area with not more than 95,000 television households."[196]  While Section 2(c)(3)(B) directs that a converted station is to remain in compliance with paragraph (2)(B)'s eligibility requirements during the term of the license, commenters argue that this language is properly interpreted to require only that a station be in compliance with the DMA requirement "as of" the date of enactment of the LPPA (January 5, 2023), not that it remain in compliance going forward.[197]

44.    We are persuaded by commenters who argue that a station, once it converts to Class A status pursuant to the LPPA, should not later lose eligibility and therefore be required to revert back to an LPTV station with secondary spectrum use status as a result of changes beyond the station's control.[198]  We conclude that Congress did not intend for LPPA Class A stations to subsequently lose Class A status through DMA changes that are not under the control of the station because Congress intended that the communities served by these stations should be able to rely on uninterrupted service from the stations.[199]

---

[189] *See NPRM* at para. 38.

[190] *Id*.

[191] *See* Flood Comments at 12-14; Identical Comments at 3-5; Lockwood Comments at 4-6; NAB Comments at 5; NPG Comments at 7-8.  *See also* Flood Reply Comments at 4; LPTVBA Reply Comments at 6-7.

[192] *Id*.

[193] *See* Identical Comments at 4.

[194] *See* Flood Comments at 13-14.

[195] *See* Lockwood Comments at 4-5; Identical Comments at 4-5; NPG Comments at 7.

[196] LPPA Sec.2(c)(2)(B)(iii).

[197] Lockwood also notes that the FCC measures the number of TV households for purposes of its national TV, local TV, and local radio ownership cap "at the time of grant" of the application, and that divestiture is not required if a licensee later exceeds the threshold audience reach or market size/ranking.  *See* Lockwood Comments at 5-6.

[198] *See*, *e.g*., REC Comments at 6 (arguing that if Nielsen changes a DMA designation or the population of the DMA grows beyond the threshold amount, it should have no impact on the status of the Class A station if they remain in the same community).

[199] *See* Activity Report of the House Committee on Energy and Commerce, Low Power Protection Act, H.R.117-702 (Jan 2, 2023) (introduced as S. 3405) (stating the statute "would afford [low power television stations] with

(continued….)

000024
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

Accordingly, we will not require LPPA Class A stations to continue to comply with the 95,000 TV household threshold if the population in the station's DMA later exceeds the threshold amount as a result of changes beyond the station's control. We find that the reasons that a station may no longer comply with the 95,000 TV household threshold that are beyond the station's control are a change in the market size through (1) population growth, (2) a change in the boundaries of a qualifying DMA such that the population of the DMA exceeds 95,000 television households, or (3) the merger of a qualifying DMA into another DMA such that the combined DMA exceeds the threshold amount.

45. We will not, however, permit an LPPA Class A station to maintain its Class A status if the size of the market it serves increases beyond 95,000 television households due to a change within the control of the station. For instance, we will not permit an LPPA Class A station to initiate a move to a different DMA that does not meet the LPPA population threshold at the time of the move and still retain the station's Class A status. We interpret the LPPA's continuing compliance mandate to preclude changes under the station's control that would result in the station's failure to continue to comply with the Act's eligibility requirements. We disagree with those commenters who argue that the Act requires only that the station be in compliance with the DMA requirement as of January 5, 2023.[200] This reading of section 2(c)(2)(B)(iii) of the Act is contrary to the language of section 2(c)(3)(B), which does not carve out the 95,000 TV household threshold requirement from the continuing compliance mandate. Such an interpretation would also undercut the purpose of the LPPA to strengthen protections for TV stations located in smaller DMAs,[201] as it would allow LPPA Class A stations to move to DMAs with larger populations, depriving smaller DMAs of the service these stations provide. We also disagree with those commenters who argue that stations that convert to Class A status pursuant to the LPPA should be able to initiate later site changes that would move the station to a non-qualifying DMA.[202] The language of the Act requires that LPPA Class A licensees remain in compliance with the LPPA's eligibility requirements for the term of their Class A license, including the requirement that they operate in a DMA with no more than 95,000 TV households. Apart from changes to a DMA that are beyond the station's control, we will require that LPPA Class A licensees remain in compliance with the 95,000 TV household threshold DMA requirement for the term of the Class A license. Stations that choose to pursue a non-compliant modification may do so, but will have to surrender their Class A status.

## C. Application Process

46. As proposed in the *NPRM*, we will evaluate applications to convert to Class A status pursuant to the LPPA as a modification of the LPTV station's existing license. No commenters addressed this issue. For purposes of the LPPA, applications to convert to Class A status will be limited to the conversion of existing LPTV facilities as they exist at the time of application, without consideration of

---

(Continued from previous page) ——————

protections against harmful interference and ensure the communities served by such stations can receive news, emergency information, and other broadcasts without disruption").

[200] *See supra* para. 43.

[201] LPPA Sec.2(c)(2)(B)(iii) (limiting eligibility for Class A status to stations operating in a DMA with not more than 95,000 TV households).

[202] *See, e.g.*, Communications Technologies Comments at 2-3 (arguing that it would be more equitable to require that stations operate for a fixed period of time (*e.g.*, one year) before proposing a site change to a non-qualifying DMA and adopt other criteria that would evaluate the public interest in terms of the number of other services available in the area currently served by the station versus the proposed new area); REC Comments at 6 (arguing that an LPPA Class A station should be permitted to retain its Class A status if a modification proposed by the station, and any subsequent modifications, "still result in the station providing a noise limited contour within at least 50 percent of the noise limited contour the station had at the time the station it was granted a conversion to Class A status." This would "prevent the station from making multiple 'hops' to move the station to a more desirable market while still affording stations the flexibility to adapt to changing situations" regarding tower siting, etc.).

000025
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

any pending modifications to those facilities or unbuilt construction permits.[203]  This approach will allow for expeditious consideration of all applications, and will eliminate delays that could arise from the possibility of mutual exclusivity between a Class A conversion application and other licensed full power or Class A facilities, were we to entertain license modifications during the application window.  A licensed LPTV station holding a construction permit to modify its facilities will either need to license those permitted facilities before applying to convert to Class A status, or may apply for a new modification after the Commission has processed the applications from the window.[204]

47.     When implementing the CBPA, the Commission required stations applying for Class A status to provide local public notice of applications for Class A status "since the nature of the underlying service is changing from secondary to primary service."[205]  We adopt the tentative conclusion in the *NPRM*, that for the same reason we will require an applicant seeking Class A status pursuant to the LPPA to provide local public notice of the application.  No commenters addressed this issue.

48.     Application Form.  As proposed in the *NPRM*, we will require that applications for modification of an LPTV station's existing license to convert to Class A status pursuant to the LPPA be filed using FCC Form 2100, Schedule F.[206]  Such applications must be filed electronically and must include the required filing fee.[207]  No commenters addressed these issues.[208]

### D.     TV Broadcast Incentive Auction, Post-Auction Transition, and Reimbursement

49.     We affirm the tentative conclusion in the *NPRM* that nothing in the LPPA or in our implementation of the Act can or will affect the Commission's work related to the Broadcast Incentive Auction.[209]  No commenters addressed this issue.

### E.     Digital Equity and Inclusion

50.     The Commission sought comment in the *NPRM* on how its proposals may promote or inhibit advances in diversity, equity, inclusion, and accessibility.  Only one commenter, REC, addressed this issue.  In REC's view, the overall impact to digital equity and inclusion of the LPPA "is slightly negative" as some LPTV stations on channels 5 and 6 could obtain primary status, thus limiting the ability in some areas to implement full-service FM broadcasting as a part of REC's WIDE-FM proposal, which REC asserts would increase the number of radio voices.[210]  While REC notes that the language of the Act is outside the Commission's control,[211] REC asserts that its proposals in response to the *NPRM* will help ensure that rural LPTV stations that provide a minimal level of locally originated programming

---

[203] In other words, stations will not be permitted to seek technical modification of their facilities in conjunction with their Class A conversion application.  This avoids potential confusion regarding the facilities to be protected as a Class A station.

[204] This ensures that any later-filed modification is properly flagged in our database as a Class A record.

[205] *Class A R&O*, 15 FCC Rcd at 6398, para. 108.

[206] The Commission will add to its Licensing Management System database (LMS) as part of FCC Form 2100, Schedule F, portions of the existing FCC Form 302-CA (Application for Class A Television Broadcast Station Construction Permit or License).  That form was developed for use by LPTV stations applying to convert to Class A status under the CBPA.  Once an LPTV station obtains Class A status, it can file for minor modification of license using FCC Form 2100, Schedule E.

[207] The filing fee for an application for a "new license" for a Class A station is $ 425.00.  *See* 47 CFR § 1.1104.

[208] We direct the Media Bureau to implement necessary updates to the form and issue a Public Notice announcing availability at the appropriate time.

[209] *See NPRM* at para. 43.

[210] REC Comments at 6.

[211] *Id.*

will be given "a level of expectation of longevity" as a result of changing from secondary to primary status, which "could help persons who live in rural or Tribal areas" to continue to receive local TV service.[212]  In addition, REC comments that requiring LPPA Class A stations to comply with full service rules will allow the Commission to better measure diversity in broadcast ownership and, through the public file process, require stations to be more accountable to their local audiences.[213]

51.    We appreciate receiving REC's views and have considered them fully in reaching our conclusions herein regarding implementation of the LPPA.  We acknowledge the importance of advancing diversity, equity, inclusion, and accessibility, and we believe that the LPPA itself, and the rules we adopt herein implementing the Act, will advance those aims.

### F.    Other Issues

52.    <u>Must Carry Rights</u>.  Two commenters, RCC and Dockins, argue that the Commission should amend its rules to give Class A stations must carry status.[214]  RCC argues that the Commission should "clarify" that Class A stations are incorrectly classified as "low power stations," whose carriage is limited as provided in section 76.55(d)[215] of our rules, but should instead be classified as "local commercial television stations" which are entitled to more expansive carriage rights as provided in section 76.555(c).[216]  Dockins asserts that "there is no logical reason why the Commission cannot amend the rules to allow must-carry status for Class A stations" and that the "historic failure" of the Commission to give Class A stations must-carry rights "appears to be an oversight" that should be corrected.[217]

53.    Consistent with the Commission's conclusion in the *Class A MO&O* with respect to LPTV stations that converted to Class A status pursuant to the CBPA, we conclude that LPPA Class A stations have the same limited must carry rights as LPTV stations, and do not have the same must carry rights as full service commercial television stations under section 76.55(c) of our rules.[218]  In the *Class A MO&O*, the Commission noted that both the language of the CBPA and the accompanying legislative history were silent with respect to the issue of must carry rights for Class A stations, and concluded that it is unlikely that Congress intended to grant Class A stations full must carry rights, equivalent to those of full-service stations, without addressing the issue directly.[219]  The LPPA is also silent with respect to the

---

[212] *Id.* at 7.

[213] *Id.*

[214] *See* RCC Comments at 15-16; Dockins Comments at 3-4.  *See also* RCC Reply Comments at 8.

[215] 47 CFR § 76.55(d).

[216] 47 CFR § 76.55(c).  *See* RCC Comments at 15.

[217] Dockins Comments at 4.

[218] *See Class A MO&O*, 16 FCC Rcd at 8259-60, paras. 39-43.  Section 614 of the Communications Act of 1934, as amended, establishes different sets of must carry eligibility requirements for local commercial television stations and for "qualified low power stations."  47 U.S.C. § 534.  Under very narrow circumstances, low power stations can become "qualified" and eligible for must carry.  47 U.S.C. § 534(h)(2).  For example, if a full power station is located in the same county or other political subdivision (of a State) as an otherwise qualified low power station, then the low power station will not be eligible for cable must-carry status.  *See* 47 U.S.C. § 534(h)(2)(F).  *See also Implementation of the Cable Television Consumer Protection and Competition Act of 1992, Broadcast Signal Carriage Issues*, MM Docket No. 92-259, Report and Order, 8 FCC Rcd 2965, 2983, para. 67 & n.211 (1993) (*Must Carry Order*).  Moreover, an otherwise qualified LPTV station qualifies for cable carriage only if the community of license of that station and the franchise area of the cable system on which it seeks carriage are both located outside of the largest 160 Metropolitan Statistical Areas, ranked by population, as determined by the Office of Management and Budget on June 30, 1990, and the population of the community of license on that date did not exceed 35,000.  *See* 47 U.S.C. § 534(h)(2)(E).

[219] The Commission noted in the *Class A MO&O* that its conclusion with respect to Class A must carry rights was consistent with the view expressed by the Commission in its Report and Order implementing the Satellite Home

(continued….)

RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

issue of must carry rights, and we similarly conclude therefore that Congress did not intend to confer full must carry rights on LPPA Class A stations equivalent to full-service stations, and different from the rights of CBPA Class A stations, without addressing the issue in the statute.  Instead, we find that Congress intended LPPA Class A stations to have the same limited must carry rights as LPTV stations and existing Class A stations.  We thus decline to revise our rules as RCC and Dockins request.

54.     _De Minimis_ Exception to the 95,000 TV Household Requirement.  We also decline to adopt a _de minimis_ exception to the LPPA's 95,000 TV household eligibility requirement, as proposed by Lockwood.[220]  Lockwood argues that the Commission should adopt an exception of up to 5 percent to the 95,000 TV household amount to "further the underlying purpose" of the LPPA to afford eligibility for Class A protection to LPTV stations serving smaller DMAs.[221]  Lockwood also argues that such an exception would afford flexibility in the case of fluctuations in the number of TV households in the DMA due to the methodology used to make the calculation or changes related to seasonal tourism or college/university populations.[222]  Finally, Lockwood argues that the Commission has implemented _de minimis_ exceptions to other of its regulatory requirements and has discretion to do so with respect to the LPPA as the Act expressly permits the Commission to select the appropriate system for determining DMAs.[223]

55.     The language of the Act clearly requires that, to be eligible for Class A status, a station must operate in a DMA with no more than 95,000 TV households.[224]  The Act also requires that LPPA Class A licensees remain in compliance with the LPPA's eligibility requirements for the term of their Class A license.[225]  With respect to the Act's DMA limit, as discussed above we interpret this continuing compliance mandate to preclude changes under the station's control that would result in the station's failure to continue to comply with the 95,000 TV household threshold.[226]

56.     As discussed above, while the LPPA provides the Commission with additional discretion in evaluating applicants for Class A status to treat a station as qualifying for Class A status if "the Commission determines that the public interest, convenience, and necessity would be served" or "for other reasons determined by the Commission,"[227] we are not inclined to expand the specific qualifying criteria beyond that identified in the statute.[228]  The LPPA provides precise and limited eligibility criteria and, except in very limited circumstances, we are not inclined to expand the specific qualifying criteria beyond that identified in the statute.  Accordingly, we decline to adopt a blanket _de minimis_ exception to the DMA eligibility requirement.  As discussed above, we will allow deviation from the strict statutory

---

(Continued from previous page)  ————————————————

Viewer Improvement Act of 1999.  _In the Matter of Implementation of the Satellite Home Viewer Improvement Act of 1999, Broadcast Signal Carriage Issues, Retransmission Consent Issues_, Report and Order, 16 FCC Rcd 1918 (2000).  In that Order, the Commission concluded that Class A stations are low power stations for mandatory carriage purposes, and are therefore not entitled to mandatory satellite carriage.

[220] _See_ Lockwood Comments at 6.

[221] _Id._

[222] _Id._ at 7-8.

[223] _Id._

[224] LPPA Sec.2(c)(2)(B)(iii).

[225] LPPA Sec.2(c)(3)(B).

[226] _See supra_ paras. 44-45.

[227] _See supra_ para. 27.  _See also_ 47 U.S.C. § 336(f)(2)(B).

[228] _See supra_ para. 28.

000028
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

eligibility criteria in the LPPA only on a case-by-case basis where such deviations are insignificant or where there are compelling circumstances such that equity mandates a deviation.[229]

## IV.    PROCEDURAL MATTERS

57.    *Regulatory Flexibility Act Analysis.*  The Regulatory Flexibility Act of 1980, as amended (RFA),[230] requires that an agency prepare a regulatory flexibility analysis for notice and comment rulemakings, unless the agency certifies that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities."[231]  Accordingly, we have prepared a Final Regulatory Flexibility Analysis (FRFA) concerning the possible impact of rule changes contained in this *Report and Order* on small entities.  The FRFA is set forth in Appendix C.

58.    *Final Paperwork Reduction Act Analysis.*  This document contains new information collection requirements subject to the Paperwork Reduction Act of 1995 (PRA).[232]  The requirements will be submitted to the Office of Management and Budget (OMB) for review under Section 3507(d) of the PRA.  OMB, the general public, and other Federal agencies will be invited to comment on the information collection requirements contained in this proceeding.  The Commission will publish a separate document in the *Federal Register* at a later date seeking these comments.  In addition, we note that, pursuant to the Small Business Paperwork Relief Act of 2002 (SBPRA),[233] we will seek specific comment on how the Commission might further reduce the information collection burden for small business concerns with fewer than 25 employees.

59.    *Congressional Review Act.*  The Commission has determined, and the Administrator of the Office of Information and Regulatory Affairs, Office of Management and Budget, concurs, that these rules are non-major under the Congressional Review Act, 5 U.S.C. § 804(2).  The Commission will send a copy of the *Report and Order* to Congress and the Government Accountability Office pursuant to 5 U.S.C. § 801(a)(1)(A).

## V.    ORDERING CLAUSES

60.    Accordingly, **IT IS ORDERED** that, pursuant to the authority found in sections 1, 2, 4(i), 4(j), 303, 307, 309, 311, and 336(f) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152, 154(i), 154(j), 303, 307, 309, 311, 336(f), and the Low Power Protection Act, Pub. L. 117-344, 136 Stat. 6193 (2023), this *Report and Order* **IS ADOPTED**, effective thirty (30) days after the date of publication in the *Federal Register*.

61.    **IT IS FURTHER ORDERED** that the Commission's rules **ARE HEREBY AMENDED** as set forth in Appendix B and such amendments will be effective 30 days after publication in the Federal Register, except for 47 C.F.R. §§ 73.6030(c) and 73.6030(d) which contain new or modified information collection requirements that require review by OMB under the PRA. The Commission directs the Media Bureau to announce the effective date of that information collection in a document published in the Federal Register after the Commission receives OMB approval.

---

[229] *Id*.

[230] *See* 5 U.S.C. §§ 601–612. The RFA has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[231] *See* 5 U.S.C. § 605(b).

[232] The Paperwork Reduction Act of 1995 (PRA), Pub. L. No. 104-13, 109 Stat. 163 (1995) (codified in Chapter 35 of title 44 U.S.C.).

[233] The Small Business Paperwork Relief Act of 2002 (SBPRA), Pub. L. No. 107-198, 116 Stat. 729 (2002) (codified in Chapter 35 of title 44 U.S.C.).  *See* 44 U.S.C. § 3506(c)(4).

000029
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

62.     **IT IS FURTHER ORDERED** that, pursuant to 47 U.S.C. 155(c), the Media Bureau is granted delegated authority for the purpose of amending FCC Form 2100 as necessary to implement the licensing process adopted herein and to establish the one-year application filing window once the revised form is available for use by applicants, and for the purpose of submitting the report to Congress required pursuant to the Low Power Protection Act, Pub. L. 117-344, 136 Stat. 6193, Sec. 2(d) (2023).

63.     **IT IS FURTHER ORDERED** that the Media Bureau is granted delegated authority for the purpose of activating an OPIF for LPTV stations that apply to convert to Class A status pursuant to the LPPA and of informing applicants when their OPIF is ready for the applicant to upload documents required to be maintained in OPIF.

64.     **IT IS FURTHER ORDERED** that the Commission's Office of the Secretary **SHALL SEND** a copy of this *Report and Order*, including the Final Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

65.     **IT IS FURTHER ORDERED** that Office of the Managing Director, Performance Program Management, **SHALL SEND** a copy of this *Report and Order* in a report to be sent to Congress and the Government Accountability Office pursuant to the Congressional Review Act, 5 U.S.C. § 801(a)(1)(A).

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

**APPENDIX A**

**List of Commenters**

Comments

Block Communications, Inc. (Block)

Communications Technologies

County of Los Angeles, California

Dockins Communications, Inc. (Dockins)

Flood Communications (Flood)

Channel 23 WXWZ, JB Media Group, Jose Berrios Diaz (JB Media Group)

Lockwood Broadcasting, Inc. (Lockwood)

LPTV Broadcasters Association (LPTVBA)

National Association of Broadcasters (NAB)

News-Press & Gazette Broadcasting (NPG)

One Ministries, Inc.

Radio Communications Corporation, LPTV Station W24EZ-D Formerly Class A Station W28AJ (RCC)

REC Networks (REC)

KFLA-LD; Data Wave, LLC; M&C Broadcasting Corporation – WCEA-LD; The Videohouse Inc.; ATV Holdings, Inc.; G.I.G., Inc.; Michael Karr; Caribevision Holdings; Tycke Media, LLC; America CV Station Group, Inc.; Viper Communications, Inc.; Lowcountry 34 Media, LLC; Paramount Broadcasting Communication LLC; Look Media; Lawrence F. Loesch; Agape Broadcasters Inc; Richardson Broadcasting; King Forward Inc; KADO/Word of Life Ministries, Inc; Dockins Broadcast Group (collectively referred to herein as "Identical Comments")

Reply Comments

Flood Communications

LPTV Broadcasters Association

Radio Communications Corp.

REC Networks

RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

**APPENDIX B**

**Final Rules**

Part 73 of Title 47 of the U.S. Code of Federal Regulations is amended to read as follows:

PART 73 – RADIO BROADCAST SERVICES

1.      The Authority citation for Part 73 continues to read as follows:

AUTHORITY: 47 U.S.C. 154, 155, 301, 303, 307, 309, 310, 334, 336, 339.

2.      Amend Section 73.3580 by revising paragraph (c) to add new paragraph (c)(7) to read as follows:

§ 73.3580 Local public notice of filing of broadcast applications.

…

(c) Applications requiring local public notice.  The following applications filed by licensees or permittees of the following types of stations must provide public notice in the manner set forth in paragraphs (c)(1) through (7) of this section:

…

(7) Applications by LPTV stations to convert to Class A status pursuant to the Low Power Protection Act.  The applicant shall both broadcast on-air announcements and give online notice.

…

2.      Section 73.6030 is adopted as follows.

§ 73.6030  Low Power Protection Act

(a) Definitions.  For purposes of the Low Power Protection Act, a low power television station's Designated Market Area (DMA) shall be defined as the DMA where its transmission facilities (i.e., the structure on which its antenna is mounted) are located.  DMAs are determined by Nielsen Media Research.  A low power television station shall be defined in accordance with § 74.701(k).

(b) Eligibility Requirements.  In order to be eligible for Class A status under the Low Power Television Protection Act, low power television licensees must:
(1) have been operating in a DMA with not more than 95,000 television households as of January 5, 2023;
(2) have been broadcasting a minimum of 18 hours per day between October 7, 2022 and January 5, 2023;
(3) have been broadcasting a minimum of at least three hours per week of locally produced programming between October 7, 2022 and January 5, 2023;
(4) have been operating in compliance with the Commission's requirements applicable to low power television stations between October 7, 2022 and January 5, 2023;
(5) be in compliance with the Commission's operating rules for full-power television stations from and after the date of its application for a Class A license; and

000032
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

(6) demonstrate that the Class A station for which the license is sought will not cause any interference described in 47 U.S.C. 336(f)(7).

(c) Application Requirements.  Applications for conversion to Class A status must be submitted using FCC Form 2100, Schedule F within one year beginning on the date on which the Commission issues notice that the rules implementing the Low Power Protection Act takes effect. The licensee will be required to submit, as part of its application, a statement concerning the station's operating schedule during the 90 days preceding January 5, 2023 and a list of locally produced programs aired during that time period.  The applicant may also submit other documentation, or may be requested by Commission staff to submit other documentation, to support its certification that the licensee meets the eligibility requirements for a Class A license under the Low Power Protection Act.

(d) Licensing Requirements.  A Class A television broadcast license will only be issued under the Low Power Protection Act to a low power television licensee that files an application for a Class A Television license (FCC Form 2100, Schedule F), which is granted by the Commission.

(e) Service Requirements.  Stations that convert to Class A status pursuant to the Low Power Protection Act are required to meet the service requirements specified in § 73.6001(b)-(d) of this chapter for the term of their Class A license.  In addition, such stations must remain in compliance with the programming and operational standards set forth in the Low Power Protection Act for the term of their Class A license.  In addition, such stations must continue to operate in DMAs with not more than 95,000 television households in order to maintain their Class A status unless the population in the station's DMA later exceeds 95,000 television households through (1) population growth, (2) a change in the boundaries of a qualifying DMA such that the population of the DMA exceeds 95,000 television households, or (3) the merger of a qualifying DMA into another DMA such that the combined DMA exceeds 95,000 television households.  LPPA Class A stations will not be permitted to initiate a move to a different DMA with more than 95,000 television households at the time of the move and still retain their Class A status.

(f) Other regulations.  From and after the date of applying for Class A status under the Low Power Protection Act, stations must comply with the requirements applicable to Class A stations specified in subpart J of this part (§§ 73.6000 through 73.6029) and must continue to comply with such requirements for the term of their Class A license.

000033
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

**APPENDIX C**

**Final Regulatory Flexibility Analysis**

1.        As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[1] an Initial Regulatory Flexibility Act Analysis (IRFA) was incorporated into the *Notice of Proposed Rulemaking* (*NPRM*) released March 30, 2023.[2]  The Federal Communications Commission (Commission) sought written public comment on the proposals in the *NPRM*, including comment on the IRFA.  No comments were filed addressing the IRFA.  This Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA.[3]

        **A.        Need for, and Objectives of, the Report and Order**

2.        The *Report and Order* adopts rules to implement the Low Power Protection Act (LPPA or Act),[4] which was enacted on January 5, 2023.  The LPPA provides certain low power television (LPTV) stations with a "limited window of opportunity" to apply for primary spectrum use status as Class A television stations.[5]  The rules adopted herein reflect most of the Commission's proposals in the *Implementation of the Low Power Protection Act*, *Notice of Proposed Rulemaking* (*NPRM*)[6] in this proceeding, with limited exceptions.[7]  We establish herein the period during which eligible stations may file applications for Class A status pursuant to the LPPA, clarify eligibility and interference requirements, and establish the process for submitting applications for Class A status pursuant to the Act.  Our rules provide eligible LPTV stations with a limited opportunity to apply for primary spectrum use status as Class A television stations, consistent with Congress's directive in the LPPA.

3.        We conclude that the application window will be limited to the one year application window contemplated by the Act, and that an application filed for Class A status must demonstrate that the LPTV station operated in a Designated Market Area (DMA) with not more than 95,000 television households on January 5, 2023.  We also conclude that LPTV stations that convert to Class A status under the LPPA must comply with the interference protection standards set forth in section 336(f)(7) of the Communications Act of 1934, with the exception of those provisions that are now obsolete given the transition of all television stations from analog to digital operations.  We apply the Commission's recently updated definition of an LPTV station for purposes of determining which stations are eligible for Class A status under the LPPA and codify in our rules the eligibility criteria set forth in the LPPA.  We also implement provisions of the LPPA which provide that licenses issued to stations that convert to Class A status are subject to full power television station license terms and renewal standards, with certain exceptions.  We conclude that LPPA Class A licensees are required to remain in compliance with the LPPA's eligibility requirements for the term of their Class A license, except for changes to the station's DMA that are beyond the control of the station.  We conclude that we will evaluate Class A status to

---

[1] 5 U.S.C. § 603.  The RFA, 5 U.S.C. §§ 601-612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[2] *See Implementation of the Low Power Protection Act*, MB Docket No. 23-126, Notice of Proposed Rulemaking, FCC 23-23 (rel. March 30, 2023) (*NPRM*).

[3] 5 U.S.C. § 604.

[4] Low Power Protection Act, Pub. L. 117-344, 136 Stat. 6193 (2023).

[5] LPPA Sec.2(b).

[6] *See Implementation of the Low Power Protection Act*, MB Docket No. 23-126, Notice of Proposed Rulemaking, FCC 23-23 (rel. March 30, 2023) (*NPRM*).

[7] We received over thirty comments in response to the *NPRM*.  Twenty of these commenters filed identical comments supporting the adopting of MSAs as an alternative local market methodology for determining eligibility under the LPPA

000034
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

eligible LPTV stations as a modification of the station's existing license, and that nothing in the LPPA, or our rules implementing the Act, affects the Commission's work related to the Broadcast Incentive Auction.  We address how our actions implementing the LPPA advance diversity, equity, inclusion, and accessibility and, lastly, decline to amend our rules to afford Class A stations must carry rights equivalent to full service stations and decline to adopt a de minimis exception to the LPPA's DMA eligibility requirement.

> **B.     Summary of Significant Issues Raised by Public Comments in Response to the IRFA**

4.     There were no comments filed that specifically addressed the rules and policies proposed in the IRFA.

> **C.     Response to Comments by the Chief Counsel for Advocacy of the Small Business Administration**

5.     Pursuant to the Small Business Jobs Act of 2010, which amended the RFA, the Commission is required to respond to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration (SBA), and to provide a detailed statement of any change made to the proposed rules as a result of those comments.[8]

6.     The Chief Counsel did not file any comments in response to the proposed rules in this proceeding.

> **D.     Description and Estimate of the Number of Small Entities To Which the Proposed Rules will Apply**

7.     The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the proposed rules, if adopted.[9]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[10]  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[11]  A small business concern is one which:  (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[12]  Below, we provide a description of such small entities, as well as an estimate of the number of such small entities, where feasible.

8.     *Television Broadcasting*.  This industry is comprised of "establishments primarily engaged in broadcasting images together with sound."[13]  These establishments operate television broadcast studios and facilities for the programming and transmission of programs to the public.[14]  These establishments also produce or transmit visual programming to affiliated broadcast television stations,

---

[8] 5 U.S.C. § 604(a)(3).

[9] 5 U.S.C. § 603(b)(3).

[10] *Id*. § 601(6).

[11] *Id*. § 601(3) (incorporating by reference the definition of "small-business concern" in 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."  5 U.S.C. § 601(3).

[12] 15 U.S.C. § 632.

[13] *See* U.S. Census Bureau, *2017 NAICS Definition, "515120 Television Broadcasting*,"
https://www.census.gov/naics/?input=515120&year=2017&details=515120.

[14] *Id*.

000035
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

which in turn broadcast the programs to the public on a predetermined schedule. Programming may originate in their own studio, from an affiliated network, or from external sources. The SBA small business size standard for this industry classifies businesses having $41.5 million or less in annual receipts as small.[15] 2017 U.S. Census Bureau data indicate that 744 firms in this industry operated for the entire year.[16] Of that number, 657 firms had revenue of less than $25,000,000.[17] Based on this data we estimate that the majority of television broadcasters are small entities under the SBA small business size standard.

9.       As of September 30, 2023, there were 1,377 licensed commercial television stations.[18] Of this total, 1,258 stations (or 91.4%) had revenues of $41.5 million or less in 2022, according to Commission staff review of the BIA Kelsey Inc. Media Access Pro Television Database (BIA) on October 4, 2023, and therefore these licensees qualify as small entities under the SBA definition. In addition, the Commission estimates as of September 30, 2023, there were 383 licensed noncommercial educational (NCE) television stations, 380 Class A TV stations, 1,889 LPTV stations and 3,127 TV translator stations.[19] The Commission, however, does not compile and otherwise does not have access to financial information for these television broadcast stations that would permit it to determine how many of these stations qualify as small entities under the SBA small business size standard. Nevertheless, given the SBA's large annual receipts threshold for this industry and the nature of these television station licensees, we presume that all of these entities qualify as small entities under the above SBA small business size standard.

E.       **Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities**

10.       In implementing the LPPA, the *Report and Order* adopts new or additional reporting, recordkeeping or other compliance requirements for small and other entities. For example, the LPPA requires that, to be eligible for Class A status, during the 90 days preceding the date of enactment of the LPPA an LPTV station must have broadcast a minimum of 18 hours/day and an average of at least 3 hours per week of programming produced within the "market area" served by the station[20] and have been in compliance with the Commission's requirements for LPTV stations.[21] The rules also require that small and other applicants seeking to convert to Class A status under the LPPA certify in their application for Class A status that they have complied with these eligibility requirements during the 90 days preceding the January 5, 2023 enactment of the statute. An applicant must submit, as part of its application, a statement concerning the station's operating schedule during the 90 days preceding January 5, 2023 and a list of locally produced programs aired during that time period. The applicant may also submit other documentation to support its certification that the licensee meets the eligibility requirements for a Class A

---

[15] *See* 13 CFR § 121.201, NAICS Code 515120 (as of 10/1/22 NAICS Code 516120).

[16] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017*, Table ID: EC1700SIZEREVFIRM, NAICS Code 515120, https://data.census.gov/cedsci/table?y=2017&n=515120&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.

[17] *Id.* The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard. We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

[18] *Broadcast Station Totals as of September 30, 2023*, Public Notice, DA 23-921 (rel. Oct. 3, 2023) (*October 2023 Broadcast Station Totals PN*), https://docs.fcc.gov/public/attachments/DA-23-921A1.pdf.

[19] *Id.*

[20] LPPA Sec.2(c)(2)(B)(i)(I), 47 U.S.C. § 336(f)(2)(A)(i)(II).

[21] LPPA Sec.2(c)(2)(B)(i)(I), 47 U.S.C. § 336(f)(2)(A)(i)(III).

000036
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

license under the Low Power Protection Act.  In addition, the Commission staff may also request additional documentation if necessary during consideration of the application.

11.    Beginning on the date of its application for a Class A license and thereafter, a station "must be in compliance with the Commission's operating rules for full-power stations."[22]  We will apply to small and other applicants for Class A status under the LPPA, and to stations that are awarded Class A licenses under that statute, all Part 73 regulations except for those that cannot apply for technical or other reasons.  For example, Class A stations must comply with the requirements for informational and educational children's programming, the political programming and political file rules, and the public inspection file rule.

12.    The LPPA requires that a station that converts to Class A status pursuant to the statute continue to meet the eligibility requirements of the LPPA during the term of the station's Class A license.  To be eligible under the LPPA, in addition to other eligibility requirements, section 2(c)(2)(B)(iii) of the Act requires an LPTV station must "as of the date of enactment" of the LPPA operate in a DMA with not more than 95,000 television households.[23]  Section 2(c)(3)(B) of the Act, however, requires that stations that convert to Class A status under the LPPA "remain in compliance" with paragraph (2)(B) "during the term of the license."[24]  We interpret section 2(c)(3)(B) to require that stations that convert to Class A status, including small entities, remain in DMAs with not more than 95,000 television households in order to maintain their Class A status except for situations in which the population in the station's DMA later exceeds the threshold amount through (1) population growth, (2) a change in the boundaries of a qualifying DMA such that the population of the DMA exceeds 95,000 television households, or (3) the merger of a qualifying DMA into another DMA such that the combined DMA exceeds the threshold amount.  LPPA Class A stations will not be permitted to initiate a move to a different DMA with more than 95,000 television households at the time of the move and still retain their Class A status.  In addition, licensed Class A stations must also continue to meet the minimum operating requirements for Class A stations.[25]  Licensees unable to continue to meet the minimum operating requirements for Class A television stations, or that elect to revert to low power television status, must promptly notify the Commission, in writing, and request a change in status.[26]  The *Report and Order* also requires that stations that convert to Class A status pursuant to the LPPA comply with all rules applicable to existing Class A stations, including interference requirements.

13.    The *Report and Order* requires small and other stations seeking to convert to Class A designation pursuant to the LPPA to submit an application to the Commission within one year of the effective date of the rules adopted in this proceeding.  The *Report and Order* concludes that the Commission will not continue to accept applications to convert to Class A status under the LPPA beyond the one-year application period set forth in the statute.  In addition, we will allow deviation from the strict statutory eligibility criteria under the LPPA only where deviations are insignificant or where there are compelling circumstances such that equity mandates a deviation.[27]  In the *NPRM*, we noted that one

---

[22] LPPA Sec.2(c)(2)(B)(i)(I); 47 U.S.C. § 336(f)(2)(A)(ii).

[23] LPPA Sec.2(c)(2)(B)(iii).

[24] LPPA Sec.2(c)(3)(B).

[25] 47 CFR § 73.6001(c).

[26] *Id.* § 73.6001(d).

[27] The LPPA provides that the Commission may approve an application for Class A status if the application satisfies section 336(f)(2) of the Communications Act of 1934, codified as part of the CBPA.  LPPA Sec.2(c)(2)(B)(i)(I); 47 U.S.C. § 336(f)(2)(A).  The CBPA provided the Commission with additional discretion in evaluating applicants for Class A status if "the Commission determines that the public, interest, convenience, and necessity would be served by treating the station as a qualifying low-power television station for purposes of this section, or for other reasons determined by the Commission."  47 U.S.C. § 336(f)(2)(B).  In the *Class A Order*, the Commission determined that it would allow deviation from the strict statutory eligibility criteria in the CBPA "only where such deviations are
(continued….)

000037
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

example of such compelling circumstances might be "a natural disaster or interference conflict which forced the station off the air" during the 90-day period preceding enactment of the statute.

14.    We expect the actions we have taken in the *Report and Order* achieve the goals of implementing the LPPA without placing significant additional costs and burdens on small entities. At present, there is not sufficient information on the record to quantify the cost of compliance for small entities, or to determine whether it will be necessary for small entities to hire professionals to comply with the adopted rules. However, we anticipate that the compliance obligations for small stations will be outweighed by the benefits provided through the LPPA's granting of a limited opportunity for LPTV stations to apply for primary status as a Class A television licensee.

### F.    Steps Taken to Minimize the Significant Economic Impact on Small Entities and Significant Alternatives Considered

15.    The RFA requires an agency to provide, "a description of the steps the agency has taken to minimize the significant economic impact on small entities…including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected."[28]

16.    Through comments provided by interested parties during the rulemaking proceeding, the Commission considered various proposals from small and other entities. The adopted rules reflect the Commission's efforts to implement the LPPA by balancing the Commission's proposals in the *NPRM* with alternative proposals provided by the commenters and weighing their benefits against their potential costs to small and other entities. As discussed above, the LPPA provides a limited window of opportunity for an LPTV station to attain primary status as a Class A TV station, if the LPTV station meets the eligibility criteria set forth in the LPPA. The *Report and Order* adopts most of the Commission's proposals in the *NPRM*, with one significant exception. We do not adopt the proposal to require that all licensees that convert to Class A status pursuant to the LPPA remain in compliance with the LPPA's requirement that the station be in a DMA with no more than 95,000 TV households for the term of their Class A license. Instead, we conclude that LPPA Class A stations will not be required to continue to comply with the 95,000 TV household threshold if the population in the station's DMA later exceeds the threshold amount either through (1) population growth, (2) a change in the boundaries of a qualifying DMA such that the population of the DMA exceeds 95,000 television households, or (3) the merger of a qualifying DMA into another DMA such that the combined DMA exceeds the threshold amount. This one change to our approach in implementing the LPPA may minimize a potentially significant impact on a small entity in circumstances where the station is in a DMA that later exceeds the threshold TV household eligibility amount for reasons beyond the station's control. We also considered but did not, however, permit an LPPA Class A station to initiate a move to a DMA that does not meet the 95,000 TV household eligibility requirement and still retain its status as a Class A station.

17.    Additionally, in the *Report and Order* the Commission adopted a simplified license application approach regarding the documentation stations are required to submit as part of their application for a Class A license. Rather than mandating that an applicant provide specific additional documents to support its application, the Report and *Order* permits an applicant to provide whatever additional documentation the applicant has that best support its certification that it met the operational and programming requirements of the LPPA during the eligibility period. This flexibility minimizes the impact on small LPTV stations, some of which may have difficulty providing specific mandated documents because they do not have the necessary documents or lack the resources necessary to provide

---

(Continued from previous page) ───────────────

insignificant or when we determine that there are compelling circumstances, and that in light of those compelling circumstances, equity mandates such a deviation."  *Class A Order*, 15 FCC Rcd at 6369, para. 33.

[28] 5 U.S.C. § 604(a)(6).

000038
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

the document in a form that supports their certification.  We also took the step of reducing a potential economic burden to small LPTV stations by adopting the proposal to use data from the Nielsen Local TV Station Information Report (Nielsen Local TV Report) in order to determine the DMA where the LPTV station's transmission facilities are located for purposes of eligibility.  The Commission considered proposed alternatives such as using census data for Metropolitan Statistical Areas (MSAs) and Rural Service Areas (RSAs), or Comscore data.  However, we have determined that using the Nielsen Local TV Report would be less burdensome to small and other LPTV stations based on current industry practices and because certain data, such as DMA station assignment information, can be provided to stations at no cost.

> **G. Report to Congress**

18. The Commission will send a copy of the *Report and Order*, including this FRFA, in a report to Congress pursuant to the Congressional Review Act.[29]  In addition, the Commission will send a copy of the *Report and Order*, including this FRFA, to the Chief Counsel for Advocacy of the SBA.  A copy of the *Report and Order*, and FRFA (or summaries thereof) will also be published in the *Federal Register*.[30]

---

[29] *See Id.*. § 801(a)(1)(A).

[30] *See Id.*  § 604(b).

000039
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

PUBLIC LAW 117–344—JAN. 5, 2023        136 STAT. 6193

Public Law 117–344
117th Congress

## An Act

To require the Federal Communications Commission to issue a rule providing that certain low power television stations may be accorded primary status as Class A television licensees, and for other purposes.

*Jan. 5, 2023*
[S. 3405]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

Low Power
Protection Act.
47 USC 336 note.

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Low Power Protection Act".

**SEC. 2. LOW POWER TV STATIONS.**

(a) DEFINITIONS.—In this section—

(1) the term "Commission" means the Federal Communications Commission;

(2) the term "Designated Market Area" means—

(A) a Designated Market Area determined by Nielsen Media Research or any successor entity; or

(B) a Designated Market Area under a system of dividing television broadcast station licensees into local markets using a system that the Commission determines is equivalent to the system established by Nielsen Media Research; and

(3) the term "low power TV station" has the meaning given the term "digital low power TV station" in section 74.701 of title 47, Code of Federal Regulations, or any successor regulation.

(b) PURPOSE.—The purpose of this section is to provide low power TV stations with a limited window of opportunity to apply for the opportunity to be accorded primary status as Class A television licensees.

(c) RULEMAKING.—

(1) IN GENERAL.—Not later than 90 days after the date of enactment of this Act, the Commission shall issue a notice of proposed rulemaking to issue a rule that contains the requirements described in this subsection.

Deadline.
Notice.

(2) REQUIREMENTS.—

(A) IN GENERAL.—The rule with respect to which the Commission is required to issue notice under paragraph (1) shall provide that, during the 1-year period beginning on the date on which that rule takes effect, a low power TV station may apply to the Commission to be accorded primary status as a Class A television licensee under section 73.6001 of title 47, Code of Federal Regulations, or any successor regulation.

Time period.

(B) CONSIDERATIONS.—The Commission may approve an application submitted under subparagraph (A) if the low power TV station submitting the application—

(i) satisfies—

*Time period.*

(I) section 336(f)(2) of the Communications Act of 1934 (47 U.S.C. 336(f)(2)) and the rules issued under that section, including the requirements under such section 336(f)(2) with respect to locally produced programming, except that, for the purposes of this subclause, the period described in the matter preceding subclause (I) of subparagraph (A)(i) of such section 336(f)(2) shall be construed to be the 90-day period preceding the date of enactment of this Act; and

(II) paragraphs (b), (c), and (d) of 73.6001 of title 47, Code of Federal Regulations, or any successor regulation;

(ii) demonstrates to the Commission that the Class A station for which the license is sought will not cause any interference described in section 336(f)(7) of the Communications Act of 1934 (47 U.S.C. 336(f)(7)); and

(iii) as of the date of enactment of this Act, operates in a Designated Market Area with not more than 95,000 television households.

(3) APPLICABILITY OF LICENSE.—A license that accords primary status as a Class A television licensee to a low power TV station as a result of the rule with respect to which the Commission is required to issue notice under paragraph (1) shall—

(A) be subject to the same license terms and renewal standards as a license for a full power television broadcast station, except as otherwise expressly provided in this subsection; and

(B) require the low power TV station to remain in compliance with paragraph (2)(B) during the term of the license.

(d) REPORTING.—Not later than 1 year after the date of enactment of this Act, the Commission shall submit to the Committee on Commerce, Science, and Transportation of the Senate and the Committee on Energy and Commerce of the House of Representatives a report regarding the implementation of this section, which shall include—

*List.*

(1) a list of the current, as of the date on which the report is submitted, licensees that have been accorded primary status as Class A television licensees; and

(2) of the licensees described in paragraph (1), an identification of each such licensee that has been accorded the status described in that paragraph because of the implementation of this section.

(e) RULE OF CONSTRUCTION.—Nothing in this section may be construed to affect a decision of the Commission relating to completion of the transition, relocation, or reimbursement of entities as a result of the systems of competitive bidding conducted pursuant to title VI of the Middle Class Tax Relief and Job Creation Act of 2012 (47 U.S.C. 1401 et seq.), and the amendments made by

000041
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

PUBLIC LAW 117–344—JAN. 5, 2023        136 STAT. 6195

that title, that are collectively commonly referred to as the "Television Broadcast Incentive Auction".

Approved January 5, 2023.

---

LEGISLATIVE HISTORY—S. 3405:

CONGRESSIONAL RECORD, Vol. 168 (2022):
    Dec. 21, considered and passed Senate.
    Dec. 22, considered and passed House.

○

000042
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | MB Docket No. 23-126 |
| Implementation of the | ) | FCC 23-23 |
| Low Power Protection Act | ) | |
| | ) | |

**COMMENTS OF RADIO COMMUNICATIONS CORPORATION**
**LPTV STATION W24EZ-D FORMERLY CLASS A STATION W28AJ**

**Radio Communications Corporation**
**Timothy E. Welch, Esq.**
**Hill and Welch**
**1116 Heartfields Drive**
**Silver Spring, MD 20904**
**(202) 321-1448**
**welchlaw@earthlink.net**

# Table of Contents

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A.  RCC's First "Protected" LPTV Station Was Eventually Displaced . . . . . . . . . . . 1

B.  The LPPA Requires LPTV Protection & License Permanence . . . . . . . . . . . . . . 3
     1.  FCC 23-23:  Reads "Protection" Out of The LPPA . . . . . . . . . . . . . . . . . . 3
     2.  FCC 23-23:  Fails To Protect LPTV Service To 98% Of TV Households . . 5
     3.  FCC 23-23:  Fails To Use Section 307(b) Communities Of License . . . . . . 6
     4.  FCC 23-23:  Misreads The LPPA's 95,000 TV Household Limitation . . . . 9
     5.  FCC 23-23:  Harms LPTV Licensees In Four Ways . . . . . . . . . . . . . . . . . 11

C.  Instruct CATV Systems That Class A Licensees Have Must Carry Rights  . . . 14

D.  The LPPA Prohibits Auction Of LPTV Licensed Spectrum . . . . . . . . . . . . . . . 16

E.  Licensing Based Upon Nielsen's DMAs Is Unconstitutional . . . . . . . . . . . . . . 18

i

## Summary

Media concentration is a significant problem in the United States. This problem has grown ever more serious owing to the Commission's decades long failure to foster diversity of voices in the broadcast marketplace. FCC 23-23 was adopted and released to implement the Low Power Protection Act (LPPA), but FCC 23-23 proposes delivery of more of that same regulatory failure.

The explicitly stated purpose of the LPPA is "to provide low power TV stations with a limited window of opportunity to apply for the opportunity to be accorded **primary status** as Class A television licensees." LPPA Section 2(b) (emphasis added). However, the Commission ignores longstanding rules and Section 307(b) and interprets the LPPA as the Large Power Protection Act. FCC 23-23's proposed rules rely upon unconstitutional market structures, *Schechter*, to remove the LPPA's licensing protection from LPTV stations covering 98.4% of the nation's TV households. The Commission's proposal to apply the LPPA, a national act, in a manner which protects LPTV stations covering only 1.6% of the nation's TV households, is ridiculous on its face. There is nothing in FCC 23-23 which even remotely explains why Congress would waste its time for the purpose of affecting such a marginal impact.

In addition to interpreting the LPPA more rationally, the Commission must clarify that Class A stations are able to assert must carry/retransmission consent rights and clarify that LPTV licenses will not be seized for the purpose of selling spectrum at a spectrum auction. LPTV licensees must have licensing stability to allow them to make rational investment decisions regarding station improvements.

## Introduction

Radio Communications Corporation (RCC), Licensee of LPTV Station W24EZ-D, by its attorney, hereby submits comments in the captioned rulemaking proceeding as an interested party/Licensee directly affected by the Commission's proposed implementation of the Low Power Protection Act (LPPA).[1]  In support whereof, the following is respectfully submitted:

### A.  RCC's First "Protected" LPTV Station Was Eventually Displaced

The LPPA marks the second time that the Commission has addressed LPTV protection and for the second time it appears that the Commission is turning another opportunity to protect LPTV stations into another effort to eliminate LPTV stations. The Commission's proposed LPTV protection rules are irrational because, contrary to plain Congressional intent expressed in the LPPA, the proposed rules protect full-power TV stations at the expense of LPTV stations.   The proposed LPPA "protection" proposal conflicts with   the text of LPPA, 47 U.S.C. § 307(b), constitutional requirements, and irrationally turns the Low Power Protection Act into the Large Power Protection Act.

LPTV Station W24EZ-D was initially licensed as analog Station W28AJ in the late 1980s to serve Allingtown, Connecticut.[2]  With limited exception, Station W24EZ-

---

[1]  Low Power Protection Act, Pub. L. 117-344, 136 Stat. 6193 (2023).

[2]  RCC's community of license, Allingtown, CT, is a small community located within the City of West Haven, CT.  Connecticut Hometown Locator.  The city of West Haven has a population of 55,584 persons according to the 2020 U.S. Census and 21,750 Total Housing Units according to the 2020 U.S. Census.  As of July 1, 2022 it

1

D, or its predecessor, has been broadcasting for more than thirty years originating programming for its local service area.[3]

In 2000 the Commission then adopted rules to "protect" LPTV stations by allowing qualified LPTV stations to be upgraded and reclassified as "Class A" protected stations. FCC 23-23 ¶ 4. Protected Class A stations were required to follow the programming and reporting rules applicable to full power TV stations and they were given "protection" from future displacement by full power TV stations. However, protected Class A stations were denied the ability to assert must carry rights by CATV systems based upon an erroneous reading of 47 C.F.R. § 76.55(d)(5).[4] Accordingly, protected Class A stations like W24EZ-D's predecessor Station W28AJ, licensed within the Top 160 markets, were burdened with the obligations of full power TV stations, but

---

is estimated that West Haven has 22,704 Total Housing Units (including 1,377 vacant housing units). Connecticut Hometown Locator. The West Haven, Allingtown Fire Department estimates that the population of Allingtown is about 15,000 persons.

[3] RCC's LPTV Station W24EZ-D "originates" programming as defined at 47 C.F.R. § 74.701(h) because it controls "the program source, as it reaches the transmitter site." FCC 23-23, n.44. *See*, Amendment to Renewal of License, Station W24EZ-D, filed November 14, 2022, File No. 0000203363, Exhibit 1 ("Licensee airs programming from an Internet source under contract").

[4] 47 C.F.R. § 76.55(d)(5) provides that a "qualified low power station" able to assert must carry rights is one which has as its 47 U.S.C. § 307(b) "community of license . . . located outside of the largest 160 Metropolitan Statistical Areas." As discussed more fully in Section C below, Class A television stations are not unprotected "low power stations" limited by § 76.55(d), Class A stations are protected "local commercial television stations" pursuant to 47 C.F.R. § 76.55(c)(1) and are now "primary" stations pursuant to Section 2(b) of the LPPA.

2

they were denied the significant economic benefit of being able to assert a must carry right on cable TV systems.

For Station W28AJ the burdens associated with being a protected Class A station were not offset by the economic gains associated with being able to assert a must carry right and Station W28AJ downgraded itself from Class A protected status to unprotected LPTV status. Eventually, after many years of service to the public and investments in equipment, programming, and audience building, unprotected Station W28AJ was displaced during the FCC's program to transition TV stations from analog to digital broadcasting.

RCC survived the Commission's first regulatory effort to eliminate LPTV stations which competed against full-power TV stations, though just barely. It was only through happenstance that, at the 11th hour, RCC was able to engineer a digital replacement for Station W28AJ, Station W24EZ-D. RCC's objective in this proceeding is to "protect" its LPTV service in the true sense of the word as mandated in the LPPA.

### B. The LPPA Requires LPTV Protection & License Permanence

#### 1. FCC 23-23: Reads "Protection" Out of The LPPA

Rather than protecting LPTV stations as required by the LPPA, the Commission's proposed licensing rules improperly removes LPTV stations from their 47 U.S.C. § 307(b) communities of license and reassigns them to much larger DMA markets in the name of "protecting" those small LPTV stations.[5] However, reassigning

---

[5] RCC's LPTV Station W24EZ-D does not come close to covering substantially all of the Hartford & New Haven DMA 34 market area and there is no support for a

000048
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

LPTV stations from their communities of license to larger DMA markets removes LPTV stations from coast-to-coast from the protection of the LPPA by breaching the Commission's interpretation of the LPPA's 95,000 TV household threshold.

The Commission's continuing failure to protect LPTV stations while protecting full-power TV stations, despite asserting an intent to do so, and despite the LPPA's plain directive to do so, is confusing at best and is contrary to the public interest. FCC 23-23 represents the Commission's second effort to eliminate LPTV stations as competitors to full-power TV stations across the country. The Commission's proposed regulatory scheme, spawned in the name of protecting the LPTV industry, ignores the plain language of the LPPA, conflicts with Section 307(b) of the Communications Act, 47 U.S.C. § 307(b), and runs afoul of the Constitution by adopting an industrial code, the Nielsen DMA market structure, thereby improperly delegating legislative power to private industry.[6]

---

47 U.S.C. § 307(b) "community of license" finding. Moreover, FCC 23-23 fails to explain the proposed change to existing policy where Part 74 licensees seeking to assert must carry rights, rather than looking to their § 307(b) "community of license," *cf.* 47 C.F.R. § 76.55(d)(5), where they are now "primary" service providers pursuant to Section 2(b) of the LPPA, they must now look to much larger DMAs under a proposed rule which is designed to eliminate LPTV competition from 98% of the TV households as shown in Section B.2 below.

[6] FCC 23-23 1) ignores the community of license requirement of 47 U.S.C. § 307(b), except to make the unsupported conclusion that FCC 23-23 is somehow authorized by § 307(b), FCC 23-23 ¶ 51; 2) misreads the LPPA's 95,000 TV household provision, Section 2(c)(2)(B)(iii); and 3) adopts a DMA market structure which is unconstitutional under *Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) because the rule improperly delegates legislative authority to a private, non-governmental entity.

**2. FCC 23-23: Fails To Protect LPTV Service To 98% Of TV Households**

For the 2022-23 television season Nielsen determined that there are a total of 123,785,250 TV households in 210 DMAs and that there are 177 DMAs with more than 95,000 TV households. *See* https://ustvdb.com/seasons/2022-23/markets/ The Top 177 DMAs contain a total of 121,826,140 TV households. Accordingly, FCC 23-23 proposes to exclude the LPPA's benefit of voice diversity from 84% of the DMA markets (177/210 = .842) and 98% of the TV households (121,826,140/123,785,250 = .984).

FCC 23-23 completely fails to explain why Allingtown, CT is not considered a qualified DMA for licensing under the LPPA, or what the underlying rules are for determining the composition of DMA areas, or how Allingtown or any LPTV licensee in a Section 307(b) community might seek to qualify for protection under the LPPA, or what circumstances might exist in a Section 307(b) community of license which would warrant a waiver,[7] or whether and how the Commission should regulate Nielsen Media Research's decision making regarding DMA composition. *Schechter Poultry Corp. v. U.S.*, 295 U.S. 495, 537-38 (1935) (Congress cannot delegate unfettered legislative power and private parties cannot exercise any legislative power). Nor does FCC 23-23 discuss any national public interest benefits which accrue where the Commission, not

---

[7]  For instance, if the LPTV station's Section 307(b) community of license is covered by the Grade B signal of at least one full-power TV station, it would seem that the purpose of the LPPA would be served by grant of a waiver to allow an increase in the number of permanently licensed voices in the market. In cases where the LPTV provides the only TV signal available in the Section 307(b) community of license, if there are any such cases, there is a lesser national interest in the identity of who projects that voice and waiver might reasonably be deemed unavailable.

5

Congress, proposes that only just over 1% of the TV households should receive the benefits of the LPPA.

FCC 23-23 does not explain why Congress would spend its valuable time, and use its scarce political capital, to pass national legislation which protects a scant 1.16% of TV households. With all due respect, the Commission's unconstitutional approach to the LPPA is nonsensical on its face. The LPPA is "Low Power Protection Act," not the "Large Power Protection Act," but FCC 23-23 reads as if Congress intended to protect full-power TV from competition across substantially all of the United States.[8] For ease of administration, the Commission could reclassify all LPTV stations as protected Class A stations if their Section 307(b) community of license has fewer than 95,000 TV households, subject to downgrade upon the written request of the LPTV licensee submitted at any time.

### 3. FCC 23-23: Fails To Use Section 307(b) Communities Of License

Section 307(b) of the Communications Act of 1934 provides that

In considering applications for licenses, and modifications and renewals thereof, when and insofar as there is demand for the same, the Commission shall make such distribution of licenses, frequencies, hours of operation, and of power among the several States and communities as to provide a fair, efficient, and equitable distribution of radio service to each of the same.

47 U.S.C. § 307(b)

---

[8] Section 2(b) of the LPPA provides that the purpose of the LPPA

is to provide low power TV stations with a limited window of opportunity to apply for the opportunity to be **accorded primary status** as Class A television licensees. (Emphasis added).

6

For the purpose of interpreting the LPPA, FCC 23-23 proposes to change LPTV Station W24EZ-D's community of license from Allingtown, CT, a community with approximately 15,000 people, to a very large regional "community" specified by Nielsen as DMA 34 which has "963,950 TV Homes"[9] and a population of more than 2.3 million people.[10]    By changing W24EZ-D's community of license in this manner the Commission improperly reassigns Station W24EZ-D to a market with over the 95,000 TV household cap specified in the LPPA.

LPTV signal reach is much less than that of full power TV stations.  It is irrational to select very large DMAs as the community of license under the LPPA when even full power TV stations are not required to demonstrate service to large DMA areas to obtain their licenses and assert must carry/retransmission consent rights.  The Commission's choice here clearly intends to limit LPTV's ability to compete with full power TV stations.  The Commission's nationwide protection of full-power TV stations in this manner violates the plain language and express purpose of the LPPA which, on its face, protects LPTV stations such as W24EZ-D which are licensed to serve small communities.  FCC 23-23 offers no reasonable justification for withdrawing the LPPA's protection from Station W24EZ-D for the purpose of protecting full-power TV stations.

Since the 1930s Section 307(b) has served as the standard to allocate licenses to discrete communities.  Broadcast licenses are not issued to serve regional areas

---

[9]  https://www.mediamarketmap.com/hartford-new-haven-designated-market-media-map/

[10]  https://www.nexstar.tv/stations/wtnh/

7

created by private entities, such as the DMAs created by Nielsen Media Research. There is nothing in the LPPA which indicates that Congress intended to alter the longstanding Section 307(b) community of license allocation system. For example, W24EZ-D is licensed to serve the community of Allingtown, CT which has a population of approximately 15,000 people. W24EZ-D is not licensed to the Hartford and New Haven DMA 34. It is significant that Station W24EZ-D is the only television broadcast station, and the only broadcast license of any type, which is licensed to serve Allingtown, CT, but Allingtown is also served by the Grade B (and better) signals of multiple full-power TV broadcasters.[11]

FCC 23-23 fails to explain the change to existing policy where Part 74 licensees asserting must carry rights must now look to much larger DMAs, the composition of which is beyond the Commission's control, rather than to their much smaller § 307(b) "communities of license" to which they are "primary" service providers pursuant to Section 2(b) of the LPPA. *See* 47 C.F.R. § 76.55(d)(5) (assertion of must carry rights is based upon the broadcast licensee's § 307(b) "community of license").[12] Moreover, RCC's LPTV Station W24EZ-D does not come close to covering substantially all of the

---

[11] In the Commission's comparative system of awarding licenses the "first license" to a community is a very significant enhancement.

[12] For more than thirty years the Section 307(b) community of license has been the critical determinant of must carry rights under 47 C.F.R. §§ 76.55(c),(d), 58 FR 17350 (April 2, 1993), but FCC 23-23 changes course without a word of justification or explanation. Class A stations have been authorized to assert must carry and retransmission consent rights from the moment Congress authorized them in 1999, years after the FCC adopted the § 76.55(c)(1) must carry services exclusion list in 1993.

000053
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

Hartford & New Haven DMA 34 market area. There is no support for a 47 U.S.C. § 307(b) "community of license" finding regarding DMA 34 and FCC 23-23 makes no effort to support that finding. Accordingly, the Commission's community reassignment for W24EZ-D is irrational as a matter of law. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57 (1983) ("an agency changing its course must supply a reasoned analysis"); *Petroleum Communications, Inc. v. FCC*, 22 F.3d 1164, 1172 (CADC 1994) (reversal is appropriate when agency fails to provide a reasoned explanation and when the record is contrary to the agency's conclusion). Not only does LPPA Section 2(a)(2)(B) explicitly authorize the FCC to abandon DMA markets as a licensing tool, it is respectfully submitted that the Commission is required to do so as a matter of regulatory, statutory, and constitutional law.

### 4. FCC 23-23: Misreads The LPPA's 95,000 TV Household Limitation

Section 2(c)(2)(B)(iii) of the LPPA provides that

> The Commission may approve an application submitted under subparagraph (A) if the low power TV station submitting the application *** as of the date of enactment of this Act, operates in a Designated Market Area with not more than 95,000 television households.

The subject matter of the cited statutory section is plainly " the low power TV station submitting the application" which operates in a Section 307(b) licensed market area "with not more than 95,000 television households."[13] All LPTV stations, and all

---

[13]   The population of Allingtown, CT is approximately 15,000 persons; the population of West Haven, CT is approximately 55,000 persons. Even if every person the W24EZ-D's community of license, including minors, owned/rented a TV household within W24EZ-D's community of license, W24EZ-D would qualify for protected status under the LPPA.

broadcast stations, are licensed to communities pursuant to 47 C.F.R. § 307(b). Section 307(b) does not refer to DMAs and broadcast licenses are not allocated based upon DMAs. Nevertheless, FCC 23-23 completely fails to discuss the applicability of Section 307(b) to this broadcast licensing proceeding.

The "Designated Market Areas" definition at Section (2)(a)(2) of the LPPA does not contain any limitation regarding size and on its face plainly includes all DMAs regardless of the number of TV households.[14] The subject matter of Section 2(c)(2)(B)(iii) of the LPPA is "the low power TV station submitting the application" seeking LPPA protection and the numerical limitation found in that section refers to the number of TV households within the LPTV's Section 307(b) community of license.[15] There is no other reasonable reading of Sections (2)(a)(2) and 2(c)(2)(B)(iii) of the LPPA

---

[14] Section (2)(a)(2) provides that

the term "Designated Market Area" means—(A) a Designated Market Area determined by Nielsen Media Research or any successor entity; or (B) a Designated Market Area under a system of dividing television broadcast station licensees into local markets using a system that the Commission determines is equivalent to the system established by Nielsen Media Research***

[15] Given the broadcast licensing structure of the Communications Act, it is irrational for Congress to establish any numerical TV household limitation for a LPTV seeking protection under the LPPA. There is not any rational purpose served by limiting the LPPA's protection merely because a LPTV station is licensed to a Section 307(b) community which has more than some randomly selection number of TV households. All LPTV stations provide service to the public, provide competitive service to full-power TV stations, and have an interest in protecting investments in equipment, programming, and audience building. Yet LPTV stations located in the most lucrative markets are subject to displacement by full-power TV licensing actions and Commission sponsored broadcast spectrum auctions.

10

and Section 307(b)'s broadcast license allocation requirement. FCC 23-23 does not make any attempt to reconcile these statutory requirements.

Notwithstanding plainly stated broadcast licensing directives found at Section 307(b) and in the LPPA which must be read as a whole, FCC 23-23 interprets the "95,000" limit found at Section 2(c)(2)(B)(iii) of the LPPA as a disconnected appendage of the "Designated Market Area" definition found at Section (2)(a)(2). There is nothing in the LPPA which compels the Commission to disadvantage LPTV stations in this manner. In fact, Congress intended the exact opposite result and directed the Commission to protect LPTV; the Commission's choice is plainly at odds with the notion of protecting LPTV stations. By interpreting the LPPA as it does, FCC 23-23 reaches an absurd and irrational conclusion: that the purpose of the Low Power Protection Act is to protect full-power TV stations covering 98% of the TV households from competition at the expense of LPTV stations.

## 5. FCC 23-23: Harms LPTV Licensees In Four Ways

There are at least four adverse consequences to LPTV stations which flow from the Commission's proposed illegal and unconstitutional community of license reassignment rule.[16] First, the Commission's effort to protect full-service TV stations from low power TV stations is the exact opposite of what Congress directed in the LPPA. The Congress directed the Commission to protect LPTV stations. Congress did

---

[16] Whether or not the FCC physically alters LPTV licenses to reflect their new communities of license is irrelevant because the practical effect of the FCC's proposed action would do that very thing. The Commission's illegal proposal cannot be saved by a ministerial "failure to act" fig leaf.

11

not direct the Commission to develop a regulatory environment which sacrifices LPTV stations to protect full-service TV stations through the adoption of rules modeled after as if Congress had enacted a unicorn entitled the Large Power Protection Act.

Second, the Commission's proposed rule is contrived in such a manner that it will most likely lead to more LPTV stations failing, including W24EZ-D. As explained in Section B.4 above, the Commission has created a market size requirement which is contrary to the 95,000 TV household limit plainly stated in the LPPA and denies Class A TV service to 98% of the television households.

Third, the Commission's illegal community of license reassignment proposal will result in LPTV stations being displaced over time by at least two predictable, future licensing actions. LPTV stations which are left unprotected under the Commission's Orwellian effort to "protect" LPTV stations will cause the displacement of LPTV stations by full-service stations which increase their coverage area. Alternatively, as discussed more fully in Section D below, it seems likely that the Commission will eventually take the footprints of unprotected LPTV stations in metropolitan areas, reclassify those LPTV footprints as "initial" licenses for the spectrum auction purposes, and reassign those LPTV licenses via auction to generate U.S. Treasury revenue.[17]

Whether displaced by action of existing licensees or by reassignment of LPTV licenses as "initial" licenses via auction, the Commission's failure to extend LPTV

---

[17] RCC, and many other similarly situated LPTV licensees, are being placed in positions where they will suffer 5th Amendment Due process violations through Commission LPTV license seizure and devaluation of their broadcast-related investments to generate non-tax revenue via spectrum auction.

000057
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

protection to W24EZ-D will cause RCC to suffer another failed LPTV endeavor.[18] Such failure will not result from an inability to operate profitably, but will result from arbitrary third-party licensing actions which are completely beyond the LPTV licensees' control. This bleak future outlook works to reduce current investments in TV equipment, programming, and audience building in the LPTV industry and does not serve the public interest.

Fourth, viewed from a macro-licensing level, the Commission's proposal to leave LPTV stations unprotected will reduce competition to full-service TV stations and increase media concentration. The Commission's failure over the past 40+ years to protect a diversity of voices in the marketplace is remarkable. For instance, the Commission's loosening of what were longstanding ownership restrictions has directly resulted in huge concentrations of broadcast licenses and wealth in a few hands. Basic economic theory instructs that the goal of marketplace competitors is to beat the other competitors, take their customers and business and profits, and put the competitor out of business. The basic goal of the government as a regulator of broadcast licenses and wire communications is to control the marketplace's tendency to destroy competitors and competition to ensure a diversity of voices in the marketplace of ideas.

The Commission's decades long failure to protect the diversity of marketplace voices is plainly bearing bitter fruit: hundreds of millions of people across the country have become involuntary subjects of limited and poisonously polarizing information

---

[18] The Commission's licensing rules has caused RCC, and its predecessor in interest Paging Associates, Inc., to lose two LPTV licenses: W28AJ and W65DZ.

000058
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

bubbles.  Notwithstanding Congress's plain directive in the LPPA to change course, FCC 23-23 continues to protect full-power TV stations from LPTV competition, delivering still more regulatory failure.  Reducing competition and increasing media concentration is contrary to the LPPA's expressly stated LPTV protection purpose.

## C.  Instruct CATV Systems That Class A Licensees Have Must Carry Rights

In 2000, pursuant to a statute that Congress passed in 1999, the Commission the adopted rules to "protect" LPTV stations by allowing qualified LPTV stations to be upgraded and reclassified as "Class A" protected stations.  FCC 23-23 ¶ 4 & n.11.[19] However, despite creating a new class of protected TV stations, the Commission did not substantially revisit the must carry rules adopted shortly after passage of the  Cable Television Consumer Protection and Competition Act of 1992.  P.L. 102-385, 106 Stat. 1460 (October 5, 1992).   Class A stations have been authorized to assert must carry and retransmission consent rights from the moment Congress authorized them in 1999, years after the FCC adopted the § 76.55(c) must carry exclusion list in 1993.[20]

---

[19] *Class A Order*, 15 FCC Rcd 6355 (2000); Community Broadcasters Protection Act of 1999, Pub. L. No. 106-113, 113 Stat. Appendix I at pp. 1501A-594 - 1501A-598 (1999), *codified at* 47 U.S.C. § 336(f).

[20] 47 C.F.R. §76.55(c) provides, in pertinent part:

Local commercial television station. A local commercial television station is any full power television broadcast station, other than a qualified NCE television station as defined in paragraph (a) of this section, licensed and operating on a channel regularly assigned to its community by the Commission that, with respect to a particular cable system, is within the same television market, as defined below in paragraph (e) of this section, as the cable system, except that the term local commercial television station does not include: (1) Low power television stations, television translator stations, and passive repeaters with [sic] operate pursuant to part 74 of this chapter. ***

Over the ensuing 30 years since the passage of the Cable Act of 1992, there have been monumental technological advances in cable television transmission technology. As a general matter, cable TV systems, especially those in urban areas, do not operate under whatever limited channel constraints which might have existed in 1992.

RCC's predecessor Paging Associates, Inc. (commonly owned) successfully upgraded W28AJ to Class A protected status. However, RCC was unsuccessful in its efforts to secure must carry rights on CATV systems. Those CATV systems asserted that, pursuant to 47 C.F.R. § 76.55(d)(5), low power TV stations within the Top 160 Metropolitan Statistical Areas could not assert must carry/retransmission consent rights. The adverse economic consequences of that incorrect rule interpretation by cable systems eventually forced W28AJ to downgrade from Class A back to unprotected LPTV status.

It is respectfully submitted that the Commission must clarify that Class A stations are not properly classified as "low power stations" whose carriage is limited by 47 C.F.R. 76.55(d). Rather, Class A TV stations are properly classified as "local commercial television stations" pursuant to 47 C.F.R. § 76.55(c) and are entitled to assert must carry rights pursuant to that rule section. The upgrade to Class A licensing status removes that license from LPTV status and Class A licenses are properly considered "primary" stations pursuant to Section 2(b) of the LPPA "local commercial television stations" pursuant to 47 C.F.R. § 76.55(c)(1) (Class A licenses are not included in the listing of license types explicitly excluded from the definition of

15

"local commercial television stations").[21]  This finding is required by the fact that, for the second time, Congress has directed the Commission to protect Class A TV stations and, as disclosed in the history of Station W28AJ discussed in Section A above, must carry/retransmission rights are essential to viability and protection of Class A stations.

### D.  The LPPA Prohibits Auction Of LPTV Licensed Spectrum

The LPPA requires that the Commission protect LPTV licensees and protect their investments in equipment, programming, and audience building, and ensure the permanence of their LPTV licenses.  Accordingly, the Commission must commit by rule that it will not use its broadcast licensing rules for broadcast spectrum mining for the purpose of selling broadcast spectrum at auction to raise funds for the U.S. Treasury.

In 2000, over the objection of licensees in the Part 22 paging industry, the Commission established the precedent that the Commission can force existing licensees to go to auction to protect their existing investment in licensed spectrum.  *See Benkelman Tel. Co. v. FCC*, 220 F.3d 601, 605 (2000) (the Commission can relicense spectrum via auction merely by classifying the new license as "initial" and awarding it "under a new licensing scheme . . . involving a different set of rights and obligations for the licensee").  RCC and its sister company Paging Associates, Inc. were victims of the Commission's 2000-era paging spectrum auction.

---

[21]  In other words, a Class A TV station is not a "low power television station" (LPTV) which "operate[] pursuant to Part 74."  A Class A television station is a different class of station compared to a LPTV station.

16

In *Benkelman* the Commission obtained an appellate ruling that a statutory prohibition against auctioning spectrum for station modifications, 47 U.S.C. § 309(j), did not preclude the Commission from classifying "the incumbent licensees' applications for modification under the new geographic system as applications for 'initial' licenses under such a 'new licensing scheme.'" *Benkelman*, 220 F.3d at 605. RCC respectfully submits that the LPPA prohibits the Commission from displacing any LPTV licensee, regardless of whether the license contains a Class A designation, for the purpose of selling that LPTV spectrum at auction.[22]

The auction authority Congress provided to the Commission has effectively established the Commission as a spectrum competitor whose goal is to raise money for the U.S. Treasury. This conflict of interest places the public at a disadvantage regarding its property rights in spectrum, equipment, and other investments, notwithstanding the fact that the conflict is a statutorily authorized one.

Accordingly, given the Commission's case winning sophistry in *Benkelman*, given the misdirection underlying the Commission's misinterpretation of the LPPA as the Large Power Protection Act, and to protect LPTV licensees and their broadcast-related investments on a going forward basis, the Commission must provide rule notice explaining whether the Commission will use, intends to use, or might consider using,

---

[22]  Class A TV licenses are not properly referred to as "LPTV" licenses. The upgrade to Class A licensing status removes that license from LPTV status and the license is properly considered a "local commercial television station" pursuant to 47 C.F.R. § 76.55(c)(1) (Class A licenses are omitted from the listing of licenses which are not considered "local commercial television stations") and a "primary" station pursuant to Section 2(b) of the LPPA.

LPTV licensees as involuntary spectrum miners for the purpose of locating spectrum which the Commission will use at future broadcast spectrum auctions. The LPPA prohibits the Commission from disrupting protected LPTV operations by seizing licensed spectrum and selling that spectrum at auction and the Commission must disclose its intention as a matter of notice and 5th Amendment Due Process.

### E. Licensing Based Upon Nielsen's DMAs Is Unconstitutional

FCC 23-23 renders the LPPA unconstitutional, as applied, by interpreting the LPPA in a manner which protects full-power TV stations because it adopts an unconstitutional industrial code, Nielsen Media Research's DMA markets to license protected Class A TV broadcast stations. *Schechter Poultry Corp. v. U.S.*, 295 U.S. 495, 537-38 (1935) (Congress cannot delegate unfettered legislative power and private parties cannot exercise any legislative power). Congress did not order the Commission to cede its Section 307(b) licensing authority to a private company which creates artificial economic regions designed to serve its own profit motive. The Commission could substantially avoid this constitutional infirmity by adopting RCC's interpretation of the 95,000 TV household limitation discussed above. The Commission is not required to limit Class A licensing, and the reach of the LPPA's protection, based upon Nielsen Media Research's privately created DMA market sizes as proposed in FCC 23-23. Should it be determined that the Commission is required to regulate in this manner, then this portion of the LPPA is unconstitutional on its face. *Schechter.*

The Commission chose to interpret the 95,000 TV household limitation as describing the size of the improperly legislated Nielsen DMA markets, rather than

viewing the 95,000 TV household limitation as describing the size of the Class A applicant's Section 307(b) community of license. Accordingly, the Commission has selected a statutory interpretation of the LPPA which renders the LPPA unconstitutional, as applied, when another interpretation which does not rely upon those arbitrary DMA market classifications developed by a private actor promoting its own pecuniary interest, is plainly available. Moreover, RCC's synthesis of Section 307(b) and the plain text of the LPPA, an analysis that FCC 23-23 completely failed to undertake, compels a statutory interpretation which completely avoids the *Schechter*-related constitutional infirmity proposed in FCC 23-23.


WHEREFORE, in view of the information presented herein, the Commission should upgrade LPTV stations such as W24EZ-D to Class A status and clarify that Class A stations are entitled to assert must carry/retransmission rights.

Respectfully submitted,
RADIO COMMUNICATIONS CORP.


Timothy E. Welch
Hill & Welch
1116 Heartfields Drive
Silver Spring, MD 20904
(202) 321-1448
welchlaw@earthlink.net
Attorney for Applicant

May 4, 2023

000064
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | MB Docket No. 23-126 |
| Implementation of the | ) | FCC 23-23 |
| Low Power Protection Act | ) | |
| | ) | |

**REPLY COMMENTS OF RADIO COMMUNICATIONS CORPORATION**
**LPTV STATION W24EZ-D FORMERLY CLASS A STATION W28AJ**

**Radio Communications Corporation**
**Timothy E. Welch, Esq.**
**Hill and Welch**
**1116 Heartfields Drive**
**Silver Spring, MD 20904**
**(202) 321-1448**
**welchlaw@earthlink.net**

# Table of Contents

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A.  Various Comments Must Be Discounted On Interested Party Grounds . . . . . . . 1

B.  MSAs And DMAs Cannot Be Used To License Broadcast Stations . . . . . . . . . . 3

C.  Using The LPPA To Regulate Local Economic Activity Is Unconstitutional . . . 6

D.  Class A Must Carry Right . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

E.  The LPPA Freezes Full-Power Displacement Applications . . . . . . . . . . . . . . . 8

F.  NAB Proposes Unconstitutional Program Content Regulation . . . . . . . . . . . . 10

## Summary

The Commission must be mindful of the interested party requirement. Many comments are substantially similar and, in substantial part, contain the exact same text. Those comments obviously originated from the same source, but that source is not disclosed in any of the comments. The NAB's comments must also be discounted on interested party grounds, but for another reason. The NAB asserts a representational interest, but the NAB fails to disclose the identity of any member and the NAB fails to disclose that it represents any LPTV licensee who is interested in the restrictive approach taken in the NAB's comments.

The repetitive comments seek to use MSAs rather than the Commission's proposed DMAs as the markets for licensing Class A stations. However, the MSA proposal suffers from the same defects as the Commission's DMA proposal. For instance, broadcast licensing is based upon Section 307(b) of the Act, no broadcast license is issued based upon a DMA or an MSA. Moreover, the MSA proposal eliminates substantially all of the TV households and population in the United States and, therefore, promotes an unconstitutional regulation of local commerce.

The ultimate goal of the LPPA is the protection of LPTV licensees. Accordingly, the Class A stations must be accorded "must carry" status. Moreover, the LPPA effectively freezes full-power TV stations from filing displacement applications until the Class A licensing process has been completed. Finally, the Commission should reject the NAB's request to impose content regulation upon Class A licensees. Content regulation is not required under the LPPA and is unconstitutional in any event.

000067
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

## Introduction

Radio Communications Corporation (RCC), Licensee of LPTV Station W24EZ-D, by its attorney, hereby submits reply comments in the captioned rulemaking proceeding as an interested party/Licensee directly affected by the Commission's proposed implementation of the Low Power Protection Act (LPPA).[1]  In support whereof, the following is respectfully submitted:

## A.  Various Comments Must Be Discounted On Interested Party Grounds

Many generic, repetitive comments promoting an MSA-based Class A licensing process were filed during the initial comment phase of this proceeding.[2]  Those repetitive comments were, on their face, filed by different entities, but the comments obviously originated from the same source.  The unknown coordinating party inundated the Commission, and the public, with multiple comments to make it appear that its one voice is many voices.[3]

None of those MSA promoting comments discloses the commonality of interest which would explain the similarity of the comments which were submitted.  Nor do those comments provide any information regarding the person or persons directing the filing of those common comments.  None of the MSA promoting commenters held itself

---

[1]  Low Power Protection Act (LPPA), Pub. L. 117-344, 136 Stat. 6193 (2023).

[2]  Each repetitive comment uses identical language.  For instance, the filers of those repetitive comments uses the unique phrase "A. The FCC Should Adopt MSAs for Determination of Qualifying DMAs" on page 1.  *See e.g.*, Comments of Data Wave, LLC, Comments of M&C Broadcasting Corporation, Comments of KFLA-LD.

[3]  It is unclear why anyone would think that filing repetitive comments is better than filing a single set of comments.  Commission decisions, and appellate review, do not turn on the throw weight of a comment pile or the number of "me toos" in that pile.

000068
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

out as an attorney representing the undisclosed interested party and none disclosed the "name and mailing address" of the undisclosed party. *See* 47 C.F.R. § 1.415(a) (only "interested persons" may file comments in rulemaking proceedings); 47 C.F.R. § 1.419(e) ("Parties not represented by an attorney that file comments and replies and other documents in electronic form shall provide their name and mailing address"). Because the Commission cannot discern who is behind the filing of those multiple substantially similar comments, a substantial party in interest question arises. Because those comments mislead the Commission regarding the identity of the undisclosed party in interest promoting the comments, the Commission must discount those comments in their entirety.

The Commission must also discount the Comments of The National Association of Broadcasters (NAB). The NAB does not explain that the proposed rules will regulate the NAB's conduct in any way or otherwise explain that the NAB will be affected by the proposed rules. The only justification that the NAB provides for filing comments in this proceeding is that it

> is the nonprofit trade association that advocates on behalf of free local radio and television stations and broadcast networks before Congress, the Federal Communications Commission and other federal agencies, and the courts.

NAB Comments at 1 n.1.

To qualify as an association representing the interests of other parties which are attempting to deny or limit the rights or interests of another, an association must "allege that one or more of its members has standing." *In the Matter of Consent to Transfer Control of Certain Subsidiaries of TEGNA Inc.*, 2023 FCC LEXIS 553, DA 23-

149, n.46 (MB released February 24, 2023).  Because the NAB failed to identify any specific broadcaster it represents, the NAB failed to establish associational standing authorized to seek denial of RCC's and other LPTV licensees' assertion of rights as primary Class A broadcast stations under the LPPA or to seek denial of other rights such as must carry.

NAB does not claim to represent any LPTV licensees and the NAB has utterly failed to establish any interest in this proceeding which seeks to protect LPTV stations under the LPPA.[4]  Even if NAB did represent LPTV licensees, NAB's Comments work against, conflict with, and are contrary to, those LPTV interests because the NAB "urges the Commission to limit" the application of the LPPA for the purpose of protecting full-power stations.  NAB's Comments do not protect LPTV interests, the NAB's Comments promote full-power TV interests over the LPPA protected LPTV interests.  NAB Comments at 4.  The NAB's use of this rulemaking proceeding as a tool to harm LPTV licensees is plainly beyond the scope of the instant rulemaking proceeding which seeks to protect LPTV licensees.

**B.  MSAs And DMAs Cannot Be Used To License Broadcast Stations**

Some repetitive comments suggest that the Commission use MSAs rather rather than the Commission proposed DMAs as the markets used to determine Class A eligibility.  *See e.g.*, Comments of Data Wave, LLC at 1-3; Comments of M&C Broadcasting Corporation at 1-3; Comments of KFLA-LD at 1-3 ("A. The FCC Should

---

[4]  RCC explained in its Comments at 1 that it is a LPTV licensee "directly affected by the Commission's proposed implementation of the" LPPA.

3

Adopt MSAs for Determination of Qualifying DMAs"). There are several problems with the MSA proposal.

First, for purposes of licensing primary station Class A status under the LPPA, a licensee's market area is its Section 307(b) community of license, not some "market" area defined by a private company serving its own profit motive. RCC Comments at 6-11; *Report and Order, In the Matter of The Suburban Community Policy, the Berwick Doctrine, and the De Facto Reallocation Policy*, 93 F.C.C.2d 436, 438-39 (1983) (the "applicant request[s] the desired community and provid[es] engineering exhibits to show the absence of harmful interference to existing stations").[5] The Commission and all commenters, except RCC, fail to address the Section 307(b) community of license requirement which serves as the lynchpin for allocating broadcast licenses across the nation. *See Report and Order*, 93 F.C.C.2d at 438 ("the legislative intent behind the original Section 9 of the Radio Act is still controlling today; namely, to effect an equitable geographical distribution of stations across the entire nation" pursuant to Section 307(b)). The purpose of the Communications Act and the LPPA is the promotion of broadcast outlets, not the elimination of them.

Second, the term "Metropolitan Statistical Area" can mean several things and no comment specifies which MSA definition should to be used. There are the 160 MSAs which are referenced at 47 C.F.R. § 76.55(d)(5). RCC Comments at 2 n.4, 15.

---

[5] A community for licensing purposes under Section 307(b) is not a political subdivision defined by a State or an economic area defined by a third party private entity or the Federal government. A Section 307(b) community is a grouping of households which has a demand for service that the broadcaster has chosen to serve. DMAs and MSAs are large areas composed of numerous communities and these areas created by non-licensee third parties have no part in broadcast licensing.

There are the 306 MSAs which the FCC used in cellular licensing in the 1980s-1990s.[6] There are the 384 MSAs utilized by the U.S. Census Bureau.[7]

Third, no matter which of the proposed MSA definitions is intended, the MSA proposal suffers from the same defect as the Commission's proposal to use DMAs to define the area in which a LPTV is allowed to seek primary station status: MSAs represent huge populations and areas and are composed of multiple communities and adoption of an MSA market area would exclude a very substantial number of the TV households/population from receiving the benefits available under the LPPA. RCC Comments at 3-6.

Using the U.S. Census Bureau's easily accessible 2020 population data for the 384 MSAs as an example:[8] There is a total of 274,790,957 persons living in these 384 MSAs.[9] Only 18 of these 384 MSAs (5%) has a population of 95,000 or fewer persons. The total population of these "qualifying" 18 MSAs is 1,236,345 persons = 1,236,345 / 274,790,957 = 0.4% of the total 384 MSA population. Accordingly, the commenters promoting an MSA approach would exclude 99.6% of the MSA population from the benefits of the LPPA. This is an even worse result, though marginally so, than the

---

[6] *See* the Commission's "CMA (Or MSA & RSA)" market info.

[7] 2020 U.S. Census 384 MSA Populations – Metropolitan Statistical Area; and for Puerto Rico (CBSA-MET-EST2021-POP) accessed June 5, 2023. The data utilized in this Comment excludes population data relating to Puerto Rico.

[8] The U.S. Census Bureau's 384 MSAs tend to be somewhat smaller than Nielsen's 210 DMAs. RCC Comments at 5 (discussing the DMA information).

[9] More than 50 million people live outside MSAs. The MSA promoting commenters do not define or discuss the population that lives outside MSAs and it seems to be a massive omission with Commenters licensing plan.

Commission's proposal to exclude 98.4% of TV households from the benefits of the LPPA.[10]  RCC Comments at 5, 11, 12.

### C.  Using The LPPA To Regulate Local Economic Activity Is Unconstitutional

Like the Commission's DMA proposal, the commenters' MSA proposal converts a nationwide LPPA statute into something which does not a address a nationwide issue, but instead addresses a smattering of rural, local areas.  Accordingly, the commenters' MSA proposal suffers from the same defect as the Commission's DMA proposal:  the approach does not address the LPPA in a nation-wide manner.

The Commerce Clause authorizes Congress to regulate commerce "among" the states, i.e., interstate commerce.  U.S. Const. Art. 1 Sec. 8 Cl. 3.  Congress is not authorized to regulate local economic  activity unless Congress makes a finding that regulation of that local economic activity has a "substantial" effect upon interstate commerce.  *United States v. Lopez* 514 U.S. 549 (1995) (invalidating the Gun-Free School Zones Act of 1990 for lack of a substantial effect upon interstate commerce).

LPTV is licensed as a local service and Commenters' and the Commission's proposed exclusion of substantially all of the United States from the benefits of the LPPA renders the LPPA non-national in purpose and unconstitutional as applied.

---

[10]  The MSA promoting commenters discuss populations rather than TV households.  The ratio of TV households to population is not a 1 to 1 proposition and there are fewer TV households than people in a given area.  RCC Comments at 9 n.13.  Viewed from this perspective, the MSA promoting commenters' proposal seems unnecessarily restrictive.  RCC's Section 307(b) community of license has 15,000 persons and a smaller number of TV households.  *Id*.  RCC does not object to the use of population as a proxy for TV households, but an adjustment factor is required.  The 2.60 "persons per household" average found by the U.S. Census Bureau is appropriate.

6

RCC Comments at ii, 5-6. Neither the LPPA, nor the NPR at issue instantly, nor the commenters supporting MSA markets, makes any showing that an aggregation of economic effects of limited, sparsely populated, remote rural areas substantially affects interstate commerce. Therefore, an aggregation of those rural economic areas cannot be said to substantially affect interstate commerce. *Wickard v. Filburn*, 317 U.S. 111, 127-28 (1942) (allowing Congressional regulation of local economic activity upon a Congressional finding that an aggregation of local activity substantially affects interstate commerce); *Lopez*, 514 U.S. at 557.[11]

Congress made no finding that restricting Class A licensing to a small population in rural areas has a substantial effect upon interstate commerce. Therefore, the Commission and commenters plainly misinterpret the LPPA by limiting the LPPA's benefits to those sparsely populated rural areas. *Lopez*, 514 U.S. at 563 (where no substantial effect on interstate commerce is obvious, Congressional findings are critical). The Commission lacks authority to make this basic finding which Congress did not make, especially where it is the Commission's own limited reading of the LPPA, and not the text of the LPPA itself, which excludes substantially all of the United States from the benefits of the LPPA. The Commission cannot give the LPPA a non-national reading, but then in its next breath, proclaim that non-national statutory interpretation as somehow incorporating a national interpretation. *Chevron,*

---

[11]     The Commission's authority to regulate the technical issue of radio interference is addressed at the LPTV licensing stage. The constitutional principle at issue here is the lack of Federal authority to regulate local economic matters where Congress made no finding that limiting Class A licensing to a low population rural areas substantially impacts interstate commerce. Nothing in the Communications Act or the LPPA authorizes the Commission to regulate local economies.

7

*U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984) (no agency deference where the agency's interpretation is not permitted by the statute).

### D.  Class A Must Carry Right

Dockins Comments at 3 states that under FCC 23-23 "Class A is not entitled to must carriage under the Commission's rule" and argues that the Commission must authorize Class A must carry within the pertinent DMA.  RCC agrees.  No currently existing rule which restricts Class A stations from asserting must carry.  Under existing rule 47 C.F.R. §§ 76.55(c),(d) Class A stations are authorized to assert must carry based upon their Section 307(b) community of license.  FCC 23-23 seeks to change the existing rule by prohibiting Class A must carry in DMAs with more than 95,000 TV households without explaining how that change protects LPTV stations under the LPPA and without describing any public interest benefits which would flow from imposing a must carry limitation upon primary Class A stations.  RCC Comments at 8, 14-16.

### E.  The LPPA Freezes Full-Power Displacement Applications

The NAB's Comments read as if the LPPA were the "Large Power Protection Act" rather than the "Low Power Protection Act".  *See e.g.*, NAB Comments at 4 ("One reason why the LPPA restricts eligibility to LPTV stations LPTV stations in television markets with fewer than 95,000 television households is to minimize the likelihood of inadvertent impacts in spectrum-constrained large markets").  The assertion that spectrum scarcity requires limitation of LPPA rights in large markets is nonsensical. LPTV stations must satisfy interference rules before they are licensed under Section

8

307(b);[12] "spectrum-constraints" are addressed prior to LPTV licensing.  The NAB's effort to use the LPPA to freeze the application of LPPA rights, merely because full-power stations might want to expand coverage in the future, is speculative and unauthorized by the LPPA which was enacted to protect the very LPTV stations which the NAB seeks to harm.

The LPPA cannot be read as granting full-power TV stations a last chance opportunity to displace LPTV stations during the time that the LPPA is being implemented.  Such a reading ignores and contradicts the express, primary purpose of the LPPA to preserve the existence of LPTV stations:  the LPPA is the "Low Power Protection Act," it is not the "Last Prod to Pad Act".

Rather than freezing LPTV stations as suggested by the NAB, the LPPA can only be read as freezing, as of the time the LPPA was enacted, the ability of full-power TV stations to file applications to displace LPTV stations interested in asserting LPPA rights.  The LPPA's necessarily implied full-power modification filing freeze remains effective until after final resolution of the instant rulemaking proceeding and the associated LPTV license upgrade proceedings.  *See* RCC Comments at 12 ("the Commission's illegal community of license reassignment proposal will result in LPTV stations being displaced over time by at least two predictable, **future** licensing actions") (emphasis added).  Nothing in the LPPA grants, or even suggests, that full-

---

[12] The licensing of LPTV stations to communities under Section 307(b) mirrors AM licensing.  LPTV stations "are allocated on a demand basis, with an applicant requesting the desired community and providing engineering exhibits to show the absence of harmful interference to existing stations." *Report and Order*, 93 F.C.C.2d at 438-39.

9

power stations have any current authorization to impede RCC's and other LPTV licensees' ability to claim primary station classification and protection under the LPPA.

## F.  NAB Proposes Unconstitutional Program Content Regulation

The NAB Comments at 5 seeks to require Class A stations to list "locally produced" programming and to keep a log "detailing hours of operation".  The Commission no longer requires broadcasters to maintain program lists and undersigned counsel does not recall that there was ever any requirement to "detail hours of operation."  Class A Stations are "subject to the same license terms and renewal standards as a license for a full power television broadcast station, except as otherwise **expressly** provided in this subsection" (emphasis added) and no such requirements are expressly provided in Section 2(c)(3)(A) of the LPPA.  NAB has not presented any substantial reason for saddling primary Class A stations with these unusual compliance requirements which are not applicable to full power TV stations and which are plainly excluded by the LPPA's explicit text.

NAB's proposal that Class A stations provide a periodic "list of locally produced programs" utterly fails to explain how program content monitoring passes muster under the First Amendment.[13]  "RCC's LPTV Station W24EZ-D 'originates' program-ming as defined at 47 C.F.R. § 74.701(h) because it controls 'the program source, as it

_____

[13] Like full-power stations, Class A stations are required to place in their public files quarterly issue/programming lists, briefly describing issues of interest to the community of license and the programming which addressed those issues.  47 CFR 73.3526(e)(11)(i). This regulation does not impose any content regulation or program production requirements.

reaches the transmitter site. FCC 23-23, n.44.'" RCC Comments at 2 n.3.[14] The Commission's rules currently specify a proper content-neutral approach to programming content under the First Amendment and the LPPA does not specify any change to that approach. While NAB seeks to impose a content-based programming approach upon Class A qualification, NAB fails to address the fact that neither the LPPA nor FCC 23-23 proposes any alteration to Section 74.701(h).[15]

The NAB's theory of Class A programming content qualification means that programming created by a licensee pointing a camera at a bird feeder outside the backdoor of its studio for three hours a week is qualified programming for purposes of obtaining Class A status, while other programming that the licensee might obtain over the Internet using its First Amendment content and editorial rights, such as state or national political coverage or news programming, is disqualifying.[16] The Commission

---

[14] 47 C.F.R. § 74.701(h) allows for licensee editorial discretion in program selection by defining "local origination" as

> Program origination if the parameters of the program source signal, as it reaches the transmitter site, are under the control of the low power TV station licensee. Transmission of TV program signals generated at the transmitter site constitutes local origination.

Control over program selection is a core First Amendment right of broadcasters.

[15] "Locally produced programming" must be interpreted as "local origination" programming where the Class A station controls "the program source, as it reaches the transmitter site. FCC 23-23, n.44." 47 C.F.R. § 74.701(h); RCC Comments at 2 n.3. This is especially true where the LPTV broadcaster exercises its editorial right and modifies the signal before broadcasting it. Other interpretations intrude upon Class A licensee's protected First Amendment content and editorial rights.

[16] Congress has determined that the Internet offers "an extraordinary advance in the availability of educational and informational resources" which allows for "a true diversity of political discourse, unique opportunities for cultural development, and

11

must reject the NAB's promotion of content-based regulation because it plainly contravenes basic First Amendment principles and Congress's explicitly stated goal of fostering diverse voices through use of the Internet.[17]

Morever, the manner in which a licensee exercises its constitutionally protected programming discretion is not a concern properly asserted by NAB because it has no cognizable interest in licensee programming decisions. All that is required under the explicit text of the LPPA is the Class A's certification that it has originated an average of three hours of programming per week from its Class A station. *See* FCC 23-23 ¶ 21.[18] The NAB's effort to restrict programming choices, while completely failing to address the First Amendment and Section 74.701(h), borders on, if not crosses the line into, frivolity.[19]

The purpose of the LPPA is to protect LPTV stations, to provide competition to full-power TV stations, and to increase the diversity of voices in the broadcast market.

_____

myriad avenues for intellectual activity."  47 U.S.C. § 230(a)(1),(3).

[17] The anti-First Amendment approach that the NAB takes in this proceeding is an odd choice for an organization which claims to "advocate on behalf of free local radio and television stations and broadcast networks." NAB Comments at 1 n.1.

[18] RCC supports Comments of Block Communications, Inc. at 3 and agrees that a Class A applicant should be allowed to support its certification with any available documentation, including documentation generated by the LPTV licensee itself, such as computer generated logs.

[19] For clarification, undersigned counsel occasionally watches "bird feeder" videos with his cats. Given the massive availability of cat programming on the Internet, undersigned counsel is not the only one to do so. The First Amendment indeed protects a licensee's choice to air "bird feeder" videos and to do so even if the audience were composed entirely of cats. *See* Exhibit A, (Mean) Mr. Mustard The Cat Watching A Bird Feeder Program. The legal point being made is that program selection is licensee's choice, not to NAB's or the government's.

000079
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

NAB's proposal to burden LPTV stations with unnecessary and unconstitutional regulatory compliance requirements works against these purposes, yields no public interest benefits, and should be rejected as an obvious, and weak, attempt to protect its unspecified, full-power broadcasting clients from competition.

Respectfully submitted,
RADIO COMMUNICATIONS CORP.

_____

Timothy E. Welch
Hill & Welch
1116 Heartfields Drive
Silver Spring, MD 20904
(202) 321-1448
June 13, 2023                          welchlaw@earthlink.net
Attorney for Radio Communications Corp.

13

**Exhibit A**
**(Mean) Mr. Mustard The Cat Watching A Bird Feeder Program**



This content is from the eCFR and is authoritative but unofficial.

📅 Displaying title 47, up to date as of 1/05/2024. Title 47 was last amended 1/05/2024.

**Title 47 —Telecommunication**
**Chapter I —Federal Communications Commission**
**Subchapter C —Broadcast Radio Services**
**Part 76 —Multichannel Video and Cable Television Service**
**Subpart D —Carriage of Television Broadcast Signals**

### § 76.55 Definitions applicable to the must-carry rules.

For purposes of the must-carry rules set forth in this subpart, the following definitions apply:

(a) *Qualified noncommercial educational (NCE) television station.* A qualified NCE television station is any television broadcast station which

  (1)

    (i) Under the rules and regulations of the Commission in effect on March 29, 1990, is licensed by the Commission as an NCE television broadcast station and which is owned and operated by a public agency, nonprofit foundation, corporation, or association; and

    (ii) Has as its licensee an entity which is eligible to receive a community service grant, or any successor grant thereto, from the Corporation for Public Broadcasting, or any successor organization thereto, on the basis of the formula set forth in section 396(k)(6)(B) of the Communications Act of 1934, as amended; or

  (2) Is owned and operated by a municipality and transmits noncommercial programs for educational programs for educational purposes, as defined in § 73.621 of this chapter, for at least 50 percent of its broadcast week.

  (3) This definition includes:

    (i) The translator of any NCE television station with five watts or higher power serving the franchise area,

    (ii) A full-service station or translator if such station or translator is licensed to a channel reserved for NCE use pursuant to § 73.606 of this chapter, or any successor regulations thereto, and

    (iii) Such stations and translators operating on channels not so reserved but otherwise qualified as NCE stations.

> Note to paragraph (a): For the purposes of § 76.55(a), "serving the franchise area" will be based on the predicted protected contour of the NCE translator.

(b) *Qualified local noncommercial educational (NCE) television station.* A qualified local NCE television station is a qualified NCE television station:

  (1) That is licensed to a community whose reference point, as defined in § 76.53 is within 80.45 km (50 miles) of the principal headend, as defined in § 76.5(pp), of the cable system; or

  (2) Whose Grade B service contour encompasses the principal headend, as defined in § 76.5(pp), of the cable system.

  (3) Notwithstanding the provisions of this section, a cable operator shall not be required to add the signal of a qualified local noncommercial educational television station not already carried under the provision of § 76.56(a)(5), where such signal would be considered a distant signal for copyright purposes unless such station agrees to indemnify the cable operator for any increased copyright liability resulting from carriage of such signal on the cable system.

(c) *Local commercial television station.* A local commercial television station is any full power television broadcast station, other than a qualified NCE television station as defined in paragraph (a) of this section, licensed and operating on a channel regularly assigned to its community by the Commission that, with respect to a particular cable system, is within the same television market, as defined below in paragraph (e) of this section, as the cable system, except that the term local commercial television station does not include:

  (1) Low power television stations, television translator stations, and passive repeaters with operate pursuant to part 74 of this chapter.

  (2) A television broadcast station that would be considered a distant signal under the capable compulsory copyright license, 17 U.S.C. 111, if such station does not agree to indemnify the cable operator for any increased copyright liability resulting from carriage on the cable system; or

  (3) A television broadcast station that does not deliver to the principal headend, as defined in § 76.5(pp), of a cable system a signal level of −45dBm for analog UHF signals, −49dBm for analog VHF signals, or −61dBm for digital signals at the input terminals of the signal processing equipment, *i.e.*, the input to the first active component of the signal processing equipment relevant to the signal at issue, if such station does not agree to be responsible for the costs of delivering to the cable system a signal of good quality or a baseband video signal.

000082
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112

(d) *Qualified low power station.* A qualified low power station is any television broadcast station conforming to the low power television rules contained in part 74 of this chapter, only if:

(1) Such station broadcasts for at least the minimum number of hours of operation required by the Commission for full power television broadcast stations under part 73 of this chapter;

(2) Such station meets all obligations and requirements applicable to full power television broadcast stations under part 73 of this chapter, with respect to the broadcast of nonentertainment programming; programming and rates involving political candidates, election issues, controversial issues of public importance, editorials, and personal attacks; programming for children; and equal employment opportunity; and the Commission determines that the provision of such programming by such station would address local news and informational needs which are not being adequately served by full power television broadcast stations because of the geographic distance of such full power stations from the low power station's community of license;

(3) Such station complies with interference regulations consistent with its secondary status pursuant to part 74 of this chapter;

(4) Such station is located no more than 56.32 km (35 miles) from the cable system's principal headend, as defined in § 76.5(pp), and delivers to that headend an over-the-air signal of good quality;

(5) The community of license of such station and the franchise area of the cable system are both located outside of the largest 160 Metropolitan Statistical Areas, ranked by population, as determined by the Office of Management and Budget on June 30, 1990, and the population of such community of license on such date did not exceed 35,000; and

(6) There is no full power television broadcast station licensed to any community within the county or other equivalent political subdivision (of a State) served by the cable system.

> Note to paragraph (d): For the purposes of this section, for over-the-air broadcast, a good quality signal shall mean a signal level of either −45 dBm for analog VHF signals, −49 dBm for analog UHF signals, or −61 dBm for digital signals (at all channels) at the input terminals of the signal processing equipment.

(e) *Television market.*

(1) Until January 1, 2000, a commercial broadcast television station's market, unless amended pursuant to § 76.59, shall be defined as its Area of Dominant Influence (ADI) as determined by Arbitron and published in the Arbitron 1991−1992 Television ADI Market Guide, as noted below, except that for areas outside the contiguous 48 states, the market of a station shall be defined using Nielsen's Designated Market Area (DMA), where applicable, as published in the Nielsen 1991−92 DMA Market and Demographic Rank Report, and that Puerto Rico, the U.S. Virgin Islands, and Guam will each be considered a single market.

(2) A commercial broadcast station's market, unless amended pursuant to § 76.59, shall be defined as its Designated Market Area (DMA) as determined by Nielsen Media Research and published in its Nielsen Local TV Station Information Report or any successor publications.

   (i) The applicable DMA list for the 2023 election pursuant to § 76.64(f) will be the DMA assignments specified in the Nielsen October 2021 Local TV Station Information Report, and so forth using the publications for the October two years prior to each triennial election pursuant to § 76.64(f).

   (ii) The applicable DMA list for the 2002 election pursuant to § 76.64(f) will be the DMA assignments specified in the 2000−2001 list, and so forth for each triennial election pursuant to § 76.64(f).

(3) In addition, the county in which a station's community of license is located will be considered within its market.

(4) A cable system's television market(s) shall be the one or more ADI markets in which the communities it serves are located until January 1, 2000, and the one or more DMA markets in which the communities it serves are located thereafter.

(5) In the absence of any mandatory carriage complaint or market modification petition, cable operators in communities that shift from one market to another, due to the change in 1999−2000 from ADI to DMA, will be permitted to treat their systems as either in the new DMA market, or with respect to the specific stations carried prior to the market change from ADI to DMA, as in both the old ADI market and the new DMA market.

(6) If the change from the ADI market definition to the DMA market definition in 1999−2000 results in the filing of a mandatory carriage complaint, any affected party may respond to that complaint by filing a market modification request pursuant to § 76.59, and these two actions may be jointly decided by the Commission.

> Note to paragraph (e): For the 1996 must-carry/retransmission consent election, the ADI assignments specified in the *1991−1992 Television ADI Market Guide,* available from the Arbitron Ratings Co., 9705 Patuxent Woods Drive, Columbia, MD, will apply. For the 1999 election, which becomes effective on January 1, 2000, DMA assignments specified in the 1997−98 *DMA Market and Demographic Rank Report,* available from Nielsen Media Research, 299 Park Avenue, New York, NY, shall be used. The applicable DMA list for the 2002 election will be the 2000−2001 list, etc.

(f) *Network.* For purposes of the must-carry rules, a commercial television network is an entity that offers programming on a regular basis for 15 or more hours per week to at least 25 affiliates in 10 or more states.

[58 FR 7309, Apr. 2, 1993, as amended at 58 FR 44851, Aug. 25, 1993; 59 FR 62344, Dec. 5, 1994; 61 FR 29319, June 10, 1996; 64 FR 42677, Aug. 5, 1999; 68 FR 17312, Apr. 9, 2003; 73 FR 5685, Jan. 30, 2008; 83 FR 7626, Feb. 22, 2018; 87 FR 74988, Dec. 7, 2022]

This content is from the eCFR and is authoritative but unofficial.

> 📅 Displaying title 47, up to date as of 1/17/2024. Title 47 was last amended 1/17/2024. ⓘ

**Title 47 —Telecommunication**
**Chapter I —Federal Communications Commission**
**Subchapter C —Broadcast Radio Services**
**Part 74 —Experimental Radio, Auxiliary, Special Broadcast and Other Program Distributional Services**
**Subpart G —Low Power TV and TV Translator Stations**

---

EDITORIAL NOTE ON PART 74

**Editorial Note:** Nomenclature changes to part 74 appear at 64 FR 4055, Jan. 27, 1999.

---

## ⊙ § 74.701 Definitions.

(a) *Television broadcast translator station.* A station in the broadcast service operated for the purpose of retransmitting the programs and signals of a television broadcast station, without significantly altering any characteristic of the original signal other than its frequency and amplitude, for the purpose of providing television reception to the general public.

(b) *Primary station.* The television station which provides the programs and signals being retransmitted by a television broadcast translator station.

(c) *Analog to Digital Replacement Translator (DRT).* A television translator licensed to a full power television station that allows it to restore service to any loss areas that may have occurred as a result of its transition from analog to digital.

(d) *Digital to Digital Replacement Translator (DTDRT).* A television translator licensed to a full power television station that allows it to restore service to any loss areas that may have occurred as a result of the station being assigned a new channel pursuant to the Incentive Auction and repacking process.

(e) [Reserved]

(f) *Low power TV station.* A station authorized under the provisions of this subpart that may retransmit the programs and signals of a TV broadcast station and that may originate programming in any amount greater than 30 seconds per hour and/or operates a subscription service. (See § 73.641 of part 73 of this chapter.)

(g) [Reserved]

(h) *Local origination.* Program origination if the parameters of the program source signal, as it reaches the transmitter site, are under the control of the low power TV station licensee. Transmission of TV program signals generated at the transmitter site constitutes local origination. Local origination also includes transmission of programs reaching the transmitter via TV STL stations, but does not include transmission of signals obtained from either terrestrial or satellite microwave feeds or low power TV stations.

(i) [Reserved]

(j) *Television broadcast translator station ("TV translator station").* A station operated for the purpose of retransmitting the programs and signals of a television broadcast station, without significantly altering any characteristic of the original signal other than its frequency, for the purpose of providing television reception to the general public.

(k) *Low power TV station ("LPTV station").* A station authorized under the provisions of this subpart that may retransmit the programs and signals of a television broadcast station, may originate programming in any amount greater than 30 seconds per hour for the purpose of providing television reception to the general public and, subject to a minimum video program service requirement, may offer services of an ancillary or supplementary nature, including subscription-based services. (*See* § 74.790.)

(l) *Digital program origination.* For purposes of this part, digital program origination shall be any transmissions other than the simultaneous retransmission of the programs and signals of a TV or DTV broadcast station or transmissions related to service offerings of an ancillary or supplementary nature. Origination shall include locally generated television program signals and program signals obtained via video recordings (tapes and discs), microwave, common carrier circuits, or other sources.

(m) *Existing low power television or television translator station.* When used in this subpart, the terms existing low power television and existing television translator station refer to a low power television station or television translator station that is either licensed or has a valid construction permit.

[28 FR 19722, Dec. 31, 1963, as amended at 43 FR 1961, Jan. 13, 1978; 47 FR 21497, May 18, 1982; 48 FR 21486, May 18, 1983; 52 FR 7422, Mar. 11, 1987; 52 FR 31403, Aug. 20, 1987; 62 FR 26720, May 14, 1997; 69 FR 69331, Nov. 29, 2004; 87 FR 58202, Sept. 23, 2022]

# PUBLIC NOTICE

**Federal Communications Commission**
**45 L Street NE**
**Washington, DC 20554**

News Media Information 202-418-0500
Internet: www.fcc.gov
TTY: 888-835-5322

---

**DA 24-26**
**Released:  January 10, 2024**

## MEDIA BUREAU ANNOUNCES EFFECTIVE DATE OF CERTAIN LOW POWER PROTECTION ACT RULES

**MB Docket No. 23-126**

On December 12, 2023, the Commission released a *Report and Order* (*Order*) that adopted rules to implement the Low Power Protection Act (LPPA).[1]  The LPPA provides qualifying low power television (LPTV) stations with a limited window of opportunity to apply for primary spectrum use status as Class A television stations.[2]

On January 10, 2024, the Federal Register published a summary of the final rules adopted in the *Order*.[3]  Accordingly, the rules adopted in the *Order* will take effect on February 9, 2024, except for sections 73.6030(c) and 73.6030(d) which contain new or modified information collection requirements that require review by OMB.[4]  At the conclusion of the OMB review process, the Media Bureau will announce the effective date of that information collection in a document published in the Federal Register.  The Media Bureau will thereafter issue a Public Notice that establishes the one-year application filing window once the revised application form (FCC Form 2100) is available for use by applicants.[5]

For additional information, contact Kim Matthews, Policy Division, Media Bureau at Kim.Matthews@fcc.gov or (202) 418-2154.

**-- FCC --**

---

[1] Low Power Protection Act, Pub. L. 117-344, 136 Stat. 6193 (2023); *Implementation of the Low Power Protection Act*, MB Docket No. 23-126, Report and Order, FCC 23-112 (rel. Dec. 12, 2023) (*Order*) available at https://docs.fcc.gov/public/attachments/FCC-23-112A1.pdf.

[2] *See id*.

[3] *See* Federal Communications Commission, 47 CFR Part 73, Low Power Protection Act, Final Rule, 89 FR 1466 (Jan. 10, 2024).

[4] *See Order* at para. 61 & Appx. B (Final Rules), 47 CFR §§ 73.6030(c) (Application Requirements), 73.6030(d) (Licensing Requirements).  The information collection requirements contained in the rules that require OMB approval are subject to the Paperwork Reduction Act of 1995 (PRA).  Pub. L. No. 104-13, 109 Stat. 163 (1995) (codified in Chapter 35 of title 44 U.S.C.).

[5] *See Order* at para. 62 (delegating authority to the Media Bureau for the purpose of amending FCC Form 2100 as necessary to implement the licensing process adopted in the *Order* and to establish the one-year application filing window once the revised form is available for use by applicants).

the regulator of the private sector. Nothing in this Order reassigns any function vested by law in the Federal Communications Commission.

6–304. This Order shall be effective March 26, 1978.

## § 306. Foreign ships; application of section 301

Section 301 of this title shall not apply to any person sending radio communications or signals on a foreign ship while the same is within the jurisdiction of the United States, but such communications or signals shall be transmitted only in accordance with such regulations designed to prevent interference as may be promulgated under the authority of this chapter.

(June 19, 1934, ch. 652, title III, §306, 48 Stat. 1083.)

REFERENCES IN TEXT

This chapter, referred to in text, was in the original ''this Act'', meaning act June 19, 1934, ch. 652, 48 Stat. 1064, known as the Communications Act of 1934, which is classified principally to this chapter. For complete classification of this Act to the Code, see section 609 of this title and Tables.

## § 307. Licenses

### (a) Grant

The Commission, if public convenience, interest, or necessity will be served thereby, subject to the limitations of this chapter, shall grant to any applicant therefor a station license provided for by this chapter.

### (b) Allocation of facilities

In considering applications for licenses, and modifications and renewals thereof, when and insofar as there is demand for the same, the Commission shall make such distribution of licenses, frequencies, hours of operation, and of power among the several States and communities as to provide a fair, efficient, and equitable distribution of radio service to each of the same.

### (c) Terms of licenses

#### (1) Initial and renewal licenses

Each license granted for the operation of a broadcasting station shall be for a term of not to exceed 8 years. Upon application therefor, a renewal of such license may be granted from time to time for a term of not to exceed 8 years from the date of expiration of the preceding license, if the Commission finds that public interest, convenience, and necessity would be served thereby. Consistent with the foregoing provisions of this subsection, the Commission may by rule prescribe the period or periods for which licenses shall be granted and renewed for particular classes of stations, but the Commission may not adopt or follow any rule which would preclude it, in any case involving a station of a particular class, from granting or renewing a license for a shorter period than that prescribed for stations of such class if, in its judgment, the public interest, convenience, or necessity would be served by such action.

#### (2) Materials in application

In order to expedite action on applications for renewal of broadcasting station licenses and in order to avoid needless expense to applicants for such renewals, the Commission shall not require any such applicant to file any information which previously has been furnished to the Commission or which is not directly material to the considerations that affect the granting or denial of such application, but the Commission may require any new or additional facts it deems necessary to make its findings.

#### (3) Continuation pending decision

Pending any administrative or judicial hearing and final decision on such an application and the disposition of any petition for rehearing pursuant to section 405 or section 402 of this title, the Commission shall continue such license in effect.

### (d) Renewals

No renewal of an existing station license in the broadcast or the common carrier services shall be granted more than thirty days prior to the expiration of the original license.

### (e) Operation of certain radio stations without individual licenses

(1) Notwithstanding any license requirement established in this chapter, if the Commission determines that such authorization serves the public interest, convenience, and necessity, the Commission may by rule authorize the operation of radio stations without individual licenses in the following radio services: (A) the citizens band radio service; (B) the radio control service; (C) the aviation radio service for aircraft stations operated on domestic flights when such aircraft are not otherwise required to carry a radio station; and (D) the maritime radio service for ship stations navigated on domestic voyages when such ships are not otherwise required to carry a radio station.

(2) Any radio station operator who is authorized by the Commission to operate without an individual license shall comply with all other provisions of this chapter and with rules prescribed by the Commission under this chapter.

(3) For purposes of this subsection, the terms ''citizens band radio service'', ''radio control service'', ''aircraft station'' and ''ship station'' shall have the meanings given them by the Commission by rule.

### (f) Areas in Alaska without access to over the air broadcasts

Notwithstanding any other provision of law, (1) any holder of a broadcast license may broadcast to an area of Alaska that otherwise does not have access to over the air broadcasts via translator, microwave, or other alternative signal delivery even if another holder of a broadcast license begins broadcasting to such area, (2) any holder of a broadcast license who has broadcast to an area of Alaska that did not have access to over the air broadcasts via translator, microwave, or other alternative signal delivery may continue providing such service even if another holder of a broadcast license begins broadcasting to such area, and shall not be fined or subject to any other penalty, forfeiture, or revocation related to providing such service including any fine, penalty, forfeiture, or revocation

for continuing to operate notwithstanding orders to the contrary.

(June 19, 1934, ch. 652, title III, §307, 48 Stat. 1083; June 5, 1936, ch. 511, §2, 49 Stat. 1475; July 16, 1952, ch. 879, §5, 66 Stat. 714; Pub. L. 86–752, §3, Sept. 13, 1960, 74 Stat. 889; Pub. L. 87–439, Apr. 27, 1962, 76 Stat. 58; Pub. L. 97–35, title XII, §1241(a), Aug. 13, 1981, 95 Stat. 736; Pub. L. 97–259, title I, §§112, 113(a), Sept. 13, 1982, 96 Stat. 1093; Pub. L. 104–104, title II, §203, title IV, §403(i), Feb. 8, 1996, 110 Stat. 112, 131; Pub. L. 108–447, div. J, title IX [title II, §213(1), (2)], Dec. 8, 2004, 118 Stat. 3431.)

REFERENCES IN TEXT

This chapter, referred to in subsecs. (a) and (e), was in the original "this Act", meaning act June 19, 1934, ch. 652, 48 Stat. 1064, known as the Communications Act of 1934, which is classified principally to this chapter. For complete classification of this Act to the Code, see section 609 of this title and Tables.

AMENDMENTS

2004—Subsec. (c)(3). Pub. L. 108–447, §213(1), substituted "any administrative or judicial hearing" for "any hearing" and inserted "or section 402" after "section 405".

Subsec. (f). Pub. L. 108–447, §213(2), added subsec. (f).

1996—Subsec. (c). Pub. L. 104–104, §203, inserted heading and amended text generally, restructuring existing provisions into pars. (1) to (3) and substituting provisions providing 8 year term for licenses of broadcasting stations for provisions providing 5 year term for licenses of television broadcasting stations, 7 year term for licenses of radio broadcasting stations, and 10 year term for other broadcasting stations.

Subsec. (e). Pub. L. 104–104, §403(i), amended subsec. (e) generally. Prior to amendment, subsec. (e) read as follows:

"(1) Notwithstanding any licensing requirement established in this chapter, the Commission may by rule authorize the operation of radio stations without individual licenses in the radio control service and the citizens band radio service if the Commission determines that such authorization serves the public interest, convenience, and necessity.

"(2) Any radio station operator who is authorized by the Commission under paragraph (1) to operate without an individual license shall comply with all other provisions of this chapter and with rules prescribed by the Commission under this chapter.

"(3) For purposes of this subsection, the terms 'radio control service' and 'citizens band radio service' shall have the meanings given them by the Commission by rule."

1982—Subsec. (c). Pub. L. 97–259, §112, redesignated subsec. (d) as (c), substituted "ten years" for "five years" after "station" shall be for a longer term than" and "term of not to exceed", and inserted provision that the term of any license for the operation of any auxiliary broadcast station or equipment which can be used only in conjunction with a primary radio, television, or translator station shall be concurrent with the term of the license for such primary radio, television, or translator station. Former subsec. (c), which required the Commission to study proposal that Congress allocate fixed percentages of radio broadcasting facilities to nonprofit activities and report recommendations, with reasons, to Congress not later than Feb. 1, 1935, was struck out.

Subsec. (d). Pub. L. 97–259, §112(a), redesignated subsec. (e) as (d). Former subsec. (d) redesignated (c).

Subsec. (e). Pub. L. 97–259, §§112(a), 113(a), added subsec. (e) and redesignated former subsec. (e) as (d).

1981—Subsec. (d). Pub. L. 97–35 substituted provisions authorizing term of five years for a television broadcasting station license, seven years for a radio broad-

casting station license, and five years for any other class of license, with comparable provisions for renewal, for provisions authorizing term of three years for a broadcasting station license, and five years for any other class of station license, with comparable provisions for renewal.

1962—Subsec. (e). Pub. L. 87–439 inserted "in the broadcast or the common carrier services" before "shall be granted".

1960—Subsec. (d). Pub. L. 86–752 inserted last sentence dealing with the Commission's authority to grant licenses for periods shorter than 3 years.

1952—Subsec. (d). Act July 16, 1952, provided that upon the expiration of any license, any renewal applied for may be granted "if the Commission finds that public interest, convenience, and necessity would be served thereby", and provided that pending a hearing and final decision on an application for renewal and the disposition of any petition for a rehearing the Commission shall continue the license in effect.

1936—Subsec. (b). Act June 5, 1936, amended subsec. (b) generally.

EFFECTIVE DATE OF 1981 AMENDMENT

Section 1241(b) of Pub. L. 97–35 provided that: "The amendments made in subsection (a) [amending this section] shall apply to television and radio broadcasting licenses granted or renewed by the Federal Communications Commission after the date of the enactment of this Act [Aug. 13, 1981]."

## § 308. Requirements for license

### (a) Writing; exceptions

The Commission may grant construction permits and station licenses, or modifications or renewals thereof, only upon written application therefor received by it: *Provided*, That (1) in cases of emergency found by the Commission involving danger to life or property or due to damage to equipment, or (2) during a national emergency proclaimed by the President or declared by the Congress and during the continuance of any war in which the United States is engaged and when such action is necessary for the national defense or security or otherwise in furtherance of the war effort, or (3) in cases of emergency where the Commission finds, in the nonbroadcast services, that it would not be feasible to secure renewal applications from existing licensees or otherwise to follow normal licensing procedure, the Commission may grant construction permits and station licenses, or modifications or renewals thereof, during the emergency so found by the Commission or during the continuance of any such national emergency or war, in such manner and upon such terms and conditions as the Commission shall by regulation prescribe, and without the filing of a formal application, but no authorization so granted shall continue in effect beyond the period of the emergency or war requiring it: *Provided further*, That the Commission may issue by cable, telegraph, or radio a permit for the operation of a station on a vessel of the United States at sea, effective in lieu of a license until said vessel shall return to a port of the continental United States.

### (b) Conditions

All applications for station licenses, or modifications or renewals thereof, shall set forth such facts as the Commission by regulation may prescribe as to the citizenship, character, and financial, technical, and other qualifications of

000089
RCC's Emerg. Mot. for Stay, Exp. Rev., Summ. Reversal
Case No. 24-1004--FCC 23-112