ORAL ARGUMENT NOT YET SCHEDULED

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

RADIO COMMUNICATIONS CORPORATION,

    *Petitioner*,

      v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

    *Respondents*.

No. 24-1004

On Petition for Review of an Order of
the Federal Communications Commission

## RESPONDENT FEDERAL COMMUNICATIONS COMMISSION'S OPPOSITION TO EMERGENCY MOTION FOR STAY, EXPEDITED REVIEW, AND SUMMARY REVERSAL

### INTRODUCTION

Petitioner Radio Communications Corporation (RCC) challenges Federal Communications Commission rules implementing the Low Power Protection Act that, RCC contends, prevent it from upgrading to Class A status its low power television station in Allingtown, Connecticut, a suburban neighborhood in West Haven.

In doing so, RCC asks this Court for three kinds of extraordinary relief. None is warranted. RCC is not entitled to a stay of the

Commission's rules from this Court because it failed to seek one before the Commission. RCC likewise has failed to establish the substantial showings necessary for summary reversal and expedited review. RCC has no reasonable chance to prevail on the merits—let alone to clear the high bar necessary for extraordinary relief at this stage—because the Commission in this matter did nothing more than follow the clear commands of the statute. RCC's motion should be denied.

## BACKGROUND

### A. Statutory And Regulatory Background

#### 1. Low Power Television Service And Class A Licenses

The Commission began licensing low power television stations in 1982 to extend TV service to otherwise unserved or underserved areas. *Low Power Television Service*, Report and Order, 51 R.R.2d 476 (1982), *recon. granted in part*, 48 Fed. Reg. 21478 (1983). Low power stations have lower authorized power levels and serve smaller geographic regions than full power stations. *Implementation of the Low Power Prot. Act*, FCC 23-112, 2023 WL 8646731, at *1 (Dec. 12, 2023) ("Order"). From its inception, low power television service has been restricted to "secondary" priority, meaning that low power stations "may not cause interference to, and must accept interference from, full power stations." *Id.*

In 1999, Congress directed the Commission to create a new set of "Class A" television licenses that would provide some eligible low power stations with a degree of protection from interference from full power stations if they could meet specified statutory criteria and if they applied within a set timeframe.  *See* Community Broadcasters Protection Act of 1999, Pub. L. 106-113, 113 Stat. 1501 (Nov. 29, 1999); *Establishment of a Class A Television Service*, Report and Order, 15 FCC Rcd 6355 (2000), *recon. granted in part*, 16 FCC Rcd 8244 (2001).  At Congress's direction, the Commission issued these Class A licenses for a limited time and only to those stations that met the specified statutory requirements.  *Id*.

### 2.    The Low Power Protection Act

Last year, Congress enacted the Low Power Protection Act. Pub. L. 117-344, 136 Stat. 6193 (January 5, 2023). Like the Community Broadcasters Protection Act before it, the Low Power Protection Act provides low power TV stations with another limited window of opportunity to apply for Class A status.  And once again, Congress set specific eligibility criteria for low power stations seeking Class A designation.  Among other things, the Low Power Protection Act authorizes the Commission to approve applications only from stations that, "as of the date of enactment of this Act, operate[] in a Designated

Market Area with not more than 95,000 television households." LPPA § 2(c)(2)(B)(iii).

The statute defines "Designated Market Area" as either "(A) a Designated Market Area determined by Nielsen Media Research or any successor entity; or (B) a Designated Market Area under a system of dividing television broadcast station licensees into local markets using a system that the Commission determines is equivalent to the system established by Nielsen Media Research." LPPA § 1(a)(2).

### 3.    The Commission's Implementing Rules

Consistent with Congress's instructions, the Commission adopted rules to open a new window for low power television stations to apply for Class A status. *See* Order.

As relevant here, the Commission chose to use Nielsen's Local TV Report—a collection of data on local television markets—for determining a station's "Designated Market Area" for purposes of the Low Power Protection Act's eligibility criteria. *Id*. ¶ 35. First, the Commission reasoned, using Nielsen's Local TV Report was consistent with the statute, which expressly contemplates the use of Nielsen data for demarcating TV market areas. *Id*. Second, the use of the Local TV Report was consistent with past agency practice—a previous Commission

order had used Nielsen's Local TV Report to define the term "local market" for the purposes of other statutory provisions and agency rules. *Id.* (citing *Update to Publication for Television Broadcast DMA Determination for Cable and Satellite Penetration*, Report and Order, 37 FCC Rcd 13886 (2022)). Third, the Commission noted, commenters had unanimously supported using Nielsen's Local TV Report in a previous proceeding, where "the record indicated that the Local TV Report was the sole source of information regarding [Designated Market Area] determinations." *Id.*

While other commenters in the Low Power Protection Act proceeding supported the use of the Nielsen Local TV Report, RCC did not. Instead, RCC argued that relying on Nielsen data would be "nonsensical" because 177 of the 210 Designated Market Areas in Nielsen's report had more than 95,000 TV households—and thus would be ineligible for Class A status under the statute. RCC Comments at 1, 6 (Attach. 3 to Motion). According to RCC, using Nielsen's data would exclude too many stations. *Id.* The Commission considered and rejected this argument because "Congress clearly intended that eligibility under the [Low Power Protection Act] be limited, as the Act expressly provides that eligibility is limited to DMAs with no more than 95,000 TV

households."  Order ¶ 38.  As the Commission explained, Congress recognized that affording low power stations Class A status comes at a price—potential interference with full power stations—and thus adopted a "balanced approach" by restricting eligibility to smaller markets.  *Id.*

As an alternative to using Nielsen's Designated Market Areas, RCC asked the Commission to "allow all [Low Power Television] stations whose 'Section 307(b) community of license has fewer than 95,000 TV households" to convert to Class A status.  RCC Comments 6.  The Commission rejected RCC's proposal because it would not be "'equivalent' to the system established by Nielsen, which defines larger geographic regions than community of license"—and would thus contravene the statute's plain command to use Nielsen Designated Market Areas or an "equivalent" system.  Order ¶ 40 & n.187 (quoting LPPA § 1(a)(2)).

The Commission likewise rejected RCC's arguments that relying on Nielsen data violated the Constitution "[]by improperly delegating legislative power to private industry."  RCC Comments 4.  As the Commission explained, using privately collected data "for a particular purpose specified in the statute" does not reflect an impermissible delegation of legislative authority.  Order n.186.

Similarly, the Commission declined to read the Low Power Protection Act as "prohibit[ing] the Commission from displacing any [Low Power Television] licensee, regardless of whether the license contains a Class A designation, for the purpose of selling that [Low Power Television] spectrum at auction." RCC Comments 17. The Low Power Protection Act "is silent," the Commission explained, "with respect to the issue of auctioning broadcast spectrum, and there is no evidence that Congress intended [the agency to] consider this issue" in implementing the statute. Order n.186.

Finally, the Commission declined RCC's request that it amend its rules to give Class A stations the same "must carry" status as full power stations. Order ¶¶ 52-53; RCC Comments 15-16. Under the Commission's must carry rules, certain local broadcast television stations have a right to demand that cable providers carry their channel to local customers. *See* 47 C.F.R. § 76.55. But low power stations are not afforded the same must carry privileges as full power stations. *Id*. The Commission concluded that Congress did not intend to alter this scheme through the creation of Class A licenses. Order ¶¶ 52-53. Consistent with a previous order denying full must carry status to Class A stations, the Commission reasoned that neither the Community Broadcasters

Protection Act, the Low Power Protection Act, nor their accompanying legislative histories make any mention of must carry rights and, given this silence, Congress did not intend to expand those rights along with the grant of Class A licenses. *Id.* (citing *In Re Establishment of a Class A Television Service*, 16 FCC Rcd 8244, 8259-60 ¶¶ 39-43 (2001)).

## B.     RCC's Request For Judicial Review

On January 10, 2024, RCC petitioned this Court for review of the Commission's order. *See* ECF No. 2036140. It filed its emergency motion on January 23, 2024. *See* ECF No. 2037054.

## ARGUMENT

RCC's motion lays out a dizzying array of statutory, constitutional, and economic theories that underly its various disagreements with the Commission's implementation of the Low Power Protection Act. But the defects in RCC's motion are simple. It is not entitled to a stay because it never sought one from the Commission. Its merits arguments fail largely because they do not account for the plain text of the statute. And at every turn, RCC falls short of the demanding standards necessary for extraordinary relief.

## I.      RCC IS NOT ENTITLED TO A STAY

This Court should not stay the Commission's order because RCC has not asked the Commission to do so, nor has it explained that failure to do so.

This Court's longstanding practice is unequivocal: "Application for a stay or any other appropriate emergency relief *must* first be made to the district court or agency whose order is being appealed, or the motion filed in this Court must explain why such relief was not sought." D.C. CIRCUIT HANDBOOK OF PRACTICE AND INTERNAL PROCEDURES 32 (2021) (emphasis added). *See* Fed. R. App. P. 18 (a)(1). RCC has filed no such request with the Commission and its motion makes no attempt to explain that failure. *See* Motion at 9-10. That is reason enough alone to deny the stay.

To the extent that RCC's reference to "interim relief" (Motion at 10) might suggest that the Commission denied RCC a stay, that notion is mistaken. RCC cites to its argument in comments before the Commission that the Low Power Protection Act should "be read as freezing, as of the time the [Low Power Protection Act] was enacted, the ability of full-power TV stations to file applications to displace [Low Power Television] stations interested in asserting [Low Power Protection Act] rights." RCC

Reply Comments at 9 (Attach. 4 to Motion). That statutory construction argument was not a stay request—indeed, it preceded the Commission's order. And RCC's post-hoc characterization that its preferred interpretation of the statute would protect it "from displacement during the pendency of this litigation" (Motion at 10), cannot retroactively transform a commenter's statutory argument into a stay request required by the Federal Rules.

Nothing else in RCC's emergency motion justifies a stay. Even if RCC had exhausted its administrative remedies, it would need to show that (1) it is likely to prevail on the merits, (2) it will suffer irreparable harm unless a stay is granted, (3) other parties will not be harmed if a stay is granted, and (4) a stay will serve the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009).

RCC fails to satisfy that demanding standard. As discussed below, RCC is highly unlikely to prevail on the merits. *See infra* Section II. That alone is "an arguably fatal flaw" that should preclude a grant of RCC's stay request. *Citizens for Resp. and Ethics in Washington v. FEC*, 904 F.3d 1014, 1019 (D.C. Cir. 2018).

RCC's assertion (Motion at 11) that it will suffer irreparable harm is highly speculative, not "certain and great," as this Court requires. *See*

*Mexichem Specialty Resins, Inc. v. E.P.A.*, 787 F.3d 544, 555 (D.C. Cir. 2015). The one-year window to apply for a Class A license under the Low Power Protection Act has not yet opened, and even if it had, nothing in the Commission's Order would prevent RCC from seeking the Commission's permission to file a provisional application if this litigation remained pending. RCC, which does not currently hold a Class A license, does not explain how declining to stay the order would damage its "revenue, viewers, and viewer relationships." Motion at 11. Meanwhile, staying the order would burden those low power stations that are eligible to apply for Class A licenses by delaying their ability to do so.

Because none of the relevant factors support RCC's stay request, it should be denied.

## II.   Summary Reversal Is Unwarranted

RCC's emergency motion also does not meet this Court's demanding standard for summary disposition. "Summary reversal is rarely granted and is appropriate only where the merits are 'so clear, plenary briefing, oral argument, and the traditional collegiality of the decisional process would not affect [the Court's] decision.'" D.C. Circuit Handbook of Practice and Internal Procedures 36 (2021) (quoting *Sills v. Fed.*

*Bureau of Prisons*, 761 F.2d 792, 793-94 (D.C. Cir. 1985)). The merits of this case are extraordinarily clear, but not in RCC's favor.

At bottom, RCC objects that its licensee station is ineligible to apply for Class A status under the Commission's interpretation of the Low Power Protection Act because it does not fall within a Designated Market Area with not more than 95,000 television households as defined by Nielsen's Local TV Report. *See* Motion at 31 ("RCC cannot file a Class A upgrade application per the terms of FCC 23-112"); RCC Comments at 7 (RCC's licensee station is in a Nielsen Designated Market Area with 963,950 television households). But the Low Power Protection Act requires the Commission to use Nielsen's system or an equivalent one. RCC fails to grapple with the plain language of the statute and identifies no other valid basis for setting aside the Commission's order.

## A. The Commission Correctly Interpreted The Low Power Protection Act To Require Use Of Nielsen Designated Market Areas

It is well settled that where "Congress has directly spoken to the precise question at issue," and "the intent of Congress is clear, that is the end of the matter," and both the Court and the Commission "must give effect to the unambiguously expressed intent of Congress." *Eagle Broad.*

*Grp., Ltd. v. F.C.C.*, 563 F.3d 543, 550 (D.C. Cir. 2009) (internal quotation marks omitted).

Just so here. The Low Power Protection Act sets clear eligibility criteria for low power stations to apply for Class A status. "The Commission may approve an application . . . if the low power TV station submitting the application . . . satisfies" the listed requirements, including that it "operates in a Designated Market Area with not more than 95,000 television households." LPPA § 2(c)(2)(B). The statute defines "Designated Market Area" to mean "a Designated Market Area determined by Nielsen Media Research" or "a system that the Commission determines is equivalent to the system established by Nielsen Media Research." LPPA § 2(a)(2).

In the challenged order, the Commission did nothing more than faithfully follow these statutory commands. It correctly concluded that Congress had instructed the Commission to define "Designated Market Areas" by reference to Nielsen's data or an equivalent system, evaluated alternatives to determine whether they were "equivalent," and, finding no such equivalent option, applied Congress's chosen definition to set eligibility requirements for Class A licenses. Order ¶¶ 35-40. That straightforward approach was plainly correct.

**B.    RCC's Contrary Arguments Are Mistaken**

RCC's emergency motion advances a range of statutory and constitutional arguments for setting aside the Commission's implementation of the Low Power Protection Act. But none is likely to prevail, let alone is so clearly meritorious as to warrant summary reversal.

**1.    RCC misreads the Low Power Protection Act**

RCC fundamentally misunderstands the Low Power Protection Act. It argues that the "[t]he [Designated Market Area] definition at Section (2)(a)(2) of the [Low Power Protection Act], does not contain any limitation regarding size and plainly includes all [Designated Market Areas] regardless of the number of [Designated Market Area] TV households, thus mandating nationwide Class A licensing." Motion at 21. At the same time, it insists that the statute's reference to "a Designated Market Area with not more than 95,000 television households" somehow "refers to the number of TV households served in the qualifying [Low Power Television] station's § 307(b) community of license." Motion at 22. In other words, RCC reads the statute to mean that *any* low power station is entitled to a Class A license if it (1) operates

- 14 -

in a Designated Market Area of *any* size, and (2) serves a community of license of not more than 95,000 households.  That reading is incorrect.

To start, the fact that the statutory definition of "Designated Market Area" does not contain a numerical limitation is entirely distinct from the statute's eligibility criteria, which (among other things) expressly exclude stations that operated in a Designated Market Area with more than 95,000 households at the time of enactment.  *See* LPPA § 2(c)(2)(B).  In no event can the statutory definition of the term "Designated Market Area" be read to "mandat[e] nationwide Class A licensing" without respect to the eligibility criteria laid out elsewhere in the statute.

Nor does RCC explain how the phrase "a Designated Market Area with not more than 95,000 television households" can be read to redirect to a distinct concept—"community of license"—from a different statutory provision—Section 307(b)—when the Low Power Protection Act and its legislative history nowhere contains any mention of that concept or statutory provision.

That conclusion is confirmed by the plain text of the statute, as well as common sense.  The phrase "with not more than 95,000 television households" modifies the immediately preceding phrase—"Designated

Market Area"—and not the much earlier phrase, "the low power TV station submitting the [application]," as RCC (Motion at 22) erroneously suggests. Indeed, a "station" does not contain "television households," whereas a "Designated Market Area" does. And because *every* television station in the lower 48 states falls within one of Nielsen's Designated Market Areas, RCC's proposed interpretation—that Congress merely meant to require an eligible station to fall within *any* Designated Market Area—would render the Designated Market Area language largely superfluous. That cannot be what Congress intended. *See Amoco Prod. Co. v. Watson*, 410 F.3d 722, 733 (D.C. Cir. 2005) ("'[I]f possible,' [this Court will] construe a statute so as to give effect to 'every clause and word.'"). And if there were any ambiguity, the Commission's interpretation would be by far the most reasonable, and thus would be entitled to deference. *See Mozilla Corp. v. F.C.C.*, 940 F.3d 1, 19 (D.C. Cir. 2019).

### 2. Statutory purpose cannot override the Low Power Protection Act's plain text

Throughout its motion, RCC argues that the Commission's interpretation of the Low Power Protection Act fails to carry out the statute's general "purpose of protecting [Low Power Television] licenses."

*See, e.g.*, Motion at 15, 17. But the language of the statute belies RCC's contention that Congress's purpose was to guarantee limitless protection to all low power stations. To the contrary, as the Commission explained, Order ¶ 38, Congress adopted a "balanced approach," with the stated purpose of "provid[ing] low power TV stations with a limited window of opportunity to apply for" Class A licenses, subject to statutory requirements. LPPA § 2(b). And even if "the text of [the] statute" had "conflict[ed] with the statute's larger purpose," that "alone [would] not warrant departing from the text." *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 334 (D.C. Cir. 2020);.

For similar reasons, RCC's criticism that the Commission's interpretation would render most low power stations ineligible for Class A licenses is unavailing. *See* Motion at 13. The statute, by its terms, makes clear that Congress intended to limit Class A licenses by restricting eligibility to market areas with no more than 95,000 television households. LPPA § 2(c)(2)(B). And RCC points to nothing in the statute or legislative history that suggests Congress did not mean what it said when it instructed the Commission to use Nielsen Designated Market Areas or an equivalent system.

### 3.    RCC misinterprets Section 307(b) of the Communications Act

Section 307(b) of the Communications Act of 1934 is not to the contrary.  RCC argues that restricting eligibility for Class A licenses under the Low Power Protection Act "reassigns [Low Power Television] licenses from their very small § 307(b) communities of license to much larger 'non-qualifying DMAs' to eliminate Class A licenses, completely ignoring § 307(b)'s mandate to issue Class A licenses nationwide to achieve a national goal."  Motion at 14.  That argument conflates two distinct statutory provisions.

Section 307(b) states that "the Commission shall [distribute] licenses, frequencies, hours of operation, and of power among the several States and communities as to provide a fair, efficient, and equitable distribution of radio service to each of the same."  47 U.S.C. § 307(b).  That provision generally "empowers the Commission to allow licenses so as to provide a fair distribution among communities," *F.C.C. v. Allentown Broad. Corp.*, 349 U.S. 358, 362 (1955), by, for example, allotting channels to different communities across the country.  *See* 47 C.F.R. § 73.622.  It does not address the treatment of low power stations, Class A licenses, or "Designated Market Areas."

The Low Power Protection Act's use of "Designated Market Area" to determine Class A eligibility is wholly unrelated to the concept of communities of license under Section 307(b).  *See* Order ¶ 40 & n.187. Using Nielsen Designated Market Areas for determining Class A eligibility "is consistent with the [Low Power Protection Act], relates only to implementation of the [Low Power Protection Act], and does not affect the communities [Low Power Television] stations are licensed to serve." Order n.187.  RCC's suggestions to the contrary are simply mistaken. The Commission has not "reallocat[ed]" (Motion at 14) any low power television licenses, *de facto* or otherwise, in the underlying order.

Even if Section 307(b) could be read to conflict with the Low Power Protection Act, RCC's interpretation would be unavailing.  It is a "basic principle of statutory construction that a specific statute . . . controls over a general provision."  *Sierra Club v. Env't Prot. Agency*, 21 F.4th 815, 821 (D.C. Cir. 2021) (alterations in original; internal quotation marks omitted).  Here, there can be no question that Congress's precise employment of "Designated Market Area" to determine Class A eligibility in the Low Power Protection Act controls over the earlier-enacted general instruction to equitably distribute broadcasting resources.  Section 307(b) is of no help to RCC at all.

### 4.    Nothing in the Low Power Protection Act extends must carry rights

RCC further objects (Motion at 27-30) to the Commission's reasonable conclusion, in the face of statutory silence, that Congress did not intend to extend must carry rights to all Class A stations in the Low Power Protection Act.   Order ¶ 53.   Here too, summary reversal is unwarranted.

Nothing in the statutory text or legislative history of the Low Power Protection Act provides any indication that Congress intended to alter the status quo with respect to must carry rights and Class A licenses. Congress was presumably aware that the Commission had declined to read such rights into the Community Broadcasters Protection Act, *see* 16 FCC Rcd at 8259-60 ¶¶ 39-43, and opted to take no further action.

RCC identifies nothing to the contrary in the text or history of the Low Power Protection Act.  While the "[Low Power Protection Act] does not contain any explicit limitation on Class A must-carry rights," Motion at 28, neither does it contain any explicit grant (or any other mention) of must carry rights.   Contrary to RCC's contention (Motion at 27), the statute's use of the phrase "primary status" refers to spectrum priority, not must carry rights.  And the fact that the statute provides that Class

A stations are "subject to the same license terms and renewal standards as a license for a full power television broadcast station" does not help RCC because must carry rights are not a "license term" or "renewal standard." Motion at 28 (quoting LPPA § 2(c)(3)(A)). The Commission's interpretation is, at very least, a reasonable one. *See Glob. Crossing Telecomms., Inc. v. F.C.C.*, 259 F.3d 740, 744 (D.C. Cir. 2001) (upholding the Commission's reasonable interpretation in the face of statutory silence).

### 5.  RCC's constitutional objections lack merit

In addition to its statutory arguments, RCC argues that the challenged order violates the Constitution because it (1) impermissibly regulates "local economic activity" beyond the reach of the Commerce Clause, Motion at 17-18; (2) impermissibly subdelegates legislative authority to Nielsen, a private party, Motion at 23-25; and (3) violates the First Amendment, Motion at 25-27. These arguments are baseless.

"The power of Congress over interstate commerce is not confined to the regulation of commerce among the states," and extends to any activity with "a substantial effect on interstate commerce." *United States v. Darby*, 312 U.S. 100, 118-19 (1941). Congress's power is not only "not limited to regulation of an activity that by itself substantially affects

interstate commerce, but also extends to activities that do so only when aggregated with similar activities of others." *Sebelius*, 567 U.S. at 549. It has long been recognized that local television broadcasting substantially affects interstate commerce. *See*, *e.g.*, *Allen B. Dumont Labs. v. Carroll*, 184 F.2d 153, 154 (3d Cir. 1950) ("There is no doubt but that television broadcasting is in interstate commerce.").[1] Indeed, for its part RCC repeatedly complains that the Commission's implementation of the Low Power Protection Act will affect its ability to compete against national broadcasters. *E.g.*, Motion at 13. Congress has ample constitutional authority to regulate in this area, including setting eligibility requirements for broadcast licenses.

RCC's private non-delegation argument likewise falls flat. This Court has long recognized that "a federal agency may use an outside entity, such as a state agency or a private contractor, to provide the agency with factual information." *U.S. Telecom Ass'n v. F.C.C.*, 359 F.3d 554, 567 (D.C. Cir. 2004). The challenged order does no more than that—

---

[1] *See also Fed. Radio Comm'n v. Nelson Bros. Bond & Mortg. Co.*, 289 U.S. 266, 279 (1933) ("No state lines divide the radio waves, and national regulation is not only appropriate but essential to the efficient use of radio facilities.").

relying on Nielsen "to provide the agency with factual information," and even then at Congress's express instruction. *Id.* This case bears no resemblance to the "sweeping delegation of legislative power" (Motion at 24-25) at issue in *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 539 (1935). The Commission thus correctly concluded that "us[ing] an outside entity's market definition for a particular purpose specified in the statute" violates no constitutional principle. Order n.186.

The Commission's order also does not violate the First Amendment. The Low Power Protection Act requires that eligible stations have carried a certain amount of "locally produced programming" in the 90 days preceding the statute's effective date. LPPA § 2(c)(2)(B)(i)(I); *see* Order ¶¶ 18-20. The Commission defined "locally produced programming" by reference to Section 73.6000 of the Commission's rules, 47 C.F.R. § 73.6000, just as it did for stations that converted to Class A status under the Community Broadcasters Protection Act, Order ¶ 19. Thus, a low power television station seeking to upgrade to Class A status under the Low Power Protection Act "must have broadcast an average of at least 3 hours per week of programming that was produced within the market area served by such station, or the market area served by a group of commonly controlled [low power television] stations that carry common

local programming produced within the market area served by such group." *Id.* ¶ 18.

RCC contends that this requirement "violates the First Amendment by restricting a Class A applicant's program content and editorial choices." Motion at 25. Not so. "Government regulation of expressive activity is content neutral so long as it is justified without reference to the content of the regulated speech." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). And content neutral regulation is permissible so long as "it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *BellSouth Corp. v. F.C.C.*, 144 F.3d 58, 69-70 (D.C. Cir. 1998). Here, the local programming requirement does not regulate the content of any "viewpoint" or "editorial choices," Motion at 25, but merely specifies the location from which the programming must have originated for a limited time. That relatively minor burden is amply justified by the government's interest in ensuring that local stations serve local audiences.

RCC additionally contends (Motion at 26) that the order "violates the First Amendment by unevenly applying the program importation restriction" to allow commonly controlled low power television stations to

count programming as "local" so long as it is produced somewhere within the market area served by the group of commonly owned stations. That argument is foreclosed because neither RCC nor any other party raised it before the Commission. *See* 47 U.S.C. § 405(a). In any event, for the reasons already explained, a rule that merely specifies the location from which programming must have originated is not an impermissible, content-based restriction on speech.

### 6. The Commission adequately responded to RCC's comments

Throughout its emergency motion, RCC objects that the Commission did not respond to every aspect of its comments before the agency. *E.g.*, Motion at 11, 16. But the Commission did not "fail[] to respond to RCC's arguments" or relegate its response to "terse and insubstantial" analysis. Motion at 11-12. To the contrary, the Commission adequately explained why it was rejecting the majority of RCC's arguments, mentioning RCC nearly 30 times in its order.

In any event, "[t]he FCC 'need not address every comment,'" and must only "respond in a reasoned manner to those that raise significant problems." *Covad Commc'ns Co. v. F.C.C.*, 450 F.3d 528, 550 (D.C. Cir. 2006) (internal quotation marks omitted). Any "failure to respond to

- 25 -

comments is significant only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors." *Thompson v. Clark*, 741 F.2d 401, 409 (D.C. Cir. 1984) (internal quotation marks and citation omitted). Here, there is no indication that the Commission failed to consider the relevant factors in implementing the Low Power Protection Act.

Because the merits of this case are not clearly in its favor—indeed, they heavily favor the Commission[2]—RCC fails to carry its "heavy burden" to justify summary reversal. *Sills*, 761 F.2d at 793.

## III. THIS CASE DOES NOT WARRANT EXPEDITED REVIEW

RCC also fails to meet the demanding standard for expedited review. This Court "grants expedited consideration very rarely." D.C. CIRCUIT HANDBOOK OF PRACTICE AND INTERNAL PROCEDURES 34 (2021). "The movant must demonstrate that the delay will cause irreparable injury and that the decision under review is subject to substantial

---

[2] Should it deem the respective positions of the parties sufficiently clear, the Court may summarily deny RCC's petition for review. *See, e.g.*, *Grant v. United States Dep't of Def.*, No. 18-5308, 2019 WL 668086, at *1 (D.C. Cir. Jan. 25, 2019) (summarily affirming the challenged decision, on the court's own motion, where "a motion for summary reversal placed the merits of the appeal before the court, and the merits of the parties' positions [were] so clear as to warrant summary action").

challenge." *Id*. For all the reasons explained above, *supra* Sections I & II, RCC here fails to establish that it will be irreparably injured by review in the ordinary course, or that its merits arguments amount to a "substantial" challenge to the underlying order. Expedited review is not warranted.

## CONCLUSION

The emergency motion for stay, expedited review, and summary reversal should be denied.

Dated: February 26, 2024            Respectfully submitted,

/s/ *Adam L. Sorensen*

P. Michele Ellison
  *General Counsel*

Sarah E. Citrin
  *Deputy Associate General Counsel*

Adam L. Sorensen
  *Counsel*

FEDERAL COMMUNICATIONS
  COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

*Counsel for Respondent Federal
  Communications Commission*

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.  This document complies with the type-volume limit of Fed. R. App. P. 27(d)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1):

    ☒    this document contains <u>5,198</u> words, *or*

    ☐    this document uses a monospaced typeface and contains <u>    </u> lines of text.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☒    this document has been prepared in a proportionally spaced typeface using <u>Microsoft Word for Office 365</u> in <u>14-point Century Schoolbook</u>, *or*

    ☐    this document has been prepared in a monospaced spaced typeface using <u>        </u> with <u>         </u>.

/s/ *Adam L. Sorensen*
Adam L. Sorensen
*Counsel for Respondent*
*Federal Communications Commission*