**NOT SCHEDULED FOR ORAL ARGUMENT**

**No. 24-1004**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

**RADIO COMMUNICATIONS CORPORATION,**
                                        **Petitioner,**
v.

**FEDERAL COMMUNICATIONS COMMISSION,**
                                        **Respondent.**

**PETITIONER'S INITIAL BRIEF**

_____
_____

**On Petition for Review of an Order from the
Federal Communications Commission (FCC 23-112)
Adopting Implementing Rules For The
Low Power Protection Act**

_____
_____

**Radio Communications Corporation
Timothy E. Welch, Esq.
Hill and Welch
1116 Heartfields Drive
Silver Spring, MD 20904
(202) 321-1448 (cell)
(301) 622-2864 (FAX)
welchlaw@earthlink.net
April 22, 2024**

## I.  Rule 28(a)(1) Certificate as to Parties, Rulings, and Related Cases

**Parties and Amici:**  The following parties entered comments in the rulemaking underlying FCC 23-112:

Block Communications, Inc.
Communications Technologies
County of Los Angeles, California
Dockins Communications, Inc.
Flood Communications
Channel 23 WXWZ, JB Media Group
Jose Berrios Diaz
Lockwood Broadcasting, Inc.
LPTV Broadcasters Association

National Association of Broadcasters
News-Press & Gazette Broadcasting
One Ministries, Inc.
Radio Communications Corporation
LPTV W24EZ-D, Formerly
Class A W28AJ (RCC)
REC Networks

KFLA-LD; Data Wave, LLC; M&C Broadcasting Corporation – WCEA-LD; The Videohouse Inc.; ATV Holdings, Inc.; G.I.G., Inc.; Michael Karr; Caribevision Holdings; Tycke Media, LLC; America CV Station Group, Inc.; Viper Communications, Inc.; Lowcountry 34 Media, LLC; Paramount Broadcasting Communication LLC; Look Media; Lawrence F. Loesch; Agape Broadcasters Inc; Richardson Broadcasting; King Forward Inc; KADO/Word of Life Ministries, Inc; Dockins Broadcast Group (collectively referred to as "Identical Comments" in FCC 23-112)

**Rulings Under Review:**  FCC 23-112 released December 12, 2023, 89 Fed. Reg. 1466 (January 10, 2024), App. _____.

**Related Cases:** There are no related cases.

## II.  Rule 26.1 Disclosure Statement

RCC is a domestic, closely held, family-owned telecommunications and media company, principal business office in West Haven, CT.  RCC has no publicly held owner or parent and its principals do not own or control, nor are they owned or controlled by, any publicly owned company.  All principals are U.S. Citizens.

i

# III.  Table of Contents

I.  Rule 28(a)(1) Certificate as to Parties, Rulings, and Related Cases . . . . . . . . . .   i
    Parties and Amici . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   i
    Rulings Under Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   i
    Related Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   i

II.  Rule 26.1 Disclosure Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   i

III.  Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   ii

IV.  Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   iv
    Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   iv
    Constitutional Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   v
    Statutory Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   v
    Regulatory Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   vii
    Administrative Orders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   vii

V.  Glossary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   viii

VI.  Jurisdictional Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

VII.  Venue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

VIII.  Statement Of The Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

IX.  Statutes And Regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

X.  Statement Of The Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3
    A.  Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3
    B.  FCC Created Secondary Service LPTV In 1982 . . . . . . . . . . . . . . . . . . . .   4
    C.  Must-Carry Rules Adopted In 1993, Years Before Class A Created . . .   5
    D.  Congress Created A New Primary Class A TV In 1999's CBPA . . . . . .   6
    E.  RCC Obtained CBPA Class A Status, Then Lost It . . . . . . . . . . . . . . . .   8
    F.  Congress Created A New Primary Class A TV In 2023's LPPA . . . . . .   9
    G.  First Amendment Violation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

XI.  Summary Of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

XII.  Standing And Ripeness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

XIII.  Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    A.  Standard Of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    B.  Reopening Doctrine:  CBPA And Must-Carry Rulemakings . . . . . . . . 18
    C.  § 307(b) And The LPPA Regulate Interstate Commerce . . . . . . . . . . 19
        1.  The FCA Mandates Nationwide Class A Licensing . . . . . . . . . 19
        2.  FCC 23-112 Insubstantially Affects Interstate Commerce . . . . 24
            a.  Improper Regulation of Local Economic Activity . . . . . . 24
            b.  FCC 23-112 Fails To Address The Commerce Issue . . . . 29
        3.  Reading § 307(b) And LPPA Constitutionally . . . . . . . . . . . . 29
            a.  The FCA Requires Nationwide Licensing . . . . . . . . . . . . 29
            b.  The LPPA Does Not Abolish § 307(b) . . . . . . . . . . . . . 30
            c.  § 307(b), LPPA, And Nationwide Class A Licensing . . . . 33
    D.  Unlawful Full-Power TV Protection At LPTV's Expense . . . . . . . . . . 36
        1.  FCC Adopts NAB's Anti-Competitive Lobbying Position . . . . . 36
        2.  LPPA Protects Small Community TV . . . . . . . . . . . . . . . . . . 37
        3.  The FCA Requires Nationwide Class A Licensing, Not
            LPPA Defeating *De Facto* LPTV License Reallocation . . . . 38
        4.  LPPA Is Unconcerned With "Spectrum Scarcity" . . . . . . . . . . . 40
    E.  Unconstitutional Delegation Of Governmental Authority . . . . . . . . . . 42
    F.  Unconstitutional Class A Program Content Eligibility Rule . . . . . . . . 45
    G.  Unlawful Denial Of Primary Class A Must-Carry . . . . . . . . . . . . . . . 48

XIV.  Requested Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Certificate of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Certificate of Digital Submission and Privacy Redactions . . . . . . . . . . . . . . . 56

Certificate Of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Statutory Addendum:  Pertinent Statutes And Regulations . . . . . . . . . . . . . . . 58

1)  Community Broadcasters Protection Act of 1999 . . . . . . . . . . . . . . . . . . 00001
2)  Low Power Protection Act (2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 00006
3)  47 U.S.C. § 307(b) Allocation Of Facilities . . . . . . . . . . . . . . . . . . . . . . 00009
4)  47 C.F.R. § 74.701(h) Definitions – Local Origination . . . . . . . . . . . . . . 00011
5)  47 C.F.R. § 76.55 Definitions Applicable To The Must-Carry Rules . . . . 00013

# IV.  Table of Authorities

## Cases

*Alvin Lou Media, Inc. v. FCC*, 571 F.3d 1 (CADC 2009), *citing FCC v. Allentown Broad. Corp.*, 349 U.S. 358 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Burlington Truck Lines v. United States*, 371 U.S. 156 (1962) . . . . . . . . . . . 18, 29

*Citizens for Responsibility & Ethics in Washington v. United States Dep't of Homeland Sec.*, 527 F. Supp. 2d 76 (DCDC 2007), *citing Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568 (1988) . . . 32, 45

*Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004 (CADC 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*\*Covad Communs. Co. v. FCC*, 450 F.3d 528 (CADC 2006)  15, 17, 19-23, 25, 26, 29, 33, 40-42, 47, 50, 53

*CTIA - The Wireless Ass'n v. FCC*, 466 F.3d 105 (CADC 2006) . . . . . . . . . . . . 19

*DOC v. New York*, 139 S. Ct. 2551 (2019)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*FCC v. Nextwave Personal Comms., Inc.,* 537 U.S. 293 (2003), *affirming*, *Nextwave Personal Comms., Inc. v. FCC*, 254 F.3d 130 (CADC 2001) . . . . . . . . . . . . . . . 17

*Hibbs v. Winn*, 542 U.S. 88 (2004)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*\*Hikvision USA, Inc. v. FCC*, 2024 U.S. App. LEXIS 7710, __ F.4th __ (CADC April 2, 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 20, 26, 31, 33

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)  . . . . . . . . . . . . . . . . . . . . . 16

*Miss. Comm'n on Envtl. Quality v. EPA*, 790 F.3d 138 (CADC 2015) . . . . . . . . 25

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

Authorities upon which we chiefly rely
are marked with asterisks.                        iv

*Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55 (2004) . . . . . . . . . . . . . . . . . . 1

*Petroleum Communications, Inc. v. FCC*, 22 F.3d 1164 (CADC 1994). . . . . 17, 18

*Reuters, Ltd. v. FCC*, 781 F.2d 946 (CADC 1986) . . . . . . . . . . . . . . . . . . . . . . . 53

*\*Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) . . . . . . . . 2, 42, 43

*\*Syracuse Peace Council v. FCC*, 867 F.2d 654 (CADC 1989), *cert. denied*,
493 U.S. 1019 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 48

*Syufy v. United States*, 818 F.2d 1457 (CA9 1987), *citing Foster v. United States*, 303
U.S. 118 (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Darby*, 312 U.S. 100 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*\*United States v. Lopez*, 514 U.S. 549 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . 25, 36

*Viasat, Inc. v. FCC*, 47 F.4th 769 (CADC 2022). . . . . . . . . . . . . . . . . . . . . . . . . 16

*\*Wickard v. Filburn*, 317 U.S. 111 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 36

### Constitutional Provisions

U.S. Const. Amend. I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 45, 47

U.S. Const. Art. 1 Sec. 8 Cl. 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

### Statutory Provisions

5 U.S.C. § 551 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5 U.S.C. § 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 17

5 U.S.C. § 704 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5 U.S.C. § 705 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5 U.S.C. § 706(1),(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Authorities upon which we chiefly rely
are marked with asterisks.                    v

28 U.S.C. § 2342(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 2343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 2344 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 2347(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 2348 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*47 U.S.C. § 230 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 53

47 U.S.C. § 307(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 20, 23, 41

*47 U.S.C. § 307(b) . . viii, 2, 4, 5, 11, 13, 14, 19-24, 28-35, 38, 39, 41-44, 46, 48, 50, 52-54

47 U.S.C. § 336 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

47 U.S.C. § 402(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

47 U.S.C. § 534(h)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Community Broadcasters Protection Act of 1999 (CBPA), Pub. L. No. 106-113, 113 Stat. Appendix I at pp. 1501A-594 - 1501A-598 (1999), codified at 47 U.S.C. § 336(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8, 15, 18, 24, 27, 29, 51

Federal Communications Act of 1934, 48 Stat. 1064 (June 19, 1934) . . . . . . 19, 28

Low Power Protection Act, Pub. L. 117-344, 136 Stat. 6193 (Jan. 5, 2023) . . . viii, 2, 3, 7-13, 16, 20-30, 33-41, 43-45, 48, 50-53

*LPPA Section 2(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 34, 35, 38, 44

LPPA Section 2(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 48

*LPPA Section 2(c)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Authorities upon which we chiefly rely are marked with asterisks.                    vi

*LPPA Section 2(c)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 10, 15, 48, 50

**Regulatory Provisions**

*47 C.F.R. § 74.701(h). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 46, 47, 53

*47 C.F.R. § 76.55 . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 9, 15, 31, 48-52, 54

**Administrative Orders**

*Establishment of a Class A Television Service*, *Report and Order*, 15 FCC Rcd 6355, 6357-58 ¶ 2 (2000), *recon. granted in part*, 16 FCC Rcd. 8244 (2001) (*2000 CBPA Class A MO&O*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 9

*Implementation of the Cable Television Consumer Protection and Competition Act of 1992, Broadcast Signal Carriage Issues*, MM Docket No. 92-259, *Report and Order*, 8 FCC Rcd. 2965 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*In the Matter of Implementation of the Satellite Home Viewer Improvement Act of 1999, Broadcast Signal Carriage Issues, Retransmission Consent Issues* (*SHVIA*), *Report and Order*, 16 FCC Rcd. 1918 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Inquiry Into The Future Role of Low-Power Television Broadcasting*, 45 Fed. Reg. 69178 (Oct. 17, 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Report and Order, In the Matter of The Suburban Community Policy, the Berwick Doctrine, and the De Facto Reallocation Policy* (*De Facto Reallocation*), 93 F.C.C.2d 436 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii, 4, 32, 39, 40

Authorities upon which we chiefly rely are marked with asterisks.                     vii

# V.  Glossary

App.--The Deferred Appendix filed as a separate volume in this case.

Addend.--The Statutory Addendum attached to this Brief.

CBPA--Community Broadcasters Protection Act of 1999 enacted by Congress and amending the FCA to protect low power TV licenses by creating a new "primary" Class A TV station class with the "same" license terms as full-power TV stations.

*De Facto Reallocation* Policy--A broadcast license allocation policy the Commission eliminated in 1983 as being anti-competitive, seeking to promote low power TV service in urban areas.  The policy involved an implicit license assignment from a small proposed Section 307(b) community of license to the larger metro community to preclude licensing of the new service.  The Commission abandoned the policy because incumbent full-power broadcasters misused the policy to avoid competition. *Report and Order, In the Matter of The Suburban Community Policy, the Berwick Doctrine, and the De Facto Reallocation Policy* (*De Facto Reallocation*), 93 F.C.C.2d 436 (1983).

Disqualifying Regions--The Nielsen DMA television markets FCC 23-112 uses in a manner to deny Class A licenses to more than 98% of the Nation's population.

FCA--Federal Communications Act of 1934, as amended.

FCC Opposition--Respondent Federal Communications Commission's Opposition to Emergency Motion for Stay, Expedited Review, and Summary Reversal [2042388], filed February 26, 2024 filed in this proceeding (No. 24-1004).

LPPA--Low Power Protection Act (2023) enacted by Congress and amending the FCA to protect low power TV licenses by creating a second, new "primary" Class A TV station class with the "same" license terms as full-power TV stations.

LPTV--In 1982 the Commission created a secondary, low-power TV service to compete against full-power TV service in urban areas.

NAB's Clients--FCC 23-112 at 21-22 ¶ 38, App. x_____-x_____, grants the National Association of Broadcasters's objection to LPPA's purpose and protects NAB's full-service TV clients (NAB's Clients) because "elevating LPTV stations from secondary to primary Class A status comes at the cost of 'effectively block[ing] coverage and service improvements by full-service stations.'"

RCC Comments & RCC Reply: RCC's May 4, 2023 Comments, App. x____, and RCC's June 13, 2023 Reply Comments, App. x____, filed in FCC 23-126, the rulemaking underlying this review proceeding.

## VI.  Jurisdictional Statement

RCC's Petition for Review is authorized by 5 U.S.C. §§ 551, 702, 704, 705, 706(1),(2), 47 U.S.C. § 402(a), 28 U.S.C. §§ 2342(1), 2343, 2344, 2347(b)(2), 2348. These statutory provisions grant RCC the right to appellate review in this Court as an entity aggrieved by the Commission's unlawful actions in FCC 23-112.[1]  RCC timely filed the underlying Petition for Review on January 10, 2024 "within sixty (60) days after its entry" at 89 Fed. Reg. 1466 (January 10, 2024).  28 U.S.C. § 2344.

5 U.S.C. § 702 grants the right of judicial review to persons aggrieved by agency action.  5 U.S.C. § 706(2) authorizes the Court to set aside agency action which is (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and (D) without observance of procedure required by law.

## VII.  Venue

Venue is appropriate in this Court pursuant to 28 U.S.C. § 2343.[2]

---

[1] *See generally*, *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 63 (2004).

[2] RCC's principal office and transmitter have been located in Allingtown, Connecticut since 1986; venue is proper in the Second Circuit or the D.C. Circuit.

## VIII.  Statement Of The Issues

1.  Whether FCC 23-112 unlawfully protects full-power TV stations, at a cost to LPTV stations the LPPA was enacted to protect, by reassigning LPTV licenses from their small Section 307(b) communities of license to much larger DMA markets for the purpose of denying LPPA Class A licenses nationwide.

2.  Whether FCC 23-112, by ignoring Section 307(b)'s  nationwide licensing mandate, unlawfully transforms the LPPA from a nationwide LPTV license protection program into unconstitutional, non-nationwide regulation of local economic activity in a smattering of communities covering less than 2% of the country's population.

3.  Whether FCC 23-112 unconstitutionally delegates legislative authority to a private, non-governmental entity, contrary to the long standing prohibition announced in *Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935), by using  unregulated Nielsen Designated Market Areas, rather than Section 307(b) communities of license, for the purpose of assigning LPPA Class A licenses.

4.  Whether FCC 23-112 unconstitutionally limits LPTV programming content which qualifies a LPTV license for Class A licenses by disqualifying program content which is imported from outside the LPTV station's noise contour over the Internet.

5.  Whether FCC 23-112 unlawfully denies Class A licensees the right to assert must-carry on cable TV systems even though the LPPA Section 2(c)(3)(A) classifies Class A stations as "primary" broadcast stations with the "same license terms" as full-

2

power TV stations, "except as otherwise expressly provided" in the LPPA, and where the must-carry rule was never amended to exclude Class A stations.

## IX.  Statutes And Regulations

An Addendum of pertinent statutes and regulations is attached to this brief.

## X.  Statement Of The Case
### A.  Executive Summary

The Commission's *Report and Order*, FCC 23-112, MB Docket No. 23-126, released December 12, 2023, 89 Fed. Reg. 1466 (Jan. 10, 2024), implements the Low Power Protection Act (LPPA) which was enacted in January 2023.[3]  The LPPA directs the Commission to protect LPTV and to create nationwide Class A licenses.  The Commission responded to this direction by literally adopting the National Association of Broadcasters' (NAB) anti-competitive, nonstatutory position that nationwide LPTV protection cannot arise under the LPPA because "elevating LPTV stations from secondary to primary Class A status comes at the cost of 'effectively block[ing] coverage and service improvements by full-service stations.'" FCC 23-112 at 21-22 ¶ 38, App. x____-x____.  The LPPA does not authorize the Commission to sacrifice LPTV, or to deny Class A licenses nationwide, for the benefit of NAB's full-power TV client base ("NAB's Clients").  RCC Comments at ii, 1, 6, 12, 17, App. x____, x____, x____, x____, x____; RCC Reply at 8, 9, 13, App. x____, x____, x____.

---

[3]  Low Power Protection Act, Pub. L. 117-344, 136 Stat. 6193 (Jan. 5, 2023), Addend.  00006.

FCC 23-112 ignores the nearly century-old Section 307(b) community of license allocation requirement in favor of licensing Class A stations using Nielsen's Designated Market Areas (DMA) which are Class A disqualifying, much "larger geographic regions than community of license."[4]  FCC 23-112 at 23 ¶ 40, App. x____.  Despite acknowledging that its Class A license allocation scheme is based upon Disqualifying Regions, rather than Section 307(b) communities of license, FCC 23-112 at 23 n.187, App.  x____, asserts that there is no *de facto* LPTV license reallocation to those Disqualifying Regions for purposes of Class A licensing, while simultaneously denying Class A licensing to an area containing more than 98% of the Nation's population because those LPTV licenses are located in those very same Disqualifying Regions.

## B.  FCC Created Secondary Service LPTV In 1982

In 1982 the Commission created the LPTV service as a secondary service which must accept interference, and possible license displacement, to compete against full-power TV service because full-power TV had reached maturity.  FCC 23-112 at 2 ¶ 2, App.  x____; RCC Comments at 3-4, 6-7, 10 n.15, 11, 13-14, App. x____-x____, x____-x____, x____, x____, x____-x____; RCC Reply at 4, App. ____, citing *Report and Order, In the Matter of The Suburban Community Policy, the Berwick Doctrine, and the De Facto Reallocation Policy* (*De Facto Reallocation*),

---

[4]  Referred to hereafter as "Disqualifying Regions."

4

93 F.C.C.2d 436 (1983). In *De Facto Reallocation* the Commission removed regulatory impediments to suburban lower power TV licensing. In 1986 RCC licensed its first LPTV station, W28AJ (Allingtown, Connecticut).

### C. Must-Carry Rules Adopted In 1993, Years Before Class A Created

In 1993 the Commission adopted the "must-carry" rule found at 47 C.F.R. § 76.55, Addend. 00013, by which commercial TV stations can require cable TV systems to carry their signals. Except for a very limited subset of LPTV stations, "qualified low power" TV stations in very small markets, LPTV stations were excluded from the class of stations which could assert must-carry rights. 47 U.S.C. § 534(h)(2); *Implementation of the Cable Television Consumer Protection and Competition Act of 1992, Broadcast Signal Carriage Issues*, MM Docket No. 92-259, *Report and Order*, 8 FCC Rcd. 2965, 2983, ¶ 67 & n.211 (1993) (defining "qualified low power" TV stations).

The Section 76.55 must-carry rule adopted in 1993 is substantially unchanged today for purposes of this review proceeding and does not preclude Class A from asserting must-carry.

> For more than thirty years the Section 307(b) community of license has been the critical determinant of must carry rights under 47 C.F.R. §§ 76.55(c),(d), 58 FR 17350 (April 2, 1993), but FCC [23-112] changes course without a word of justification or explanation. Class A stations have been authorized to assert must carry and retransmission consent rights from the moment Congress authorized them in 1999, years after the FCC adopted the § 76.55(c)(1) must carry services exclusion list in 1993.

RCC Comments at 8 n.12, App. x_____.

## D.  Congress Created A New Primary Class A TV In 1999's CBPA

In 1999 Congress enacted legislation to protect LPTV stations by creating a new "primary" Class A TV station class which were subject to the "same license terms and renewal standards as the licenses for full-power television stations except as provided in this subsection."  Community Broadcasters Protection Act of 1999 (CBPA), 47 U.S.C. § 336(f)(1)(A)(i),(ii), Addend. 00002; FCC 23-112 at 3 ¶ 4, App. x_____.  The CBPA did not limit Class A eligibility to LPTV stations which were previously classified as "qualified low power" TV stations and did not preclude newly created Class A stations from asserting must-carry rights.

The Commission adopted CBPA Class A implementing regulations in 2000. *Establishment of a Class A Television Service*, *Report and Order*, 15 FCC Rcd 6355, 6357-58 ¶ 2 (2000), *recon. granted in part*, 16 FCC Rcd. 8244 (2001) (*2000 CBPA Class A MO&O*).  The Commission did not amend the must-carry rule at Section 76.55(c)(1) to include primary "Class A" TV stations as a station class which is precluded from asserting must-carry rights.  RCC Comments at 2-3, 14-16, App. x____-x____, x_____-x_____ (LPTV stations are "upgraded and reclassified as 'Class A' protected stations").  FCC 23-112 does not discuss this aspect of must-carry regulatory history and mischaracterizes RCC's argument as a request to "amend" the must-carry rule.  FCC 23-112 at 27 ¶ 52, App. x_____.  RCC sought  clarification that

the existing must-carry rule allows Class A licenses to assert must-carry rights.  RCC Comments at ii, 2, 15-16, 19, App.  x____, x____, x____-x____, x____.

FCC 23-112 at 27 ¶ 53, App.  x___ concludes that the reasoning contained in *2000 CBPA Class A MO&O* restricts LPPA Class A stations from asserting must-carry rights.  FCC 23-112's reliance upon *2000 CBPA Class A MO&O* reopens that rulemaking proceeding to review in this review proceeding.  While FCC 23-112 points to the *2000 CBPA Class A MO&O* as supporting the  Commission's view that it properly excluded Class A from must-carry rights in the rulemaking underlying this review proceeding, FCC 23-112 fails to address RCC's arguments that: 1) Class A was never added to the list of station classes which are prohibited from asserting must-carry; and 2) the CBPA and the LPPA explicitly classify Class A as a "primary" broadcast service with the "same license terms" as NAB's Clients.  Addend. 00002 (CBPA); 00007 (LPPA).

FCC 23-112 at 28 n.219, App. x____ relies upon *In the Matter of Implementation of the Satellite Home Viewer Improvement Act of 1999, Broadcast Signal Carriage Issues, Retransmission Consent Issues* (*SHVIA*)*, Report and Order*, 16 FCC Rcd. 1918 (2000).  However, that order does not address the primary license, same license terms, and must-carry rule amendment failure issues raised in the LPPA rulemaking.  RCC Comments at ii, 2 n.4, 4 n.5, 6 n.8, 8, 15, 17 n.22, App. x____,

x____, x____, x____, x____, x____, x____;  NAB Comments at 1, x____;  RCC Reply at 10, App. x____.

Moreover, FCC 23-112 at 28 n.219, App. x____ asserts that in the *SHVIA* order "the Commission concluded that Class A stations are low power stations for mandatory carriage purposes, and are therefore not entitled to mandatory satellite carriage."  That is inaccurate.  The *SHVIA* order declined to grant Class A licenses must-carry rights because

> the principal intent of the CBPA was to protect low power television stations from digital television ("DTV") interference.  The CBPA did not create a new class of television stations eligible for full-fledged carriage rights on cable systems or satellite carriers.

16 FCC Rcd. at 1977.  The LPPA does not express any limited protection purpose.[5]

The LPPA is a new statute compared to the CBPA and licenses a new group of Class A stations.  The LPPA required the Commission to commence a new rulemaking proceeding, not reissue rules initially promulgated years ago designed for long dead technology.

### E.  RCC Obtained CBPA Class A Status, Then Lost It

In 2001 RCC upgraded W28AJ to primary Class A status within the terms of the CBPA.  W28AJ was never classified as a "qualified low power" TV station under

---

[5]  From RCC's perspective, the Commission's CBPA protection effort was a failure because RCC lost **three** LPTV licenses and significant broadcast-related investments (W65DZ-LPTV; W28AJ-Class A; W28AJ-LPTV).  RCC Comments at 10 n.15, 12 n.17, 13 & n.18, 15-17, App.  x____, x____,  x____, x____-x____.

the Commission's 1993 must-carry rulemaking – being a "qualified" LPTV was not a CBPA Class A licensing requirement. Even though W28AJ was a primary Class A station with the same rights as full-power TV stations, it was denied must-carry by cable TV systems "based upon an erroneous reading of 47 C.F.R. § 76.55(d)(5)." RCC eventually downgraded Station W28AJ from primary Class A to unprotected LPTV status because it was "burdened with the obligations of full power TV stations, but . . . denied the significant economic benefit of being able to assert a must carry right on cable TV systems." RCC Comments, at 2-3, App. x____-x____.

RCC's LPTV station W28AJ was eventually displaced during the TV industry's transition to digital transmission technology "after many years of service to the public and investments in equipment, programming, and audience building." However, in 2021 RCC was able to locate a new digital channel under the repacking rules and licensed W24EZ-D. RCC Comments at 2-3, App. x____-x____.

### F. Congress Created A New Primary Class A TV In 2023's LPPA

FCC 23-112 relies upon the non-statutory phrases "qualifying DMA" and "non-qualifying DMA" multiple times -- those phrases are not found in the LPPA or the CBPA. FCC 23-112 created those phrases to disqualify the maximum number of eligible Class A applicants in deference to NAB's Clients' request for protection. FCC 23-112 at 21-22 ¶ 38, App. x____-x____. Similarly, in the 2000 CBPA Class A rulemaking proceeding, the Commission created the non-statutory term "Class A

LPTV" to limit Class A must-carry rights.  15 FCC Rcd. at 6369 n.61.  However, under both the CBPA and the LPPA, Congress created "Class A" licenses, Congress did not create "Class A LPTV" licenses.  The Commission created regulatory phrases for the purpose of limiting LPTV protection, when the proper course required furthering the abundantly clear Congressional purposes to protect LPTV licenses and to create Class A licenses nationwide.

On January 5, 2023 Congress enacted the LPPA to create new "primary" Class A stations, granting them "the same license terms" as NAB's Clients "except as otherwise **expressly** provided in the LPPA."  FCC 23-112 at 4 ¶ 8, App.  x____. (Emphasis added); LPPA Section 2(c)(3)(A), Addend. 00007.  FCC 23-112 establishes Class A license upgrade eligibility rules which preclude RCC from receiving a Class A license upgrade and other LPPA benefits.

Nothing in the LPPA requires community of license reassignment as part of the Class A upgrade process.  Nevertheless, FCC 23-112 effectively reassigns the Nation's LPTV licenses, collectively covering more than 98% of the country's population, from their small Section 307(b) communities of license to much larger, Nielsen controlled DMAs.

FCC 23-112 fails to follow the LPPA's direction to protect LPTV stations and to create nationwide Class A licenses by explicitly adopting NAB's anti-competitive lobbying position that nationwide LPTV protection cannot arise under the LPPA

because "elevating LPTV stations from secondary to primary Class A status comes at the cost of 'effectively block[ing] coverage and service improvements by full-service stations.'" FCC 23-112 at 21-22 ¶ 38, App.   x_____-x_____.   The Commission treats the LPPA as if it were the "Large Power Protection Act" or the "Last Prod to Pad Act" rather than the "Low Power Protection Act."  RCC Comments at ii, 1, 6, 12, 17, App. x_____, x_____, x_____, x_____, x_____; RCC Reply at 8, 9, App. x_____, x_____.[6]

FCC 23-112 at 23 n.187, App.   x_____, denies that community of license reassignment is occurring.  However, FCC 23-112 determines that RCC, licensed to serve Allingtown, CT with fewer than 15,000 TV households, does not qualify for Class A upgrade licensing because RCC's LPTV station is located in the Hartford-New Haven DMA which has nearly one million TV households, effectively changing W24EZ-D's Section 307(b) community of license to a "larger geographic region" to deny RCC a Class A license under the LPPA with the express goal of protecting NAB's Clients.  FCC 23-112 at 23 ¶ 40 & n.187; RCC Comments at 7-9, App. x_____-x_____.

---

[6]  The population of RCC's Section 307(b) community of license, Allingtown, CT, is approximately 15,000 – if every person were a "TV household" Allingtown would still be well under LPPA's 95,000 TV household limit.  RCC Comments at 9-11, App.  x_____-x_____.  FCC 23-112 reassigns RCC's LPTV license to a "non-qualifying" DMA to disqualify RCC from the LPPA's Class A licensing benefits.  RCC Comments at 4-5, 7-8, 11-12, App.  x_____-x_____, x_____-x_____, x_____-x_____.

11

FCC 23-112 literally adopted NAB's anti-competitive objection to the LPPA statute itself (!) and determined that NAB "need not 'represent' or seek to 'protect' LPTV licensees in order to file comments in this proceeding." FCC 23-112 at 5 n.28, App. x____; RCC Reply at 3, App. x____ ("NAB use of this rulemaking proceeding as a tool to harm LPTV licensees is plainly beyond the scope of the instant rulemaking proceeding which seeks to protect LPTV licensees."). NAB failed to intervene in this case even after RCC served it with a courtesy copy of RCC's January 23, 2024 Emergency Motion [2037054] and NAB has no *bona fide* interest in this proceeding either here or below.[7]

### G. First Amendment Violation

For Class A eligibility purposes FCC 23-112 restricts program content and editorial discretion based upon whether and how the station owner imports program content from outside its noise contour to meet a "locally produced" program requirement. RCC Reply at 10-14, App. x____-x____. FCC 23-112 fails to address RCC's program importation/First Amendment argument.

---

[7] NAB filed its May 15, 2023 rulemaking Comments, App. x____-x____, more than week after RCC filed its May 4, 2023 Comments, but does not discuss RCC's Comments. NAB did not file reply comments. NAB has not expressed any interest in RCC's issues or in the resolution of this review proceeding.

## XI.  Summary Of Argument

FCC 23-112 fails to follow the LPPA's direction to protect LPTV and to create Class A licenses nationwide by explicitly adopting NAB's anti-competitive lobbying position that nationwide LPTV protection cannot arise under the LPPA because "elevating LPTV stations from secondary to primary Class A status comes at the cost of 'effectively block[ing] coverage and service improvements by full-service stations.'" FCC 23-112 at 21-22 ¶ 38, App. x____-x____.

The LPPA is the "Low Power Protection Act," not the "Large Power Protection Act" or the "Last Prod to Pad Act." The LPPA instructs the Commission to protect LPTV and to create Class A licenses nationwide.  The LPPA does not authorize the Commission to sacrifice LPTV and Class A licenses for the benefit of NAB's Clients. RCC Comments at ii, 1, 6, 12, 17, App. x____, x____, x____, x____, x____; RCC Reply at 8, 9, 13, App. x____, x____, x____.

FCC 23-112 minimizes LPTV protection, and Class A licensing, by treating the LPPA as if it were a standalone licensing statute rather than an integrated part of the Communications Act of 1932 (FCA).  FCC 23-112 ignores the nearly century-old Section 307(b) community of license allocation requirement in favor of licensing Class A stations using Nielsen's DMAs which are much "larger geographic regions than community of license."  FCC 23-112 at 23 ¶ 40, App. x____.  Despite acknowledging that its Class A license allocation scheme is based upon Disqualifying

Regions compared to the LPTV licensees' Section 307(b) communities of license, FCC 23-112 asserts that there is no *de facto* LPTV license reallocation to those Disqualifying Regions for purposes of its Class A license allocation scheme, FCC 23-112 at 23 n.187, App. x____, but denies Class A licensing to areas containing more than 98% of the Nation's population merely because those LPTV licensees are located in the very same Disqualifying Regions the Commission denies that it is using for Class A licensing purposes.

Rather than comply with the requirement to distribute Class A licenses on a nationwide basis, FCC 23-112 excludes service to populated areas and promotes Class A service to deserts, rivers, lakes, mountains, prairie grasslands, literally authorizing Class A service to everywhere, except those places where people are located. The FCA's purpose is the provision of broadcast services to communities of people, the FCA's purpose is not limiting broadcast service to vast, unpopulated swatches of the Nation. Sections 307(a),(b). *Hikvision USA, Inc. v. FCC*, 2024 U.S. App. LEXIS 7710, __ F.4th __ (CADC April 2, 2024) (Slip Op. at 16, 19) (the Commission must follow Congressional intent when interpreting a statute).

FCC 23-112 accomplishes this Class A limiting licensing approach by violating the Constitution in two respects. First, by limiting Class A service to less than 2% of the population FCC 23-112 fails to substantially affect interstate commerce.

14

Second, the manner in which FCC 23-112 utilizes Nielsen's DMAs constitutes an improper and unregulated delegation of governmental authority to a private entity.

FCC 23-112 is unconstitutional because it disqualifies RCC from Class A licensing merely because RCC produces its local programming by importing it over the Internet. FCC 23-112 fails to explain why RCC's program importation of news and political programming does not qualify for Class A licensing while RCC "originates" that programming in compliance with 47 C.F.R. § 74.701(h).

RCC lost three LPTV licenses after Congress enacted the CBPA including a Class A license issued under the CBPA which was lost because RCC was not able to claim the financial benefit of asserting must-carry on cable TV systems, but bore the full regulatory burden of full-power stations which do assert must-carry. FCC 23-112 fails to discuss that under the Commission's existing rule Section 76.55(c) Class A licensees are authorized to assert must-carry. Moreover, FCC 23-112 fails to discuss the fact that the CBPA and the LPPA grant Class A licenses "primary" license status possessing the "same license terms" as NAB's Clients "except as otherwise expressly provided" in the LPPA, including Section 76.55(c) must-carry rights. LPPA Section 2(c)(3)(A), Addend 00007; *Covad Communs. Co. v. FCC*, 450 F.3d 528, 550 (CADC 2006) (agencies must address arguments which "challenge the empirical justification" of the proposed rule).

15

## XII.  Standing And Ripeness

Article III standing requires that Petitioners were injured in fact, that their injuries were caused by the challenged conduct, and that the injuries would likely be redressed by a favorable decision of the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). FCC 23-112, *inter alia*, adopted rules which prohibit RCC from filing an upgrade application under the LPPA to upgrade its low power TV (LPTV) license W24EZ-D[8] to a Primary Class A license, bringing with it substantial economic benefits such as protection from another license displacement, thereby preventing total loss of station value, while affording RCC the substantial economic benefit of being able to assert a must-carry right on cable TV systems.  FCC 23-112's denial of these economic benefits to RCC can be remedied by this Court's review of FCC 23-112.  Accordingly, RCC has Article III standing to maintain this action in this Court.[9]  Moreover, the case is ripe for review because FCC 23-112 is a final Commission order which is not under review by the Commission.

---

[8] W24EZ-D's call sign was recently changed to WETN-LD, however, we shall continue to refer to the station as W24EZ-D to promote consistency and ease of reference to the various documents at issue in this review proceeding.

[9] RCC's standing is demonstrated by the record on review which establishes that RCC is the holder of a LPTV broadcast license which is "directly and adversely affected" by the Commission's licensing decisions in FCC 23-112.  *Viasat, Inc. v. FCC*, 47 F.4th 769, 780-81 (CADC 2022).  *See also Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004, 1024 (CADC 2022) (standing exists where the petitioner is "'directly regulated by the challenged [order]'").

## XIII.  Argument
### A.  Standard Of Review

5 U.S.C. § 706(2)(A) "requires federal courts to set aside agency action which is 'not in accordance with the law.'"  *FCC v. Nextwave Personal Communications, Inc.,* 537 U.S. 293, 300 (2003), *affirming*, *Nextwave Personal Communications, Inc. v. FCC*, 254 F.3d 130, 133 (CADC 2001) (agency compliance with all Federal law is "fundamental").  It is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983); *id.* at 57 ("An agency changing its course must supply a reasoned analysis.");  *Covad*, 450 F.3d at 550 (agencies must address arguments which "challenge the empirical justification" of the proposed rule); *Petroleum Communications, Inc. v. FCC*, 22 F.3d 1164, 1172 (CADC 1994) (reversal when agency fails to provide a reasoned explanation or the record is contrary to the agency's conclusion).

An agency's failure to compile a supporting record is a critical legal defect because FCC conclusions must be supported by the record on review.  *DOC v. New York*, 139 S. Ct. 2551, 2573 (2019) (Roberts, C.J.) ("a court is ordinarily limited to

evaluating the agency's contemporaneous explanation in light of the existing administrative record"); *Petroleum Communications, Inc*., 22 F.3d at 1172 (record must support agency conclusions).  RCC Comments at 6-9, App. x____-x____.  Lack of agency discussion cannot be corrected by the agency during appellate review nor supplied by a reviewing court.  *State Farm*, 463 U.S. at 43; *Burlington Truck Lines v. United States*, 371 U.S. 156, 168-69 (1962) (it is fundamental that the agency order, not appellate counsel, must justify the action).

### B.  Reopening Doctrine:  CBPA And Must-Carry Rulemakings

The Commission relies heavily upon the reasoning of the 2000 CBPA rulemaking to support its actions in FCC 23-112, referring to the "CBPA" at least fifty-two times.  *See, e.g.,* FCC 23-112 at 6 ¶ 12, App.  x____ ("we find no reason to deviate from these prior determinations"), 7 ¶ 14, App.  x____ ("the LPPA does not expressly require that the locally produced content aired by a low power station be produced by that station itself  *** under the CBPA the Commission specifically found that TV translator stations were not eligible for Class A status" because they do not originate programming), 9 ¶ 18, App. x____ ("the LPPA sets forth eligibility criteria for stations seeking Class A designation that are similar to the eligibility criteria under the CBPA").  Moreover, FCC 23-112 references "must-carry" or "must carry" at least twenty-one times.  *See, e.g.,* FCC 23-112 at 5 ¶ 10, App.  x____ (declining "to amend our rules . . .  to give LPPA Class A stations must-carry rights

equivalent to full service stations"), but as discussed in Section XIII.G below, no rule amendment was requested or needed. FCC 23-112 fails to discuss RCC's argument that the Commission's current rules do not preclude Class A must-carry. *Covad*, 450 F.3d at 550 (agencies must address arguments which "challenge the empirical justification" of the proposed rule).

FCC 23-112 substantially justifies its LPPA determinations based upon the Commission's review and affirmation of its prior adjudications of the CBPA Class A and "must-carry" issues and examination of those proceedings is appropriate here under the "reopening doctrine." *CTIA - The Wireless Ass'n v. FCC*, 466 F.3d 105, 110-11 (CADC 2006) (reopening is appropriate "when the later proceeding explicitly or implicitly shows that the agency actually reconsidered the rule, the matter has been reopened and the time period for seeking judicial review begins anew").

### C. § 307(b) And The LPPA Regulate Interstate Commerce
#### 1. The FCA Mandates Nationwide Class A Licensing

Section 307(b) of the FCA has been in place since the FCA was enacted in 1934. 48 Stat. 1064 (June 19, 1934). Section 307(b) of the Act requires the Commission to allocate broadcast licensing in "a fair, efficient, and equitable" manner to discrete communities across the Nation.[10] Nothing in the LPPA requires

---

[10] As adopted in 1934, Section 307(b) required that radio licenses be allocated in "a fair and equitable" manner across the Nation. The nationwide community of license allocation system has existed since the Radio Act of 1927. RCC Reply at 4, (continued...)

alteration of this longstanding nationwide license allocation mandate in favor of the nationwide Class A license denial system adopted in FCC 23-112. RCC Comments at 6-8, App. x____-x____; RCC Reply at 4, 6-8, App. x____, x____-x____. "The purpose of the Communications Act and the LPPA is the promotion of broadcast outlets, not the elimination of them." Sections 307(a),(b); RCC Reply at 4, App. x____. *Hikvision*, 2024 U.S. App. LEXIS 7710, __ F.4th __ (Slip Op. at 16, 19) (the Commission must follow Congressional intent when interpreting a statute).

FCC 23-112 fails to address RCC's comments that Section 307(b) requires that Class A broadcast licenses must be distributed on a nationwide basis. *Covad*, 450 F.3d at 550 (agencies must address arguments which "challenge the empirical justification" of the proposed rule). Instead, as discussed in Section XIII.C.2 immediately below, FCC 23-112 adopts an extremely restrictive Class A license allocation procedure, severely limiting the distribution of Class A broadcast licenses to LPTV licensees serving less than 2% of the Nation's population.

The Commission ignores Section 307(b) because

elevating LPTV stations from secondary to primary Class A status comes at the cost of "effectively block[ing] coverage and service improvements by full-service stations." *** We decline to read the LPPA as promoting maximum elevation of LPTV stations to primary status; rather, Congress adopted a much more balanced approach.

---

[10](...continued)
App. x____, *citing De Facto Reallocation*, 93 F.C.C.2d at 438.

FCC 23-112 at 21-22 ¶ 38, App. x____ (quoting NAB's full-power TV lobbying comments).

FCC 23-112 utterly fails to explain how the "Low Power Protection Act" can be read as the "Large Power Protection Act" or the "Last Prod to Pad Act" in light of the Commission's Section 307(b) and LPPA responsibilities to allocate Class A licenses on a nationwide basis. Moreover, FCC 23-112 fails to explain what kind of scale shows a 98-unserved to 2-served weighing as "balanced". RCC Comments at ii, 1, 5-6, 11-12, App. x____, x____, x____, x____-x____; RCC Reply at 8, 9, App. x____, x____. *Covad*, 450 F.3d at 550 (agencies must address arguments which "challenge the empirical justification" of the proposed rule).

> The Commission's effort to protect full-service TV stations from low power TV stations is the exact opposite of what Congress directed in the LPPA. The Congress directed the Commission to protect LPTV stations. Congress did not direct the Commission to develop a regulatory environment which sacrifices LPTV stations to protect full-service TV stations through the adoption of rules modeled [] as if Congress had enacted a unicorn entitled the Large Power Protection Act.

RCC Comments at 11-12, App. x____-x____; RCC Reply at 9, App. x____ ("the LPPA is the 'Low Power Protection Act,' it is not the 'Last Prod to Pad Act.'").

FCC 23-112's Class A license allocation choice was not informed by any concern for nationwide economic effects which its chosen license allocation scheme might have. Instead, rather than implementing a nationwide economic policy relating to the protection of low power TV stations and the nationwide creation of Class A

licenses, the purposes served by the LPPA, FCC 23-112 explicitly admits that it selected a Class A license allocation scheme to protect the economic interests of NAB's Clients.  Not only does FCC 23-112 leave unexplained how protection of NAB's Clients promotes the nationwide protection of LPTV licenses and the creation of Class A licenses, FCC 23-112 inexplicitly determines that the LPPA's licensing requirements must yield to NAB's Clients anti-competitive desires.

Generally, the Commission has discretion to choose which communities have a greater need for broadcast licenses when complying with Section 307(b)'s nationwide license allocation requirement.  *Alvin Lou Media, Inc. v. FCC*, 571 F.3d 1, 10 (CADC 2009), *citing FCC v. Allentown Broad. Corp.*, 349 U.S. 358 (1955). However, FCC 23-112 fails to discuss the fact that the LPPA explicitly cabins the Commission's discretion by requiring protection of LPTV licenses and the nationwide creation of Class A licenses.  *Covad*, 450 F.3d at 550  (agencies must address arguments which "challenge the empirical justification" of the proposed rule). Instead of discussing the Commission's responsibility under Section 307(b) and the LPPA to issue Class A licenses on nationwide basis, FCC 23-112 does the exact opposite and explicitly protects NAB's Clients and denies Class A licenses nationwide, even though protection of NAB's Clients is not a statutory objective. FCC 23-112 at 21-22 ¶ 38, App.  x____.

Adopting a license allocation plan which fails to issue licenses on a nationwide basis cannot be properly termed a nationwide license allocation plan. Section 307(b) does not authorize the Commission to deny licensing on a nationwide basis and the LPPA does not authorize implementation of a severely limited Class A license allocation scheme. The Commission's licensing action must be directed toward issuing Class A licenses on a nationwide basis, not denying them on a nationwide basis. 47 U.S.C. § 307(a); RCC Reply at 4, App. x____.

FCC 23-112 ignores Section 307(b) and adopts a non-nationwide Class A license allocation plan for the explicit purpose of promoting NAB's Clients over the LPTV licenses protected by the LPPA. FCC 23-112 reads as if the LPPA exists to protect full-power TV licenses rather than LPTV licenses, and as if the Commission retains unfettered discretion to prefer, and to protect, full-power TV licenses and impose costs upon LPTV licenses. FCC 23-112's Class A license allocation scheme, designed to protect NAB's Clients, is arbitrary and capricious: it fails to address Section 307(b)'s nationwide Class A licensing requirement while turning the LPPA's LPTV protection purpose on its head. *Covad*, 450 F.3d at 550 (agencies must address arguments which "challenge the empirical justification" of the proposed rule).

23

## 2. FCC 23-112 Insubstantially Affects Interstate Commerce
### a. Improper Regulation of Local Economic Activity

FCC 23-112 interprets the LPPA in an unconstitutional manner and assumes authority to regulate local economic activity in a "smattering of rural, local areas" covering less than 2% of the Nation's population without any demonstration of a substantial effect upon interstate commerce. "Nothing in the Communications Act or the LPPA authorizes the Commission to regulate local economies." RCC Comments at 6-8 & n.11, App. x____-x____. The Commission's function under Section 307(b) and the LPPA is licensing radio stations across the nation, not regulating economic activity in several local communities.

The LPPA is the second statute which Congress enacted to protect the LPTV industry, the CBPA being the first, but which the Commission interprets to eliminate competition to NAB's Clients. RCC Comments at 3-4 & n.5, 6-7, 11, 13-14, App. x____-x____, x____-x____, x____, x____-x____. FCC 23-112 at 21-22 ¶ 38, App. x____-x____, explicitly acknowledges a competition limiting purpose for the benefit of NAB's Clients: "elevating LPTV stations from secondary to primary Class A status comes at the cost of 'effectively block[ing] coverage and service improvements by full-service stations.'"

FCC 23-112's limited LPPA reading causes FCC 23-112 to fail as a matter of settled constitutional law.

> The Commerce Clause authorizes Congress to regulate commerce "among" the states, i.e., interstate commerce. U.S. Const. Art. 1 Sec. 8 Cl. 3. Congress is not authorized to regulate local economic activity unless Congress makes a finding that regulation of that local economic activity has a "substantial" effect upon interstate commerce.

RCC Reply at 6-7, App. x____-x____, citing *United States v. Lopez*, 514 U.S. 549, 557 (1995) (invalidating the Gun-Free School Zones Act of 1990 for lack of a substantial effect upon interstate commerce); *Wickard v. Filburn*, 317 U.S. 111, 127-28 (1942) (Congressional finding that aggregated local activity substantially affects interstate commerce authorizes federal regulation of same); *Miss. Comm'n on Envtl. Quality v. EPA*, 790 F.3d 138, 180 (CADC 2015) ("The question for a court is whether there was a 'rational basis' for the Congress' conclusion that a regulated activity substantially affects interstate commerce."). The Commission asserts that its reading of the LPPA is neither unconstitutional nor "nonsensical," FCC 23-112 at 21 ¶ 38, 23 n.186, App. x____, x____ (citing RCC's Comments), but neither *Lopez* nor *Wickard* are cited in FCC 23-112, much less discussed, and FCC 23-112 provides no citation supporting Commission authority to regulate intrastate economic activity.

FCC 23-112 denies the LPPA's economic and program content benefits to more than 98% of the Nation's population, but fails to explain how that limited approach serves a national purpose, or substantially affects interstate commerce, or is somehow a "much more balanced approach." *Covad*, 450 F.3d at 550 (agencies must address arguments which "challenge the empirical justification" of the proposed

rule).  FCC 23-112's limited extension of the LPPA's economic benefits to several scattered, small communities, affecting less than 2% of the population, is not supported by Congressional findings that a nationwide restriction of benefits amounts to a "substantial effect" upon interstate commerce.  Even if FCC 23-112 could fill that fact-finding void, doubtful because the fact-finding needs to be done prior to statutory enactment, FCC 23-112 is utterly silent on the subject.[11]

The FCC's LPPA reading "violates the plain language and express purpose of the LPPA which, on its face, protects LPTV stations such as W24EZ-D which are licensed to serve small communities."  RCC Comments at ii, 6 & n.8, 7, App. x____, x____, x____.  *Hikvision*, 2024 U.S. App. LEXIS 7710, __ F.4th __ (Slip Op. at 16, 19) (the Commission must follow Congressional intent when interpreting a statute). FCC 23-112 fails to address the fact that "the LPPA is 'Low Power Protection Act,' not the 'Large Power Protection Act,'" FCC 23-112 "reads as if Congress intended to protect full-power TV from competition across substantially all of the United States." RCC Comments at 6, App. x____.  *Covad*, 450 F.3d at 550 (agencies must address arguments which "challenge the empirical justification" of the proposed rule).

---

[11] FCC 23-112 ignores RCC's discussion of this issue and "there is nothing in FCC [23-112] which even remotely explains why Congress would waste its time for the purpose of affecting such a marginal impact."  RCC Comments at ii, 5-6, App. x____, x____-x____; RCC Reply at 6-8, App. x____-x____.

"Reducing competition and increasing media concentration is contrary to the LPPA's expressly stated LPTV protection purpose."  RCC Comments at 14, App. x_____.  "FCC 23-23 represents the Commission's second effort to eliminate LPTV stations as competitors to full-power TV stations across the country."  RCC Comments at 4, 6, 10 n.5, 11, 13-14, App.  x_____, x_____, x_____, x_____, x_____-x_____, RCC Reply at 12-13, App.  x_____ x_____.  RCC lost **three** LPTV licenses because the Commission did not protect them under the CBPA.  RCC Comments at 2 n.18, App.  x_____.

Instead of protecting LPTV stations, FCC 23-112 adopts NAB's anti-competitive position that LPTV protection "comes at the cost of 'effectively block[ing] coverage and service improvements by full-service stations.'"  FCC 23-112 at 21-22 ¶ 38, App.  x_____-x_____.[12]  "By interpreting the LPPA as it does, FCC [23-112] reaches an absurd and irrational conclusion:  that the purpose of the Low Power Protection Act is to protect full-power TV stations covering 98% of the TV households from competition at the expense of LPTV stations." RCC Comments at 1 ("irrational"), 6 ("nonsensical"), 11 ("absurd and irrational"), App.  x_____, x_____, x_____.  FCC 23-112 fails to apply an elementary rule of statutory construction,

---

[12]  FCC 23-112 removes the LPPA's LPTV protection based upon NAB's speculative complaint that LPTV protection might preclude NAB's Clients from expanding some time in the future.

27

"statutes are to be read in a manner that avoids absurd results." FCC 23-112 at 15 n.118, App. x_____.

Commission counsel argued in motions practice that *United States v. Darby*, 312 U.S. 100, 118-19 (1941), and other precedent, recognize that it "has long been recognized that local television broadcasting substantially affects interstate commerce . . . when aggregated with similar activities of others." Respondent Federal Communications Commission's Opposition to Emergency Motion for Stay, Expedited Review, and Summary Reversal (FCC Opposition) [2042388], filed February 26, 2024, No. 24-1004, at 21-22. Even if that argument were properly before the Court, FCC 23-112 fails to address the issue, it ignores the fact that FCC 23-112 ignores Section 307(b)'s (and the LPPA's) nationwide licensing mandate, a mandate which existed during the "long recognition" period cited in the Opposition.

The issue is not whether the Commission has constitutional authority to regulate aggregated economic activity. The issue presented is whether the Commission has constitutional authority to regulate unaggregated local economic activity in a "smattering of rural, local areas" covering less than 2% of the Nation's population while ignoring the FCA's nationwide licensing mandate for the purpose of protecting NAB's Clients. "Nothing in the Communications Act or the LPPA

authorizes the Commission to regulate local economies." RCC Comments at 6-9 & n.11, App.  x_____-x_____.[13]

### b.  FCC 23-112 Fails To Address The Commerce Issue

FCC 23-112 fails to discuss the Interstate Commerce Clause, the fact that Section 307(b) and the LPPA require that Class A licenses be allocated on a nationwide basis rather than denied on a nationwide basis, and the insubstantial effect FCC 23-112's adopted Class A license allocation plan has upon interstate commerce. *Covad*, 450 F.3d at 550  (agencies must address arguments which "challenge the empirical justification" of the proposed rule).  Commission counsel is not allowed to fill this gap in this review proceeding. *Burlington Truck Lines*, 371 U.S. at 168-69 (a "fundamental rule of administrative law" is that the agency order, not appellate counsel, must justify the action taken).

### 3.  Reading § 307(b) And LPPA Constitutionally
### a.  The FCA Requires Nationwide Licensing

Neither the LPPA nor the CBPA direct the Commission to ignore the FCA's nationwide license allocation requirement.  LPPA Sections 2.(a)(2)(A),(B) authorize

---

[13]    FCC Opposition at 22 raises an interstate frequency interference issue. However, neither FCC 23-112 nor FCC Opposition consider that LPTV licensees seeking Class A licenses already occupy their spectrum, having demonstrated non-interference to incumbent TV stations at initial licensing.  As discussed in Section XIII.D.4 below, eliminating LPTV licenses today might clear interference roadblocks in the path of NAB Clients' future expansion opportunities, but such protection is not the LPPA's purpose.

nationwide Class A licensing through the use of either Nielsen's DMAs or by "dividing television broadcast station licensees into local markets using a system that the Commission determines is equivalent to the system established by Nielsen Media Research."  Addend. at 00006.

LPPA Section 2(a)(2)'s market definition does not limit Class A licensing based upon the number of TV households within either of the two defined licensing markets, plainly including all Nielsen DMAs across the Nation and all "local markets" for purposes of Class A licensing.  LPPA Section 2(a)(2) requires nationwide Class A licensing whether Nielsen DMAs or "local markets" are used. Addend. at 00006; RCC Comments at 9-11, App.  x____-x____.[14]

### b.  The LPPA Does Not Abolish § 307(b)

FCC 23-112 at ¶ 35, App. x____, citing NAB, notes that "the Commission and the television industry have long relied on Nielsen DMA data to define television markets."  However, the primary issue in this case is not defining "television markets," the primary issue in this proceeding concerns the manner in which Class A stations are **licensed** under Section 307(b) and the LPPA.  While Nielsen DMAs have long been used to define areas for must-carry, RCC Comments at 8, App.  x____,

_____

[14]  RCC Comments at 10, App.  x____, argued that

The "Designated Market Areas" definition at Section 2(a)(2) of the LPPA does not contain any limitation regarding size and on its face plainly includes all DMAs regardless of the number of TV households.

*citing* 47 C.F.R. § 76.55, DMAs were not previously a broadcast licensing consideration.

Nothing in the LPPA instructs the Commission to ignore the Section 307(b) requirement that Class A broadcast licenses must be issued to communities of people on a nationwide basis.  Effect is to be give to all provisions of a statute.  *Hibbs v. Winn*, 542 U.S. 88, 101 (2004).  FCC 23-112's elimination of Class A licenses on a nationwide basis is contrary to the LPPA's expressly stated purposes of protecting LPTV and creating nationwide Class A licenses while improperly furthering NAB's effort to restrain competition.  *See Hikvision*, 2024 U.S. App. LEXIS 7710, __ F.4th __ (Slip Op. at 16, 19) (the Commission must follow Congressional intent when interpreting a statute); *Syufy v. United States*, 818 F.2d 1457, 1461 (CA9 1987), *citing Foster v. United States*, 303 U.S. 118, 120 (1938) ("Courts should construe laws in harmony with the legislative intent and seek to carry out legislative purpose").

Instead of following the LPPA's and Section 307(b)'s clear direction to issue Class A licenses on a nationwide basis, FCC 23-112 creates a non-nationwide Class A license allocation system which denies Class A licensing to LPTV licensees covering more than 98% of the Nation's population.  RCC Comments at 4 n.5, 5-6, 11, 12, App.  x____, x____-x____, x____, x____; RCC Reply at 5-6, App.  x____-x____.  FCC 23-112's reading of the LPPA cannot be correct because it: 1) reimposes an urban proximity policy jettisoned forty years ago without justifying the

31

change in policy despite protesting that it is doing no such thing;[15] 2) denies Class A licenses nationwide, rather than granting them nationwide; and 3) results in unconstitutional regulation of local economic activity in several small markets.

Rather than comply with Section 307(b)'s nationwide mandate to provide broadcast service to communities of people, FCC 23-112 promotes Class A service to deserts, rivers, lakes, mountains, prairie grasslands, literally authorizing Class A service to everywhere, except those places where people are located. The FCA exists to provide broadcast services to communities of people, not licensing broadcast services to vast, unpopulated swatches of beautiful, natural vistas. The Court avoids the local economic regulation issue by determining that Commission adoption of RCC's reasonable and easily administered Section 307(b) community of license "local markets" satisfies the LPPA's statutory requirements. *Citizens for Responsibility & Ethics in Washington v. United States Dep't of Homeland Sec.*, 527 F. Supp. 2d 76, 98 (DCDC 2007), *citing Edward J. DeBartolo Corp. v. Fla. Gulf*

---

[15]   In *De Facto Reallocation* the Commission eliminated Section 307(b) community of license urban proximity as a licensing consideration to enable small community LPTV licensees to "compete[] in the larger metropolitan area."  93 F.C.C.2d at 445 ¶ 20, 450-51 ¶¶ 30-31, 452 n.29; RCC Comments at 6-9, App. x____-x____; RCC Reply at 4 & n.5, App.  x____.  FCC 23-112 creates a Class A license allocation scheme based upon Disqualifying Regions compared to Section 307(b) communities of license, but then irrationally denies that there is any *de facto* LPTV license reallocation to those Disqualifying Regions even though Class A licensing is denied based upon that same urban reassignment.  FCC 23-112 at 23 ¶ 40 & n.187, App.  x____.

*Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress").

### c. § 307(b), LPPA, And Nationwide Class A Licensing

RCC provided a reasonable LPPA reading which accounts for all legal requirements, RCC Comments at 9-11, App. x____-x____, but FCC 23-112 fails to discuss RCC's statutory reading. *See Hikvision*, 2024 U.S. App. LEXIS 7710, __ F.4th __ (Slip Op. at 16, 19) (the Commission must follow Congressional intent when interpreting a statute); *Covad*, 450 F.3d at 550 (agencies must address arguments which "challenge the empirical justification" of the proposed rule).

The LPPA's Class A qualifying text at Section 2(c)(2)(B)(iii) provides:

> The Commission may approve an application submitted under subparagraph (A) if the low power TV station submitting the application *** as of the date of enactment of this Act, operates in a Designated Market Area with not more than 95,000 television households.

Addend. 00007. The subject of Section 2(c)(2)(B)'s Class A qualifying language is "the low power TV station submitting the" Class A license application. The "95,000 television households" standard at Section 2(c)(2)(B)(iii) refers to the number of TV households served in the qualifying LPTV licensee's Section 307(b) community of license, it does not refer back to, or further define, the LPPA's Section 2(b)(2)(A),(B)

DMA definitions. The "95,000 television household" standard is "not a disconnected appendage of the 'Designated Market Area' definition found at Section 2(a)(2)." RCC Comments at 11, App. x____. The LPPA's Section 2(a)(2) definitions of "DMA," Addend. 00006, includes all DMAs nationwide, that definition is not limited with reference to any TV household number.

LPPA Section 2(a)(2), Addend. 00006, mandates nationwide Class A licensing systems using Nielsen DMAs or an equivalent "local markets" licensing system established by the Commission. Congress clearly provided that "local markets" can be used for Class A licensing on a nationwide basis. Congress did not mandate a Class A licensing scheme which utilizes Disqualifying Regions in the manner adopted in FCC 23-112, the Commission's determination to the contrary notwithstanding. FCC 23-112 at 23 ¶ 40, App. x____. LPPA Section 2(a)(2)(B) expressly authorizes establishment of a nationwide "local markets" Class A licensing system and even authorized the Commission to use Nielsen's trademark, "Designated Market Area," to describe those Class A "local markets". The LPPA does not mandate use of Nielsen's Disqualifying Regions to deny Class A licensing nationwide. RCC Comments at 7-8, 11, App. x____-x____, x____; RCC Reply at ii, 3-6 & n.5, App. x____, x____-x____.

FCC 23-112 at 23 ¶ 40, App. x____, rejected RCC's suggestion that the most efficient manner of allocating Class A licenses would utilize LPTV licensees' Section

34

307(b) communities of license as the DMAs.  RCC Comments at 6, App.  x_____ ("ease of administration").  Instead of utilizing DMAs based upon nationwide "local markets" as RCC proposed, FCC 23-112 concludes that the best way to further the LPPA's LPTV protection and nationwide Class A licensing purposes is to allocate Class A licenses to Disqualifying Regions, only to deny Class A licensing nationwide because LPTV licenses are in those very same "larger geographic regions."  FCC 23-112 utilizes the Disqualifying Regions Class A licensing scheme for the anti-competitive purpose of protecting NAB's Clients from much smaller LPTV competitors.  FCC 23-112 at 21-22 ¶ 38, App.  x_____-_____.

RCC's reading of the 95,000 TV household standard as defining the number of TV households in Section 307(b) communities of license:  1) avoids constitutional issues by using "local markets" nationwide;  2) serves the LPPA's purpose of protecting LPTV stations nationwide;  3) complies with the LPPA's Section 2(a)(2)(B)'s, Addend. 00006, "local markets" definition;  4) serves Section 307(b)'s and the LPPA's fair, efficient, nationwide Class A licensing mandate;  5) complies with the 1983 elimination of the restrictive suburban community licensing policies and promotes competition against NAB's Clients;  and 6) follows the longstanding combined use of Section 307(b) community of license and DMA to determine where must-carry rights can be asserted.  RCC Comments at 3-4, 6, 8 n.12, 9-11, 18-19, App.  x_____-x_____, x_____, x_____, x_____-x_____, x_____-x_____;  RCC Reply at 6-7

35

& n.11, App. x____-x____. The Commission's LPPA reading does not serve any of these purposes.

If FCC 23-112's LPPA reading were the only one possible, then the LPPA would be facially unconstitutional for having an insubstantial effect upon interstate commerce. *Lopez*; *Wickard*; RCC Comments at 18-19, App. x____-x____; RCC Reply at 6-8, App. x____-x____. However, the Court can avoid that constitutional issue because RCC provided a reasonable alternative statutory reading which completely avoids the constitutional question.

If there is a way to issue Class A licenses using "larger geographic regions," the Disqualifying Regions Class A license allocation system adopted in FCC 23-112 is obviously not it. Given the LPPA's LPTV license protection purpose, given FCC 23-112's failure to allocate Class A licenses nationwide, given the simultaneous denial of Class A licenses nationwide, and given the explicit protection afforded to NAB's Clients, one must conclude that FCC 23-112's "large geographic regions" Class A license allocation scheme does not rationally serve the LPPA's purpose.

### D. Unlawful Full-Power TV Protection At LPTV's Expense
### 1. FCC Adopts NAB's Anti-Competitive Lobbying Position

The Commission "declined to read the LPPA as promoting maximum elevation of LPTV stations to primary status; rather, Congress adopted a much more balanced approach." FCC 23-112 implements NAB's anti-competitive position that "elevating

LPTV stations from secondary to primary Class A status comes at the cost of 'effectively block[ing] coverage and service improvements by full-service stations.'" FCC 23-112 at 21-22 ¶ 38, App. x____-x____ (quoting NAB). Nothing in the LPPA requires, or even remotely suggests, that the Commission adopt the NAB's anti-competitive statutory construction. FCC 23-112's adoption of NAB's anti-competitive position, under LPPA's protective banner, is explicit and jaw-dropping.

FCC 23-112 acknowledges that NAB's position is anti-competitive and that NAB is disinterested in the proceeding. FCC 23-112 at 5 n.28, App. x____ determines that NAB "need not 'represent' or seek to 'protect' LPTV licensees in order to file comments in this proceeding." However, "NAB use of this rulemaking proceeding as a tool to harm LPTV licensees is plainly beyond the scope of the instant rulemaking proceeding which seeks to protect LPTV licensees." RCC Reply at 3, App. x____. The LPPA rulemaking was instituted to protect LPTV licenses, the LPPA was not enacted to protect NAB's "full-power broadcasting clients from competition." RCC Reply at 13, App. x___.

## 2. LPPA Protects Small Community TV

The Commission reads the LPPA "as if Congress intended to protect full-power TV from competition across substantially all of the United States," even though "the plain language and express purpose of the LPPA, on its face, protects LPTV stations such as [RCC's LPTV station] which are licensed to serve small communities." FCC

23-112 denies LPPA's benefits to LPTV stations collectively covering more than 98% of the country's population notwithstanding the lack of textual support in the LPPA which protects NAB's Clients across substantially all of the United States. RCC Comments at 5-7, App. x____-x____.

### 3. The FCA Requires Nationwide Class A Licensing, Not LPPA Defeating *De Facto* LPTV License Reallocation

FCC 23-112 transforms the "Low Power Protection Act" into the "Large Power Protection Act" by unreasonably limiting, at every critical determination, LPPA's economic protection of LPTV stations. RCC Comments at 1, 9, App. x____, x____. For instance, FCC 23-112 fails to extend the LPPA's economic benefits to LPTV stations across the nation as required by Section 307(b) and LPPA Section 2(a)(2). Instead, for Class A licensing purposes, FCC 23-112 reassigns LPTV licenses from their very small Section 307(b) communities of license to much larger "non-qualifying DMAs"/Disqualified Regions to deny Class A licenses covering more than 98% of the Nation's population, completely ignoring the statutory mandates to issue Class A licenses nationwide to achieve a national objective. RCC Comments at 6-11, App. x____-x____; RCC Reply at 4-6, App. x____-x____.[16]

Whether or not the FCC physically alters LPTV licenses to reflect their new communities of license is irrelevant because the practical effect of the FCC's

---

[16] "Section 307" is generally referenced in FCC 23-112's ordering clauses as authorizing Commission action, but without any discussion about how the adopted Class A licensing rules protects LPTV or promotes nationwide Class A licensing.

proposed action would do that very thing.  The Commission's illegal proposal cannot be saved by a ministerial "failure to act" fig leaf.

RCC Comments at 11 n.16, App.  x____.  *De facto* reallocation of LPTV licenses from small communities to much larger "non-qualifying DMAs"/Disqualified Regions limits LPPA's economic benefits to a smattering of LPTV stations covering less than 2% of the nation's population.[17]  RCC Comments at 5-6, App.  x____-x____.

FCC 23-112 at 23 n.187, App.  x____, tersely denies that any community of license reassignment is occurring by rejecting, without substantive comment, RCC's argument that

> "the Commission's proposed licensing rules improperly removes LPTV stations from their 47 U.S.C. § 307(b) communities of license and reassigns them to much larger DMA markets in the name of 'protecting' those small LPTV stations." RCC Comments at 3.

However, RCC is licensed to serve Allingtown, CT, with fewer than 15,000 TV households.  For purposes of Class A licensing, FCC 23-112 disqualifies RCC's LPTV station from Class A licensing by reassigning RCC's LPTV station to the Hartford-New Haven DMA which has more than 95,000 TV households.  RCC

---

[17] *De facto* reallocation is defined as "[a]n attempt to utilize a channel assigned to one community in order to establish a broadcast service in another community . . .." *De Facto Reallocation*, 93 F.C.C.2d at 438-440; RCC Reply at 4, App. x____. FCC 23-112 revives a long ago discarded community reallocation prohibition rule to deny LPPA benefits by imputing a disqualifying *de facto* LPTV license reassignment to larger Disqualifying Regions.

Comments at 7-9, App. x____-x____. FCC 23-112 suggests that Congress intended nationwide Class A licensing denials, but fails to explain how reassigning the nation's LPTV licenses from small communities to much larger "non-qualifying DMAs"/Disqualified Regions, for the purpose of denying Class A status, serves LPPA's purpose of protecting LPTV licenses. *Covad*, 450 F.3d at 550 (agencies must address arguments which "challenge the empirical justification" of the proposed rule).

### 4. LPPA Is Unconcerned With "Spectrum Scarcity"

FCC 23-112 at 21-22 ¶ 38, App. x____-x____ protects NAB Clients' speculative, future TV expansion plans, at the expense of Class A licensing based upon NAB's "spectrum scarcity" concern, a concern which is not a purpose of the LPPA. NAB Comments at 4, App. x____. First, incumbent LPTV licenses exist because they have already demonstrated non-interference to incumbent TV stations at initial licensing and already occupy the spectrum; "spectrum scarcity" is not an issue for Class A license upgrade applications. RCC Reply at 4, 7 n.11, 8-10, App. x____, x____, x____-x____.

Second, four decades ago the Commission found that "the goals of the Table [of Assignments for full-power TV stations] have been largely achieved" and LPTV was created to compete against NAB's Clients. *De Facto Reallocation*, 93 F.C.C.2d at 452 n.29 citing *Inquiry Into The Future Role of Low-Power Television Broadcasting*, 45 Fed. Reg. 69178, 69179 (Oct. 17, 1980). Suburban licensing

policies were eliminated because full-power stations used them to stifle small station competition. *Id.* at 454 ("the policy [of prohibiting service to large communities] places a burden on the establishment and improvement of service in small communities that is not in keeping with the objectives of § 307(b)").

Despite Section 307(b) and the LPPA's nationwide licensing goal, FCC 23-112 fails to respond to RCC's argument that the Commission has failed for "40+ years . . . to protect the diversity of marketplace voices" and as a result has created dangerous "information bubbles" which adversely affect millions of Americans. RCC Comments at 13-14, App. x_____-x_____. FCC 23-112 completely ignores the fact that "the purpose of the Communications Act and the LPPA is the promotion of broadcast outlets, not the elimination of them." Sections 307(a),(b); RCC Reply at 4, App. x_____. *Covad*, 450 F.3d at 550 (agencies must address arguments which "challenge the empirical justification" of the proposed rule).

Third, FCC 23-112 fails to explain how limiting the LPPA's economic benefits to LPTV stations covering less than 2% of the country's population, while denying those economic benefits to the remaining 98% of the population, is a "balanced" approach to Class A licensing. FCC 23-112 at 22 ¶ 38, App. x_____. In any event, the LPPA has an explicit 95,000 TV household service standard and does not authorize NAB's anti-competitive, massively uneven, 98%-to-2% "balance." *Covad*,

41

450 F.3d at 550 (agencies must address arguments which "challenge the empirical justification" of the proposed rule).

### E.  Unconstitutional Delegation Of Governmental Authority

The LPPA does not mandate alteration of the longstanding Section 307(b) community of license allocation system.  RCC Comments at 8, App.  x____.  "Congress did not order the Commission to cede its Section 307(b) licensing authority to a private company which creates artificial economic regions designed to serve its own profit motive."  RCC Comments at 18, App.  x____; RCC Reply at 4, App.  x____.

Nevertheless, FCC 23-112 ignores Section 307(b) and "adopts a DMA market structure which is unconstitutional under *Schechter Poultry* because the rule improperly delegates legislative authority to a private, non-governmental entity." RCC Comments at 4 n.6, App.  x____.

> The Commission's proposed regulatory scheme, spawned in the name of protecting the LPTV industry, ignores the plain language of the LPPA, conflicts with Section 307(b) of the Communications Act, 47 U.S.C. § 307(b), and runs afoul of the Constitution by adopting an industrial code, the Nielsen DMA market structure, thereby improperly delegating legislative power to private industry.

RCC Comments at 4, App.  x____.[18]

---

[18] FCC 23-112 touts that Nielsen "has 'always told stations the DMAs to which they have been assigned upon request and free of charge,'" FCC 23-112 at 21 n.168, App.  x____, but everyone must subscribe to Nielsen to ascertain the scope of the
(continued...)

FCC 23-112 at 23 n.186 rejects this constitutional, government structure question with a terse, non-substantive response which reads in its entirety as follows:

> We reject this argument. Congress does not run afoul of subdelegation principles because it permits an agency to use an outside entity's market definition for a particular purpose specified in the statute. There is no assignment of unguided or unchecked authority here.

FCC 23-112 fails to discuss *Schechter*, tries to insulate FCC 23-112 by blaming Congress for the non-nationwide Class A licensing rules adopted in FCC 23-112, and

> completely fails to explain why Allingtown, CT is not considered a qualified DMA for licensing under the LPPA, or what the underlying rules are for determining the composition of DMA areas, or how Allingtown or any LPTV licensee in a Section 307(b) community might seek to qualify for protection under the LPPA, or what circumstances might exist in a Section 307(b) community of license which would warrant a waiver, or whether and how the Commission should regulate Nielsen Media Research's decision making regarding DMA composition. *Schechter Poultry Corp. v. U.S.*, 295 U.S. 495, 537-38 (1935) (Congress cannot delegate unfettered legislative power and private parties cannot exercise any legislative power).

RCC Comments at 5, App. x____.

FCC 23-112 requires the public to subscribe to Nielsen's DMA service to determine whether Nielsen might have smaller DMAs, such as city-sized DMAs or zip-code-based DMAs, as of the LPPA's adoption date, which are better suited to Class A stations which generally have smaller service areas. RCC Comments at 7, App. x____ ("LPTV signal reach is much less than that of full power TV stations.

---

[18](...continued)
Commission's Class A licensing system. FCC 23-112 at 17 n.133, App. x____ (directing interested persons to Nielsen's subscription service).

It is irrational to select very large DMAs as the community of license under the LPPA when even full power TV stations are not required to demonstrate service to large DMA areas to obtain their licenses and assert must carry/retransmission consent rights.").

FCC 23-112 at 23 ¶ 40, App. x____, rejected RCC's request that DMAs be based upon Section 307(b) communities nationwide because "such a system of defining local TV markets would be very different than the one required by the LPPA to be 'equivalent' to the system established by Nielsen, which defines larger geographic regions than community of license." However, Congress did not mandate that the Commission use DMAs which use "larger geographic regions than community of license," that was the Commission's choice over selecting RCC's "small markets" Class A license allocation approach.

Nielsen provides market services for a whole range of media including radio, TV, newspaper, and Internet, providing information down to the zip code and Census tract levels. Nielsen's DMA construction is not regulated by the Commission: there are no DMA size requirements or DMA population requirements, and the LPPA does not specify any.[19] FCC 23-112 misuses a slice of Nielsen's proprietary, unregulated, monopoly DMAs to deny Class A licensing under circumstances where the DMA

---

[19] LPPA Section 2(a)(2)(B) authorizes establishment of a nationwide "local markets" Class A licensing system. Use of "larger regional regions" is neither mandated by the LPPA nor authorized by the LPPA as employed by FCC 23-112.

options Nielsen might offer in lieu of the "larger geographic regions than community of license" are not in the public domain.

The Court can avoid this constitutional issue by determining that Commission adoption of RCC's reasonable and easily administered nationwide Section 307(b) community of license "local markets" satisfies the LPPA's statutory requirements. *Citizens for Responsibility*, 527 F. Supp. 2d at 98), *citing Edward J. DeBartolo Corp.*, 485 U.S. at 575 ("where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress").

### F.  Unconstitutional Class A Program Content Eligibility Rule

FCC 23-112 unreasonably limits the LPPA's viewpoint diversity benefits by imposing Class A programming qualification rules which violate the First Amendment.  FCC 23-112 applies a disqualifying program importation rule which on its face violates the First Amendment by restricting a Class A applicant's program content and editorial choices and by allowing program importation for multiple station owners, but not for single station owners like RCC.

The restrictive rule can lead to absurd results such as imported news, political programming, and weather is unqualified, as is use of programming created by air talent located in another part of the state or in another state, but broadcasting bird feeder programs for cats, or views of the sky or ant hills, from the LPTV studio's

backdoor, is qualifying.  The net result of the program content qualification is a likely loss of public affairs and news programming, while qualifying programs for cats, cloud lovers, and ant watchers are allowed to thrive.  RCC Reply at 10-13, App. x____-x____.  *Syracuse Peace Council v. FCC*, 867 F.2d 654, 684 (CADC 1989), *cert. denied*, 493 U.S. 1019 (1990) ("regulatory schemes that tread unnecessarily on the editorial discretion of broadcasters contravene the First Amendment").

FCC 23-112 unevenly applies a program importation restriction where some imported programs are considered "local," but only for multiple LPTV station owners.  FCC 23-112 at 9 ¶ 19, App. x____.  "Control over program selection is a core First Amendment right of broadcasters" and "other interpretations intrude upon Class A licensee's protected First Amendment content and editorial rights." RCC Reply at 10-13, App. x____-x____.

RCC's LPTV Station W24EZ-D "originates" programming under Section 74.701(h) for its Section 307(b) community of license because RCC selects the programming, receives that program content via the Internet, modifies the program signal for airing and prepares it for broadcast, and then transmits that programming: if not for RCC's program production, that programming would not be available in RCC's Section 307(b) community of license.  RCC controls "the program source, as it reaches the transmitter site." ("Licensee airs programming from an Internet source under contract.")  RCC Comments at 2 n.3, App.  x____; RCC Reply at 10-12 & n.16,

App.  x_____-x_____  (RCC's receipt of programming via the Internet implicates First Amendment program content issues and is authorized by 47 U.S.C. § 230).

FCC 23-112 adopts NAB's anti-First Amendment, anti-competitive prodding by restricting the manner in which LPTV licensee's can receive programming content.  FCC 23-112 at 7 n.46, App. x_____ (programs received by "terrestrial" feed are Class A disqualifying).  FCC 23-112 fails to consider the fact that Section 230 is Congressional authorization for LPTV licensees to receive program content via the Internet, promotes broadcaster First Amendment rights, and serves as a statutory exception to Section 74.701(h)'s "terrestrial" feed content limitation.   RCC's approach resolves the First Amendment issue in a content-neutral manner while complying with Section 74.701(h)'s program origination rule as modified by Section 230.   *Covad*, 450 F.3d at 550 (agencies must address arguments which "challenge the empirical justification" of the proposed rule).

FCC Opposition at 25 argued that "a rule that merely specifies the location from which programming must have originated is not an impermissible, content-based restriction on speech."  Even if that argument were properly before the Court, FCC 23-112 fails to address the issue, the argument fails to consider two facts.  First, RCC is originating programming in compliance with Section 74.701(h).  Second, the government cannot limit editorial discretion by consigning RCC's First Amendment rights to a governmentally defined box.  The critical First Amendment

47

issue is RCC's determination that selected programming meets the needs of its Section 307(b) community of license, how RCC exercises its editorial discretion is not a proper subject of regulation. *Syracuse Peace Council.*

### G.  Unlawful Denial Of Primary Class A Must-Carry

Another example of the Commission's unreasonable minimization of the LPPA's economic benefits is the denial of Class A must-carry rights.  FCC 23-112 at 27-28 ¶ 53, App.  x_____-x_____.  FCC 23-112 finds that "it is unlikely that Congress intended to grant Class A stations full must carry rights, equivalent to those of full-service stations, without addressing the issue directly."  However, FCC 23-112 completely ignores the facts that 1) LPPA Sections 2(b) and 2(c)(3)(A) explicitly classify Class A as "primary" broadcast stations; 2) Class A stations are "subject to the same license terms and renewal standards as a license for a full power television station" unless "**expressly**" limited by the LPPA; and 3) the 47 C.F.R. § 76.55 must-carry rule does not include Class A licenses in the list of station classes which cannot assert must-carry rights.  FCC 23-112 at 4 ¶ 8 & n.26, App.  x_____; RCC Comments at ii, 2 n.4, 4 n.5, 6 n.8, 8, 15, 17 n.22, App. x_____, x_____, x_____, x_____, x_____, x_____, x_____; RCC Reply at 3-5, 8-10, App. x_____-x_____, x_____-x_____.

FCC 23-112 treats primary Class A licenses differently compared to NAB's Clients for must-carry purposes in violation of the LPPA's plain text.  The LPPA does not contain any textual limitation on Class A must-carry rights.  Moreover, FCC 23-

48

112 fails to describe "any public interest benefits which would flow from imposing a must carry limitation upon primary Class A stations." RCC Reply at 8, App. x____. Nor does FCC 23-112 explain how denial of must-carry to LPTV and Class A licenses protect them where their much larger competitors, NAB Clients, have access to that enormous financial opportunity.

FCC Opposition at 7 argued that "low power stations are not afforded the same must carry privileges as full power stations," as if the Commission were denying RCC a favor which the Commission had dispensed to NAB's Clients, rather than writing a generally applicable regulation. The FCC Opposition failed to address the fact that Class A licenses are not classified as "low power stations" because "Class A" specifies a Congressionally created license class which has the "same license terms" as full-power licenses "except as otherwise expressly provided in" the LPPA. Addend. at 00007. Congress even added the word "expressly" to the LPPA's Class A definition compared to the CBPA Class A definition to emphasize the point. *Compare* CBPA Section f(1)(A)(i), Addend. 00002.

Longstanding Commission rule classifies LPTV stations which are upgraded to Class A status as "local commercial television stations," a station class which has must-carry rights, rather than as LPTV stations which cannot assert must-carry rights. 47 C.F.R. §§ 76.55(c)(1),(d)(5); RCC Comments at ii, 2 n.4, 8-9 & n.12, 14-16 & n.21, App. x____, x____, x____-x____, x____-x____ ("a Class A television station

49

is a different class of station compared to a LPTV station"); RCC Reply at 10, App. x____. FCC 23-112 also ignores the fact that "for more than thirty years the Section 307(b) community of license has been the critical determinant of must-carry rights under 47 C.F.R. §§ 76.55(c),(d), * * * but FCC [23-112] changes course in direct contradiction of Section 76.55 without discussion." RCC Comments at 8 n.12, App. x____.

Further, Class A stations are "subject to the same license terms and renewal standards as a license for a full power television broadcast station, except as otherwise **expressly** provided in this subsection." RCC Reply at 10, App. x____, *citing* LPPA Section 2(c)(3)(A) (emphasis in original). The LPPA has no express limitation preventing Class A licensees from asserting the same must-carry right asserted by NAB's Clients. RCC Comments at 14-16, App. x____-x____; RCC Reply at 8, App. x____. FCC 23-112 fails to address this issue. *Covad*, 450 F.3d at 550 (agencies must address arguments which "challenge the empirical justification" of the proposed rule).

FCC Opposition at 21 argued that "must carry rights are not a 'license term.'" Even if that argument were properly before the Court, FCC 23-112 fails to address the issue, this argument fails to recognize an obvious fact: no one can assert must-carry on a cable TV system without first possessing a broadcast license -- must-carry is an explicit right granted under the Commission's regulations to a "licensed and

operating" "local commercial television station."  *See* 47.C.F.R. § 76.55(c)(1), Addend. at 00014; RCC Comments at 2 n.4, 8 n.12, 14-16, 17 n.22, App.  x____, x____, x____-x____, x____; RCC Reply at 8, App.  x____.[20]

Contrary to what FCC 23-112 at 28 ¶ 53, App.  x____, asserts, RCC did not ask the Commission "to revise" or "amend" its must-carry rule.  Rather, RCC pointed out that the Commission's **existing** must-carry rule authorizes Class A TV stations to assert must-carry, but the rule was misapplied by the cable TV industry which ignored the fact that qualifying LPTV stations are "upgraded and reclassified as 'Class A' protected stations" and are no longer classified as LPTV stations which cannot assert must-carry.  RCC Comments at 2-3, 14-16, App.  x____-x____, x____-x____.  RCC sought clarification in MB Docket 23-126 that the Commission's existing rules plainly authorize Class A stations to assert must-carry rights, but FCC 23-112 fails to address RCC's must-carry argument.

Congress enacted the CBPA in 1999, and the LPPA in 2023, aware that:

● preexisting § 76.55(c)(1) was adopted years before Congress first created Class A stations and, absent exclusionary statutory text, prohibiting Class A from asserting must-carry could not have possibly been the intent of Congress;

---

[20] The Commission adopted the § 76.55(c)(1) must-carry exclusion list in 1993 and never amended it to exclude Class A stations after Congress created Class A licenses in 1999's CBPA and 2023's LPPA.  RCC plainly raised this rule issue, but FCC 23-112 ignored RCC's comments and failed to amend § 76.55(c)(1) to exclude Class A, or the fictitiously monikered "Class A LPTV," license class even after receiving RCC's Comments.

● preexisting § 76.55(c) provided "licensed commercial television stations" with must-carry rights based upon their Section 307(b) community of license;

● Congress itself created a new type of Class A broadcast license and provided them with the "same" license rights as "licensed commercial television stations" to protect them on a going forward basis;

● Congress itself endowed Class A licenses with the "the same license terms" as licenses "for a full power television broadcast station, except as otherwise expressly provided in this subsection"; and

● Congress did not limit the ability of new Class A licensees to assert must-carry rights when it knew that the text of preexisting § 76.55(c)(1) did not limit must-carry for the newly created Class A license.

Despite these unassailable facts, FCC 23-112 concludes that Class A licenses do not have the same must-carry rights as full-power stations based upon the Commission's view that "the LPPA is also silent with respect to the issue of must carry rights." FCC 23-112 at 27-28 ¶ 53, App. x____-x____. The LPPA isn't "silent" on the must-carry issue, the LPPA grants the "same" rights to Class A licenses as are granted to "full power television broadcast station[s], except as provided in this subsection." The Commission's avoidance of the LPPA's plain text is not reasonably viewed as "Congressional silence" regarding must-carry.

The continuing, unamended existence of decades old Section 76.55(c)(1) directly contradicts FCC 23-112's assertion that primary Class A stations cannot assert must-carry rights. FCC 23-112 completely ignored RCC's argument. RCC Comments at ii, 2 & n.4, 8 n.12, 14-16, 17 n.22, App. x____, x____, x____, x____-

____, x____; RCC Reply at 8, App. x____.[21] FCC 23-112 fails to address RCC's

rule argument, relies upon a nonexistent Congressional silence, ignores the history

of must-carry, ignores the fact that a Class A license has "the same license terms" as

full-power licenses, and ignores the plain text of the must-carry rule. *Covad*, 450

F.3d at 550 (agencies must address arguments which "challenge the empirical

justification" of the proposed rule).

## XIV.  Requested Relief

FCC 23-112 is grounded in NAB's anti-competitive lobbying that the LPPA

does not protect LPTV licenses or create primary Class A licenses nationwide,

because LPTV protection "comes at the cost of 'effectively block[ing] coverage and

service improvements by full-service stations.'" RCC seeks determinations that:

1) FCC 23-112 is unlawful; 2) RCC's Section 307(b) community of license, not its

current DMA, controls for LPPA Class A licensing purposes; 3) RCC qualifies for

the LPPA's economic benefits because RCC's Section 307(b) community of license

has fewer than 95,000 TV households; 4) RCC's program content cannot be used to

deny Class A licensing because RCC "originates" programming by importing it over

the Internet pursuant to Section 74.701(h) and Section 230; and 5) primary Class A

licenses have the same license terms as full-power licenses and, upon Class A

---

[21]  *Reuters, Ltd. v. FCC*, 781 F.2d 946, 950 (CADC 1986) ("it is elementary
that an agency must adhere to its own rules and regulations").

licensing, RCC may assert must-carry rights under Section 76.55(c) in the DMA where RCC's Section 307(b) community of license is located.

Respectfully submitted,

April 22, 2024

/S/ _Timothy E. Welch_

Timothy E. Welch, Esq.
Attorney for Petitioner
Hill and Welch
1116 Heartfields Drive
Silver Spring, MD 20904
welchlaw@earthlink.net
(202) 321-1448 (cell)
(301) 622-2864 (FAX)

## Certificate of Compliance

I certify that Petitioner's Initial Brief is proportionally spaced using 14 point Times New Roman typeface and, in compliance with the 13,000-word limit found at Rule 32(a)(7)(B)(i) and contains 12,923 words, excluding those items listed at F.R.A.P. 32(f), Circuit Rule 32(e)(1), Handbook of Practice and Internal Procedures and at 40-41 (March 16, 2021) as counted by WordPerfect 2021 Ver. 21.0.0.194. I certify that the information on this form is true and correct to the best of my knowledge and belief.

/S/ _____

Timothy E. Welch
Counsel to Radio Communications Corporation

April 22, 2024

**Certificate of Digital Submission and Privacy Redactions**

Petitioner's Initial Brief have been scanned for viruses with the most recent version of a commercial virus scanning program (Microsoft Defender Antivirus Version 1.409.425.0, last updated April 21, 2024) and is free of viruses. In addition, I certify that all required privacy redactions have been made.

/S/ _____

Timothy E. Welch
Counsel to Radio Communications Corporation

April 22, 2024

## Certificate Of Service

I hereby certify that pursuant to F.R.A.P. 25(d) and Circuit Rule 25(f) and 27(a) the Clerk of the Court will serve a copy of the foregoing Petitioner's Initial Brief by email using the CM/ECF System upon the following:

\*Adam Sorensen
Sarah E. Citrin
General Counsel's Office
Federal Communications Commission
445 12th Street, S.W.
Washington, D.C.  20554

\*Robert B. Nicholson
Alice A. Wang
Antitrust Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W., Room 3224
Washington, D.C. 20530


\*Courtesy service by undersigned counsel's email.


/S/ _____

     Timothy E. Welch
     April 22, 2024

**Statutory Addendum:  Pertinent Statutes And Regulations**

1) Community Broadcasters Protection Act of 1999 . . . . . . . . . . . . . . . . . . . 00001
2) Low Power Protection Act (2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 00006
3) 47 U.S.C. § 307(b) Allocation Of Facilities . . . . . . . . . . . . . . . . . . . . . . . 00009
4) 47 C.F.R. § 74.701(h) Definitions – Local Origination . . . . . . . . . . . . . . 00001
5) 47 C.F.R. § 76.55 Definitions Applicable To The Must-Carry Rules . . . . 00013

"(B) that is designed and capable of carrying and transporting one or more passengers.".

(4) Section 1313(c) of title 17, United States Code, is amended by adding at the end the following: "Costs of the cancellation procedure under this subsection shall be borne by the nonprevailing party or parties, and the Administrator shall have the authority to assess and collect such costs.".

(b) TARIFF ACT OF 1930.—Section 337 of the Tariff Act of 1930 (19 U.S.C. 1337) is amended—

(1) in subsection (a)—

(A) in paragraph (1)—

(i) in subparagraph (A), by striking "and (D)" and inserting "(D), and (E)"; and

(ii) by adding at the end the following:

"(E) The importation into the United States, the sale for importation, or the sale within the United States after importation by the owner, importer, or consigner, of an article that constitutes infringement of the exclusive rights in a design protected under chapter 13 of title 17, United States Code."; and

(B) in paragraphs (2) and (3), by striking "or mask work" and inserting "mask work, or design"; and

(2) in subsection (l), by striking "or mask work" each place it appears and inserting "mask work, or design".

### SEC. 5006. INFORMAL RULEMAKING OF COPYRIGHT DETERMINATION.

Section 1201(a)(1)(C) of title 17, United States Code, is amended in the first sentence by striking "on the record".

### SEC. 5007. SERVICE OF PROCESS FOR SURETY CORPORATIONS.

Section 9306 of title 31, United States Code, is amended—

(1) in subsection (a) by striking all beginning with "designates a person by written power of attorney" through the end of such subsection and inserting the following: "has a resident agent for service of process for that district. The resident agent—

"(1) may be an official of the State, the District of Columbia, the territory or possession in which the court sits who is authorized or appointed under the law of the State, District, territory or possession to receive service of process on the corporation; or

"(2) may be an individual who resides in the jurisdiction of the district court for the district in which a surety bond is to be provided and who is appointed by the corporation as provided in subsection (b)"; and

(2) in subsection (b) by striking "The" and inserting "If the surety corporation meets the requirement of subsection (a) by appointing an individual under subsection (a)(2), the".

### SEC. 5008. LOW-POWER TELEVISION.

(a) SHORT TITLE.—This section may be cited as the "Community Broadcasters Protection Act of 1999".

(b) FINDINGS.—Congress finds the following:

(1) Since the creation of low-power television licenses by the Federal Communications Commission, a small number of license holders have operated their stations in a manner beneficial to the public good providing broadcasting to their communities that would not otherwise be available.

PUBLIC LAW 106–113—APPENDIX I    113 STAT. 1501A–595

(2) These low-power broadcasters have operated their stations in a manner consistent with the programming objectives and hours of operation of full-power broadcasters providing worthwhile services to their respective communities while under severe license limitations compared to their full-power counterparts.

(3) License limitations, particularly the temporary nature of the license, have blocked many low-power broadcasters from having access to capital, and have severely hampered their ability to continue to provide quality broadcasting, programming, or improvements.

(4) The passage of the Telecommunications Act of 1996 has added to the uncertainty of the future status of these stations by the lack of specific provisions regarding the permanency of their licenses, or their treatment during the transition to high definition, digital television.

(5) It is in the public interest to promote diversity in television programming such as that currently provided by low-power television stations to foreign-language communities.

(c) PRESERVATION OF LOW-POWER COMMUNITY TELEVISION BROADCASTING.—Section 336 of the Communications Act of 1934 (47 U.S.C. 336) is amended—

(1) by redesignating subsections (f) and (g) as subsections (g) and (h), respectively; and

(2) by inserting after subsection (e) the following new subsection:

"(f) PRESERVATION OF LOW-POWER COMMUNITY TELEVISION BROADCASTING.—

"(1) CREATION OF CLASS A LICENSES.—

"(A) RULEMAKING REQUIRED.—Within 120 days after the date of the enactment of the Community Broadcasters Protection Act of 1999, the Commission shall prescribe regulations to establish a class A television license to be available to licensees of qualifying low-power television stations. Such regulations shall provide that—

"(i) the license shall be subject to the same license terms and renewal standards as the licenses for full-power television stations except as provided in this subsection; and

"(ii) each such class A licensee shall be accorded primary status as a television broadcaster as long as the station continues to meet the requirements for a qualifying low-power station in paragraph (2).

"(B) NOTICE TO AND CERTIFICATION BY LICENSEES.—Within 30 days after the date of the enactment of the Community Broadcasters Protection Act of 1999, the Commission shall send a notice to the licensees of all low-power television licenses that describes the requirements for class A designation. Within 60 days after such date of enactment, licensees intending to seek class A designation shall submit to the Commission a certification of eligibility based on the qualification requirements of this subsection. Absent a material deficiency, the Commission shall grant certification of eligibility to apply for class A status.

"(C) APPLICATION FOR AND AWARD OF LICENSES.—Consistent with the requirements set forth in paragraph (2)(A)

113 STAT. 1501A–596    PUBLIC LAW 106–113—APPENDIX I

of this subsection, a licensee may submit an application for class A designation under this paragraph within 30 days after final regulations are adopted under subparagraph (A) of this paragraph. Except as provided in paragraphs (6) and (7), the Commission shall, within 30 days after receipt of an application of a licensee of a qualifying low-power television station that is acceptable for filing, award such a class A television station license to such licensee.

"(D) RESOLUTION OF TECHNICAL PROBLEMS.—The Commission shall act to preserve the service areas of low-power television licensees pending the final resolution of a class A application. If, after granting certification of eligibility for a class A license, technical problems arise requiring an engineering solution to a full-power station's allotted parameters or channel assignment in the digital television Table of Allotments, the Commission shall make such modifications as necessary—

"(i) to ensure replication of the full-power digital television applicant's service area, as provided for in sections 73.622 and 73.623 of the Commission's regulations (47 CFR 73.622, 73.623); and

"(ii) to permit maximization of a full-power digital television applicant's service area consistent with such sections 73.622 and 73.623,

if such applicant has filed an application for maximization or a notice of its intent to seek such maximization by December 31, 1999, and filed a bona fide application for maximization by May 1, 2000. Any such applicant shall comply with all applicable Commission rules regarding the construction of digital television facilities.

"(E) CHANGE APPLICATIONS.—If a station that is awarded a construction permit to maximize or significantly enhance its digital television service area, later files a change application to reduce its digital television service area, the protected contour of that station shall be reduced in accordance with such change modification.

"(2) QUALIFYING LOW-POWER TELEVISION STATIONS.—For purposes of this subsection, a station is a qualifying low-power television station if—

"(A)(i) during the 90 days preceding the date of the enactment of the Community Broadcasters Protection Act of 1999—

"(I) such station broadcast a minimum of 18 hours per day;

"(II) such station broadcast an average of at least 3 hours per week of programming that was produced within the market area served by such station, or the market area served by a group of commonly controlled low-power stations that carry common local programming produced within the market area served by such group; and

"(III) such station was in compliance with the Commission's requirements applicable to low-power television stations; and

"(ii) from and after the date of its application for a class A license, the station is in compliance with the

00003

Case No. 24-1004

PUBLIC LAW 106–113—APPENDIX I    113 STAT. 1501A–597

Commission's operating rules for full-power television stations; or

"(B) the Commission determines that the public interest, convenience, and necessity would be served by treating the station as a qualifying low-power television station for purposes of this section, or for other reasons determined by the Commission.

"(3) COMMON OWNERSHIP.—No low-power television station authorized as of the date of the enactment of the Community Broadcasters Protection Act of 1999 shall be disqualified for a class A license based on common ownership with any other medium of mass communication.

"(4) ISSUANCE OF LICENSES FOR ADVANCED TELEVISION SERVICES TO TELEVISION TRANSLATOR STATIONS AND QUALIFYING LOW-POWER TELEVISION STATIONS.—The Commission is not required to issue any additional license for advanced television services to the licensee of a class A television station under this subsection, or to any licensee of any television translator station, but shall accept a license application for such services proposing facilities that will not cause interference to the service area of any other broadcast facility applied for, protected, permitted, or authorized on the date of filing of the advanced television application. Such new license or the original license of the applicant shall be forfeited after the end of the digital television service transition period, as determined by the Commission. A licensee of a low-power television station or television translator station may, at the option of licensee, elect to convert to the provision of advanced television services on its analog channel, but shall not be required to convert to digital operation until the end of such transition period.

"(5) NO PREEMPTION OF SECTION 337.—Nothing in this subsection preempts or otherwise affects section 337 of this Act.

"(6) INTERIM QUALIFICATION.—

"(A) STATIONS OPERATING WITHIN CERTAIN BANDWIDTH.—The Commission may not grant a class A license to a low-power television station for operation between 698 and 806 megahertz, but the Commission shall provide to low-power television stations assigned to and temporarily operating in that bandwidth the opportunity to meet the qualification requirements for a class A license. If such a qualified applicant for a class A license is assigned a channel within the core spectrum (as such term is defined in MM Docket No. 87–286, February 17, 1998), the Commission shall issue a class A license simultaneously with the assignment of such channel.

"(B) CERTAIN CHANNELS OFF-LIMITS.—The Commission may not grant under this subsection a class A license to a low-power television station operating on a channel within the core spectrum that includes any of the 175 additional channels referenced in paragraph 45 of its February 23, 1998, Memorandum Opinion and Order on Reconsideration of the Sixth Report and Order (MM Docket No. 87–268). Within 18 months after the date of the enactment of the Community Broadcasters Protection Act of 1999, the Commission shall identify by channel, location, and applicable technical parameters those 175 channels.

113 STAT. 1501A–598    PUBLIC LAW 106–113—APPENDIX I

"(7) NO INTERFERENCE REQUIREMENT.—The Commission may not grant a class A license, nor approve a modification of a class A license, unless the applicant or licensee shows that the class A station for which the license or modification is sought will not cause—

"(A) interference within—

"(i) the predicted Grade B contour (as of the date of the enactment of the Community Broadcasters Protection Act of 1999, or November 1, 1999, whichever is later, or as proposed in a change application filed on or before such date) of any television station transmitting in analog format; or

"(ii)(I) the digital television service areas provided in the DTV Table of Allotments; (II) the areas protected in the Commission's digital television regulations (47 CFR 73.622 (e) and (f)); (III) the digital television service areas of stations subsequently granted by the Commission prior to the filing of a class A application; and (IV) stations seeking to maximize power under the Commission's rules, if such station has complied with the notification requirements in paragraph (1)(D);

"(B) interference within the protected contour of any low-power television station or low-power television translator station that—

"(i) was licensed prior to the date on which the application for a class A license, or for the modification of such a license, was filed;

"(ii) was authorized by construction permit prior to such date; or

"(iii) had a pending application that was submitted prior to such date; or

"(C) interference within the protected contour of 80 miles from the geographic center of the areas listed in section 22.625(b)(1) or 90.303 of the Commission's regulations (47 CFR 22.625(b)(1) and 90.303) for frequencies in—

"(i) the 470–512 megahertz band identified in section 22.621 or 90.303 of such regulations; or

"(ii) the 482–488 megahertz band in New York.

"(8) PRIORITY FOR DISPLACED LOW-POWER STATIONS.—Low-power stations that are displaced by an application filed under this section shall have priority over other low-power stations in the assignment of available channels.".

# TITLE VI—SUPERFUND RECYCLING EQUITY

### SEC. 6001. SUPERFUND RECYCLING EQUITY.

(a) PURPOSES.—The purposes of this section are—

(1) to promote the reuse and recycling of scrap material in furtherance of the goals of waste minimization and natural resource conservation while protecting human health and the environment;

(2) to create greater equity in the statutory treatment of recycled versus virgin materials; and

PUBLIC LAW 117–344—JAN. 5, 2023          136 STAT. 6193

Public Law 117–344
117th Congress

## An Act

To require the Federal Communications Commission to issue a rule providing that certain low power television stations may be accorded primary status as Class A television licensees, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Low Power Protection Act".

**SEC. 2. LOW POWER TV STATIONS.**

(a) DEFINITIONS.—In this section—

(1) the term "Commission" means the Federal Communications Commission;

(2) the term "Designated Market Area" means—

(A) a Designated Market Area determined by Nielsen Media Research or any successor entity; or

(B) a Designated Market Area under a system of dividing television broadcast station licensees into local markets using a system that the Commission determines is equivalent to the system established by Nielsen Media Research; and

(3) the term "low power TV station" has the meaning given the term "digital low power TV station" in section 74.701 of title 47, Code of Federal Regulations, or any successor regulation.

(b) PURPOSE.—The purpose of this section is to provide low power TV stations with a limited window of opportunity to apply for the opportunity to be accorded primary status as Class A television licensees.

(c) RULEMAKING.—

(1) IN GENERAL.—Not later than 90 days after the date of enactment of this Act, the Commission shall issue a notice of proposed rulemaking to issue a rule that contains the requirements described in this subsection.

(2) REQUIREMENTS.—

(A) IN GENERAL.—The rule with respect to which the Commission is required to issue notice under paragraph (1) shall provide that, during the 1-year period beginning on the date on which that rule takes effect, a low power TV station may apply to the Commission to be accorded primary status as a Class A television licensee under section 73.6001 of title 47, Code of Federal Regulations, or any successor regulation.

Jan. 5, 2023
[S. 3405]

Low Power
Protection Act.
47 USC 336 note.

Deadline.
Notice.

Time period.

136 STAT. 6194          PUBLIC LAW 117–344—JAN. 5, 2023

(B) CONSIDERATIONS.—The Commission may approve an application submitted under subparagraph (A) if the low power TV station submitting the application—

(i) satisfies—

(I) section 336(f)(2) of the Communications Act of 1934 (47 U.S.C. 336(f)(2)) and the rules issued under that section, including the requirements under such section 336(f)(2) with respect to locally produced programming, except that, for the purposes of this subclause, the period described in the matter preceding subclause (I) of subparagraph (A)(i) of such section 336(f)(2) shall be construed to be the 90-day period preceding the date of enactment of this Act; and

(II) paragraphs (b), (c), and (d) of 73.6001 of title 47, Code of Federal Regulations, or any successor regulation;

(ii) demonstrates to the Commission that the Class A station for which the license is sought will not cause any interference described in section 336(f)(7) of the Communications Act of 1934 (47 U.S.C. 336(f)(7)); and

(iii) as of the date of enactment of this Act, operates in a Designated Market Area with not more than 95,000 television households.

(3) APPLICABILITY OF LICENSE.—A license that accords primary status as a Class A television licensee to a low power TV station as a result of the rule with respect to which the Commission is required to issue notice under paragraph (1) shall—

(A) be subject to the same license terms and renewal standards as a license for a full power television broadcast station, except as otherwise expressly provided in this subsection; and

(B) require the low power TV station to remain in compliance with paragraph (2)(B) during the term of the license.

(d) REPORTING.—Not later than 1 year after the date of enactment of this Act, the Commission shall submit to the Committee on Commerce, Science, and Transportation of the Senate and the Committee on Energy and Commerce of the House of Representatives a report regarding the implementation of this section, which shall include—

(1) a list of the current, as of the date on which the report is submitted, licensees that have been accorded primary status as Class A television licensees; and

(2) of the licensees described in paragraph (1), an identification of each such licensee that has been accorded the status described in that paragraph because of the implementation of this section.

(e) RULE OF CONSTRUCTION.—Nothing in this section may be construed to affect a decision of the Commission relating to completion of the transition, relocation, or reimbursement of entities as a result of the systems of competitive bidding conducted pursuant to title VI of the Middle Class Tax Relief and Job Creation Act of 2012 (47 U.S.C. 1401 et seq.), and the amendments made by

*Time period.*

*List.*

PUBLIC LAW 117–344—JAN. 5, 2023        136 STAT. 6195

that title, that are collectively commonly referred to as the "Television Broadcast Incentive Auction".

Approved January 5, 2023.

---

LEGISLATIVE HISTORY—S. 3405:

CONGRESSIONAL RECORD, Vol. 168 (2022):
  Dec. 21, considered and passed Senate.
  Dec. 22, considered and passed House.

○

*47 USCS § 307*

Current through Public Law 118-46, approved March 22, 2024, with a gap of Public Law 118-42.

*United States Code Service  >  TITLE 47. TELECOMMUNICATIONS (Chs. 1 — 16)  >  CHAPTER 5. WIRE OR RADIO COMMUNICATION (§§ 151 — 646)  >  SPECIAL PROVISIONS RELATING TO RADIO (§§ 301 — 399b)  >  GENERAL PROVISIONS (§§ 301 — 345)*

## § 307. Licenses

(a) **Grant.**   The Commission, if public convenience, interest, or necessity will be served thereby, subject to the limitations of this Act [*47 USCS §§ 151* et seq.], shall grant to any applicant therefor, a station license provided for by this Act [*47 USCS §§ 151* et seq.].

(b) **Allocation of facilities.**   In considering applications for licenses, and modifications and renewals thereof, when and insofar as there is demand for the same, the Commission shall make such distribution of licenses, frequencies, hours of operation, and of power among the several States and communities as to provide a fair, efficient, and equitable distribution of radio service to each of the same.

(c) **Terms of licenses.**

(1)  Initial and renewal licenses. Each license granted for the operation of a broadcasting station shall be for a term of not to exceed 8 years. Upon application therefor, a renewal of such license may be granted from time to time for a term of not to exceed 8 years from the date of expiration of the preceding license, if the Commission finds that public interest, convenience, and necessity would be served thereby. Consistent with the foregoing provisions of this subsection, the Commission may by rule prescribe the period or periods for which licenses shall be granted and renewed for particular classes of stations, but the Commission may not adopt or follow any rule which would preclude it, in any case involving a station of a particular class, from granting or renewing a license for a shorter period than that prescribed for stations of such class if, in its judgment, the public interest, convenience, or necessity would be served by such action.

(2)  Materials in application. In order to expedite action on applications for renewal of broadcasting station licenses and in order to avoid needless expense to applicants for such renewals, the Commission shall not require any such applicant to file any information which previously has been furnished to the Commission or which is not directly material to the considerations that affect the granting or denial of such application, but the Commission may require any new or additional facts it deems necessary to make its findings.

(3)  Continuation pending decision. Pending any administrative or judicial hearing and final decision on such an application and the disposition of any petition for rehearing pursuant to section 405 or section 402 [*47 USCS § 405* or *402*], the Commission shall continue such license in effect.

**(d) Renewals.**   No renewal of an existing station license in the broadcast or the common carrier services shall be granted more than thirty days prior to the expiration of the original license.

**(e) Operation of certain radio stations without individual licenses.**

   **(1)**  Notwithstanding any license requirement established in this Act, if the Commission determines that such authorization serves the public interest, convenience, and necessity, the Commission may by rule authorize the operation of radio stations without individual licenses in the following radio services: (A) the citizens band radio service; (B) the radio control service; (C) the aviation radio service for aircraft stations operated on domestic flights when such aircraft are not otherwise required to carry a radio station; and (D) the maritime radio service for ship stations navigated on domestic voyages when such ships are not otherwise required to carry a radio station.

   **(2)**  Any radio station operator who is authorized by the Commission to operate without an individual license shall comply with all other provisions of this Act and with rules prescribed by the Commission under this Act.

   **(3)**  For purposes of this subsection, the terms "citizens band radio service", "radio control service", "aircraft station" and "ship station" shall have the meanings given them by the Commission by rule.

**(f) Areas in Alaska without access to over the air broadcasts.**   Notwithstanding any other provision of law, (1) any holder of a broadcast license may broadcast to an area of Alaska that otherwise does not have access to over the air broadcasts via translator, microwave, or other alternative signal delivery even if another holder of a broadcast license begins broadcasting to such area, (2) any holder of a broadcast license who has broadcast to an area of Alaska that did not have access to over the air broadcasts via translator, microwave, or other alternative signal delivery may continue providing such service even if another holder of a broadcast license begins broadcasting to such area, and shall not be fined or subject to any other penalty, forfeiture, or revocation related to providing such service including any fine, penalty, forfeiture, or revocation for continuing to operate notwithstanding orders to the contrary.

## History

**HISTORY:**

June 19, 1934, ch 652, Title III, Part I, § 307, *48 Stat. 1083*; June 5, 1936, ch 511, § 2, *49 Stat. 1475*; May 20, 1937, ch 229, § 10(a), *50 Stat. 192*; July 16, 1952, ch 879, § 5, *66 Stat. 714*; Sept. 13, 1960, *P. L. 86-752*, § 3, *74 Stat. 889*; April 27, 1962, *P. L. 87-439*, *76 Stat. 58*; Aug. 13, 1981, *P. L. 97-35*, Title XII, Subtitle B, Ch 2 § 1241(a), *95 Stat. 736*; Sept. 13, 1982, *P. L. 97-259*, Title I, §§ 112, 113(a), *96 Stat. 1093*; Feb. 8, 1996, *P. L. 104-104*, Title II, § 203, Title IV, § 403(i), *110 Stat. 112*, 131; Dec. 8, 2004, *P. L. 108-447*, Div J, Title IX, Title II, § 213(1), (2), *118 Stat. 3431*.

Annotations

## Notes

## *47 CFR 74.701*

This document is current through the Apr. 10, 2024 issue of the Federal Register, with the exception of the amendments appearing at 89 FR 25434, 89 FR 25147, and 89 FR 25378.

*LEXISNEXIS' CODE OF FEDERAL REGULATIONS  > Title 47 Telecommunication  > Chapter I — Federal Communications Commission  > Subchapter C — Broadcast Radio Services  > Part 74 — Experimental Radio, Auxiliary, Special Broadcast and Other Program Distributional Services  > Subpart G — Low Power TV and TV Translator Stations*

# § 74.701 Definitions.

**(a)** Television broadcast translator station. A station in the broadcast service operated for the purpose of retransmitting the programs and signals of a television broadcast station, without significantly altering any characteristic of the original signal other than its frequency and amplitude, for the purpose of providing television reception to the general public.

**(b)** Primary station. The television station which provides the programs and signals being retransmitted by a television broadcast translator station.

**(c)** Analog to Digital Replacement Translator (DRT). A television translator licensed to a full power television station that allows it to restore service to any loss areas that may have occurred as a result of its transition from analog to digital.

**(d)** Digital to Digital Replacement Translator (DTDRT). A television translator licensed to a full power television station that allows it to restore service to any loss areas that may have occurred as a result of the station being assigned a new channel pursuant to the Incentive Auction and repacking process.

**(e)** [Removed and Reserved]

**(f)** *Low power TV station*. A station authorized under the provisions of this subpart G of this part that may retransmit the programs and signals of a TV broadcast station and that may originate programming in any amount greater than 30 seconds per hour.

**(g)** [Removed and Reserved]

**(h)** Local origination. Program origination if the parameters of the program source signal, as it reaches the transmitter site, are under the control of the low power TV station licensee. Transmission of TV program signals generated at the transmitter site constitutes local origination. Local origination also includes transmission of programs reaching the transmitter site via TV STL stations, but does not include transmission of signals obtained from either terrestrial or satellite microwave feeds or low power TV stations.

**(i)** [Removed and Reserved]

**(j)** Television broadcast translator station ("TV translator station"). A station operated for the purpose of retransmitting the programs and signals of a television broadcast station, without significantly

altering any characteristic of the original signal other than its frequency, for the purpose of providing television reception to the general public.

**(k)** Low power TV station ("LPTV station"). A station authorized under the provisions of this subpart that may retransmit the programs and signals of a television broadcast station, may originate programming in any amount greater than 30 seconds per hour for the purpose of providing television reception to the general public and, subject to a minimum video program service requirement, may offer services of an ancillary or supplementary nature, including subscription-based services. ( See § 74.790.)

**(l)** Digital program origination. For purposes of this part, digital program origination shall be any transmissions other than the simultaneous retransmission of the programs and signals of a TV or DTV broadcast station or transmissions related to service offerings of an ancillary or supplementary nature. Origination shall include locally generated television program signals and program signals obtained via video recordings (tapes and discs), microwave, common carrier circuits, or other sources.

**(m)** Existing low power television or television translator station. When used in this subpart, the terms existing low power television and existing television translator station refer to a low power television station or television translator station that is either licensed or has a valid construction permit.

## Statutory Authority

*Authority Note Applicable to 47 CFR Ch. I, Subch. C, Pt. 74*

## History

[28 FR 13722, Dec. 14, 1963, as amended at 43 FR 1951, Jan. 13, 1978; 47 FR 21497, May 18, 1982; 48 FR 21486, May 12, 1983; 52 FR 7422, Mar. 11, 1987; 52 FR 31403, Aug. 20, 1987; *62 FR 26684*, 26720, May 14, 1997; *69 FR 69325*, 69331, Nov. 29, 2004; *70 FR 56581*, Sept. 28, 2005; *87 FR 58200*, 58202, Sept. 23, 2022; *89 FR 7224*, 7265, Feb. 1, 2024]

Annotations

## Notes

**[EFFECTIVE DATE NOTE:**

*69 FR 69325* , 69331, Nov. 29, 2004, added paragraphs (j) through (p), effective Jan. 28, 2005; *70 FR 56581*, Sept. 28, 2005, provides that the effective date of the amendment at *69 FR 69325* is Sept. 15, 2005; *87 FR 58200*, 58202, Sept. 23, 2022, amended this section, effective Oct. 24, 2022; *89 FR 7224*, 7265, Feb. 1, 2024, amended this section, effective Mar 4, 2024.]

**Notes to Decisions**

**Communications Law: Broadcasting: Rate Regulation**

## *47 CFR 76.55*

This document is current through the Apr. 10, 2024 issue of the Federal Register, with the exception of the amendments appearing at 89 FR 25434, 89 FR 25147, and 89 FR 25378.

*LEXISNEXIS' CODE OF FEDERAL REGULATIONS  > Title 47 Telecommunication  > Chapter I — Federal Communications Commission  > Subchapter C — Broadcast Radio Services  > Part 76 — Multichannel Video and Cable Television Service  > Subpart D — Carriage of Television Broadcast Signals*

## § 76.55 Definitions applicable to the must-carry rules.

For purposes of the must-carry rules set forth in this subpart, the following definitions apply:

**(a)** Qualified noncommercial educational (NCE) television station. A qualified NCE television station is any television broadcast station which

**(1)**

**(i)** Under the rules and regulations of the Commission in effect on March 29, 1990, is licensed by the Commission as an NCE television broadcast station and which is owned and operated by a public agency, nonprofit foundation, corporation, or association; and

**(ii)** Has as its licensee an entity which is eligible to receive a community service grant, or any successor grant thereto, from the Corporation for Public Broadcasting, or any successor organization thereto, on the basis of the formula set forth in section 396(k)(6)(B) of the Communications Act of 1934, as amended; or

**(2)** Is owned and operated by a municipality and transmits noncommercial programs for educational programs for educational purposes, as defined in § 73.621 of this chapter, for at least 50 percent of its broadcast week.

**(3)** This definition includes:

**(i)** The translator of any NCE television station with five watts or higher power serving the franchise area,

**(ii)** A full-service station or translator if such station or translator is licensed to a channel reserved for NCE use pursuant to § 73.606 of this chapter, or any successor regulations thereto, and

**(iii)** Such stations and translators operating on channels not so reserved but otherwise qualified as NCE stations.

Note to paragraph (a): For the purposes of § 76.55(a), "serving the franchise area" will be based on the predicted protected contour of the NCE translator.

**(b)** Qualified local noncommercial educational (NCE) television station.1 A qualified local NCE television station is a qualified NCE television station:

(1) That is licensed to a community whose reference point, as defined in § 76.53 is within 80.45 km (50 miles) of the principal headend, as defined in § 76.5(pp), of the cable system; or

(2) Whose Grade B service contour encompasses the principal headend, as defined in § 76.5(pp), of the cable system.

(3) Notwithstanding the provisions of this section, a cable operator shall not be required to add the signal of a qualified local noncommercial educational television station not already carried under the provision of § 76.56(a)(5), where such signal would be considered a distant signal for copyright purposes unless such station agrees to indemnify the cable operator for any increased copyright liability resulting from carriage of such signal on the cable system.

(c) Local commercial television station. A local commercial television station is any full power television broadcast station, other than a qualified NCE television station as defined in paragraph (a) of this section, licensed and operating on a channel regularly assigned to its community by the Commission that, with respect to a particular cable system, is within the same television market, as defined below in paragraph (e) of this section, as the cable system, except that the term local commercial television station does not include:

(1) Low power television stations, television translator stations, and passive repeaters with operate pursuant to part 74 of this chapter.

(2) A television broadcast station that would be considered a distant signal under the capable compulsory copyright license, *17 U.S.C. 111*, if such station does not agree to indemnify the cable operator for any increased copyright liability resulting from carriage on the cable system; or

(3) A television broadcast station that does not deliver to the principal headend, as defined in § 76.5(pp), of a cable system a signal level of -45dBm for analog UHF signals, -49dBm for analog VHF signals, or -61dBm for digital signals at the input terminals of the signal processing equipment, i.e., the input to the first active component of the signal processing equipment relevant to the signal at issue, if such station does not agree to be responsible for the costs of delivering to the cable system a signal of good quality or a baseband video signal.

(d) Qualified low power station. A qualified low power station is any television broadcast station conforming to the low power television rules contained in part 74 of this chapter, only if:

(1) Such station broadcasts for at least the minimum number of hours of operation required by the Commission for full power television broadcast stations under part 73 of this chapter;

(2) Such station meets all obligations and requirements applicable to full power television broadcast stations under part 73 of this chapter, with respect to the broadcast of nonentertainment programming; programming and rates involving political candidates, election issues, controversial issues of public importance, editorials, and personal attacks; programming for children; and equal employment opportunity; and the Commission

determines that the provision of such programming by such station would address local news and informational needs which are not being adequately served by full power television broadcast stations because of the geographic distance of such full power stations from the low power station's community of license;

**(3)** Such station complies with interference regulations consistent with its secondary status pursuant to part 74 of this chapter;

**(4)** Such station is located no more than 56.32 km (35 miles) from the cable system's principal headend, as defined in § 76.5(pp), and delivers to that headend an over-the-air signal of good quality;

**(5)** The community of license of such station and the franchise area of the cable system are both located outside of the largest 160 Metropolitan Statistical Areas, ranked by population, as determined by the Office of Management and Budget on June 30, 1990, and the population of such community of license on such date did not exceed 35,000; and

**(6)** There is no full power television broadcast station licensed to any community within the county or other equivalent political subdivision (of a State) served by the cable system.

Note to Paragraph (d): For the purposes of this section, for over-the-air broadcast, a good quality signal shall mean a signal level of either -45 dBm for analog VHF signals, -49 dBm for analog UHF signals, or -61 dBm for digital signals (at all channels) at the input terminals of the signal processing equipment.

**(e)** Television market.

**(1)** Until January 1, 2000, a commercial broadcast television station's market, unless amended pursuant to § 76.59, shall be defined as its Area of Dominant Influence (ADI) as determined by Arbitron and published in the Arbitron 1991-1992 Television ADI Market Guide, as noted below, except that for areas outside the contiguous 48 states, the market of a station shall be defined using Nielsen's Designated Market Area (DMA), where applicable, as published in the Nielsen 1991-92 DMA Market and Demographic Rank Report, and that Puerto Rico, the U.S. Virgin Islands, and Guam will each be considered a single market.

**(2)** A commercial broadcast station's market, unless amended pursuant to § 76.59, shall be defined as its Designated Market Area (DMA) as determined by Nielsen Media Research and published in its Nielsen Local TV Station Information Report or any successor publications.

**(i)** The applicable DMA list for the 2023 election pursuant to § 76.64(f) will be the DMA assignments specified in the Nielsen October 2021 Local TV Station Information Report, and so forth using the publications for the October two years prior to each triennial election pursuant to § 76.64(f).

**(ii)** The applicable DMA list for the 2002 election pursuant to § 76.64(f) will be the DMA assignments specified in the 2000-2001 list, and so forth for each triennial election pursuant to § 76.64(f).

**(3)** In addition, the county in which a station's community of license is located will be considered within its market.

**(4)** A cable system's television market(s) shall be the one or more ADI markets in which the communities it serves are located until January 1, 2000, and the one or more DMA markets in which the communities it serves are located thereafter.

**(5)** In the absence of any mandatory carriage complaint or market modification petition, cable operators in communities that shift from one market to another, due to the change in 1999-2000 from ADI to DMA, will be permitted to treat their systems as either in the new DMA market, or with respect to the specific stations carried prior to the market change from ADI to DMA, as in both the old ADI market and the new DMA market.

**(6)** If the change from the ADI market definition to the DMA market definition in 1999-2000 results in the filing of a mandatory carriage complaint, any affected party may respond to that complaint by filing a market modification request pursuant to § 76.59, and these two actions may be jointly decided by the Commission.

Note to paragraph (e): For the 1996 must-carry/retransmission consent election, the ADI assignments specified in the 1991-1992 Television ADI Market Guide, available from the Arbitron Ratings Co., 9705 Patuxent Woods Drive, Columbia, MD, will apply. For the 1999 election, which becomes effective on January 1, 2000, DMA assignments specified in the 1997-98 DMA Market and Demographic Rank Report, available from Nielsen Media Research, 299 Park Avenue, New York, NY, shall be used. The applicable DMA list for the 2002 election will be the 2000-2001 list, etc.

**(f)** Network. For purposes of the must-carry rules, a commercial television network is an entity that offers programming on a regular basis for 15 or more hours per week to at least 25 affiliates in 10 or more states.

## Statutory Authority

*Authority Note Applicable to 47 CFR Ch. I, Subch. C, Pt. 76*

## History

[58 FR 17359, Apr. 2, 1993, as amended at 58 FR 44951, Aug. 25, 1993; 59 FR 62344, Dec. 5, 1994; *61 FR 29312*, 29313, June 10, 1996; *64 FR 33788*, 33796, June 24, 1999, as corrected at *64 FR 42617*, Aug. 5, 1999; *68 FR 17312*, Apr. 9, 2003; *73 FR 5634*, 5685, Jan. 30, 2008; *83 FR 7619*, 7626, Feb. 22, 2018; *87 FR 74987*, 74988, Dec. 7, 2022]

Annotations

## Notes