ORAL ARGUMENT NOT YET SCHEDULED

No. 24-1004

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

RADIO COMMUNICATIONS CORPORATION,

*Petitioner,*

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents.*

On Petition for Review of an Order of
the Federal Communications Commission

BRIEF FOR RESPONDENTS

P. Michele Ellison
    *General Counsel*

Jacob M. Lewis
    *Deputy General Counsel*

Sarah E. Citrin
    *Deputy Associate General Counsel*

Adam L. Sorensen
    *Counsel*

Jonathan S. Kanter
    *Assistant Attorney General*

Daniel E. Haar
Robert B. Nicholson
    *Attorneys*

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave. NW
Washington, DC 20530

FEDERAL COMMUNICATIONS
COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

## CERTIFICATE AS TO PARTIES, RULINGS,
## AND RELATED CASES

(A) **Parties and Amici.** All parties appearing in this Court are listed in the Brief for Petitioner.

(B) **Rulings Under Review.** The petition for review challenges the following order of the Federal Communications Commission: Report & Order, *Implementation of the Low Power Protection Act*, __ FCC Rcd __ (Dec. 12, 2023), *reprinted at* JA __–__.

(C) **Related Cases.** The order under review has not previously been before this Court or any other court. Respondents are aware of no other related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS,
AND RELATED CASES ................................................................... i

TABLE OF AUTHORITIES ................................................................ iv

GLOSSARY .................................................................................. viii

INTRODUCTION ............................................................................. 1

JURISDICTIONAL STATEMENT ........................................................ 3

STATEMENT OF THE ISSUES .......................................................... 3

PERTINENT STATUTES AND REGULATIONS ..................................... 4

STATEMENT OF THE CASE ............................................................. 4

    A.    Statutory And Regulatory Background ................................. 4

        1.    Low Power Television Service ........................................ 4

        2.    The Community Broadcasters Protection Act .............. 5

        3.    The Low Power Protection Act .................................... 7

        4.    The Commission's Implementing Rules ....................... 8

    B.    RCC's Petition For Review .................................................. 13

SUMMARY OF THE ARGUMENT ...................................................... 13

STANDARD OF REVIEW ................................................................. 16

ARGUMENT .................................................................................. 17

I.    THE COMMISSION CORRECTLY INTERPRETED THE
LOW POWER PROTECTION ACT ............................................. 18

    A.    The Low Power Protection Act Requires Use Of Nielsen
Designated Market Areas .................................................... 18

    B.    RCC's Reading Of The Statute Is Fundamentally
Flawed .............................................................................. 20

        1.    RCC misreads the Low Power Protection Act's
plain text ................................................................... 20

        2.    RCC overreads the Low Power Protection Act's
statutory purpose ....................................................... 23

## TABLE OF CONTENTS
## (continued)

Page

    3.    RCC misinterprets Section 307(b) of the Communications Act .................................................... 25

    4.    The Commission adequately responded to RCC's comments ......................................................... 29

II.    RCC'S CONSTITUTIONAL OBJECTIONS LACK MERIT ..... 31

    A.    The Low Power Protection Act's Designated Market Area Requirements Do Not Exceed Congress's Commerce Power .................................................... 31

    B.    Neither Congress Nor The Commission Unconstitutionally Delegated Legislative Authority .......... 34

    C.    The Low Power Protection Act's Locally Produced Programming Requirement Does Not Violate The First Amendment ................................................ 36

III.    THE LOW POWER PROTECTION ACT DOES NOT EXTEND MUST CARRY RIGHTS TO CLASS A STATIONS .................................................................. 41

CONCLUSION .................................................................. 44

CERTIFICATE OF COMPLIANCE ..................................... 45

# TABLE OF AUTHORITIES*

## Cases

*A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) ................................................................................................... 35

*ADX Commc'ns of Pensacola v. FCC*, 794 F.3d 74 (D.C. Cir. 2015) ....... 28

*Allen B. Dumont Labs. v. Carroll*, 184 F.2d 153 (3d Cir. 1950) ............ 32

*Am. Elec. Power Serv. Corp. v. FCC*, 708 F.3d 183 (D.C. Cir. 2013) ...... 20

*Am. Fam. Ass'n, Inc. v. FCC*, 365 F.3d 1156 (D.C. Cir. 2004) ............... 39

*Amoco Prod. Co. v. Watson*, 410 F.3d 722 (D.C. Cir. 2005) ................... 23

*Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288 (1936) ......................... 37

*Barnhart v. Thomas*, 540 U.S. 20 (2003) ............................................... 22

*BellSouth Corp. v. F.C.C.*, 144 F.3d 58 (D.C. Cir. 1998) ........................ 39

*Canonsburg Gen. Hosp. v. Burwell*, 807 F.3d 295 (D.C. Cir. 2015) ....... 34

*Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399 (2012) ................................................................................................... 18

*Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837 (1984) .......................... 17, 18

*City of Austin, Tx. v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61 (2022) ....................................................................................... 39

*Covad Commc'ns Co. v. FCC*, 450 F.3d 528 (D.C. Cir. 2006) ..... 29, 30, 34

*C-SPAN v. FCC*, 545 F.3d 1051 (D.C. Cir. 2008) ................................... 17

*Eagle Broad. Grp., Ltd. v. FCC*, 563 F.3d 543 (D.C. Cir. 2009) ..... 18, 19

---

* *Authorities upon which we chiefly rely are marked with asterisks.*

(iv)

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*F.C.C. v. Allentown Broad. Corp.*, 349 U.S. 358 (1955) ..........................26

*\*FCC v. League of Women Voters of Cal.*, 468 U.S. 364 (1984) .............32

*FCC v. Prometheus Radio Project*, __ U.S. __, 141 S. Ct. 1150 (2021) ...................................................................................16

*\*In re Consol. Land Disposal Regul. Litig.*, 938 F.2d 1386 (D.C. Cir. 1991) ...........................................................36, 37, 42

*Intelligent Transp. Soc'y of Am. v. FCC*, 45 F.4th 406 (D.C. Cir. 2022) ..................................................................................16

*Jackson v. Modly*, 949 F.3d 763 (D.C. Cir. 2020) ....................................42

*Lockhart v. United States*, 577 U.S. 347 (2016) ......................................22

*Logansport Broad. Corp. v. United States*, 210 F.2d 24 (D.C. Cir. 1954) ...................................................................................26

*\*Mary V. Harris Found. v. FCC*, 776 F.3d 21 (D.C. Cir. 2015) ........26, 27

*Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012)......................32

*Nat'l Lifeline Ass'n v. FCC*, 983 F.3d 498 (D.C. Cir. 2020)....................17

*Pikes Peak Broad. Co. v. F.C.C.*, 422 F.2d 671 (D.C. Cir. 1969).............21

*PSSI Glob. Servs., L.L.C. v. FCC*, 983 F.3d 1 (D.C. Cir. 2020) ..............17

*Republic of Sudan v. Harrison*, 587 U.S. 1 (2019) ..................................18

*Sierra Club v. Env't Prot. Agency*, 21 F.4th 815 (D.C. Cir. 2021) ..........29

*\*Syracuse Peace Council v. FCC*, 867 F.2d 654 (D.C. Cir. 1989).....36, 37, 40, 41

*\*Thompson v. Clark*, 741 F.2d 401 (D.C. Cir. 1984) .........................30, 31

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180 (1997) ............................ 40

*U.S. Telecom Ass'n v. F.C.C.*, 359 F.3d 554 (D.C. Cir. 2004) ................. 34

*United States v. Darby*, 312 U.S. 100 (1941) ............................................. 32

*Viasat, Inc. v. FCC*, 47 F.4th 769 (D.C. Cir. 2022) ................................. 40

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ............................... 39

*Wash. All. of Tech. Workers v. United States Dep't of Homeland Sec.*, 50 F.4th 164 (D.C. Cir. 2022) ...................................................... 42

**Statutes**

28 U.S.C. § 2342(1) ......................................................................................... 3

47 U.S.C. § 303 ............................................................................................... 26

47 U.S.C. § 307(b) .......................................................................................... 25

47 U.S.C. § 336(f)(2)(A)(i) ............................................................................. 6

47 U.S.C. § 402(a) ........................................................................................... 3

47 U.S.C. § 405(a) ......................................................................................... 40

47 U.S.C. § 534 .......................................................................................... 4, 12

5 U.S.C. § 706(2) ........................................................................................... 16

Community Broadcasters Protection Act, Pub. L. 106-113, 113 Stat. 1501 (Nov. 29, 1999) ..................................................................... 6

*Low Power Protection Act, Pub. L. 117-344, 136 Stat. 6193 (Jan. 5, 2023) .................. 1, 3, 7, 8, 11, 13, 18, 19, 22, 23, 24, 35, 37, 43

(vi)

## TABLE OF AUTHORITIES
### (continued)

Page(s)

**Regulations**

47 C.F.R. § 73.6000 ................................................................ 38

47 C.F.R. § 73.622 ................................................................. 26

47 C.F.R. § 76.55 ............................................................ 12, 41

**Administrative Materials**

*Establishment of a Class A Television Service*, Report and Order,
    15 FCC Rcd 6355 (2000), *recon. granted in part*, 16 FCC Rcd
    8244 (2001) .................................................................... 6, 7

*In Re Establishment of a Class A Television Service*, 16 FCC Rcd
    8244 (2001) .............................................................. 12, 42

*In the Matter of the Suburban Community Policy, the Berwick
    Doctrine, & the De Facto Reallocation Policy*, 93 F.C.C.2d 436
    (1983) ............................................................................ 28

*Low Power Television Service*, Report and Order, 51 R.R.2d 476
    (1982), *recon. granted in part*, 48 Fed. Reg. 21478 (1983) .................. 4

*Update to Publication for Television Broadcast DMA
    Determination for Cable and Satellite Penetration*, Report and
    Order, 37 FCC Rcd 13886 (2022) .......................................... 9

(vii)

**GLOSSARY**

LPPA                    Low Power Protection Act, Pub. L. 117-344,
                        136 Stat. 6193 (Jan. 5, 2023)

RCC                     Petitioner Radio Communications
                        Corporation

No. 24-1004

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

RADIO COMMUNICATIONS CORPORATION,

*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents*.

---

On Petition for Review of an Order of
the Federal Communications Commission

---

## BRIEF FOR RESPONDENTS

---

## INTRODUCTION

This case presents a simple question of statutory interpretation: Whether Congress meant what it said in the Low Power Protection Act, Pub. L. 117-344, 136 Stat. 6193 (Jan. 5, 2023), when it directed the Federal Communications Commission to restrict eligibility for Class A low power television licenses to those stations that "operate[]in a Designated Market Area with not more than 95,000 television households." The answer is yes. That straightforward conclusion

renders Petitioner Radio Communications Corporation's licensee station ineligible for Class A status and resolves this case.  Because RCC's station operates in a Designated Market Area with more than 95,000 television households, it is ineligible for Class A status.

In challenging the Commission's determination that the Low Power Protection Act excludes low power stations—like RCC's licensee—in Designated Market Areas with more than 95,000 television households from Class A eligibility, RCC fundamentally misreads the statutory scheme.  Its sundry other statutory, constitutional, and policy arguments against the Commission's order are simply mistaken.  It is well within Congress's power to regulate local television broadcasting.  Congress does not unconstitutionally delegate its legislative power by referring to a private company's benchmarks.  And any supposed burden on Class A licensees' First Amendment rights, or their asserted entitlement for their signals to be carried on cable stations, are entirely beside the point because RCC is ineligible for Class A status under the plain text of the statute.

The petition should be denied.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 2342(1) and 47 U.S.C. § 402(a).  The Commission issued the Order on December 12, 2023.  (JA __–__).  Petitioner timely filed a petition for review on January 10, 2024.

## STATEMENT OF THE ISSUES

1.    Whether the Commission correctly interpreted the Low Power Protection Act's requirement that a low power television station eligible for Class A status must "operate[] in a Designated Market Area with not more than 95,000 television households" to mean that an eligible station must fall within a Designated Market Area that has no more than 95,000 television households as defined by Nielsen Media Research.  LPPA § 2(c)(2)(B)(iii).

2.    Whether the Low Power Protection Act or its implementing rules violate the Constitution because:

a.    Congress or the Commission lack authority under the Commerce Clause to regulate local television stations;

b.    Congress or the Commission impermissibly delegated legislative authority to a private entity by defining the phrase "Designated Market Area" by reference to Nielsen Media Research's system of designating local television markets; or

- 3 -

c.    Congress or the Commission violated the First Amendment by conditioning eligibility for Class A low power television licenses on the requirement that stations must have broadcast an average of 3 hours per week of locally produced programming in the 90 days preceding enactment of the Low Power Protection Act.

3.    Whether the Low Power Protection Act extends the mandatory cable carriage rights established in 47 U.S.C. § 534 to Class A low power television stations.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are set forth in the statutory addendum bound with this brief.

## STATEMENT OF THE CASE

### A.    Statutory And Regulatory Background

### 1.    Low Power Television Service

The Commission began licensing low power television stations in 1982 to expand service "in unserved and lesser-served rural areas." *Low Power Television Service*, Report and Order, 51 R.R.2d 476 (1982), *recon. granted in part*, 48 Fed. Reg. 21478 (1983). Low power stations "have lower authorized power levels than full power television stations" and

serve smaller geographic regions than full power stations. *Implementation of the Low Power Protection Act*, FCC 23-112, 2023 WL 8646731, at *1 (Dec. 12, 2023) ("Order").

From its inception, low power television service has been restricted to "secondary" priority, meaning that low power stations "may not cause interference to, and must accept interference from, full power television stations as well as certain land mobile radio operations and other primary services." *Id.* (citing 1982 order). "As a result of their secondary status, [low power television] stations can also be displaced by full power stations that seek to expand their service area, or by new full power stations seeking to enter the same area as [a low power television] station." *Id*. n.5.

There are now 1,889 licensed low power television stations operating across all U.S. states and territories. Order ¶ 3 (JA___).

### 2.    The Community Broadcasters Protection Act

In the Community Broadcasters Protection Act of 1999, Congress directed the Commission to create a new set of "Class A" television licenses that would provide some low power stations with a degree of protection from interference from full power stations if they could meet

specified statutory criteria and if they applied within a set timeframe. *See* Pub. L. 106-113, 113 Stat. 1501 (Nov. 29, 1999); *Establishment of a Class A Television Service*, Report and Order, 15 FCC Rcd 6355 (2000), *recon. granted in part*, 16 FCC Rcd 8244 (2001) ("Class A Order").

At Congress's direction, the Commission issued these Class A licenses during a limited timeframe and only to those stations that met the specified statutory requirements. *Id.* at 8246–49 ¶¶ 5–9. Among other things, the Community Broadcasters Protection Act provided that a low power television station could qualify for Class A status only if, during the 90 days preceding the statute's enactment, the station: (1) broadcast a minimum of 18 hours per day; (2) broadcast an average of at least 3 hours per week of programming produced within the market area served by the station, or the market area served by a group of commonly controlled low power stations that carry common local programming produced within the market area served by such group; and (3) complied with the Commission's requirements for low power stations. 47 U.S.C. § 336(f)(2)(A)(i).

In the course of implementing the Community Broadcasters Protection Act, the Commission concluded that Congress had not

intended to extend mandatory cable carriage privileges to all Class A low power television stations.  Class A Order ¶¶ 39–43.  Because the Community Broadcasters Protection Act's text and history made no mention of must carry rights and the Commission had elsewhere concluded that "Class A stations are low power stations for mandatory carriage purposes," the Commission declined to extend must carry rights to Class A licensees.  *Id*. n.219.

### 3.    The Low Power Protection Act

Congress enacted the Low Power Protection Act, Pub. L. 117-344, 136 Stat. 6193 (Jan. 5, 2023), to provide low power television stations with another "limited window of opportunity to apply for the opportunity to be accorded primary status as Class A television licensees."  LPPA § 2(b).  As it did before in the Community Broadcasters Protection Act, Congress established specific eligibility criteria for low power stations seeking Class A designation.

Under subsection 2(c)(2) of the Act, titled "REQUIREMENTS," the Commission "may approve an application . . . if the low power TV station submitting the application" meets certain specified criteria.  LPPA § 2(c)(2)(B).  As most relevant here, an applicant must, "as of the date of

enactment of this Act, operate[] in a Designated Market Area with not more than 95,000 television households." LPPA § 2(c)(2)(B)(iii).

"Designated Market Area" is a statutorily defined term. The Act provides that "Designated Market Area" means either "(A) a Designated Market Area determined by Nielsen Media Research or any successor entity; or (B) a Designated Market Area under a system of dividing television broadcast station licensees into local markets using a system that the Commission determines is equivalent to the system established by Nielsen Media Research." LPPA § 2(a)(2).

### 4.    The Commission's Implementing Rules

Consistent with Congress's instructions, the Commission adopted rules to open a new, one-year window for low power television stations to apply for Class A status under the Low Power Protection Act. *See* Order (JA___). The Order "establish[ed] the period during which eligible stations may file applications for Class A status, eligibility and interference requirements, and the process for submitting applications." *Id.* ¶ 1 (JA___).

As most relevant here, the Commission chose to use Nielsen's Local TV Report—a collection of data on local television markets—for

determining a station's "Designated Market Area" for purposes of the Low Power Protection Act's eligibility criteria. *Id.* ¶ 35 (JA___). First, the Commission reasoned, using Nielsen's Local TV Report was consistent with the statute, which expressly contemplates the use of Nielsen data for demarcating television market areas. *Id.* (JA___). Second, the use of the Local TV Report was consistent with past agency practice—a previous Commission order had used Nielsen's Local TV Report to define the term "local market" for the purposes of other statutory provisions and agency rules. *Id.* (JA___) (citing *Update to Publication for Television Broadcast DMA Determination for Cable and Satellite Penetration*, Report and Order, 37 FCC Rcd 13886 (2022)). Third, the Commission noted, commenters had unanimously supported using Nielsen's Local TV Report in a previous proceeding, where "the record . . . indicated that the Local TV Report was the sole source of information regarding [Designated Market Area] determinations and that there was no [other] company currently accredited to determine the local market area of broadcast television stations." *Id.* (JA___).

The Commission in so ruling rejected an argument from commenter RCC—which operates a low power television station in Allingtown, a

neighborhood of West Haven, Connecticut—that reliance on Nielson data would be "nonsensical" because 177 of the 210 Designated Market Areas in Nielsen's report had more than 95,000 television households—and thus low power television stations in those Designated Market Areas would be ineligible for Class A status under the statute. RCC Comments at 1, 6 (JA___). According to RCC, using Nielsen's data would exclude too many stations. *Id.* (JA___). The Commission considered and rejected this argument because "Congress clearly intended that eligibility under the [Low Power Protection Act] be limited, as the Act expressly provides that eligibility is limited to [Designated Market Areas] with no more than 95,000 TV households." Order ¶ 38 (JA___). As the Commission explained, Congress recognized that affording low power stations Class A status comes at a price—potential interference with full power stations— and thus adopted a "balanced approach" by restricting eligibility to smaller markets. *Id.* (JA___).

As an alternative to using Nielsen's Designated Market Areas, RCC asked the Commission to "allow all [low power television] stations whose 'Section 307(b) community of license has fewer than 95,000 TV households" to convert to Class A status. RCC Comments 6 (JA___). The

Commission rejected RCC's proposal because it would not be "'equivalent' to the system established by Nielsen—which defines larger geographic regions than community of license"—and would thus contravene the statute's plain command to use Nielsen Designated Market Areas or an "equivalent" system.   Order ¶ 40 & n.187 (JA___) (quoting LPPA § 2(a)(2)).

The Commission likewise rejected RCC's arguments that relying on Nielsen data violated the Constitution by "improperly delegating legislative power to private industry."  RCC Comments 4 (JA___).  As the Commission explained, using privately collected data "for a particular purpose specified in the statute" does not reflect an impermissible delegation of legislative authority.  Order n.186 (JA___).

The Commission also clarified the Low Power Protection Act's "locally produced programming" requirement, one of the eligibility criteria carried over from the Community Broadcasters Protection Act. The Order defined "locally produced programming for purposes of the LPPA as that 'produced within the predicted noise-limited contour (*see* [47 C.F.R.] § 73.619(c)) of a Class A station broadcasting the program or

within the contiguous predicted noise-limited contours of any of the Class A stations in a commonly owned group.'" Order ¶ 19 (JA___).

Finally, the Commission declined RCC's request that the agency amend its rules to give all Class A stations the same "must carry" status as full power stations.  Order ¶¶ 52–53 (JA___); RCC Comments 15-16 (JA___).  While certain local broadcast television stations are entitled to demand that cable providers carry their channel to local customers, s*ee* 47 C.F.R. § 76.55, most low power stations are excluded from that privilege.  *See id*.; 47 U.S.C. § 534.  The Commission concluded that Congress did not intend to alter this scheme through the creation of Class A licenses.   Order ¶¶ 52–53 (JA___).   Consistent with the Commission's previous order denying full must carry status to Class A stations, the Commission reasoned that neither the Community Broadcasters Protection Act, the Low Power Protection Act, nor their accompanying legislative histories make any mention of must carry rights and, given this silence, Congress did not intend to expand those rights along with the grant of Class A licenses.  *Id*. (JA___) (citing *In Re Establishment of a Class A Television Service*, 16 FCC Rcd 8244, 8259–60 ¶¶ 39–43 (2001)).

- 12 -

**B.    RCC's Petition For Review**

RCC petitioned this Court for review of the Order on January 10, 2024.  *See* ECF No. 2036140.  It filed an emergency motion seeking a stay, summary disposition, and expedited briefing on January 23, 2024.  *See* ECF No. 2037054.  The Court denied that motion on March 12, 2024.  *See* ECF No. 2044486.

## SUMMARY OF THE ARGUMENT

I.A. The text of the Low Power Protection Act is unambiguous.  The Commission correctly interpreted the statutory requirement that an eligible station "operate[] in a Designated Market Area with not more than 95,000 television households" to mean that an eligible station must be located within a Designated Market Area that has no more than 95,000 television households.  LPPA § 2(c)(2)(B)(iii).  And it correctly defined "Designated Market Area," as the statute instructs, by reference to Nielsen Media Research's system of designating television markets.  That conclusion resolves this case because RCC's station is located within a Nielsen Designated Market Area of more than 95,000 television households.

- 13 -

I.B. RCC's contrary arguments are incorrect.

1. The phrase "with 95,000 television households" in Section 2(c)(2)(B)(iii) modifies the immediately preceding phrase "Designated Market Area," and not the phrase "community of license," which appears nowhere in the Low Power Protection Act, or the phrase "the low power TV station submitting the Class A license application," which appears much earlier in the statute.

2. The Low Power Protection Act does not provide unbounded protection for low power stations. Nor can any unexpressed Congressional purpose override the statute's plain textual commands.

3. Section 307(b) of the Communications Act of 1934 is not to the contrary. That provision generally directs the Commission to pursue equitable distribution of broadcast resources, but it does not specifically address low power stations, let alone guarantee Class A status to every low power station nationwide. The challenged order does not reassign RCC's license, de facto or otherwise, and the Commission was not free to replace Congress's chosen designation of "Designated Market Area" with the concept of communities of license under Section 307(b). In any event, Section 307(b) must be read in light of other statutory provisions and, even if Section 307(b) did conflict with the Low Power Protection Act, the

more specific, later-enacted eligibility provisions of the Low Power Protection Act would control.

4.   The Commission adequately responded to RCC's comments before the agency.  It was not obligated to answer every portion of those comments, only those that raised significant issues.  The Commission did so, and it fully explained the reasoning underlying the Order.

II.   RCC's constitutional objections likewise fail.

A.   In enacting and implementing the Low Power Protection Act, Congress and the Commission acted well within their power to regulate commerce.   Federal authority over television broadcasting is well established.

B.   Neither Congress nor the Commission delegated legislative authority to Nielsen Media Research by defining the phrase "Designated Market Area" by reference to that private company's system of designating television markets.   Agencies are free to rely on private entities to provide factual information.   Doing so here at Congress's direction violated no constitutional principle.

C.   The Court need not decide RCC's First Amendment challenge to the Low Power Protection Act's locally produced programming requirement because doing so is unnecessary to resolve this case.   RCC

- 15 -

is ineligible for Class A status irrespective of that requirement. *Supra* Part I. In any event, the locally produced programming requirement is a permissible content-neutral regulation that is amply justified by the government's interest in promoting local broadcasting.

III. The Court likewise need not reach RCC's argument that Class A stations are entitled to mandatory carriage on cable television systems. RCC's station does not have a Class A license and it is ineligible to obtain one. *Supra* Part I. In any event, the Commission reasonably concluded that the Low Power Protection Act does not extend must carry rights to Class A stations because the statute's text and history are entirely silent on that question.

## STANDARD OF REVIEW

Under the Administrative Procedure Act, this Court will overturn agency action when it is "arbitrary, capricious, or otherwise contrary to law." *Intelligent Transp. Soc'y of Am. v. FCC*, 45 F.4th 406, 411 (D.C. Cir. 2022) (citing 5 U.S.C. § 706(2)). That "deferential" standard requires only "that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, __ U.S. __, 141 S. Ct. 1150, 1158 (2021).

- 16 -

The Court generally "review[s] the FCC's legal determinations under *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 842–43 (1984)," *PSSI Glob. Servs., L.L.C. v. FCC*, 983 F.3d 1, 7 (D.C. Cir. 2020), but "review[s] constitutional challenges to agency action *de novo*." *Nat'l Lifeline Ass'n v. FCC*, 983 F.3d 498, 507 (D.C. Cir. 2020) (citing *C-SPAN v. FCC*, 545 F.3d 1051, 1054 (D.C. Cir. 2008)). The Court accepts agencies' "findings of fact so long as they are supported by substantial evidence on the record as a whole." *PSSI Global Servs.,* 983 F.3d at 7.

## ARGUMENT

This case is straightforward. As the Commission reasonably concluded, the plain text of the Low Power Protection Act excludes from Class A eligibility any station located within a Designated Market Area with more than 95,000 television households, determined by Nielsen Media Research's system of dividing television broadcast station licensees into local markets or an equivalent. Under that clear statutory command, RCC's low power station W24EZD—located in the Hartford-New Haven, Connecticut Designated Market Area with more than one million TV households—is ineligible for Class A status. And RCC's various policy objections, its strained reading of the Communications Act, and its tenuous constitutional theories cannot change its ineligibility.

- 17 -

## I.    THE COMMISSION CORRECTLY INTERPRETED THE LOW POWER PROTECTION ACT

### A.    The Low Power Protection Act Requires Use Of Nielsen Designated Market Areas

In interpreting a statute, courts "begin 'where all such inquiries must begin: with the language of the statute itself.'" *Republic of Sudan v. Harrison*, 587 U.S. 1, 8 (2019) (quoting *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399 (2012)). Where "Congress has directly spoken to the precise question at issue," and "the intent of Congress is clear, that is the end of the matter," and both the Court and the Commission "must give effect to the unambiguously expressed intent of Congress." *Eagle Broad. Grp., Ltd. v. FCC*, 563 F.3d 543, 550 (D.C. Cir. 2009) (quoting *Chevron*, 467 U.S. at 842–43).

The Low Power Protection Act's plain text is clear. It sets specific eligibility criteria for low power stations to apply for Class A status: "The Commission may approve an application . . . if the low power TV station submitting the application . . . satisfies" the listed requirements, including that, at the time of enactment, it "operates in a Designated Market Area with not more than 95,000 television households." LPPA § 2(c)(2)(B). The statute defines "Designated Market Area" to mean "a Designated Market Area determined by Nielsen Media Research" or "a

system that the Commission determines is equivalent to the system established by Nielsen Media Research." LPPA § 2(a)(2).

The Commission faithfully carried out these statutory commands. It reasonably concluded that the phrase "with not more than 95,000 television households" modifies the immediately preceding phrase "Designated Market Area." It correctly recognized that Congress had instructed the Commission to define "Designated Market Area" by reference to Nielsen's data or an equivalent system. And it evaluated alternatives to determine whether they were "equivalent." Finding no such equivalent option, the Commission applied Congress's chosen definition to set eligibility requirements for Class A licenses. Order ¶¶ 35–40 (JA___).

That straightforward approach follows the "unambiguously expressed intent of Congress," *Eagle Broad. Grp.*, 563 F.3d at 550, and resolves this case. Because RCC's station falls within a Nielsen Designated Market Area with more than 95,000 television households, it is ineligible for Class A status. And to the extent the Court concludes there is any ambiguity in the Low Power Protection Act, the Commission's interpretation is, at very least, eminently reasonable, and

thus entitled to deference. *See Am. Elec. Power Serv. Corp. v. FCC*, 708 F.3d 183, 186 (D.C. Cir. 2013).

## B.    RCC's Reading Of The Statute Is Fundamentally Flawed

Largely ignoring the statute's plain text, RCC argues that the Low Power Protection Act, read in tandem with Section 307(b) of the Communications Act, mandates "nationwide provision" of Class A licenses without respect to Nielsen Designated Market Area.   Br. 30. That is not a reasonable interpretation of either Section 307(b) or the Low Power Protection Act, let alone one that the Commission was required to adopt.

### 1.    RCC misreads the Low Power Protection Act's plain text

RCC fundamentally misreads the Low Power Protection Act.   It argues that the statute's reference to "95,000 television households" in Section 2(c)(2)(B)(iii) "refers to the number of TV households served in the qualifying [low power television] licensee's Section 307(b) community of license," and not to the number of households in its "Designated Market Area" as defined by the statute.   Br. 33–34.   In other words, RCC separates the phrase "with not more than 95,000 television households" from the immediately preceding phrase "Designated Market Area,"

contending that the statute merely requires an applicant to operate in *any* Designated Market Area. Meanwhile, RCC inserts the phrase "community of license," which appears nowhere in the Low Power Protection Act's text or history, and asserts that the statutory definition of "Designated Market Area" somehow creates mandatory nationwide Class A licensing. That reading is plainly erroneous.

The phrase "with not more than 95,000 television households" is best read to modify the immediately preceding phrase, "Designated Market Area," and not, as RCC suggests, "'the low power TV station submitting the' Class A license application." Br. 33. That conclusion follows from the ordinary meaning of language, canons of interpretation, and common sense.

Start with ordinary meaning. RCC's proposed interpretation—"the low power TV station submitting the application . . . with no more than 95,000 television households"—makes little sense. One would not typically describe a television station *itself* as containing or possessing television households, whereas television "markets" are routinely described as containing or possessing television households. *See, e.g.*, *Pikes Peak Broad. Co. v. F.C.C.*, 422 F.2d 671, 677 n.7 (D.C. Cir. 1969)

(discussing "a market *with* more than three times the number of television households in the Colorado Springs-Pueblo market" (emphasis added)).  The statutory phrase "Designated Market Area" thus fits far better with the immediately following statutory limitation ("with no more than 95,000 television households") than it does with RCC's proposed pairing, "low power TV station."

That conclusion is confirmed by well-established interpretive canons.  When a statute contains a limiting clause, courts generally follow the rule of the last antecedent, which "provides that 'a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows.'"  *Lockhart v. United States*, 577 U.S. 347, 351 (2016) (quoting *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003)).  So too here, where the limiting phrase "with no more than 95,000 television households" immediately follows "Designated Market Area." RCC's proposed pairing ("low power TV station"), by contrast, appears some 140 words earlier in the statute.  LPPA § 2(b).

RCC's interpretation also runs afoul of the rule against superfluity. "'[I]f possible,' [this Court will] construe a statute so as to give effect to 'every clause and word.'"  *Amoco Prod. Co. v. Watson*, 410 F.3d 722, 733

(D.C. Cir. 2005). Because every television station in the lower 48 states falls within one of Nielsen's Designated Market Areas, RCC's proposed interpretation—that Congress merely meant to require an eligible station to fall within *any* Designated Market Area—would render the Designated Market Area language largely superfluous. That is not what Congress intended.

RCC further contends that the statutory definition of "Designated Market Area" standing alone "mandates nationwide Class A licensing" without respect to the eligibility criteria laid out elsewhere in the statute. Br. 34 (citing LPPA § 2(a)(2)). That cannot be right. The statutory definition of the term "Designated Market Area" does not itself set forth the statute's eligibility requirements (nor any other substantive right or restriction), which are instead laid out in Section 2(c)(2)(B). It merely clarifies the meaning of the term "Designated Market Area." Section 2(a)(2) thus cannot be read to "mandate[] nationwide Class A licensing" simply because it uses the phrase "local markets." Br. 34.

## 2. RCC overreads the Low Power Protection Act's statutory purpose

Unable to account for the statute's plain text, RCC relies on its view of the scope of the statute's purpose to benefit low power television

stations. Throughout its brief, RCC faults the Commission's implementation of the Low Power Protection Act for failing to adequately protect low power stations. *See, e.g.*, Br. 26 ("FCC 23-112 fails to address the fact that 'the LPPA is 'Low Power Protection Act,' not the 'Large Power Protection Act.'"). But the language of the Low Power Protection Act belies RCC's contention that Congress intended to guarantee unbounded protection to all low power stations. As the Commission explained, Order ¶ 38 (JA___), Congress adopted a "balanced approach," with the stated purpose of "provid[ing] low power TV stations with a limited window of opportunity to apply for" Class A licenses, subject to statutory requirements. LPPA § 2(b).

RCC raises a number of policy objections to Congress's chosen approach. It complains that restricting eligibility based on Nielsen Designated Market Areas would "deny Class A licenses covering more than 98% of the Nation's population," Br. 38–39, and favor larger broadcasters' "speculative, future TV expansion plans" at the expense of some low power stations, Br. 40–42. But there is no reason to think that Congress misunderstood what it was doing in directing the Commission to restrict eligibility for Class A status based on Designated Market

Areas of a specified size. "[T]he Commission and the television industry have long relied on Nielsen [Designated Market Area] data to define television markets," and "information about the number of TV households in each [Designated Market Area] is publicly available." Order ¶¶ 35–37 (JA___). Nor is Congress's chosen approach as dramatic as RCC suggests: while 98 percent of television households may fall outside eligible Designated Market Areas (Br. 38), 33 out of 210 Designated Market Areas fall within the statute's 95,000 television household threshold. Order ¶ 38 (JA___). That is hardly an "absurd" result. Br. 27.

### 3. RCC misinterprets Section 307(b) of the Communications Act

RCC likewise misreads Section 307(b) of the Communications Act, which it repeatedly asserts "mandates nationwide Class A licensing." *E.g.*, Br. 19. Not so.

Section 307(b) provides that "the Commission shall [distribute] licenses, frequencies, hours of operation, and of power among the several States and communities as to provide a fair, efficient, and equitable distribution of radio service to each of the same." 47 U.S.C. § 307(b). That provision generally "empowers the Commission to allow licenses so

- 25 -

as to provide a fair distribution among communities," *F.C.C. v. Allentown Broad. Corp.*, 349 U.S. 358, 362 (1955), by, for example, allotting channels to different communities across the country.  *See* 47 C.F.R. § 73.622.  And it obligates the Commission to evaluate fair distribution of broadcast resources in certain circumstances—for example, "[w]hen multiple applicants seek mutually exclusive licenses to operate a noncommercial educational . . . radio station."  *See Mary V. Harris Found. v. FCC*, 776 F.3d 21, 22 (D.C. Cir. 2015).

But Section 307(b) is not, as RCC suggests, a guarantee of Class A privileges to low power stations without regard to the express limitations laid out in the Low Power Protection Act.  Indeed, Section 307 does not mention low power stations, Class A licenses, or "Designated Market Areas" at all.  "Section 307(b) must be read in the light of" other statutory provisions, including those that empower the Commission to make new regulations and impose restrictions on licensing.  *See Logansport Broad. Corp. v. United States*, 210 F.2d 24, 26 (D.C. Cir. 1954) (citing 47 U.S.C. § 303).  And in pursuing Section 307(b)'s general aims, "Congress delegated to the Commission the task of balancing myriad considerations

that neither body could fully anticipate." *Mary V. Harris Found.*, 776 F.3d at 25.

RCC points to nothing in the general language of Section 307(b) that requires the Commission to override the clearly expressed intent of Congress in the Low Power Protection Act to restrict Class A eligibility based on Nielsen Designated Market Area. *Supra* Part I.A.

At various points, RCC raises two related objections based on Section 307(b): that the Order "reassigns LPTV licenses" (Br. 38, 39 & n.17) and that the Commission should have defined the Low Power Protection Act's Designated Market Area limitation by reference to "Section 307(b) community of license" (Br. 44), instead of Nielsen Designated Market Areas. Both arguments lack merit.

First, the Order does not "reassign" any low power television licenses, *de facto* or otherwise. The Order does not alter RCC's existing low power television license in any form. It merely implements the process and criteria, dictated by Congress in the Low Power Protection Act, by which qualifying stations may apply for Class A status. Nor does the Order "reassign[] RCC's [low power television] station to the Hartford-New Haven [Designated Market Area]," Br. 39 (JA___), because

its station already falls within the Hartford-New Haven Designated Market Area. The Commission's "*de facto* reallocation" policy is entirely inapposite here because nothing in this Order would "utilize a channel assigned to one community in order to establish a broadcast service in another community," Br. 39 n.17 (quoting *In the Matter of the Suburban Community Policy, the Berwick Doctrine, & the De Facto Reallocation Policy*, 93 F.C.C.2d 436, 440 (1983)).

Second, the Commission acted reasonably in declining RCC's request to define the Low Power Protection Act's 95,000 television household restriction by reference to "community of license" rather than Designated Market Area. A "community of license" typically refers to "the community that [a] station is licensed to serve." *ADX Commc'ns of Pensacola v. FCC*, 794 F.3d 74, 77 (D.C. Cir. 2015). As the Commission explained, the concept of community of license under Section 307(b) is wholly unrelated to the Low Power Protection Act's use of "Designated Market Area" to determine Class A eligibility. *See* Order ¶ 40 & n.187 (JA___). Using Nielsen Designated Market Areas for determining Class A eligibility "is consistent with the [Low Power Protection Act], relates only to implementation of the [Low Power Protection Act], and

does not affect the communities [low power television] stations" serve. Order n.187 (JA___).   RCC's suggestions to the contrary are simply mistaken.

Even if Section 307(b) could be read to conflict with the Low Power Protection Act, RCC's interpretation would be unavailing.  It is a "basic principle of statutory construction that a specific statute . . . controls over a general provision." *Sierra Club v. Env't Prot. Agency*, 21 F.4th 815, 821 (D.C. Cir. 2021) (alterations in original; citation omitted).   Here, there can be no question that Congress's precise employment of "Designated Market Area" to determine Class A eligibility in the Low Power Protection Act controls over the earlier-enacted general instruction to equitably distribute broadcasting resources.  Section 307(b) is of no help to RCC at all.

### 4.   The Commission adequately responded to RCC's comments

RCC repeatedly objects that the Commission did not respond to every aspect of its comments before the agency.  *See* Br. 19, 21, 22, 23, 25, 26, 29, 33, 40, 42, 47, 50, 53 (citing *Covad Commc'ns Co. v. FCC*, 450 F.3d 528 (D.C. Cir. 2006)).  But the Commission did not fail to "address arguments which 'challenge the empirical justification' of the proposed

rule," *id.*; nor did it relegate its response to "terse, non-substantive" analysis, Br. 43.  To the contrary, the Commission adequately explained why it was rejecting the majority of RCC's arguments, mentioning RCC nearly 30 times in its order.  *See* Order ¶ 38 (JA___) (addressing RCC's statutory argument); Order ¶ 40 (JA___) (addressing Section 307(b)); ¶ 52 (addressing mandatory cable carriage rights); n.186 (JA___) (addressing private nondelegation).  That was more than enough to address RCC's concerns.

"The FCC need not address every comment" in a proceeding; it must only "respond in a reasoned manner to those that raise significant problems." *Covad*, 450 F.3d at 550.  Any "failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors." *Thompson v. Clark*, 741 F.2d 401, 409 (D.C. Cir. 1984) (internal quotation marks and citation omitted).  Here, the Commission considered the relevant factors in implementing the Low Power Protection Act.  It thoroughly analyzed the Low Power Protection Act's text, context, and history as well as its own past decisions on Class A licensing; balanced input from numerous commenters; and responded to the vast majority of RCC's objections.  Any

arguments that the Commission did not directly address—such as RCC's Commerce Clause argument discussed below, *infra* Part II.A, were insubstantial on their face and did not warrant discussion. *See Thompson*, 741 F.2d at 408.

## II. RCC'S CONSTITUTIONAL OBJECTIONS LACK MERIT

In addition to its statutory arguments, RCC advances a variety of constitutional theories for why the Commission's implementation of the Low Power Protection Act should be set aside. None has merit. Congress's (and the Commission's) authority to regulate television broadcasters is well established. Nothing in the Low Power Protection Act or its implementing rules delegates any legislative authority to a private entity. And not only are RCC's First Amendment objections misplaced, they are beside the point because RCC's station is otherwise ineligible for Class A status.

### A. The Low Power Protection Act's Designated Market Area Requirements Do Not Exceed Congress's Commerce Power

RCC is mistaken that the Low Power Protection Act or the Commission's implementing order "[i]nsubstantially [a]ffects [i]nterstate [c]ommerce." Br. 24.

"The power of Congress over interstate commerce is not confined to the regulation of commerce among the states," and extends to any activity with "a substantial effect on interstate commerce." *United States v. Darby*, 312 U.S. 100, 118–19 (1941). That power is not only "not limited to regulation of an activity that by itself substantially affects interstate commerce, but also extends to activities that do so only when aggregated with similar activities of others." *Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 549 (2012). In accordance with these longstanding principles, courts "have long recognized that Congress, acting pursuant to the Commerce Clause, has power to regulate the use of" broadcast communications, including television broadcasting. *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 376 (1984); *see also Allen B. Dumont Labs. v. Carroll*, 184 F.2d 153, 154 (3d Cir. 1950) ("There is no doubt but that television broadcasting is in interstate commerce."). Congress plainly had authority to enact the Low Power Protection Act and delegated that same authority to the Commission to implement it.

In its brief, RCC cites a handful of Commerce Clause precedents, Br. 25, but none involving broadcast communications. Nor does RCC explain how either the facts or reasoning of those decisions is relevant. RCC objects that the Commission's order "assumes authority to regulate

- 32 -

local economic activity in a 'smattering of rural, local areas,'" Br. 24, but the crux of RCC's argument is that Congress's decision to disallow low power stations from interfering with full power stations in populous television markets (like New Haven) hinders RCC's ability to compete with full power broadcasters. *E.g.*, Br. 27, 35. Signal interference and competition in broadcast markets are precisely the kinds of issues affecting interstate commerce that led to federal regulation of broadcasting, and Congress has ample constitutional authority to regulate in this area, including setting eligibility requirements for broadcast licensees.

In any event, it is unclear how RCC's Commerce Clause argument helps its case. If Congress lacks authority under the Commerce Clause to enact the Low Power Protection Act (or the Commission lacked authority to implement it)—which, to be clear, they do not—then *no* low power television station, including RCC's licensee station, could apply for Class A status. There is no reading of Congress's commerce power that

gets RCC what it wants—a "nationwide" guarantee of Class A privileges for low power stations.  Br. 30.[1]

## B.    Neither Congress Nor The Commission Unconstitutionally Delegated Legislative Authority

RCC's private non-delegation argument (Br. 42–45) is likewise mistaken.

This Court has long recognized that "a federal agency may use an outside entity, such as a state agency or a private contractor, to provide the agency with factual information." *U.S. Telecom Ass'n v. F.C.C.*, 359 F.3d 554, 567 (D.C. Cir. 2004).  The challenged order does no more than that—relying on Nielsen "to provide the agency with factual information," and even then at Congress's express instruction.  *Id*.  This case bears no resemblance to the delegation of legislative power at issue in *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 539

---

[1] RCC additionally argues that the FCC failed to address its Commerce Clause comments, and that "Commission counsel is not allowed to fill this gap in this review proceeding."  Br. 29.  But the Commission was only obligated to respond to "those [comments] that raise significant problems."  *Covad*, 450 F.3d at 550.  Respectfully, RCC's argument that the Commission lacks authority to regulate local television stations was not a "significant" issue necessitating a response from the Commission.  *See supra* Part I.B.4.  And the rule prohibiting *post hoc* rationalization of agency action applies only to issues of "fact, policy, or agency expertise," not legal arguments.  *Canonsburg Gen. Hosp. v. Burwell*, 807 F.3d 295, 305 (D.C. Cir. 2015).

(1935) (cited at Br. 42–43), where the National Industrial Recovery Act authorized private trade and industrial groups to write fair competition codes, *id*. at 521–23.  The Commission correctly concluded that "us[ing] an outside entity's market definition for a particular purpose specified in the statute" violates no constitutional principle.  Order n.186 (JA___).

RCC's concerns (Br. 43) that the Commission will need to "regulate Nielsen Media Research's decision making regarding [Designated Market Area] composition" and that the public will need to "subscribe to Nielsen's [Designated Market Area] service" are entirely misplaced. Nielsen's future determinations about Designated Market Area are irrelevant because the statute sets eligibility based on Designated Market Area at the time of enactment—as of January 5, 2023—for a one-time application process.  LPPA § 2(c)(2)(B)(iii).  What is more, "Class A stations will not be required to continue to comply with the 95,000 TV household threshold if the population in the station's DMA later exceeds the threshold amount for specific reasons beyond the station's control." Order ¶ 10 (JA___).  And the public has no need to subscribe to any Nielsen service because "the number of TV households in each [Designated Market Area as of January 5, 2023] is publicly available"

and a complete breakdown of relevant markets is contained in the Commission's public order.  Order ¶ 37 & n.169 (JA___).

### C.  The Low Power Protection Act's Locally Produced Programming Requirement Does Not Violate The First Amendment

RCC further objects that the Commission's implementation of the Low Power Protection Act violates the First Amendment.  Br. 45–48.  The Court need not reach this argument.  In any event, it lacks merit.

This Court may decline to decide an issue where such a decision "would provide [the petitioner] no meaningful relief."  *See, e.g.*, *In re Consol. Land Disposal Regul. Litig.*, 938 F.2d 1386, 1389 (D.C. Cir. 1991) (declining to "reach the merits of the petitioners' argument that the EPA provided inadequate notice of [requiring] post-closure permits for disposal facilities" where a remand on that issue would have provided "no meaningful relief").  Hesitance is particularly appropriate where the unnecessary resolution of an issue would require the Court to reach a constitutional question.  *See Syracuse Peace Council v. FCC*, 867 F.2d 654, 657 (D.C. Cir. 1989) ("[I]t is an elementary canon that American courts are not to 'pass upon a constitutional question . . . if there is also present some other ground upon which the case may be disposed of.'"

(quoting *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 345–48 (1936) (Brandeis, J., concurring))).

This Court need not reach RCC's First Amendment challenge. If the Court concludes that the Low Power Protection Act's Designated Market Area eligibility restriction renders RCC's station ineligible for Class A status, any inquiry into the statute's independent "locally produced programming" requirement would be unnecessary because no decision on that issue could result in RCC's station ending up with Class A status. RCC's station is ineligible for Class A status without regard to the locally produced programming requirement because it is located within a Designated Market Area with more than 95,000 television households. *See supra* Part I. That conclusion is sufficient to resolve this case, and further resolution of a constitutional question is unwarranted. *Cf. Consol. Land Disposal*, 938 F.2d at 1389; *Syracuse Peace Council*, 867 F.2d at 657.

In any event, RCC's First Amendment argument fails. The Low Power Protection Act requires that eligible stations have carried a certain amount of "locally produced programming" in the 90 days preceding the statute's effective date. LPPA § 2(c)(2)(B)(i)(I); *see* Order ¶¶ 18–20

(JA___).  As it did for stations that converted to Class A status under the Community Broadcasters Protection Act, the Commission here defined "locally produced programming" by reference to Section 73.6000 of the Commission's rules, which provides that "[l]ocally produced programming" is "programming produced within the predicted noise-limited contour (*see* § 73.619(c)) of a Class A station broadcasting the program or within the contiguous predicted noise-limited contours of any of the Class A stations in a commonly owned group."  Order ¶ 19 (JA___); 47 C.F.R. § 73.6000.  Thus, a low power television station seeking to upgrade to Class A status under the Low Power Protection Act "must have broadcast an average of at least 3 hours per week of programming that was produced within the market area served by such station, or the market area served by a group of commonly controlled [low power television] stations that carry common local programming produced within the market area served by such group."  *Id.* ¶ 18.

RCC contends that this requirement "violates the First Amendment by restricting a Class A applicant's program content and editorial choices."  Br. 45.  That is incorrect.  "Government regulation of expressive activity is content neutral so long as it is justified without reference to

the content of the regulated speech." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Here, the local programming requirement does not regulate the content of any "editorial choices," Br. 45, because it merely specifies the location from which a limited amount of programming must have originated. *Cf. City of Austin, Tx. v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 71 (2022) (distinguishing between laws that "single out [a] topic or subject matter for differential treatment" and content-neutral regulations that "distinguish based on location" only, subjecting the latter to intermediate scrutiny).

In any event, content-neutral regulation of speech is permissible so long as "it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *BellSouth Corp. v. F.C.C.*, 144 F.3d 58, 69–70 (D.C. Cir. 1998). The relatively minor burden at issue here—addressing only originating location, and even then for a limited amount of time—is amply justified by the government's interest in promoting local broadcasting and ensuring that local stations serve local audiences. *Cf. Am. Fam. Ass'n, Inc. v. FCC*, 365 F.3d 1156, 1170 (D.C. Cir. 2004) (recognizing importance of FCC's "content-neutral goal of

localism" in First Amendment challenge); *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189–90 (1997) (recognizing "important governmental interest" in "preserving the benefits of free, over-the-air local broadcast television").

RCC additionally contends (Br. 45) that the order violates the First Amendment "by allowing program importation for multiple station owners, but not for single station owners like RCC." That argument is foreclosed because neither RCC nor any other party raised it before the Commission. *See* 47 U.S.C. § 405(a); s*ee also Viasat, Inc. v. FCC*, 47 F.4th 769, 778 (D.C. Cir. 2022) ("The Communications Act bars judicial review of 'questions of fact or law upon which the Commission, or designated authority within the Commission, has been afforded no opportunity to pass.'" (citing 47 U.S.C. § 405(a)). In any event, for the reasons already explained, a rule that merely specifies the location from which programming must have originated is not an impermissible, content-based restriction on speech.

*Syracuse Peace Council*, 867 F.2d 654, the lone source RCC cites in support of its First Amendment argument (Br. 46), is not to the contrary. There, this Court upheld the Commission's decision not to enforce the

"fairness doctrine" against the parent company of a television station on public interest grounds "without reaching [any] constitutional issue." *Syracuse Peace Council*, 867 F.2d at 656. As explained above, *supra* pp. 36–37, that decision counsels against reaching the First Amendment question here; it does not in any way support RCC's argument.

## III. THE LOW POWER PROTECTION ACT DOES NOT EXTEND MUST CARRY RIGHTS TO CLASS A STATIONS

Finally, RCC argues (Br. 48–53) that the Commission acted "[u]nlawful[ly]" by declining to read the Low Power Protection Act as extending cable must carry rights to Class A stations. Again, the Court need not reach this issue, which does not, in any event, warrant granting the petition.

Deciding whether or not Class A stations are entitled to must carry rights is unnecessary to resolve this case because RCC's station is not currently a Class A station and it is ineligible to become one under the Low Power Protection Act. *Supra* Part I. With narrow exceptions not relevant here, low power stations are expressly excluded from the Commission's mandatory cable carriage rules. *See* Order ¶ 52 (JA___); 47 C.F.R. § 76.55(d). Remand on this issue would thus provide RCC "no

meaningful relief," *Consol. Land Disposal*, 938 F.2d at 1389, and this Court need not decide it.

Even if the Court were to reach the must carry issue, it should uphold the Commission. Since 2001, the Commission has declined to treat low power stations with Class A privileges as full power commercial television stations for purposes of mandatory cable carriage rules. *See* Order ¶ 53 (JA___); Class A Order, 16 FCC Rcd at 8259–60 ¶¶ 39–43. Nothing in the text or legislative history of the Low Power Protection Act provides any indication that Congress intended to alter that status quo.

Where "Congress has continually declined to disturb a longstanding interpretation of a statute, that 'may provide some indication that Congress at least acquiesces in, and apparently affirms, that interpretation.'" *Wash. All. of Tech. Workers v. United States Dep't of Homeland Sec.*, 50 F.4th 164, 182 (D.C. Cir. 2022) (quoting *Jackson v. Modly*, 949 F.3d 763, 772–73 (D.C. Cir. 2020)). Just so here. In enacting the Low Power Protection Act, Congress was presumably aware that the Commission had declined to read must carry rights into the Community Broadcasters Protection Act, knew how to confer must carry rights expressly if it so desired, and opted to take no action.

RCC identifies nothing to the contrary in the text or history of the Low Power Protection Act.  While the "[Low Power Protection Act] does not contain any textual limitation on Class A must-carry rights," Br. 48, neither does it contain any express grant (or any other mention) of must carry rights.  Contrary to RCC's suggestion (Br. 48), the statute's use of the term "primary" broadcasters refers to spectrum priority, not must carry rights.  And the fact that the statute provides that Class A stations are "subject to the same license terms and renewal standards as a license for a full power television broadcast station" does not help RCC because must carry rights are not a "license term" or "renewal standard."  Br. 50 (quoting LPPA § 2(c)(3)(A)).  The fact that "no one can assert must carry on a cable TV system without first possessing a broadcast license," Br. 50, is true enough, but that does not make must carry rights a "license term."

- 43 -

## CONCLUSION

The petition for review should be denied.

Dated:  May 22, 2024

Respectfully submitted,

/s/  *Adam L. Sorensen*

P. Michele Ellison
  *General Counsel*

Jacob M. Lewis
  *Deputy General Counsel*

Jonathan S. Kanter
  *Assistant Attorney General*

Sarah E. Citrin
  *Deputy Associate General Counsel*

Daniel E. Haar
Robert B. Nicholson

Adam L. Sorensen
  *Counsel*

  *Attorneys*

FEDERAL COMMUNICATIONS
  COMMISSION

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave. NW
Washington, DC 20530

45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

*Counsel for Respondent*
  *United States of America*[2]

*Counsel for Respondent Federal*
  *Communications Commission*

---

[2]    Filed with consent pursuant to D.C. Circuit Rule 32(a)(2).

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.   This document complies with the type-volume limit of Fed. R. App.
     P. 32(a)(7)(B) because, excluding the parts of the document
     exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1):

     ☒    this document contains <u>8,122</u> words, *or*

     ☐    this document uses a monospaced typeface and contains <u>    </u>
          lines of text.

2.   This document complies with the typeface requirements of Fed. R.
     App. P. 32(a)(5) and the type style requirements of Fed. R. App. P.
     32(a)(6) because:

     ☒    this document has been prepared in a proportionally spaced
          typeface using <u>Microsoft Word for Office 365</u> in <u>14-point
          Century Schoolbook</u>, *or*

     ☐    this document has been prepared in a monospaced spaced
          typeface using <u>        </u> with <u>        </u>.

                              */s/  Adam L. Sorensen*
                              Adam L. Sorensen
                              *Counsel for Respondents*

**STATUTORY ADDENDUM**

## STATUTORY ADDENDUM CONTENTS

**Page**

47 U.S.C. § 307(b) ................................................................ Add. 2

47 U.S.C. § 336(f) ................................................................ Add. 3

Low Power Protection Act, Pub. L. 117-344, 136 Stat. 619334 ....... Add. 4

47 C.F.R. § 73.6000 ............................................................. Add. 7

47 U.S.C. § 307(b) provides in pertinent part:

**(b) Allocation of facilities**

In considering applications for licenses, and modifications and renewals thereof, when and insofar as there is demand for the same, the Commission shall make such distribution of licenses, frequencies, hours of operation, and of power among the several States and communities as to provide a fair, efficient, and equitable distribution of radio service to each of the same.

47 U.S.C. § 336(f) provides in pertinent part:

**(2) Qualifying low-power television stations**

For purposes of this subsection, a station is a qualifying low-power television station if--

**(A)(i)** during the 90 days preceding November 29, 1999--

> **(I)** such station broadcast a minimum of 18 hours per day;
>
> **(II)** such station broadcast an average of at least 3 hours per week of programming that was produced within the market area served by such station, or the market area served by a group of commonly controlled low-power stations that carry common local programming produced within the market area served by such group; and
>
> **(III)** such station was in compliance with the Commission's requirements applicable to low-power television stations; and

**(ii)** from and after the date of its application for a class A license, the station is in compliance with the Commission's operating rules for full-power television stations; or

**(B)** the Commission determines that the public interest, convenience, and necessity would be served by treating the station as a qualifying low-power television station for purposes of this section, or for other reasons determined by the Commission.

Low Power Protection Act, Pub. L. 117-344, 136 Stat. 619334 provides in pertinent part:

## SEC. 2. LOW POWER TV STATIONS.

(a) DEFINITIONS.—In this section—

(1) the term "Commission" means the Federal Communications Commission;

(2) the term "Designated Market Area" means—

(A) a Designated Market Area determined by Nielsen Media Research or any successor entity; or

(B) a Designated Market Area under a system of dividing television broadcast station licensees into local markets using a system that the Commission determines is equivalent to the system established by Nielsen Media Research; and

(3) the term "low power TV station" has the meaning given the term "digital low power TV station" in section 74.701 of title 47, Code of Federal Regulations, or any successor regulation.

(b) PURPOSE.—The purpose of this section is to provide low power TV stations with a limited window of opportunity to apply for the opportunity to be accorded primary status as Class A television licensees.

(c) RULEMAKING.—

(1) IN GENERAL.—Not later than 90 days after the date of enactment of this Act, the Commission shall issue a notice of proposed rulemaking to issue a rule that contains the requirements described in this subsection.

(2) REQUIREMENTS.—

(A) IN GENERAL.—The rule with respect to which the Commission is required to issue notice under paragraph (1) shall provide that, during the 1-year period beginning on the date on which that rule takes effect, a low power TV station may apply to the Commission to be accorded primary status as a Class A television licensee under section 73.6001 of title 47, Code of Federal Regulations, or any successor regulation.

(B) CONSIDERATIONS.—The Commission may approve an application submitted under subparagraph (A) if the low power TV station submitting the application—

(i) satisfies—

(I) section 336(f)(2) of the Communications Act of 1934 (47 U.S.C. 336(f)(2)) and the rules issued under that section, including the requirements under such section 336(f)(2) with respect to locally produced programming, except that, for the purposes of this subclause, the period described in the matter preceding subclause (I) of subparagraph (A)(i) of such section 336(f)(2) shall be construed to be the 90-day period preceding the date of enactment of this Act; and

(II) paragraphs (b), (c), and (d) of 73.6001 of title 47, Code of Federal Regulations, or any successor regulation;

(ii) demonstrates to the Commission that the Class A station for which the license is sought will not cause any interference described in section 336(f)(7) of the Communications Act of 1934 (47 U.S.C. 336(f)(7)); and

(iii) as of the date of enactment of this Act, operates in a Designated Market Area with not more than 95,000 television households.

(3) APPLICABILITY OF LICENSE.—A license that accords primary status as a Class A television licensee to a low power TV station as a result of the rule with respect to which the Commission is required to issue notice under paragraph (1) shall—

(A) be subject to the same license terms and renewal standards as a license for a full power television broadcast station, except as otherwise expressly provided in this subsection; and

(B) require the low power TV station to remain in compliance with paragraph (2)(B) during the term of the license.

(d) REPORTING.—Not later than 1 year after the date of enactment of this Act, the Commission shall submit to the Committee on Commerce, Science, and Transportation of the Senate and the Committee on Energy and Commerce of the House of Representatives a report regarding the implementation of this section, which shall include—

> (1) a list of the current, as of the date on which the report is submitted, licensees that have been accorded primary status as Class A television licensees; and

> (2) of the licensees described in paragraph (1), an identification of each such licensee that has been accorded the status described in that paragraph because of the implementation of this section.

(e) RULE OF CONSTRUCTION.—Nothing in this section may be construed to affect a decision of the Commission relating to completion of the transition, relocation, or reimbursement of entities as a result of the systems of competitive bidding conducted pursuant to title VI of the Middle Class Tax Relief and Job Creation Act of 2012 (47 U.S.C. 1401 et seq.), and the amendments made by that title, that are collectively commonly referred to as the "Television Broadcast Incentive Auction".

Add. 6

47 C.F.R. § 73.6000 provides in pertinent part:

For the purpose of this subpart, the following definition applies:

Locally produced programming is programming produced within the predicted noise-limited contour (see § 73.619(c)) of a Class A station broadcasting the program or within the contiguous predicted noise-limited contours of any of the Class A stations in a commonly owned group.