**NOT SCHEDULED FOR ORAL ARGUMENT**

**No. 24-1004**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

**RADIO COMMUNICATIONS CORPORATION,**
**Petitioner,**

**v.**

**FEDERAL COMMUNICATIONS COMMISSION,**
**Respondent.**

**PETITIONER'S FINAL REPLY BRIEF**

_____
_____

**On Petition for Review of an Order from the
Federal Communications Commission (FCC 23-112)
Adopting Implementing Rules For The
Low Power Protection Act**

_____
_____

**Radio Communications Corporation**
**Timothy E. Welch, Esq.**
**Hill and Welch**
**1116 Heartfields Drive**
**Silver Spring, MD 20904**
**(202) 321-1448 (cell)**
**(301) 622-2864 (FAX)**
**welchlaw@earthlink.net**
**June 25, 2024**

# I. Table of Contents

I. Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

II. Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii
    Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii
    Constitutional Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii
    Statutory Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv
    Regulatory Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv
    Administrative Orders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv
    Other Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

III. Glossary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

IV. Summary Of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

V. Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    A. Issues FCC 23-112 And The FCC Brief Ignore . . . . . . . . . . . . . . . . . 1
        1. Class A Regulations Adopted To Service NAB's Clients . . . . . . . 1
        2. Nationwide Class A Licensing "Among The Several States" . . . . 3
        3. Unlawful Full-Power TV Protection At LPTV's Expense . . . . . . 8
        4. Decades Of Regulatory Failure . . . . . . . . . . . . . . . . . . . . . . . . . 9
        5. Section 230: Originating Local Programs Using The Internet . . 10
    B. Issues FCC 23-112 Or The FCC Brief Mention . . . . . . . . . . . . . . . . 13
        1. Unconstitutional Delegation Of Governmental Authority . . . . . . 13
        2. Unlawful Denial Of Primary Class A Must-Carry Right . . . . . . . 18
    C. The FCC Brief Miscasts RCC's Brief . . . . . . . . . . . . . . . . . . . . . . . . 20
        1. Statutory Interpretation Cannot Rely Upon Altering Text . . . . . . 20
        2. Congressional Authority To Enact The LPPA . . . . . . . . . . . . . . . 23
        3. Federal Authority To Regulate Broadcasting . . . . . . . . . . . . . . . 25
    D. The Commission Opposes Remand . . . . . . . . . . . . . . . . . . . . . . . . . 26

Certificate of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Certificate of Digital Submission and Privacy Redactions . . . . . . . . . . . . . . 29

Certificate Of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Addendum: Miscellaneous Documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

1) Informal Errata Sheet -- Petitioner Brief Page 52 . . . . . . . . . . . . . . . . . . . 0001
2) Example WNYW TV License Incorporates "All" FCC Regulations . . . . . 0002
3) RCC's Current LPTV License Incorporates "All" FCC Regulations . . . . . 0004
4) RCC's Canceled Class A License Incorporates "All" FCC Regulations . . 0006
5) Low Power Protection Act (2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 0008

## II.  Table of Authorities

### Cases

*Cellco P'ship v. FCC*, 700 F.3d 534 (CADC 2012) . . . . . . . . . . . . . . . . . . . . . . . 14

*Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837 (1984) . . . . . . . . . . . . . . . . . . . . . . 21

*INS v. Center for Immigration Rights, Inc.*, 502 U.S. 183 (1991) . . . . . . . . . . . . . 2

*Lockhart v. United States*, 577 U.S. 347 (2016) . . . . . . . . . . . . . . . . . . . . . . . . 22

*MCI v. FCC*, 561 F.2d 365 (CADC 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13 (CADC 2001) . . . . . . . . . 19

*Miss. Comm'n on Envtl. Quality v. EPA*, 790 F.3d 138 (CADC 2015) . . . . . . . . . 4

*Mistretta v. United States*, 488 U.S. 361 (1989) . . . . . . . . . . . . . . . . . . . . . . . 13, 17

*National Broadcasting Co. v. United States*, 319 U.S. 190 (1943) . . . . . . . . . . . 19

*Owens v. Republic of the Sudan*, 531 F.3d 884 (CADC 2008) . . . . . . . . . . . . . . 14

*Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) . . . . . . . . 13, 15-17

*Syracuse Peace Council v. FCC*, 867 F.2d 654 (CADC 1989), *cert. denied*,
493 U.S. 1019 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Lopez*, 514 U.S. 549 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 17

**Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958 (CA11 2016) . . . . . . . . 22

*Wickard v. Filburn*, 317 U.S. 111 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 17

*Yakus v. United States*, 321 U.S. 414 (1944) . . . . . . . . . . . . . . . . . . . . . . . . . . 13

### Constitutional Provisions

U.S. Const. Amend. I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-12

Authorities upon which we chiefly rely
are marked with asterisks.                         iii

U.S. Const. Art. I, Sec. 8, Cl. 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## Statutory Provisions

47 C.F.R. § 74.701(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

47 U.S.C. § 230 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-12, 24, 25

47 U.S.C. § 307(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-6, 8, 9, 12, 14, 17, 24, 25

Community Broadcasters Protection Act of 1999 (CBPA), Pub. L. No. 106-113,
113 Stat. Appendix I at pp. 1501A-594 - 1501A-598 (1999), codified at
47 U.S.C. § 336(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Low Power Protection Act, Pub. L. 117-344,
136 Stat. 6193 (Jan. 5, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 31

LPPA Section 2(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

LPPA Section 2(c)(2)(B)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

LPPA Section 2(c)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

LPPA Sections 2(a)(2)(A),(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## Regulatory Provisions

47 C.F.R. § 73.1001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

47 C.F.R. § 73.6000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

47 C.F.R. § 73.620(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

47 C.F.R. § 76.55 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## Administrative Orders

*In re FCC Proposes Rules to Implement the Low Power Protection Act*, *Notice
of Proposed Rulemaking*, FCC 23-23, 38 FCC Rcd. 2874 (2023) . . . . . . . . . . . 15

Authorities upon which we chiefly rely
are marked with asterisks.                      iv

*Report and Order, In the Matter of The Suburban Community Policy, the Berwick Doctrine, and the De Facto Reallocation Policy* (*De Facto Reallocation*), 93 F.C.C.2d 436 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

### Other Authorities

A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts (2012) . . 2

S. Hrg. 107-1114, July 17, 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Authorities upon which we chiefly rely
are marked with asterisks.                    v

## III.  Glossary

App.--The Deferred Appendix filed as a separate volume in this case.

Addend.--The Addendum attached to this Reply Brief.

CBPA--Community Broadcasters Protection Act of 1999 enacted by Congress and amending the FCA to protect low power TV licenses by creating a new "primary" Class A TV station class with the "same" license terms as full-power TV stations.

*De Facto Reallocation* Policy--A broadcast license allocation policy the Commission eliminated in 1983 as being anti-competitive, seeking to promote low power TV service in urban areas.  The policy involved an implicit license assignment from a small proposed Section 307(b) community of license to the larger metro community to preclude licensing of the new service.  The Commission abandoned the policy because incumbent full-power broadcasters misused the policy to avoid competition. *Report and Order, In the Matter of The Suburban Community Policy, the Berwick Doctrine, and the De Facto Reallocation Policy* (*De Facto Reallocation*), 93 F.C.C.2d 436 (1983).

Disqualifying Regions--The Nielsen DMA television markets FCC 23-112 uses in a manner to deny Class A licenses to more than 98% of the Nation's population.

FCA--Federal Communications Act of 1934, as amended.

FCC Brief--Brief for Respondents [2055866] filed May 22, 2024 (No. 24-1004).

FCC Opposition--Respondent Federal Communications Commission's Opposition to Emergency Motion for Stay, Expedited Review, and Summary Reversal [2042388], filed February 26, 2024 filed in this proceeding (No. 24-1004).

LPPA--Low Power Protection Act (2023) enacted by Congress and amending the FCA to protect low power TV licenses by creating a second, new "primary" Class A TV station class with the "same" license terms as full-power TV stations.  Low Power Protection Act, Pub. L. 117-344, 136 Stat. 6193 (Jan. 5, 2023).

LPTV--In 1982 the Commission created a secondary, low-power TV service to compete against full-power TV service in urban areas.

NAB's Clients--FCC 23-112 at 21-22 ¶ 38, App.  00024-25, grants the National Association of Broadcasters's objection to LPPA's purpose and protects NAB's full-service TV clients (NAB's Clients) because "elevating LPTV stations from secondary to primary Class A status comes at the cost of 'effectively block[ing] coverage and service improvements by full-service stations.'"

Petitioner Brief--Petitioner Brief [2050660] filed April 22, 2024 (No. 24-1004).

RCC Comments & RCC Reply: RCC's May 4, 2023 Comments, App. 00044, and RCC's June 13, 2023 Reply Comments, App.  00072, filed in FCC Docket No. 23-126, the rulemaking underlying this review proceeding.

RF--Radio Frequency -- often used as "RF engineer."

## IV.  Summary Of Argument

The FCC Brief ignores and miscasts many of RCC's arguments.  Even though the very first sentence of the FCC Brief at 1 states that "this case presents a simple question of statutory interpretation," its interpretation **requires** alteration of the LPPA defined term "Designated Market Area" and deletion of the verb "operate" from the LPPA.  FCC Brief at 21-23.  FCC Brief asserts that the Commission has addressed all issues, FCC Brief at 29-31, therefore, no purpose is served by remand except to instruct the Commission to issue nationwide Class A licensing rules.[1]

## V.  Argument
### A.  Issues FCC 23-112 And The FCC Brief Ignore
### 1.  Class A Regulations Adopted To Service NAB's Clients

"FCC 23-112 acknowledges that NAB's position is anti-competitive and that NAB is disinterested in the proceeding."  Petitioner Brief at 37 *citing* FCC 23-112 at 5 n.28, App. 00008.  However, the Commission fails to address the fact that

---

[1] On May 7, 2024 undersigned counsel noticed that RCC's Initial Brief at 52 (12,923 words) transcribed a direct quote from LPPA Section 2(c)(3)(A), Addend. 0009,but inadvertently omitted the words "otherwise expressly." Respondents were promptly notified and provided with an informal errata sheet, attached hereto for the Court's reference.  Addend. at 0001.  Because RCC's Initial Brief quotes the statutory phrase several other times, Brief at 3, 10, 15, 49 (explaining how the text of the LPPA differs from the CBPA), 50, 52 (above where the transcription error appears), and because the statutory text controls, the error is minor, even though the inadvertently omitted statutory text is significant to RCC's argument.  RCC requests that the Court read page 52 of RCC's Initial Brief to include the missing statutory text.  Respondents consented to this manner of informing the Court of the clerical error. RCC's Final Brief will contain the correct text and updated word count.

1

> NAB's Comments work against, conflict with, and are contrary to [ ] LPTV interests because the NAB "urges the Commission to limit" the application of the LPPA for the purpose of protecting full-power stations. NAB's Comments do not protect LPTV interests, the NAB's Comments promote full-power TV interests over the LPPA protected LPTV interests. NAB Comments at 4 [App. 00069]. The NAB's use of this rulemaking proceeding as a tool to harm LPTV licensees is plainly beyond the scope of the instant rulemaking proceeding which seeks to protect LPTV licensees.

RCC Reply at 2-3, App. 00076-77.

Rather than discuss the scope and purpose of the rulemaking proceeding, FCC 23-112 at 21-22 ¶ 38, App. 00024-25, explicitly and inexplicably, adopts disinterested NAB Clients' anti-competitive lobbying position by finding that nationwide LPTV protection cannot arise under the LPPA because "elevating LPTV stations from secondary to primary Class A status comes at the cost of 'effectively block[ing] coverage and service improvements by full-service stations.'" RCC Brief at ix, 3, 9, 11, 13, 20, 24, 27, 37, 53.[2]

The FCC Brief fails to discuss the fact that FCC 23-112 protects a group of full-service broadcasters, who are not protected by the LPPA, at the expense of LPPA

---

[2] "FCC 23-112's adoption of NAB's anti-competitive position, under LPPA's protective banner, is explicit and jaw-dropping." Petitioner Brief at 37. Even though LPTV licensees are the LPPA's nominally protected entities, FCC 23-112 protects NAB's Clients rather than LPTV licensees. The LPPA's LPTV protection purpose is manifestly clear, but any doubt about who is protected under the LPPA can be resolved with reference to the Act's title, in the absence of conflicting statutory text. A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 221 (2012) *citing INS v. Center for Immigration Rights, Inc.*, 502 U.S. 183, 189 (1991) ("the title of a statute or section can aid in resolving an ambiguity in the legislation's text").

protected LPTV licensees. RCC Brief at 22 ("FCC 23-112 leave[s] unexplained how protection of NAB's Clients, and the promotion of service to large swaths of empty land, promotes the nationwide protection of LPTV licenses and the creation of Class A licenses"). The FCC Brief doesn't even reference NAB's Clients, much less justify the economic protection of NAB's Clients at the expense of protected LPTV licenses.

The Commission's facially absurd justification for ignoring the LPPA's plain purpose, that denying the LPPA's benefits to more than 98% of the Nation's population is a "balanced approach," FCC 23-112 at 22 ¶ 38, App. 00025, is a wholly inadequate justification for eviscerating the LPPA. Petitioner Brief at 25, 36-38, 41-42. FCC 23-112 is arbitrary and capricious.

### 2. Nationwide Class A Licensing "Among The Several States"

FCC Brief at 25 argues that

Nor is Congress's chosen approach as dramatic as RCC suggests: while 98 percent of television households may fall outside eligible Designated Market Areas (Br. 38), 33 out of 210 Designated Market Areas fall within the statute's 95,000 television household threshold.

With all due respect, the Commission's promotion of TV service to empty land rather than to people is not responsive to RCC's argument that "FCC 23-112's limited LPPA reading causes FCC 23-112 to fail as a matter of settled constitutional law." Art. I, Sec. 8, Cl. 3 of the Constitution limits Congress, and the Commission, to regulating commerce "among the states, i.e., interstate commerce." RCC Brief at 25-

3

26.[3]  FCC 23-112 and the FCC Brief fail to point to any Constitutional or statutory text which explicitly authorizes FCC 23-112's non-nationwide Class A licensing regulations limited to just the lower "33 out of 210 Designated Market Areas" covering less than 2% of the Nation's population.

There are two ways in which Congress may exercise its interstate commerce power:  Congress may enact a statute which applies nationwide, such as is provided in Section 307(b).    Alternatively, Congress may enact a statute which contains specific findings that the regulation of local economic activity, aggregated on a nationwide basis, "substantially affects interstate commerce."  RCC Brief at 14, 24-26 *citing United States v. Lopez*, 514 U.S. 549 (1995)*; Wickard v. Filburn*, 317 U.S. 111 (1942)*; Miss. Comm'n on Envtl. Quality v. EPA*, 790 F.3d 138 (CADC 2015).

The FCC Brief advances a novel theory that regulation of several scattered, sparsely populated rural DMAs, where there is no nationwide aggregation, constitutes the regulation of interstate commerce as defined by the Constitution.  The FCC's novel theory of interstate economic regulation fails for three reasons.

---

[3]  Art. I, Sec. 8, Cl. 3 provides that "Congress shall have power . . . to regulate commerce . . . **among the several States**."  Emphasis added.  Section 307(b) of the Communications Act mirrors the Constitution's Commerce Clause text by requiring the Commission to distribute licenses "**among the several States** and communities as to provide a fair, efficient, and equitable distribution of radio service **to each of the same**."  Emphasis added.  *See* RCC Comments at 6, App. 00052 (citing Section 307(b)) to RCC Reply Comments at 6, App. 00080 (citing Art. I, Sec. 8, Cl. 3).

First, the FCC Brief provides no textual reference or case precedent showing constitutional authority to issue non-nationwide Class A licensing regulations limited to the smallest 33 of 210 Nielsen DMAs affecting less than 2% of the Nation's population.  Second, there is no specific Congressional finding supporting a conclusion that the Commission's limited Class A licensing scheme has a substantial affect upon interstate commerce.[4]  Third, the Commission admits that its Class A licensing scheme is intentionally limited to several scattered, sparsely populated DMAs.  The scheme does not distribute Class A licenses nationwide "among the several States" as required by the Constitution and Section 307(b).

It is not RCC's burden to show that the Commission's limited, non-nationwide Class A licensing program does not substantially affect interstate commerce.  The burden is on the Commission to show that Congress made a specific finding that the Commission's non-nationwide Class A licensing program, covering less than 2% of the Nation's population, aggregated on a nationwide basis, "substantially affects interstate commerce."

Neither FCC 23-112 nor the FCC Brief point to any Congressional finding in support of FCC 23-112's promotion of NAB's Clients because the LPPA does not contain that Congressional finding.  RCC Brief at 25-26 & n.11; RCC Reply at 6-7,

---

[4]  The requirement of a Congressional finding is the lowest of bars, requiring just an insertion of a Congressional statement.  The absence of a finding is conclusive.

App. 00080-81. The LPPA's lack of the required Congressional aggregation finding in support of the Commission's choice to license Class A stations on a non-nationwide basis conclusively demonstrates that FCC 23-112 is an unconstitutional regulation of local economic activity, something Congress could not have intended.

The Commission's reading of the LPPA raises a substantial constitutional issue because the Commission's Class A licensing program does not operate on a nationwide basis, it operates in only a few scattered, sparsely populated areas.[5] RCC's reading of the LPPA, on the other hand, where Class A licenses are distributed nationwide based upon licensees' Section 307(b) community of license, unquestionably passes constitutional muster, RCC Brief at 35, and the FCC Brief does not argue otherwise.

FCC Brief at 10, 33 offers a weak alternative argument concerning spectrum interference which miscasts RCC's argument by asserting that

> the crux of RCC's argument is that Congress's decision to disallow low power stations from interfering with full power stations in populous television markets (like New Haven) hinders RCC's ability to compete with full power broadcasters. E.g., Br. 27, 35. Signal interference and competition in broadcast markets are precisely the kinds of issues affecting interstate commerce that led to federal regulation of broadcasting, and Congress has ample constitutional authority to regulate in this area, including setting eligibility requirements for broadcast licensees.

---

[5] FCC Brief at 17 acknowledges that RCC's constitutional arguments are not frivolous.

First, nowhere did RCC argue that the Federal government lacked the authority to regulate broadcasting vis-a-vis "signal interference and competition" and the FCC Brief paints an absurd portrait of RCC's argument.  Plainly the Commission has constitutional authority to regulate broadcasting on a nationwide basis, but it lacks constitutional authority to license Class A non-nationwide only in the smallest of "33 out of 210" DMAs.[6]  RCC Brief at 4, 10, 13-14, 19-22, 29-32, 37, 44 (FCC 23-112 chooses a Class A licensing scheme which is not "required" by the LPPA).

Second, the FCC Brief and FCC 23-112 fail to respond to RCC's argument that LPTV licensees, which are in a position to apply for Class A licenses under the LPPA, have already demonstrated non-interference to existing licensees and they already occupy spectrum alongside incumbent TV licensees.  RCC Brief at 40. Indeed, FCC 23-112 at 16 ¶ 30, App. 00019, acknowledges that the Commission cannot even "imagine" a situation where it could grant a Class A license to an interfering LPTV licensee.  Equally unimaginable is a situation where the Commission's highly respected RF engineers would authorize an interfering LPTV given the fact that LPTV licenses are granted on a non-interfering basis.  FCC Brief

---

[6]  The FCC Brief miscasts RCC's arguments frequently and Section C below covers several instances.  Reliance upon strawman arguments demonstrates the weakness of the Commission's legal position.

at 5.  The Commission's RF engineering staff already addressed interference at the time incumbent LPTV licenses were issued.  RCC Brief at 29 n.13, 40.[7]

FCC Brief at 32 argues that there is no doubt that television broadcasting is a part of interstate commerce.  RCC obviously agrees that the Commission can regulate broadcasting, provided that its rules operate nationwide, including RF interference issues, or substantially affects interstate commerce based upon a Congressional finding of aggregated local economic activity.  However, FCC 23-112 adopts a Class A licensing scheme which the FCC Brief admits, as it must, is neither nationwide nor based upon a Congressional finding of aggregated local economic activity.

### 3.  Unlawful Full-Power TV Protection At LPTV's Expense

FCC 23-112 ignores Section 307(b) and adopts a non-nationwide Class A license allocation plan for the explicit and unlawful purpose of promoting NAB's Clients over the LPTV licensees protected by the LPPA.   The FCC Brief fails to explain "how the adopted Class A licensing rules protect[] LPTV or promote[] nationwide Class A licensing."  RCC Brief at 19-23, 33-36, 38 n.16.  FCC 23-112 construes the LPPA as providing the Commission with unfettered discretion to favor and protect full-power TV licenses, and to impose costs upon LPTV licenses, rather

---

[7] 47 C.F.R. § 73.620(c) allows some level of interference between incumbent primary television broadcast stations.  LPPA Section 2(c)(2)(B)(ii), Addend. at 0009, precludes an LPTV station seeking primary Class A status from modifying its license to increase the level of interference it directs toward other primary television broadcast stations.

than protecting LPTV licenses.  FCC 23-112's Class A license allocation scheme, designed to protect NAB's Clients, is arbitrary and capricious: it fails to address Section 307(b)'s nationwide Class A licensing requirement while turning the LPPA's LPTV protection purpose on its head.  RCC Brief at 23.

### 4. Decades Of Regulatory Failure

In 1982 the Commission had a great idea, the creation of LPTV.  It could have been a watershed event, but the program was executed inadequately.  Congress attempted to correct course with 1999's Community Broadcasters Protection Act (CBPA).  However, the Commission's implementation of the CBPA was flawed and RCC eventually lost three LPTV licenses including a Class A license.  Petitioner Brief at 44-5, 8 n.5, 15, 24, 27.  The Commission's decades long regulatory failure has led to highly concentrated media ownership and dangerous information bubbles.  RCC Brief at 27, 40-41.  *See generally*, S. Hrg. 107-1114, July 17, 2001.[8]

The LPPA is the second statute Congress has enacted to protect LPTV by creating a protected, primary Class A station classification, with license permanence, and the same license rights as other Part 73 full power licensees.  However, the Commission determined in the subject rulemaking that the LPPA's purpose and function is the protection of NAB's Clients rather than the LPTV licensees, the LPPA's nominally protected class.  To reach that end, the Commission's LPPA

---

[8]  https://www.congress.gov/event/107th-congress/senate-event/LC16245/text

implementation "completely ignores the fact that 'the purpose of the Communications Act and the LPPA is the promotion of broadcast outlets, not the elimination of them.'" Petitioner Brief at 41.   Congress has tried to deconcentrate television broadcasting, first with 1999 CBPA, and now with 2023's LPPA, but the Commission and NAB's Clients have jointly resisted.   FCC 23-112's elevation of media concentration in service to NAB's Clients, directly contradicting clear Congressional direction to protect LPTV, is arbitrary and capricious.

FCC Brief at 31 argues that the First Amendment issue need not be reached because RCC's station is "ineligible for Class A status."   Whether RCC is LPPA eligible is undecided, but it is clear that injured party RCC's media concentration comments are proper:   the Commission accepted ineligible NAB Clients' comments. FCC 23-112 at 5 n.28, App. 00008 (disinterested NAB Clients' anti-competitive, anti-First Amendment, anti-LPTV comments accepted); RCC Brief at 37, 41.   The unfairness of the Commission's approach to accepting comments is palpable.

## 5.  Section 230: Originating Local Programs Using The Internet

FCC Brief at 40 argues that RCC's program importation argument fails on exhaustion grounds because "neither RCC nor any other party raised it before the Commission."   RCC Brief at 45-48 addresses the exhaustion argument, including a detailing of Record references showing where RCC raised the related regulatory and constitutional issues in the subject rulemaking proceeding.   *See* RCC Brief at 46-47

*citing* "RCC Comments at 2 n.3, App. 00048; RCC Reply at 10-12 & n.16, App. 00084-86 (RCC's receipt of programming via the Internet implicates First Amendment program content issues and is authorized by 47 U.S.C. § 230)." Here FCC 23-112 improperly supports NAB's Clients' peculiar effort to limit the First Amendment rights of other broadcasters.[9]

RCC Brief places principal reliance upon 47 U.S.C. § 230 and 47 C.F.R. § 74.701(h) and RCC plainly raised these citations and the related First Amendment issue in the underlying rulemaking. The FCC Brief does not explain why FCC 23-112 ignored information RCC plainly provided in the rulemaking proceeding below. Going one step further, the FCC Brief affirmatively argues that RCC did not provide rulemaking information even though RCC's Brief plainly points to the Record.

FCC Brief at 40 argues that "the location from which programming must have originated is not an impermissible, content based restriction on speech," but fails to address RCC's argument that Section 230 (authorizing Internet-based information transmission) and 47 C.F.R. § 74.701(h) (signal importation constitutes local program origination provided the licensee controls the signal "as it reaches the transmitter site") authorize Class A applicants to use the Internet to originate local programming.

---

[9] "The anti-First Amendment approach that the NAB takes in this proceeding is an odd choice for an organization which claims to 'advocate on behalf of free local radio and television stations and broadcast networks.'" RCC Reply at 12 n.17, App. 00086.

Section 230 is Congressional rejection of the Commission's attempt to wrap RCC's First Amendment editorial discretion right into a very small box.[10]  RCC is originating local programming as defined at 47 C.F.R. § 74.701(h) and RCC was originating that local programming long before the LPPA was enacted.  In other words:  RCC is standing inside the First Amendment rights box the Commission constructed in an effort to deny Class A licenses in service to NAB's Clients.  RCC Brief at 15, 45-48, 53.

The Commission's focus on "where" local programming is produced, rather than "whether" local programming is produced, **constitutes** the First Amendment violation.  The statutory and regulatory rules already in place show that production location does not make local programming less local.  The Commission repeatedly ignores those legal provisions and, by doing so, unnecessarily intrudes upon core First Amendment broadcast editorial discretion.  *Syracuse Peace Council*.  FCC 23-112's boxing of RCC's editorial discretion violates the First Amendment and is otherwise arbitrary and capricious.

---

[10] FCC Brief at 9-10 incorrectly refers to RCC's Section 307(b) community of license as a mere "neighborhood" to minimize the importance of RCC's license and this case, but it is part of the Section 307(b) nationwide license distribution system. TV licenses are searchable by Section 307(b) "community of license," but not by DMA: https://enterpriseefiling.fcc.gov/dataentry/public/tv/publicFacilitySearch.html     In addition to understating Allingtown's significance as a Section 307(b) "community," the Commission fails to explain how severely limiting the local program production area protects LPTV licenses under the LPPA.

### B. Issues FCC 23-112 Or The FCC Brief Mention
### 1. Unconstitutional Delegation Of Governmental Authority

*Schechter Poultry Corp. v. United States*, 295 U.S. 495, 541 (1935) states that

the pertinent statute in that case

> supplies no standards for any trade, industry or activity. It does not undertake to prescribe rules of conduct to be applied to particular states of fact determined by appropriate administrative procedure. Instead of prescribing rules of conduct, it authorizes the making of codes to prescribe them.

FCC 23-112 at 23 n.186, App. 00026, tersely asserts that delegation of

governmental authority to private-party Nielsen is not of any concern. RCC Brief at

53. However, the private-party delegation problem in this case is on all fours with

the delegation issue in *Schechter*. In *Schechter* the private party was a trade

association of companies in the live chicken industry who wrote a code to regulate

interstate commerce controlling the movement and storage of chickens in New York.

*See Mistretta v. United States*, 488 U.S. 361, 373 n.7 (1989) (noting concern for

delegation of "regulatory power to private individuals"), *citing Yakus v. United

States*, 321 U.S. 414, 424 (1944) (concerned that the regulatory power in *Schechter*

was not delegated to a public official, "but to private individuals engaged in the

industry to be regulated").

Instantly, the LPPA was enacted to protect low-power broadcasters on a

nationwide basis. However, rather than adopting rules to further that purpose, FCC

23-112 chose for-profit Nielsen's large-market DMAs as a Class A licensing

13

mechanism for the non-statutory purpose of limiting the LPPA's protection nationwide to protect NAB's Clients. *See*, *e.g*., RCC Brief at 13-15.

Neither the LPPA nor FCC 23-112 establish any standard, such as population, geographic size, population density, political boundaries, transportation networks, GDP, nor any other measure, which regulates Nielsen's DMA creation. Additionally, there was no rulemaking underlying the creation and ongoing maintenance of Nielsen's DMAs. Accordingly, DMAs, **standing alone**, are not proper Class A licensing communities under the FCA -- Section 307(b) cannot be ignored. RCC Brief at 42-43.[11] Commission broadcast licensing rules cannot be based solely upon "the public interest," they must be "moor[ed] to a distinct grant of authority in [Title III]". *Cellco P'ship v. FCC*, 700 F.3d 534, 542 (CADC 2012). Because the LPPA is silent regarding standards which regulate, or even address, Nielsen's DMA creation, Congress could not have intended that the Commission use Nielsen DMA's for primary Class A licensing purposes in the manner adopted in FCC 23-112. *Owens v. Republic of the Sudan*, 531 F.3d 884, 890 (CADC 2008) (the Constitution requires that legislative power delegated to an agency be cabined by the statute).[12]

---

[11] FCC Brief at 23 miscasts RCC's argument as the LPPA "standing alone" when RCC's argument plainly is that Section 307(b) and the LPPA, read together, mandate nationwide Class A licensing.

[12] Nothing regulated Nielsen's DMA creation except its own profit motive. RCC Brief at 42-43.

14

Private entity, for-profit Nielsen creates DMAs in a process which is not only hidden from public view; there is no way for the general public, or this Court, to know how Nielsen created and maintains DMAs or even ascertain what the boundaries of Class A licensing markets are without first subscribing to Nielsen's service in exchange for payment to Nielsen of a hoped for, but unregulated, "'reasonable charge.'"[13]   RCC Brief at 42 n.18; *In re FCC Proposes Rules to Implement the Low Power Protection Act*, *Notice of Proposed Rulemaking*, FCC 23-23, 38 FCC Rcd. 2874, 2888 n.110 (2023) ("reiterating Nielsen's clarification that it has 'always told stations the DMAs to which they have been assigned upon request and free of charge,' and that it will begin offering DMA maps to non-clients at 'a reasonable charge'").  Neither the LPPA nor FCC 23-112 adopt any "rules of conduct to be applied to particular states of fact determined by appropriate administrative procedure" regarding Nielsen's creation of the Class A licensing areas.  *Schechter*, 295 U.S. at 541.

Requiring subscription to a private company to ascertain the law is a novel way for citizens to access Federal regulations, but it is not required by the LPPA.  FCC 23-112's imposition of that requirement raises serious concerns such as notice and equal

---

[13]  To the extent that the instant case differs from *Schechter*, the instant case presents a more compelling case.  In *Schechter* the public could at least see what the improper regulations were.  Instantly, Nielsen's operation is the proverbial black box whose contents are viewable only upon subscription.

protection under the law, and payment for regulation has obvious corruption implications.  Given the Commission's failure to maintain a public record regarding Nielsen's DMAs, we do not know, and cannot verify, whether parties paid money to Nielsen to have the DMAs drawn after Congress began working on the LPPA legislation, nor whether Nielsen has altered DMAs since the LPPA was adopted, or might alter the DMAs in the future based upon its own decision making or because a broadcaster pays for the change.[14]

The concern which might otherwise arise where the Supreme Court has only twice previously found Congressional legislative delegations improper is alleviated because the instant case aligns with *Schechter* and the implications of the instant case are not limited to FCC Class A licensing procedures.  This Court's endorsement of the Commission's designation of Nielsen's DMA markets as a Class A licensing condition would authorize, for example, the Environmental Protection Agency to adopt regulations, without rulemaking, written by participants in the for-profit fossil fuel industry; labor, trade, safety, and indemnity regulations written by trade associations; extraction regulations written by mine owners; transportation rules

---

[14] We do know that beneficiaries of Nielsen's DMAs, NAB's Clients, make payments to Nielsen to obtain DMA reports and FCC 23-112 encourages the public to subscribe to Nielsen's DMA service to obtain Class A licensing information.  RCC Brief at 42 n.18, 43.

written by trucking companies; and etc. across the entire regulatory sphere overseen by the Federal Government. This is exactly what *Schechter* prohibits.

The text of the LPPA does not explicitly require or authorize a change to the nationwide Section 307(b) community of license broadcast licensing procedure which has existed for nearly 100 years. Other than reliance upon the silence of the LPPA to empower private creation and regulation of Class A licensing areas, FCC 23-112 does not point to any FCA provision which authorizes Nielsen DMAs as establishing proper Class A licensing "communities."[15]

At a minimum, the Commission's LPPA interpretation creates a delegation situation which "might otherwise be thought to be unconstitutional." Accordingly, the Commission's authority to use DMAs, in lieu of Section 307(b)'s century-old licensing procedures, must be narrowly construed. *Mistretta*, 488 U.S. at 373 & n.7. The Court should find FCC 23-112's choice to use unregulated, private party-created DMAs to deny Class A licenses nationwide for the benefit of NAB's Clients to be improper under the FCA, and the LPPA, and arbitrary and capricious.

---

[15] Should the Court conclude that the LPPA locked the Commission into the choices it made, then the LPPA would be unconstitutional under *Lopez*, *Wickard*, and *Schechter*. However, there is another way to read the LPPA, but the Commission simply chose to ignore RCC's reading. RCC Brief at 35-36.

## 2. Unlawful Denial Of Primary Class A Must-Carry Right

The Commission's existing must-carry rule does not preclude Class A licensees from asserting must-carry and Class A licensees have the same license terms as other full power TV stations.[16]  RCC Brief at 19, 48-53.  FCC Brief at 41-43 does not discuss the fact that the text of the must-carry rule at 47 C.F.R. § 76.55 does not preclude Class A licensees from asserting must-carry rights, but does argue that the must-carry rule is not a "license term."  With all due respect, all TV licenses are conditioned with the phrase that the license is "subject to . . .  all regulations heretofore or hereafter made by this Commission."  *See* Addend. at 0002 (WNYW, an example New York full-power TV license incorporates "all" Commission regulations); Addend. at 0004 (RCC's current LPTV license incorporates "all" Commission regulations); and Addend. at 0006  (RCC's 2001 Class A license incorporates "all" Commission regulations).[17]

---

[16]   Class A TV stations are regulated in Part 73 along with other full-power TV stations. FCC Brief at 38 citing 47 C.F.R. § 73.6000 in Subpart J--Class A Television Broadcast Stations.   "In other words, a Class A TV station is not a 'low power television station' (LPTV) which 'operate[] pursuant to Part 74.'   A Class A television station is a different class of station compared to a LPTV station."  RCC Comments at 16 n.21, App. 00062.

[17]   RCC's Class A license, Addend. at 0006, did not classify the station as a "Class A LPTV," or a "Low Power Class A," or similar, it was a "Class A Television Station Broadcast License" licensed under Part 73 of the Commission's rules along with other full-power TV stations.  RCC Brief at 10 ("Congress created 'Class A' licenses, Congress did not create 'Class A LPTV' licenses").

If the FCC Brief were correct that the Commission's regulations are not incorporated into broadcast licenses, then the Commission would be unable to enforce a myriad of regulations against TV broadcasters, including those found at 47 C.F.R. § 73.1001 (Rules Applicable to All Broadcast Stations), including ownership changes, station identification, the limitation on the broadcast of lottery information, minimum operating schedules, public and political file requirements, periodic report filings, drug lyric limitation, station monitoring requirements, because none of those regulations is printed on a broadcast license.

The Commission's position that its regulations are not terms incorporated into a broadcast license's terms ignores the literal text of those licenses and is otherwise irrational given the Commission's regulatory function and the myriad of regulations requiring broadcast licensee compliance. *See*, *e.g.*, *National Broadcasting Co. v. United States*, 319 U.S. 190 (1943) (licensee objection to "chain broadcasting" rules rejected because the Commission properly regulates nontechnical aspects of broadcast licensing); *MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13, 18 (CADC 2001) (broadcast licensees must comply with nontechnical broadcast regulations); *cf. MCI v. FCC*, 561 F.2d 365, 377-78 (CADC 1977) (service authorized by regulation may be offered under a certificate unless restricted based upon proper findings).

Instantly, RCC must comply with "all" Commission regulations, including the must-carry rule, according to the express terms of RCC's TV broadcast license.

19

There is no exception in the Commission's rules which precludes a Class A licensee from complying with the must-carry rule merely because such rule compliance is financially advantageous to the primary Class A licensee.

### C. The FCC Brief Miscasts RCC's Brief
### 1. Statutory Interpretation Cannot Rely Upon Altering Text

FCC Brief at 21-23 argues that RCC's interpretation of the statutory phrase "'the low power TV station submitting the application . . . with not more than 95,000 television households'" -- makes little sense." RCC agrees that using an ellipsis to delete the verb "operates" from the LPPA creates nonsense.[18]  The LPPA must be construed with the statutory text the FCC Brief omits, as highlighted here, included:

> (A) if the low power TV station submitting the application *** as of the date of enactment of this Act, **operates** in a Designated Market Area with not more than 95,000 television households.

Two adverbial prepositional phrases describe where and how the subject LPTV station operates.[19]  "If the low power station submitting the application . . . operates [where?] in a Designated Market Area" makes perfect sense and is not "superfluous"

---

[18]  The FCC Brief properly uses the statutory term "operate" six times previously, but omits it to miscast RCC's interpretation; that's an unreasoned sleight of hand.

[19]  FCC Brief at 21 treats "submitting" as if it were the verb of the sentence, but it is an adjectival present participle identifying the LPTV station which is the subject of the eligibility section.

-- not every LPTV station "operates in a Designated Market Area."[20]  For instance, LPTV WWXY-LD, San Juan, PR, and K17ME-D, Bethel, AK, are not in DMAs.[21]

"If the low power station submitting the application . . . operates [how?] . . . with not more than 95,000 television households" also makes perfect sense -- RCC's LPTV station is licensed to serve Allingtown, a community of 15,000 people.  *See* Addend. at 0004 (W24EZ-D's Station License); RCC Comments at 7, App. 00053 (providing Allingtown's population).

FCC Brief's textual deletion raises several troublesome issues.  First, the very first sentence of FCC Brief at 1 states that "this case presents a simple question of statutory interpretation."  However, FCC 23-112 reads the LPPA in a certain way, but ignores RCC's interpretation, and FCC Brief at 17 seeks *Chevron* deference for a statutory interpretation given limited consideration and requiring **textual alteration**.

---

[20]  FCC Brief at 23, but not FCC 23-112, inexplicably limits the LPPA to "the lower 48 states."  DMAs exist in Alaska (Juneau, Fairbanks & Anchorage) and Hawaii (Honolulu) and the Juneau and Fairbanks DMAs are within FCC 23-112's limited universe of "33 out of 210" DMAs.  https://mymediajobs.com/market-rankings

[21]  Search TV stations here: https://enterpriseefiling.fcc.gov/dataentry/public/tv/publicFacilityDetails.html?facilityId=64856

Nielsen provides audience services in Puerto Rico through "Nielsen IBOPE." https://www.nielsen.com/about-us/locations/puerto-rico/ There are no Nielsen DMAs for any US controlled territory.  Congressional intent appears to be protection of several remote, incumbent full-power TV stations, the exact of opposite of FCC 23-112's  chosen course of protecting virtually **all** urban full-power TV stations.

Second, FCC Brief at 22 cites *Lockhart v. United States*, 577 U.S. 347, 351 (2016) for the proposition that limiting clauses "should ordinarily be read as modifying only the noun or phrase that it immediately follows." However, the FCC Brief omits the context of *Lockhart*: "'qualifying words or phrases modify the words or phrases immediately preceding them and not words or phrases more remote, **unless the extension is necessary from the context or the spirit of the entire writing**.'" *Lockhart*, 577 U.S. at 351 (emphasis added). The FCC Brief completely ignores RCC Brief at 30 & n.14, 33-34, explaining that **"Designated Market Area" is an LPPA defined term which does not include "95,000 television households" as part of the definition**. The FCC Brief adds text to the Congressionally defined term "Designated Market Area," but had Congress intended that reading, it would have written the statutory definition to reflect that. "It is very rare that a defined meaning can be replaced with another permissible meaning of the word on the basis of other textual indications; the definition is virtually conclusive." *Villarreal v. R.J. Reynolds Tobacco Co*., 839 F.3d 958, 967 (CA11 2016) (internal quote omitted).

Third, Commission touts the fact that the "95,000 television households" phrase is adjacent to a reference to "Designated Market Area," while finding problematic the fact that the actual subject of the pertinent statutory section, "the low power TV station submitting the application," is 140 words distant. However, the FCC Brief fails to address RCC's argument that FCC 23-112 mistreats the "95,000

television households" text as "a disconnected appendage of the 'Designated Market Area' **definition** found at Section 2(a)(2)." RCC Brief at 34 (emphasis added); Addend. 0008. The "Designated Market Area" definition is approximately 380 words from the "95,000 television households" text. If statutory interpretation turns upon word distance, then RCC's LPPA reading wins the day by about 240 words.

Fourth, FCC Brief at 27-28 argues that FCC 23-112 does not order *de facto* reallocation from small Section 307(b) communities of license to larger Disqualifying Regions. However, FCC 23-112's LPPA implementation effectively changes the community of license printed on RCC's station license, a *de facto* license reallocation, from a very small Section 307(b) community of license, to a much larger DMA to disqualify RCC's LPTV station from Class A licensing, rendering Section 307(b) superfluous. RCC Brief at 38-40. In addition to ignoring the requirements of Section 307(b) under which LPTV stations were initially licensed on a nationwide basis, and engaging in a *de facto* license reallocation which is not required by the LPPA's text, the Commission's interpretation unnecessarily creates two constitutional issues: a) non-nationwide regulation of unaggregated local economic activity and b) improper delegation of legislative power to a private company.

## 2. Congressional Authority To Enact The LPPA

FCC Brief at 33-34 asserts that RCC Brief at 30 argues, again without providing a direct quote, that "Congress lacks authority under the Commerce Clause

to enact the Low Power Protection Act (or the Commission lacked authority to implement it)" and that RCC seeks "a 'nationwide' guarantee of Class A privileges for low power stations."  RCC never remotely argued any such thing.[22]

RCC Brief at 30 argues that "LPPA Section 2(a)(2) requires nationwide Class A licensing whether Nielsen DMAs or 'local markets' are used."  RCC did not argue that Congress "lacks authority to enact" the LPPA and RCC is not seeking any "guarantee of Class A privileges."  RCC's argument is that the Commission **must comply** with the constitutional and statutory requirements that Class A licenses issue nationwide, rather than issue through a licensing scheme adopted to service NAB's Clients which excludes more than 98% of the population from the LPPA's benefits.

FCC Brief at 14 argues that "the Commission was not free to replace Congress's chosen designation of "Designated Market Area" with the concept of communities of license under Section 307(b)," but fails to point to anything in the LPPA requiring that Section 307(b) be ignored.  A basic rule of statutory interpretation is that all words in a statute are to be given effect, yet the Commission renders Section 307(b) and Section 230 superfluous for Class A licensing.  While

---

[22]  FCC Brief at 14 argues that "Section 307(b) . . . does not specifically address low power stations, let alone guarantee Class A status to every low power station nationwide."  The Commission's point is unclear: Section 307(b) applies to all "applications for licenses" and "radio service" nationwide without identifying **any** specific radio service.

24

FCC Brief at 14, 29 views Section 307(b) and the LPPA as "conflicting," it does not address RCC's harmonization of Section 307(b) and the LPPA.  RCC Brief at 35.

FCC Brief fails to address RCC's argument that LPPA Sections 2(a)(2)(A),(B), Addend. 0008, authorize the Commission to use Nielsen's nationwide system of 210 DMAs or to designate a system of nationwide "local markets" and refer to that system as Designated Market Areas.  FCC 23-112 made a policy choice to use Class A license disqualifying "larger geographic regions" rather than already existing, easily administrated nationwide Section 307(b) system of "local markets," ignoring the LPPA's nationwide LPTV protection purpose to benefit NAB's Clients.  RCC Brief at 4 & n.4, 14,  29-30, 32 & n.15, 34-36, 39 n.17, 44 & n.19, 45.

### 3.  Federal Authority To Regulate Broadcasting

FCC Brief at 33 miscasts RCC Brief at 27, 35, asserting that RCC argued that Congress does not have "ample constitutional authority to regulate" signal interference, competition, and broadcast licensing.  The Commission concocted its preposterous argument without quoting directly from RCC's Brief.  Nowhere did RCC argue that the Federal government lacked the authority to regulate broadcasting.

RCC Brief at 27 argues that the Commission's LPPA reading is "absurd," "irrational," and "nonsensical" because that non-nationwide reading is prompted by the Commission's improper purpose of protecting NAB's Clients. RCC Comments below provided a lawful LPPA reading that satisfies **all** regulatory, statutory, and

constitutional concerns; "the Commission's LPPA reading does not serve any of these purposes." RCC Brief at 35-36. RCC's LPPA interpretation is the only lawful one in the Record and the Commission should have adopted RCC's all encompassing harmonization rather than erecting strawmen on review.

### D. The Commission Opposes Remand

FCC Brief at 30-31 explains that FCC 23-112 "adequately explained" why it rejected RCC's arguments and that any unaddressed issues are "insubstantial on their face and did not warrant discussion." Moreover, except for the program importation issue resolved in RCC's favor in Section A.5 above, the Commission agrees that all issues are properly before the Court.

The FCC Brief and the February 26, 2024 FCC Opposition (No. 24-1004) [2042388] at 26-27 (arguing that the relevant issues were considered and that RCC's case is insubstantial) express disinterest in an opportunity for further independent consideration of any fact or question of law. Accordingly, remand is required only to instruct the Commission to: issue nationwide Class A licensing rules; accord Class A licenses the same rights as NAB's Clients, including must-carry; recognize that Section 230 authorizes Internet-transported locally produced programming; and to remind the Commission that the LPPA's purpose is the protection of LPTV licenses through the nationwide creation of Class A licenses.

Respectfully submitted,

June 25, 2024

/S/ _____

Timothy E. Welch, Esq.
Attorney for Petitioner
Hill and Welch
1116 Heartfields Drive
Silver Spring, MD 20904
welchlaw@earthlink.net
(202) 321-1448 (cell)
(301) 622-2864 (FAX)

## Certificate of Compliance

I certify that Petitioner's Final Reply Brief is proportionally spaced using 14 point Times New Roman typeface and, in compliance with the 6,500-word limit found at Rule 32(a)(7)(B)(ii) and contains 6,484 words, excluding those items listed at F.R.A.P. 32(f), Circuit Rule 32(e)(1), and Handbook of Practice and Internal Procedures at 40-41 (March 16, 2021) as counted by WordPerfect 2021 Ver. 21.0.0.194.  I certify that the information on this form is true and correct to the best of my knowledge and belief.

/S/_____

Timothy E. Welch
Counsel to Radio Communications Corporation

June 25, 2024

**Certificate of Digital Submission and Privacy Redactions**

Petitioner's Final Reply Brief has been scanned for viruses with the most recent version of a commercial virus scanning program (Microsoft Defender Antivirus Version 1.413.470.0, last updated June 23, 2024) and is free of viruses. In addition, I certify that all required privacy redactions have been made.

/S/_____

Timothy E. Welch
Counsel to Radio Communications Corporation

June 25, 2024

## Certificate Of Service

I hereby certify that pursuant to F.R.A.P. 25(d) and Circuit Rule 25(f) and 27(a) the Clerk of the Court will serve a copy of the foregoing Petitioner's Final Reply Brief by email using the CM/ECF System upon the following:

*Adam Sorensen
Sarah E. Citrin
General Counsel's Office
Federal Communications Commission
445 12th Street, S.W.
Washington, D.C.  20554

*Robert B. Nicholson
Alice A. Wang
Antitrust Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W., Room 3224
Washington, D.C. 20530


*Courtesy service by undersigned counsel's email.


/S/_____
    Timothy E. Welch
    June 25, 2024

**Addendum: Miscellaneous Documents**

1) Informal Errata Sheet -- Petitioner Brief Page 52 . . . . . . . . . . . . . . . . . . . . 0001
2) Example WNYW TV License Incorporates "All" FCC Regulations . . . . . 0002
3) RCC's Current LPTV License Incorporates "All" FCC Regulations . . . . . 0004
4) RCC's Canceled Class A License Incorporates "All" FCC Regulations . . 0006
5) Low Power Protection Act (2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 0008

● preexisting § 76.55(c) provided "licensed commercial television stations" with must-carry rights based upon their Section 307(b) community of license;

● Congress itself created a new type of Class A broadcast license and provided them with the "same" license rights as "licensed commercial television stations" to protect them on a going forward basis;

● Congress itself endowed Class A licenses with the "the same license terms" as licenses "for a full power television broadcast station, except as otherwise expressly provided in this subsection"; and

● Congress did not limit the ability of new Class A licensees to assert must-carry rights when it knew that the text of preexisting § 76.55(c)(1) did not limit must-carry for the newly created Class A license.

Despite these unassailable facts, FCC 23-112 concludes that Class A licenses do not have the same must-carry rights as full-power stations based upon the Commission's view that "the LPPA is also silent with respect to the issue of must carry rights." FCC 23-112 at 27-28 ¶ 53, App. x____-x____. The LPPA isn't "silent" on the must-carry issue, the LPPA grants the "same" rights to Class A licenses as are granted to "full power television broadcast station[s], except as otherwise expressly provided in this subsection." The Commission's avoidance of the LPPA's plain text is not reasonably viewed as "Congressional silence" regarding must-carry.

The continuing, unamended existence of decades old Section 76.55(c)(1) directly contradicts FCC 23-112's assertion that primary Class A stations cannot assert must-carry rights. FCC 23-112 completely ignored RCC's argument. RCC Comments at ii, 2 & n.4, 8 n.12, 14-16, 17 n.22, App. x____, x____, x____, x____-

# Federal Communications Commission

## TELEVISION BROADCAST STATION AUXILIARY LICENSE

**Licensee/Permittee**

FOX TELEVISION STATIONS, LLC
101 Constitution Avenue, NW
Suite 200 West
WASHINGTON, DC, 20001

| Call Sign | File Number |
|---|---|
| WNYW | 0000154640 |

**Facility ID:** 22206

**NTSC TSID:** 2160

**Digital TSID:** 2161

**This License Covers Construction Permit No.**          0000081110

| Grant Date | Expiration Date |
|---|---|
| 08/02/2021 | 06/01/2023 |

| Hours of Operation | | |
|---|---|---|
| Unlimited | | |

| Station Location | Frequency (MHz) | Station Channel |
|---|---|---|
| **City** NEW YORK<br>**State** NY | 548.0 - 554.0 | 27 |

| Facility Type | | |
|---|---|---|
| Commercial | | |

| Antenna Structure Registration Number | |
|---|---|
| 1060205 | |

| Transmitter | Transmitter Output Power(kW) |
|---|---|
| Type Accepted. See Sections 73.1660, 73.1665 and 73.1670 of the Commission's Rules. | As required to achieve authorized ERP. |

| Antenna Coordinates | Antenna Type |
|---|---|
| **Latitude** 40-48-7.6 N<br>**Longitude** 74-14-45.5 W | Directional |

| Description of Antenna | |
|---|---|
| **Make** DIELECTRIC<br>**Model** TUD-C5SP-10/34U-2-B | |

| Antenna Beam Tilt (Degrees Electrical)<br>0.5 | Antenna Beam Tilt (Degrees Mechanical @ Degrees Azimuth)<br>Not Applicable |
|---|---|
| Major Lobe Directions<br>75.0  145.0 | Maximum Effective Radiated Power (Average)<br>503 kW<br>27.02 DBK |
| Height of Radiated Center Above Ground (Meters)<br>98.5 | Height of Radiated Center Above Mean Sea Level (Meters)<br>288.1 |
| Height of Radiated Center Above Average Terrain (Meters)<br>224 | Overall Height of Antenna Structure Above Ground (Meters)<br>See the registration for this antenna structure. |

## Waivers/Special Conditions

- For emergency, maintenance & test purposes only.

Subject to the provisions of the Communications Act of 1934, as amended, subsequent acts and treaties, and all regulations heretofore or hereafter made by this Commission, and further subject to the conditions set forth in this permit, the permittee is hereby authorized to construct the radio transmitting apparatus herein described. Installation and adjustment of equipment not specifically set forth herein shall be in accordance with representations contained in the permittee's application for construction permit except for such modifications as are presently permitted, without application, by the Commission's Rules.

Equipment and program tests shall be conducted only pursuant to Sections 73.1610 and 73.1620 of the Commission's Rules.

# Federal Communications Commission

# LOW POWER TELEVISION BROADCAST STATION LICENSE

**Licensee/Permittee**

RADIO COMMUNICATIONS CORPORATION

24 ROCKDALE ROAD

WEST HAVEN, CT, 06516

| Call Sign | File Number |
|-----------|-------------|
| W24EZ-D | 0000177861 |

**Facility ID:** 51284

**NTSC TSID:**

**Digital TSID:**

**This License Covers Construction Permit No.**     0000152150

| Grant Date | Expiration Date |
|------------|-----------------|
| 02/03/2022 | 04/03/2023 |

| Hours of Operation |
|--------------------|
| Unlimited |

| Station Location | Frequency (MHz) | Station Channel |
|------------------|-----------------|-----------------|
| **City** ALLINGTOWN<br>**State** CT | 530.0 - 536.0 | 24 |

| Antenna Structure Registration Number |
|----------------------------------------|
| 1200863 |

| Transmitter | Transmitter Output Power(kW) |
|-------------|------------------------------|
| Type Accepted. See Sections 74.750 of the Commission's Rules. | As required to achieve authorized ERP. |

| Antenna Coordinates | Antenna Type |
|---------------------|--------------|
| **Latitude** 41-17-28.3 N<br>**Longitude** 72-58-4.3 W | Directional |

| Description of Antenna | Major Lobe Directions |
|------------------------|------------------------|
| **Make** PSI<br>**Model** PSILP-OI | 0.0  10.0  350.0 |

| Antenna Beam Tilt (Degrees Electrical) | Antenna Beam Tilt (Degrees Mechanical @ Degrees Azimuth) |
|----------------------------------------|-----------------------------------------------------------|
| Not Applicable | Not Applicable |

| Maximum Effective Radiated Power (Average) | |
|---|---|
| 6 kW | |
| 7.78 DBK | |

| Height of Radiated Center Above Ground (Meters) | Height of Radiated Center Above Mean Sea Level (Meters) |
|---|---|
| 52.3 | 98.0 |

| Out-Of-Channel Emission Mask | Overall Height of Antenna Structure Above Ground (Meters) |
|---|---|
| Full Service | See the registration for this antenna structure. |

## Waivers/Special Conditions

- Grant of this license application is conditioned on continuous operations of the licensed facility for the twelve-month period following grant. The failure to so operate will result in the rescission of this grant, dismissal of the license application and the forfeiture of the associated construction permit pursuant to 47 C.F.R. § 73.3598(e) unless the licensee rebuts the presumption that the authorized facilities were temporarily constructed.

Subject to the provisions of the Communications Act of 1934, as amended, subsequent acts and treaties, and all regulations heretofore or hereafter made by this Commission, and further subject to the conditions set forth in this permit, the permittee is hereby authorized to construct the radio transmitting apparatus herein described. Installation and adjustment of equipment not specifically set forth herein shall be in accordance with representations contained in the permittee's application for construction permit except for such modifications as are presently permitted, without application, by the Commission's Rules.

Equipment and program tests shall be conducted only pursuant to Sections 73.1610 and 73.1620 of the Commission's Rules.



**United States of America**

# FEDERAL COMMUNICATIONS COMMISSIONS
## CLASS A TELEVISION
## BROADCAST STATION LICENSE

Authorizing Official:

Official Mailing Address:

RADIO COMMUNICATIONS CORPORATION

24 ROCKDALE ROAD

WEST HAVEN  CT 06516

Hossein Hashemzadeh

Associate Chief

Video Division

Media Bureau

Facility Id: 51284

Analog  TSID: 10490

Digital TSID: 10491

Call Sign: W24EZ-D

License File Number: BLTTL-20010709ABL

This license converts the facilities of BLTTL-20010608AAO to Class A status.

Grant Date: November 28, 2001

This license expires 3:00 a.m. local time, April 01, 2007.

Subject to the provisions of the Communications Act of 1934, subsequent acts and treaties, and all regulations heretofore or hereafter made by this Commission, and further subject to the conditions set forth in this license, the licensee is hereby authorized to use and operate the radio transmitting apparatus herein described.

This license is issued on the licensee's representation that the statements contained in licensee's application are true and that the undertakings therein contained so far as they are consistent herewith, will be carried out in good faith. The licensee shall, during the term of this license, render such broadcasting service as will serve the public interest, convenience, or necessity to the full extent of the privileges herein conferred.

This license shall not vest in the licensee any right to operate the station nor any right in the use of the frequency designated in the license beyond the term hereof, nor in any other manner than authorized herein. Neither the license nor the right granted hereunder shall be assigned or otherwise transferred in violation of the Communications Act of 1934. This license is subject to the right of use or control by the Government of the United States conferred by Section 606 of the Communications Act of 1934.

USCA Case #24-1004     Document #2061394        Filed: 08/25/2024     Page 46 of 49
Name of Licensee: RADIO COMMUNICATIONS CORPORATION

Station Location: CT-ALLINGTOWN

Frequency (MHz): 554 - 560                    Offset: ZERO

Channel: 28

Hours of Operation: Unlimited


Transmitter: Type Accepted. See Sections 74.750 of the Commission's Rules.

Antenna type: (directional or non-directional): Directional

        Description: SCA 4DR-4-2HW


        Major lobe directions          45
        (degrees true):

Beam Tilt: Not Applicable

Antenna Coordinates: North Latitude:      41 deg  17 min   29 sec

                     West Longitude:      72 deg  58 min   03 sec


Maximum Effective Radiated Power (ERP) Towards Radio Horizon: 3.5 kW

Maximum ERP in any Horizontal and Vertical Angle: 3.5 kW

Height of radiation center above ground:          52.3 Meters

Height of radiation center above mean sea level:  98 Meters

Antenna structure registration number: 1200863

Overall height of antenna structure above ground (including obstruction
lighting if any) see the registration for this antenna structure.



Special operating conditions or restrictions:

1    This Authorization reflects the licensee/permittee's certification that
     the class A television stations will not cause interference to the
     reception of existing full-service stations on either NTSC or DTV
     channels, any DTV facilities resulting from maximization applications
     filed by May 1, 2000, and existing LPTV, television translator and
     class A television stations.


               ***  END OF AUTHORIZATION  ***


PUBLIC LAW 117–344—JAN. 5, 2023          136 STAT. 6193

Public Law 117–344
117th Congress

## An Act

To require the Federal Communications Commission to issue a rule providing that certain low power television stations may be accorded primary status as Class A television licensees, and for other purposes.

Jan. 5, 2023
[S. 3405]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

Low Power Protection Act.
47 USC 336 note.

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Low Power Protection Act".

**SEC. 2. LOW POWER TV STATIONS.**

(a) DEFINITIONS.—In this section—

(1) the term "Commission" means the Federal Communications Commission;

(2) the term "Designated Market Area" means—

(A) a Designated Market Area determined by Nielsen Media Research or any successor entity; or

(B) a Designated Market Area under a system of dividing television broadcast station licensees into local markets using a system that the Commission determines is equivalent to the system established by Nielsen Media Research; and

(3) the term "low power TV station" has the meaning given the term "digital low power TV station" in section 74.701 of title 47, Code of Federal Regulations, or any successor regulation.

(b) PURPOSE.—The purpose of this section is to provide low power TV stations with a limited window of opportunity to apply for the opportunity to be accorded primary status as Class A television licensees.

(c) RULEMAKING.—

(1) IN GENERAL.—Not later than 90 days after the date of enactment of this Act, the Commission shall issue a notice of proposed rulemaking to issue a rule that contains the requirements described in this subsection.

Deadline.
Notice.

(2) REQUIREMENTS.—

(A) IN GENERAL.—The rule with respect to which the Commission is required to issue notice under paragraph (1) shall provide that, during the 1-year period beginning on the date on which that rule takes effect, a low power TV station may apply to the Commission to be accorded primary status as a Class A television licensee under section 73.6001 of title 47, Code of Federal Regulations, or any successor regulation.

Time period.

136 STAT. 6194          PUBLIC LAW 117–344—JAN. 5, 2023

(B) CONSIDERATIONS.—The Commission may approve an application submitted under subparagraph (A) if the low power TV station submitting the application—

(i) satisfies—

Time period.

(I) section 336(f)(2) of the Communications Act of 1934 (47 U.S.C. 336(f)(2)) and the rules issued under that section, including the requirements under such section 336(f)(2) with respect to locally produced programming, except that, for the purposes of this subclause, the period described in the matter preceding subclause (I) of subparagraph (A)(i) of such section 336(f)(2) shall be construed to be the 90-day period preceding the date of enactment of this Act; and

(II) paragraphs (b), (c), and (d) of 73.6001 of title 47, Code of Federal Regulations, or any successor regulation;

(ii) demonstrates to the Commission that the Class A station for which the license is sought will not cause any interference described in section 336(f)(7) of the Communications Act of 1934 (47 U.S.C. 336(f)(7)); and

(iii) as of the date of enactment of this Act, operates in a Designated Market Area with not more than 95,000 television households.

(3) APPLICABILITY OF LICENSE.—A license that accords primary status as a Class A television licensee to a low power TV station as a result of the rule with respect to which the Commission is required to issue notice under paragraph (1) shall—

(A) be subject to the same license terms and renewal standards as a license for a full power television broadcast station, except as otherwise expressly provided in this subsection; and

(B) require the low power TV station to remain in compliance with paragraph (2)(B) during the term of the license.

(d) REPORTING.—Not later than 1 year after the date of enactment of this Act, the Commission shall submit to the Committee on Commerce, Science, and Transportation of the Senate and the Committee on Energy and Commerce of the House of Representatives a report regarding the implementation of this section, which shall include—

List.

(1) a list of the current, as of the date on which the report is submitted, licensees that have been accorded primary status as Class A television licensees; and

(2) of the licensees described in paragraph (1), an identification of each such licensee that has been accorded the status described in that paragraph because of the implementation of this section.

(e) RULE OF CONSTRUCTION.—Nothing in this section may be construed to affect a decision of the Commission relating to completion of the transition, relocation, or reimbursement of entities as a result of the systems of competitive bidding conducted pursuant to title VI of the Middle Class Tax Relief and Job Creation Act of 2012 (47 U.S.C. 1401 et seq.), and the amendments made by

PUBLIC LAW 117–344—JAN. 5, 2023    136 STAT. 6195

that title, that are collectively commonly referred to as the "Tele-vision Broadcast Incentive Auction".

Approved January 5, 2023.

---

LEGISLATIVE HISTORY—S. 3405:

CONGRESSIONAL RECORD, Vol. 168 (2022):
    Dec. 21, considered and passed Senate.
    Dec. 22, considered and passed House.

○