# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT


**ORAL ARGUMENT HEARD NOVEMBER 18, 2024**


**RADIO COMMUNICATIONS CORPORATION,**
**Petitioner**

v.                                          **Case No. 24-1004**

**FEDERAL COMMUNICATIONS COMMISSION, et al.**
**Respondents**


**PETITIONER'S THIRD REQUEST FOR JUDICIAL NOTICE**

_____
_____


**On Petition for Review of an Order from the**
**Federal Communications Commission (FCC 23-112)**
**Adopting Implementing Rules For The**
**Low Power Protection Act**

_____
_____


**Radio Communications Corporation**
**Timothy E. Welch, Esq.**
**Hill and Welch**
**1116 Heartfields Drive**
**Silver Spring, MD 20904**
**(202) 321-1448 (cell)**
**welchlaw@earthlink.net**
**May 31, 2025**

Petitioner Radio Communications Corporation (RCC), pursuant to Fed. R. Evid. 101(a), 201(b)(2),(c)(2),(d), and 1101(a),(b), supplements its unopposed February 19, 2025 and March 17, 2025 Requests For Judicial Notice [2101478, 2106016] and requests that judicial notice be taken of various facts existing as of the May 31, 2025 expiration Class A protection application filing period established in the Commission's Public Notice, DA 24-508, May 31, 2024. The facts presented below are adjudicative facts not reasonably subject to dispute and capable of immediate and accurate determination by resort to the Commission's LMS licensing database or https://ustvdb.com/markets/ both sources of reasonably indisputable accuracy on these matters.[1]

In support whereof, the following is respectfully submitted:

**Fact #1: Class A License Population Coverage Approaches 0%**

The last day to file LPPA Class A protection applications was May 30, 2025. *See* Public Notice, DA 24-508, May 31, 2024. RCC seeks judicial notice of the facts that only 21 Class A protection applications were filed (1.11% of all 1,889 Low Power TV licenses), covering only 15 of the Commission's 33 targeted low population "qualified DMAs" (7.14% of the 210 DMA total), and covering only 1,002,350 TV Households out of 125,771,320 Total U.S. TV Households (0.7970%). *See* FCC 23-112 ¶¶ 3, 38, Apdx. 00005, 00024 (1,889 "LPTV" stations "operat[ing] in all states and territories"

---

[1] FCC 23-112 cites ustvdb.com as a reliable data source -- the Commission does not possess TV market demographic data. Apdx. at 00011 n.55, 00024 n.169, 00026 n.183.

but targeting only the smallest "33 out of 210 DMAs"); https://ustvdb.com/markets/;

Attachment 1: LMS printout showing Class A applications filed as of May 30, 2025.[2]

## Fact #2: No Objections On Interference Grounds

Despite the Commission's explicit, anti-competitive defense of NAB's disinterested and anonymous "full-service" clients' speculative future expansion plans, FCC 23-112 ¶ 38, App. 00024-25, no party has raised any objection based upon purported spectrum interference, or has asserted any public interest harm, which would result from grant of RCC's pending Class A protection application, *see* LMS File No. 0000266875, after the passage of more than three months after RCC's application was accepted for filing. *See* Public Notice, Report No. PN-1-250221-01, issued February 21, 2025; *see also* Attachment 2: LMS printout showing no pleadings filed against RCC's Class A protection application.

The speculative nature of the "possible future interference" defense FCC 23-112 ¶ 38, Apdx. 00024-25 proffered for NAB's client base which is not protected by the LPPA, is supported by the lack of any objections to RCC's Class A protection application. Because there is no assertion of specific injury caused by grant of RCC's Class A protection application, the Commission's defense of NAB's unprotected client base over LPPA protected Low Power TV licensee RCC is unsupported by any record facts.

---

[2] Attachment 1 includes 6 applications, including RCC's, for DMAs that FCC 23-112 targets for Class A license denial, including 1 application which is not in a DMA. *See* RCC Reply at 21 n.21 (discussing Puerto Rico).

**Fact #3: No Objections On Must-Carry Grounds**

For the first time at oral argument the Commission, apparently assuming the mantle of *pro bono* legal representative for preferred large, non-party, non-objecting, disinterested broadcast and cable TV interests, asserted the fact-based defense that "very significant . . . hard fought" must-carry arrangements negotiated among RCC's competitors and correspondents required denial of RCC's LPPA protected "primary" Class A must-carry right. The Commission's favored company defense is, at best, merely an inference drawn from silence: FCC 23-112 is silent regarding the must-carry preferences of the Commission's favored companies; no record comment in the rulemaking below contests RCC's must-carry right specifically or Class A licensees' must-carry right generally; no party objected to the must-carry right RCC asserted in Exhibit 8 of its Class A protection application. *See* Attachment 2: LMS printout showing no pleadings filed against RCC's Class A protection application; *see also* Attachment 3: Exhibit 8 Statement Regarding Provisional Must-Carry.

## Argument

### FCC 23-112's Class A Licensing Scheme: Targets Nationwide Class A License Denial

It was easy to forecast a nearly 0% Class A population coverage under FCC 23-112's Class A license denial program. First, FCC 23-112 ¶ 38, Apdx. 00024-25 chose a non-nationwide licensing scheme, targeting the smallest 33 of 210 DMAs, with a

maximum population coverage potential of 1.6%, achieving even less at 0.7970%. While all Low Power TV licenses were issued under Section 307 to communities of people, FCC 23-112's chosen market qualification licensing scheme promoted license issuance to "deserts, rivers, lakes, mountains, prairie grasslands, literally authorizing Class A service to everywhere, except those places where people are located." RCC Brief at 14. TV broadcasters are in the business of reaching audiences of people, not prairie dogs and sagebrush.

Second, FCC 23-112 ¶ 38 minimized LPPA-protected Class A licensing for the non-statutory purpose of defending lobbyist NAB's anonymous, urban-area broadcast client base which the LPPA does not protect or even reference.[3] The Commission's reading of the LPPA as the **Large Power** Protection Act, rather than the **Low Power** Protection Act Congress enacted, failed to address numerous fundamental issues, rendering FCC 23-112 unreasoned.[4] For instance:

---

[3] FCC 23-112 ¶ 38 concedes that other LPPA readings exist, but the Commission simply "decline[d] to read the LPPA as promoting maximum elevation of LPTV stations to primary status," utterly failing to provide any legitimate justification to override the LPPA's explicit Low Power TV protection purpose. *See e.g.*, RCC Brief at 36-38, 44 & n.19 ("Congress did not mandate that the Commission use DMAs which use 'larger geographic regions than community of license,' that was the Commission's choice over selecting RCC's 'small markets' Class A license allocation approach" using Section 307(b)'s nationwide communities of license).

[4] *See* RCC Brief at 17-18 *citing Petroleum Communications, Inc. v. FCC*, 22 F.3d 1164, 1172 (CADC 1994) (agency must "provide a reasoned explanation"); *see also Advanced Integrative Med. Sci. Inst., PLLC v. United States DEA*, 128 F.4th 1133, 1143 (CA9 2025) (Courts "generally must assess the lawfulness of an agency's action in light of the explanations the agency offered for it rather than any *ex post* rationales" *citing Garland v. Ming Dai*, 593
(continued...)

**1.** The Commission never explained how its limited licensing scheme, which reaches only 0.7970% of the Nation's population and which delegates the unregulated creation and maintenance of large nationwide Class A license Disqualification Regions to a non-governmental for profit entity which acts out of public view, passes muster under *Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935). *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1325 (CADC 2024), *cert. pending*, No. 24-904 (filed February 24, 2025) unanimously instructs

> for a delegation of governmental authority to a private entity to be constitutional, the private entity must act only 'as an aid' to an accountable government agency that retains the ultimate authority to 'approve[], disapprove[], or modif[y]' the private entity's actions and decisions on delegated matters.

Not only does the Commission not regulate or monitor Nielsen's DMA activity, the Commission requires the public to pay subscription fees to Nielsen to ascertain LPPA DMA creation, maintenance and contracting information to the extent Nielsen would even agree to provide it. While "FCC 23-112 touts that Nielsen 'has always told stations the DMAs to which they have been assigned upon request and free of charge,' FCC 23-112 at 21 n.168, App. 00024, [] everyone must subscribe to Nielsen to ascertain the scope of the Commission's Class A licensing system." RCC Brief at 42-45; RCC

---

[4](...continued)
U.S. 357, 369 (2021)); *Am. Whitewater v. FERC*, 125 F.4th 1139, 1150 (CADC 2025) (the Commission must "'examine[] the relevant [considerations] and articulate[] a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'").

Reply at 13-17.  "Requiring subscription to a private company to ascertain the law is a novel way for citizens to access Federal regulations."  RCC Reply at 15.[5]

**2.**  The Commission never explained why FCC 23-112 seeks a constitutional interstate commerce issue by implementing a nationwide Class A license denial program, but utterly fails to point to the necessary Congressional finding aggregating minimal local economic activity into a substantial affect on interstate commerce.  RCC Brief at 24-28.  Moreover, the Commission never addressed FCC 23-112's specious interstate interference defense where Class A eligible Low Power TV licenses already exist in the frequency environment on an interference-free basis and merely changing the license class printed on a license does not affect radio propagation one iota.  RCC Brief at 29 n.13, 40-41.

Courts should avoid constitutional issues and RCC provided a reasonable LPPA reading which accounted for all regulatory issues, the Commission's LPPA reading accounts for none of them.  RCC Brief at 32-36, 45.  *See Kapoor v. DeMarco*, 132 F.4th  595, 607-08 (CA2 2025) ("if an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is fairly possible, [courts] are obligated to construe the statute to avoid such problems"); *Ariz. All. for Retired Ams. v. Mayes*, 117 F.4th 1165, 1170 (CA9 2024)

---

[5]  Private companies, like Lexis, provide legal subscription services, but subscription to them is a choice, not a Federal requirement to conduct business before the Commission.

(the avoidance doctrine requires courts to "steer clear of potential constitutional problems").  No party has objected to RCC's pending Class A protection application, rendering interference a non-issue.

**3.** FCC 23-112 fails to explain why "Congress would waste its time for the purpose of affecting such a marginal impact," reaching only 0.7970% of the Nation's population, or how the Commission could completely ignore Section 307(b), when it adopted its nationwide Class A license denial program.  RCC Brief at 2, 4, 13-14, 19-23, 28, 29, 40-41 (the Communications Act mandates nationwide licensing, not nationwide license denial). Moreover, the Commission never explained what legitimate national purpose is served by its nationwide Class A license denial program which "reassign[s] the nation's LPTV licenses from small communities to much larger 'non-qualifying DMAs'/Disqualified Regions" for the purpose of denying Class A licenses.  RCC Brief at 25-26 & n11, 38-40; FCC 23-112 n.173, Apdx. 00024 (quoting, but not responding to, RCC's comment that Congress does not waste its time).

Congress could have achieved the same nationwide Class A license denial result by not enacting a Low Power TV protection statute in the first place.  Like a canary in a coal mine, that fact is an excellent indicator of the invalidity of the Commission's nationwide license denial program.  RCC Reply at 23, 24 ("A basic rule of statutory interpretation is that all words in a statute are to be given effect, yet the Commission renders Section 307(b) and Section 230 superfluous for Class A licensing" while

accomplishing nothing. *See United States v. Milchin*, 128 F.4th 199, 202 (CA3 2025) ("[w]hen a statutory construction 'render[s] an entire subparagraph meaningless' . . . the canon against surplusage applies with special force").

At oral argument the Commission attempted to excuse FCC 23-112's failure to address Section 307(b), under which every broadcast license has been issued, as irrelevant because "it doesn't have anything in particular to say about low power television, about designated market areas."[6] However, the Commission contradicted itself by conceding that Section 307(b) "imposes a general obligation on the Commission to allocate broadcast facilities, channels, licences, fairly efficiently, and equitably among the several states." The Commission agrees that it must issue licenses nationwide, but confusingly insists that it can adopt non-nationwide Class A licensing to **deny** Class A licensing nationwide to benefit NAB's client base, but pointing to nothing in the LPPA which expressly overrides century-old Section 307(b)'s nationwide licensing mandate or which allows the Commission to favor NAB's clients. FCC 23-112 ¶ 38,

---

[6] "The Commission's point is unclear: Section 307(b) applies to all 'applications for licenses' and 'radio service' nationwide without identifying any specific radio service." RCC Reply at 24 n.22.

Apdx. 00024-25.[7] Section 307(b) cannot be both a statutory "obligation" and irrelevant -- that is not reasoned decision making.

The Commission failed to explain how its nationwide Class A license denial program, which generated only 21 out of a possible 1,889 Class A applications in only 15 of 210 DMAs, satisfied its acknowledged Section 307(b) nationwide licensing "obligation." The Commission's failure to explain is especially pronounced because its stated purpose is to minimize Class A licensing to defend NAB's non-protected client base, FCC 23-112 ¶ 38, App. 00024-25, and the Commission's primary motivation concern was "to restrict eligibility for Class A low power television licenses." FCC Brief at 1.[8] The Commission's failure to account for its Section 307(b) "obligation" is unreasoned, arbitrary, and capricious.

---

[7] "If FCC 23-112's LPPA reading were the only one possible, then the LPPA would be facially unconstitutional for having an insubstantial effect upon interstate commerce. *Lopez*; *Wickard*; RCC Comments at 18-19, App. 00064-65; RCC Reply at 6-8, App. 00080-82." RCC Brief at 36. FCC 23-112 ¶ 38, App. 00024-25 acknowledges that the Commission chose its LPPA reading for the non-statutory purpose of limiting Class A licensing to defend NAB's clients. However, "RCC provided a reasonable LPPA reading which accounts for all legal requirements, RCC Comments at 9-11, App. 00055-57, but FCC 23-112 fails to discuss RCC's statutory reading." RCC Brief at 33, 35-36. FCC 23-112's extremely limited LPPA reading is unconstitutional on an "as applied" basis, but the LPPA survives because RCC's LPPA reading is reasonable and accounts for all regulatory requirements.

[8] FCC Brief at 1 incorrectly asserts that Congress "directed the Federal Communications Commission to restrict eligibility for **Class A low power television licenses** . . .." Emphasis added. As discussed more fully at Issue 10 below, Congress did not direct the Commission to restrict "Class A low power television licenses" because there is no such thing as a "Class A low power television license." The Commission conflates protected Class A and unprotected Low Power TV station classes to minimize the LPPA's protection.

**4.** The Commission never explained what authorized alteration of the "virtually conclusive" LPPA defined "Designated Market Area" ("DMA") definition, a definition which on its face instructs the Commission to license Class A stations on a nationwide basis just as Nielsen's DMAs extend across the country. The Commission's unlawful definition modification, adding a TV household limit taken from the LPPA's licensee qualification section, thereby creating a nearly universal license disqualification program, rendered the LPPA a virtual nullity. RCC Brief at 30 & n.14, 33-36; RCC Reply Brief at 22 *citing Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 967 (CA11 2016) (statutory definitions are "virtually conclusive"); *see also United States v. Milchin*, 128 F.4th 199, 202 (CA3 2025) ("[w]hen a statutory construction 'render[s] an entire subparagraph meaningless' . . . the canon against surplusage applies with special force") (internal quote omitted); *Ohio Telecom Assoc., et al. v. FCC*, 124 F.4th 993, 1012 (6th Cir. 2025) (the "best reading" of a statute under *Loper Bright v. Raimondo,* 144 S. Ct. 2244, 2266 (2024) does not permit the Commission to alter a statutory definition "by adding" to it); *Rawat v. Commissioner*, 108 F.4th 891, 895 (CADC 2024) (statutory definitions are "virtually conclusive"). Only a maximum of 0.7970% of the Nation's population can receive the benefits of Class A licensing, but **Low Power TV Protection**, not its minimization, is the "**Low Power Protection Act's**" purpose. *See* RCC Reply at 2 n.2 *citing* A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 221 (2012) *citing INS v. Center for Immigration Rights, Inc*., 502 U.S. 183, 189 (1991)

("the title of a statute or section can aid in resolving an ambiguity in the legislation's text").

**5.** The Commission never explained what authorized the Commission to adopt a nationwide Class A license denial program given the fact that "the purpose of the Communications Act and the LPPA is the promotion of broadcast outlets, not the elimination of them," as if Congress had enacted a Low Power **Prevention** Act or a **Large** Power Protection Act. RCC Brief at 19-20, 23, 41. Only a maximum of 0.7970%, of the Nation can receive the LPPA's benefits.

**6.** The Commission never explained "what kind of scale shows a 98-unserved to 2-served weighting as 'balanced,'" referring to the unbalanced unserved v. served population percentages resulting from its nationwide Class A license denial program adopted at FCC 23-112 ¶ 38, Apdx. 00024-25, which denies the LPPA's benefits to more than 99% of the Nation's population based upon actual Class A protection filing data. RCC Brief at 21, 25-26, 35-37, 40-41. The Commission ignored the actual "balance" Congress struck: The LPPA protects Low Power TV licenses; the LPPA does not even reference NAB's client base. *See e.g.*, RCC Brief at 22 ("protection of NAB's Clients is not a statutory objective"), 38 (defending NAB's client base has "no textual support in the LPPA"). FCC 23-112's "balance" is even worse than the insubstantial 1.6% population coverage FCC 23-112 ¶ 38, Apdx. at 00024 projected,

achieving only a maximum of 0.7970% population coverage. The Commission never demonstrated, or even asserted, that 1.6% population coverage was "substantial."

**7.** The Commission never explained how it could ignore its 1983 *De Facto Reallocation Order*, 93 F.C.C.2d 436, which "eliminated Section 307(b) community of license urban proximity as a licensing consideration to enable small community LPTV licensees to 'compete[] in the larger metropolitan area,'" only to use the urban proximities of those same Low Power TV licensees' to deny Class A licenses nationwide. RCC Brief at 4, 5, 13, 19 n.10, 31-32 & n.15, 33-34, 38-44. FCC Brief at 27-28 denies that FCC 23-112 engages in *de facto* reallocation of Class A licenses, but utterly fails to discuss the fact that FCC 23-112 plainly uses neighboring urban demographics to deny Class A licensing nationwide. RCC Reply at 23.

Attachment 1 shows timely filed Class A applications and displays Section 307(b) communities of license, but no DMA information except for RCC's clarifying notes. The Commission's licensing database recognizes that Section 307(b) communities, not DMAs, are central to licensing. The Commission's refusal to discuss its use of urban/DMA demographic data to deny Class A licensing nationwide, in violation of the 1983 elimination of the *de facto* reallocation policy, is unreasoned. Moreover, the Commission's resistence to take ownership of what it is plainly doing implicitly concedes the unlawfulness of FCC 23-112.

**8.** The Commission never explained the source of its discretion to minimize the protection provided to Low Power TV licensees under the LPPA, a statute which, on its face, expressly provides that the protections afforded to Low Power TV licenses cannot be minimized "except as otherwise expressly provided in" the LPPA. RCC Brief at 2-3, 8, 10, 15, 26-27, 31, 37, 48-53. The Commission's LPPA minimization program was a raging success, but targeting only 0.7970% of the Nation to receive the benefits of Class A licensing is not an objective of the "Low Power Protection Act." The FCA is concerned about the public interest in service to communities of people, it is not concerned with NAB's business interests.

**9.** The Commission never explained how its nationwide Class A license denial program protects Low Power TV licenses. RCC Brief at 19-20, 22, 25, 31-32, 36-38, 39-40, 48-49. We now know that only 1.11% of the potential 1,889 Low Power TV licensees filed Class A protection applications in only 15 out of the 210 DMA total.

> Instead of utilizing DMAs based upon nationwide "local markets" as RCC proposed, FCC 23-112 concludes that the best way to further the LPPA's LPTV protection and nationwide Class A licensing purposes is to allocate Class A licenses to Disqualifying Regions, only to deny Class A licensing nationwide because LPTV licenses are in those very same "larger geographic regions." . . . RCC's reading of the 95,000 TV household standard as defining the number of TV households in Section 307(b) communities of license 1) avoids constitutional issues by using "local markets" nationwide; 2) serves the LPPA's purpose of protecting LPTV stations nationwide; 3) complies with the LPPA's Section 2(a)(2)(B)'s, Addend. 00006, "local markets" definition; 4) serves Section 307(b)'s and the LPPA's fair, efficient, nationwide Class A licensing mandate; 5) complies with the 1983 elimination of the restrictive suburban community licensing policies and promotes competition against NAB's Clients; and 6) follows the longstanding

combined use of Section 307(b) community of license and DMA to determine where must-carry rights can be asserted. . . . **The Commission's LPPA reading does not serve any of these purposes**.

RCC Brief at 35-36 (emphasis added). Not only does FCC 23-112 fail to discuss RCC's LPPA reading, the only purposes served by FCC 23-112's nationwide Class A license denial scheme are 1) minimizing Class A licensing through *de facto* reallocation of Low Power TV licenses to large Disqualified Regions to defend NAB's client base and 2) generating subscriptions for Nielsen, neither of which is a textual purpose of the LPPA and neither of which is a legitimate Commission purpose.

    **10.** The Commission never explained why FCC 23-112, and the Commission's Brief at 1 (first sentence), 4 (two references in the issues list), 7, repeatedly conflate the Congressionally created and protected primary Class A station class with the Commission created and unprotected secondary Low Power TV station class, and in so doing, "created regulatory phrases for the purpose of limiting LPTV protection." For instance, to minimize Low Power TV and Class A protections, the Commission created the "fictitiously monikered 'Class A LPTV'" station class and the equally nonexistent "Class A low power TV" station class.

    The Commission unlawfully conflated the Congressionally protected primary Class A station class with the Commission's failing, unprotected secondary "Low Power TV" station class, the station class which the LPPA was enacted to protect and preserve. Congress created the protected "primary" "Class A" station class with the "same" license

terms as the full power TV station class.  RCC Brief at 5, 6-8, 9-12, 13, 49 ("Class A

licenses are not classified as 'low power stations' because 'Class A' specifies a

Congressionally created license class which has the 'same license terms' as full-power

licenses"), 51-52 & n.20.[9]  The Commission's own official station counting system

clearly separates Class A licenses from "Low Power TV" licenses without conflating

the two license classes.  *See*  Broadcast Station Totals as of March 31, 2025, Public

Notice, DA 25-296, (rel. April 4, 2025).

The Commission even asserted at oral argument "that Class A status does not

transform a low power station into a full power station," despite the fact that FCC 23-112

¶ 18, Apdx. 00012 plainly states that "from and after the date of its application for a

Class A license, the station must be in compliance with the Commission's operating

rules for full power television stations."

> Class A TV stations are regulated in Part 73 along with other full-power TV
> stations. FCC Brief at 38 citing 47 C.F.R. § 73.6000 in Subpart J--Class A
> Television Broadcast Stations. "In other words, a Class A TV station is not a
> 'low power television station' (LPTV) which 'operate[] pursuant to Part 74.'
> A Class A television station is a different class of station compared to a LPTV
> station." RCC Comments at 16 n.21, App. 00062.

RCC Reply at 18 & nn.16-17.  If primary Full Power TV stations were ducks, then

Class A stations would waddle and quack: primary Class A ducks are licensed and

---

[9]  The Commission has now **twice** failed to protect Low Power TV licenses and Class A licenses after being directed to do so by Congress.  RCC Brief at 24, 27; *TikTok Inc. & ByteDance Ltd. v. Garland*, 122 F.4th 930, 953 (CADC 2024), *aff'd TikTok Inc. v. Garland*, 145 S. Ct. 57, 63 (2025) (deference to the political branches is heightened by repeated acts).

regulated under Part 73 just like other primary full power ducks. 47 C.F.R. § 73.6030(b)(5); FCC 23-112 ¶ 18, Apdx. at 00012. Class A protection applicant RCC is currently operating as a full power TV station, to the extent possible, as required by the Commission's rules.

**11.** The Commission never explained what provision of the LPPA defends NAB's client base's speculative future expansion potential and no broadcaster has alleged any expansion-related injury arising from grant of RCC's Class A protection application rendering that Commission concern moot. RCC Brief at 27 n.12, 29 n.13, 40-41 (the Commission cannot defend its action based upon NAB's client base's generic and unsupported assertion of "speculative" future injury); *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 369 (2024) (alleged "downstream economic injuries" do not support standing when those injuries are "speculative" and lack support in the record).[10]

FCC 23-112's "expansion reasoning" is not based upon the Commission's expertise and independent analysis: the Commission merely parrots the NAB's anti-competitive lobbying comments, commentary which the Commission explicitly, and contrary to the LPPA's explicit protection purpose, determined "need not . . . protect LPTV licensees."

---

[10] RCC has always maintained that because Class A eligible Low Power TV already exists in the frequency environment, and because Class A upgrade protection does not require change to the TV station's operating parameters, the change in station class cannot possibly cause interference. *See e.g.*, RCC Brief at 29 n.13, 40. The Commission never addressed RCC's speculative future injury and lack of interference arguments, but instead miscast those arguments to battle strawmen. RCC Reply at 6-8.

FCC 23-112 n.28, Apdx. 00008; RCC Brief at 12, 37 ("NAB use of this rulemaking proceeding as a tool to harm LPTV licensees is plainly beyond the scope of the instant rulemaking proceeding which seeks to protect LPTV licensees.").

**12.** The Commission never explained "how denial of must-carry to LPTV and Class A licenses protect[s] them where their much larger competitors, NAB Clients, have access to that enormous financial opportunity." RCC Brief at 9, 15, 48-49.[11] Nor does the Commission point to any language in the LPPA which limits Class A licensees from asserting the must-carry right; the LPPA expressly limits the Commission's ability to limit Class A licenses "except as otherwise expressly provided in the LPPA." FCC 23-112 ¶ 8, Apdx. 00007; LPPA Section 2(c)(3)(A); RCC Brief at 10, 15, 49-50, 52. The Commission never addressed its own must-carry rule, 47 C.F.R. § 76.55(c)(1) which on it face excludes the Commission's secondary unprotected Low Power TV licenses from must-carry, but does not exclude primary licenses, including Congress's primary protected Class A licenses, from asserting must-carry.

The Commission's suggestion at oral argument to the contrary notwithstanding, Federal must-carry law is not read as a feudalistic "hard fought" battle to whom the victor go the spoils. Must-carry is a three decade-old statutory right available to "primary" broadcasters. *See e.g.*, 47 C.F.R. § 76.55(c). FCC 23-112 denied RCC's must-carry

---

[11] Nothing in the record justified the Commission's unprompted leap to the legal defense of non-party companies who have expressed no interest in the must-carry issue presented in this case.

right on fallacious statutory silence grounds.[12] The Commission's unprompted effort at oral argument to defend its apparent suzerain with an irrelevant feudalistic tale of past battles fought is unsupported by the record and is otherwise unreasoned.

The Commission's unsupported stories aside, the Commission was utterly silent regarding RCC's statutory and historic must-carry arguments despite RCC's repeated prodding before this Court and in the rulemaking proceeding below. *See e.g.*, RCC Brief at 5-6, 8-9, 51-53; RCC Reply at 18.[13] Moreover, no party objected to RCC's assertion of its must-carry right as described in its Class A protection application. *See*

---

[12] FCC 23-112 ¶ 53, Apdx. 00030-31, relies solely upon the LPPA's purported silence to deny RCC's must-carry right, but the LPPA is not silent, the LPPA "expressly" provides that Class A licensee rights cannot be diminished relative to other primary TV licensees "except as otherwise expressly provided in" the LPPA. FCC 23-112 ¶ 8, Apdx. 00007. The LPPA does not express any Class A must-carry limitation. RCC Brief at 2-3, 10, 15, 48-49, 52; RCC Reply at 19-20. The Commission never addressed its own Section 76.55(c)(1) must-carry rule which authorizes must-carry for Part 73 "primary" TV licensee, including Class A. *See e.g.*, RCC Brief at 5-6. Class A is licensed under, and must comply with, the Commission's Part 73 Full Power TV rules, not the Part 74 Low Power TV rules. FCC 23-112 ¶ 18, Apdx. at 00012 ("from and after the date of its application for a Class A license, the station must be in compliance with the Commission's operating rules for full power television stations"); RCC Brief at 9, 15 (Class A stations "bear the full regulatory burden of full-power stations"); RCC Reply at 9, 18 nn.16-17, 19 (Class A is licensed under the Part 73 full-power rules).

[13] The Commission did not dispute any portion of RCC's bullet point must-carry history explaining the state of must-carry law at the time Congress enacted the 1999 CBPA and the 2023 LPPA 2023 which created "primary" Class A licenses. RCC Brief at 51-52. The CBPA refers to "primary" Class A once; Congress repeated "primary" Class A five times in the LPPA to crystalize the need to protect Class A. *TikTok Inc. & ByteDance Ltd. v. Garland*, 122 F.4th 930, 953 (CADC 2024), *aff'd TikTok Inc. v. Garland*, 145 S. Ct. 57, 63 (2025) (deference to the political branches is heightened by repeated acts).

Attachment 3.  It is respectfully submitted that the Commission's failure to engage on its own Section 76.55(c) must-carry rule is a must-carry issue concession.

Class A licensees are entitled to assert must-carry right unless and until the Commission demonstrates with "more . . . than minimum rationality" that the must-carry prohibition imposed upon them furthers an "appropriate governmental interest suitably furthered by the differential treatment."  *TikTok Inc. & ByteDance Ltd. v. Garland*, 122 F.4th 930, 966 (CADC 2024).  The Commission did not attempt to demonstrate that statutory "silence," in the face of clear statutory text to the contrary, or that defense of favored, but silent media relationships not referenced in the LPPA, are appropriate governmental interests.  RCC is not rendered ineligible to assert must-carry rights merely because RCC did not lobby for enactment of the Cable Television Consumer Protection and Competition Act of 1992.[14]

## Conclusion

The Commission ignores the LPPA's textually explicit Low Power TV/Class A protection requirements; ignores an extensive list of central premise issues; ignores the 1983 *de facto* reallocation policy elimination; ignores FCC 23-112 ¶¶ 8, 18 (protection limitations must be explicit in the LPPA; Class A applicants must comply with full power rules); ignores RCC's local programming origination/production compliance

---

[14]  The Nation's protective laws do not apply only to those who "fight" to enact them. For instance, people "fought" to enact the Communications Act of 1934, but RCC nevertheless obtained licenses notwithstanding the fact that it did not participate in that 1930s "fight".

with 47 C.F.R. § 74.701(h) and 47 U.S.C. § 230; *see* RCC Brief at 45-48; RCC Reply at 10-12 (FCC Brief at 40 raising plainly erroneous exhaustion argument); ignores the history of the 1992 Cable Act; ignores Section 76.55(c)'s explicit must-carry text; and defends silent, non-parties. FCC 23-112 is unreasoned, arbitrary and capricious.

Respectfully submitted,

May 31, 2025

/S/

Timothy E. Welch, Esq.
Attorney for Petitioner
Hill and Welch
1116 Heartfields Drive
Silver Spring, MD 20904
welchlaw@earthlink.net
(202) 321-1448

## Certificate of Compliance

I certify that this Petitioner's Third Request For Judicial Notice is proportionally spaced using 14 point Times New Roman typeface and, in compliance with the 5,200 word limit found at Circuit Rule 27(d)(2)(A), contains 5,185 words, excluding those items listed at F.R.A.P. 32(f) and Circuit Rule 32(e)(1), as counted by WordPerfect 2021 Ver. 21.0.0.194. I certify that the information on this form is true and correct to the best of my knowledge and belief.

/S/ _____
Timothy E. Welch
Counsel to Radio Communications Corporation

May 31, 2025

**Certificate of Digital Submission and Privacy Redactions**

Petitioner's Third Request For Judicial Notice was scanned for viruses with the most recent version of a commercial virus scanning program (Microsoft Defender Antivirus Version 1.428.283.0, last updated May 31, 2025) and is free of viruses. In addition, I certify that all required privacy redactions have been made.

/S/ _Timothy E. Welch_____

    Timothy E. Welch
    Counsel to Radio Communications Corporation

May 31, 2025

## Certificate Of Service

I hereby certify that pursuant to F.R.A.P. 25(d) and Circuit Rule 25(f) and 27(a) the Clerk of the Court will serve a copy of the foregoing Petitioner's Third Request For Judicial Notice by email using the CM/ECF System upon the following:

*Adam Sorensen
Sarah E. Citrin
General Counsel's Office
Federal Communications Commission
445 12th Street, S.W.
Washington, D.C.  20554

*Robert B. Nicholson
Alice A. Wang
Antitrust Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W., Room 3224
Washington, DC 20530-0001

*Courtesy service by undersigned counsel's email.

/S/ _____
     Timothy E. Welch
     May 31, 2025



# Licensing and Management System

Search | Log In

## Search Results - Application

<span style="color:red">Q & Red Highlight = First Instance of FCC 23-112 Targeted Qualified DMA</span>

Q & Black Text = Multiple Targeted Qualified DMA Filings, DMA TV Households Not Double Counted

<span style="color:green">U & Green Highlight = FCC 23-112 Targeted Unqualified DMA</span>

❓ FAQ

Refine Search Results | Clear Search Results
**Purpose:** Convert from LPTV to Class A

Showing 1 to 27 of 27 | Display: [ 50 per page ▾ ]

Download Results:   Excel |   CSV

| PDF | File Number | Submit Date | Call Sign | Facility ID | FRN | State | City | Service | Purpose | Status | Status Date | Expiration Date | Active/InActive |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| <span style="color:red">Q</span> | 0000271702 | 05/30/2025 | KJCT-LP | 128473 | 0018223693 | CO | GRAND JUNCTION | Digital Class A | Modification of License | Submitted | 05/30/2025 | 04/01/2022 | Active |
| | | | | | | | <span style="color:red">Grand Junction-Montrose CO DMA</span> | | | | | | |
| <span style="color:red">Q</span> | 0000271732 | 05/30/2025 | WMEL-LD | 16828 | 0031996812 | MS | GRENADA-GREENWOOD | Digital Class A | Modification of License | Submitted | 05/30/2025 | 06/01/2026 | Active |
| | | | | | | | <span style="color:red">Greenville-Greenwood MS DMA</span> | | | | | | |
| <span style="color:green">U</span> | 0000271741 | 05/30/2025 | WXWZ-LD | 168860 | 0011516853 | PR | GUAYAMA | Digital Class A | Modification of License | Submitted | 05/30/2025 | 02/01/2029 | Active |
| | | | | | | | <span style="color:green">Puerto Rico Not A Nielsen DMA-Waiver Requested</span> | | | | | | |
| <span style="color:red">Q</span> | 0000271748 | 05/30/2025 | KXNU-LD | 181808 | 0018223693 | TX | LAREDO | Digital Class A | Modification of License | Submitted | 05/30/2025 | 08/01/2022 | Active |
| | | | | | | | <span style="color:red">Laredo TX DMA</span> | | | | | | |
| Q | 0000271751 | 05/30/2025 | KYLX-LD | 40244 | 0018223693 | TX | LAREDO | Digital Class A | Modification of License | Submitted | 05/30/2025 | 04/01/2022 | Active |
| | | | | | | | Duplicate Market Filing Laredo TX DMA | | | | | | |
| <span style="color:red">Q</span> | 0000271745 | 05/30/2025 | WBGS-LD | 182477 | 0018223693 | KY | BOWLING GREEN | Digital Class A | Modification of License | Pending | 05/30/2025 | 08/02/2021 | Active |
| | | | | | | | <span style="color:red">Bowling Green KY DMA</span> | | | | | | |
| <span style="color:red">Q</span> | 0000271701 | 05/30/2025 | KMNF-LD | 183814 | 0018223693 | MN | MANKATO | Digital Class A | Modification of License | Pending | 05/30/2025 | 04/01/2014 | Active |
| | | | | | | | <span style="color:red">Mankato MN DMA</span> | | | | | | |
| <span style="color:red">Q</span> | 0000271696 | 05/29/2025 | WPBY-LD | 184197 | 0031172984 | IN | LAFAYETTE | Digital Class A | Modification of License | Pending | 05/30/2025 | 08/02/2021 | Active |
| | | | | | | | <span style="color:red">Lafayette IN DMA</span> | | | | | | |
| <span style="color:red">Q</span> | 0000271744 | 05/30/2025 | WOVA-LD | 125125 | 0018223693 | WV | PARKERSBURG | Digital Class A | Modification of License | Pending | 05/30/2025 | 10/01/2020 | Active |
| | | | | | | | <span style="color:red">Parkersburg WV DMA</span> | | | | | | |
| <span style="color:green">U</span> | 0000271529 | 05/28/2025 | WZTS-LD | 181609 | 0019038496 | WV | Hinton | Digital Class A | Modification of License | Pending | 05/29/2025 | 10/01/2020 | Active |
| | | | | | | | <span style="color:green">Bluefield-Beckley-Oakhill WV DMA-No Qualif. Disc</span> | | | | <span style="color:green">Applicant States Exhibits To Be Filed</span> | | | |
| <span style="color:red">Q</span> | 0000271553 | 05/28/2025 | WWPI-LD | 181585 | 0018223693 | ME | Presque Isle | Digital Class A | Modification of License | Pending | 05/29/2025 | 04/03/2023 | Active |
| | | | | | | | <span style="color:red">Presque Isle ME DMA</span> | | | | | | |
| <span style="color:red">Q</span> | 0000271683 | 05/29/2025 | KSVT-LD | 167735 | 0018223693 | ID | TWIN FALLS | Digital Class A | Modification of License | Pending | 05/30/2025 | 10/01/2022 | Active |
| | | | | | | | <span style="color:red">Twin Falls ID DMA</span> | | | | | | |
| <span style="color:red">Q</span> | 0000271693 | 05/29/2025 | KKTQ-LD | 185075 | 0029636081 | WY | CHEYENNE | Digital Class A | Modification of License | Submitted | 05/30/2025 | 10/01/2022 | Active |
| | | | | | | | <span style="color:red">Cheyenne WY-Scotts Bluff NV DMA</span> | | | | | | |
| <span style="color:red">Q</span> | 0000271694 | 05/29/2025 | KJNB-LD | 187271 | 0031173016 | AR | JONESBORO | Digital Class A | Modification of License | Submitted | 05/29/2025 | 06/01/2029 | Active |
| | | | | | | | <span style="color:red">Jonesboro AR DMA</span> | | | | | | |
| Q | 0000271695 | 05/29/2025 | WPBI-LD | 184193 | 0031172984 | IN | LAFAYETTE | Digital Class A | Modification of License | Submitted | 05/29/2025 | 08/02/2021 | Active |
| | | | | | | | Lafayette IN DMA | | | | | | |
| <span style="color:red">Q</span> | 0000271503 | 05/27/2025 | KFXF-LD | 72584 | 0018223693 | AK | FAIRBANKS | Digital Class A | Modification of License | Submitted | 05/27/2025 | 02/01/2030 | Active |
| | | | | | | | <span style="color:red">Fairbanks AK DMA</span> | | | | | | |
| <span style="color:green">U</span> | 0000271276 | 05/22/2025 | WAHU-LD | 182299 | 0028278927 | VA | CROZET | Digital Class A | Modification of License | Pending | 05/22/2025 | 10/02/2028 | Active |
| | | | | | | | <span style="color:green">Charlottesville VA DMA-Waiver Filed</span> | | | | | | |
| <span style="color:green">U</span> | 0000271275 | 05/22/2025 | WVAW-LD | 4687 | 0028278927 | VA | CHARLOTTESVILLE | Digital Class A | Modification of License | Pending | 05/22/2025 | 10/01/2028 | Active |
| | | | | | | | <span style="color:green">Charlottesville VA DMA-Waiver Filed</span> | | | | | | |
| <span style="color:green">U</span> | 0000266875 | 02/19/2025 | WETN-LD | 51284 | 0007696727 | CT | ALLINGTOWN | Digital Class A | Modification of License | Pending | 02/19/2025 | 04/03/2023 | Active |
| | | | | | | | <span style="color:green">Hartford-New Haven CT DMA-Provisional App.</span> | | | | <span style="color:green">Request Filed Pending Outcome of DC Cir. 24-1004</span> | | | |
| <span style="color:red">Q</span> | 0000258746 | 12/02/2024 | WPNM-CD | 21476 | 0018282269 | OH | LEIPSIC | Digital Class A | Modification of License | Granted | 01/14/2025 | 10/01/2029 | Active |
| | | | | | | | <span style="color:red">Lima OH DMA</span> | | | | | | |
| Q | 0000258747 | 12/02/2024 | WAMS-CD | 70612 | 0018282269 | OH | MINSTER/NEW BREMEN | Digital Class A | Modification of License | Granted | 01/14/2025 | 10/01/2029 | Active |
| | | | | | | | Lima OH DMA | | | | | | |
| <span style="color:red">Q</span> | 0000252261 | 08/23/2024 | KNPN-CD | 188056 | 0021454004 | MO | SAINT JOSEPH | Digital Class A | Modification of License | Granted | 10/09/2024 | 02/01/2030 | Active |
| | | | | | | | <span style="color:red">Saint Joseph MO DMA</span> | | | | | | |
| Q | 0000252260 | 08/23/2024 | KNPG-CD | 188055 | 0021454004 | MO | SAINT JOSEPH | Digital Class A | Modification of License | Granted | 10/09/2024 | 02/01/2030 | Active |
| | | | | | | | Saint Joseph MO DMA | | | | | | |
| Q | 0000252300 | 08/26/2024 | KCJO-CD | 188057 | 0021454004 | MO | SAINT JOSEPH | Digital Class A | Modification of License | Granted | 10/09/2024 | 02/01/2030 | Active |
| | | | | | | | Saint Joseph MO DMA | | | | | | |

| PDF | File Number | Submit Date | Call Sign | Facility ID | FRN | State | City | Service | Purpose | Status | Status Date | Expiration Date | Active/InActive |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Q | 0000252107 | 08/22/2024 | KQRE-LD | 189246 | 0006885586 | OR | BEND | Digital Class A | Modification of License | Pending | 08/22/2024 | 02/01/2023 | Active |
| | | | | | | | <span style="color:red">Bend OR DMA</span> | | | | | | |
| Q | 0000246074 | 06/11/2024 | WTLW-CD | 74373 | 0004378071 | OH | LIMA | Digital Class A | Modification of License | Granted | 07/30/2024 | 10/01/2029 | Active |
| | | | | | | | **Lima OH DMA** | | | | | | |
| U | 0000247734 | 07/09/2024 | WQIZ-LD | 49181 | 0003020260 | OH | ASHLAND | Digital Class A | Modification of License | Pending | 07/09/2024 | 10/01/2021 | Active |
| | | | | | | | <span style="color:green">Lists Watertown NY DMA, but appears to be a small</span> | | <span style="color:green">community in the Columbus OH DMA</span> | | | | |

‹‹ First    ‹ Prev    1    Next ›    Last ››

Technical problems or trouble accessing the system? Submit a help request for assistance or contact (877) 480-3201 or TTY: (717) 338-2824

Federal Communications Commission
45 L Street NE
Washington, DC 20554

Phone: 1-888-225-5322
TTY: 1-888-835-5322
Fax: 1-866-418-0232
Contact Us
Website Policies & Notices
Privacy Policy
FOIA
No Fear Act Data
FCC Digital Strategy
Open Government Directive
Plain Writing Act
RSS Feeds & Email Updates
Accessibility
About the FCC
Proceedings & Actions
Licensing & Databases
Reports & Research
News & Events
For Consumers
Consumer
Enforcement
Inspector General
International
Media
Public Safety
Wireless
Wireline
Offices



# Licensing and Management System

## Search Results - Pleadings

⊘ **FAQ**

Refine Search Results  |  Clear Search Results
**Application File Number:** 0000266875

| Application File Number | Pleading File Number | Pleading Type | Facility ID | Pleading Party Filing | Pleading Status | Pleading Filing Date |
|---|---|---|---|---|---|---|

Technical problems or trouble accessing the system? Submit a help request for assistance or contact (877) 480-3201 or TTY: (717) 338-2824

Federal Communications Commission
45 L Street NE
Washington, DC 20554

Phone: 1-888-225-5322
TTY: 1-888-835-5322
Fax: 1-866-418-0232
Contact Us
Website Policies & Notices
Privacy Policy
FOIA
No Fear Act Data
FCC Digital Strategy
Open Government Directive
Plain Writing Act
RSS Feeds & Email Updates
Accessibility
About the FCC
Proceedings & Actions
Licensing & Databases
Reports & Research
News & Events
For Consumers
Consumer
Enforcement
Inspector General
International
Media
Public Safety
Wireless
Wireline
Offices

Petitioner's Third Request For Judicial Notice
Attachment 2 -- No. 24-1004

May 31, 2025

# STATEMENT REGARDING PROVISIONAL MUST-CARRY

FCC 23-112 ¶ 18 provides that "from and after the date of its application for a Class A license, the station **must be in compliance with the Commission's operating rules for full-power television stations**" *citing* LPPA Sec.2(c)(2)(B)(i)(I); 47 U.S.C. § 336(f)(2)(A)(ii) (emphasis added). Section 76.64(f)(5) of the Commission's Rules provides that TV stations must assert must-carry rights within thirty (30) days of becoming eligible to do so. However, RCC is not currently able to assert must-carry rights directly against cable TV operators upon the filing of this application as required by the above cited plain statutory text and the Commission's order in light of the Class A must-carry prohibition announced in FCC 23-112, even though the LPPA does not expressly limit Class A must-carry.[1]

RCC is currently litigating in the United States Court of Appeals for the D.C. Circuit the Commission's refusal to allow Class A licensees to assert must-carry rights on cable TV systems. *See* FCC 23-112, released December 12, 2023, at ¶¶ 52-53; D.C. Cir. Case No. 24-1004. LPPA Class A is a different, primary station class created by Congress in 2023, compared to the Commission created secondary "low power TV" station class the Commission created in 1982 and which the Commission denied must-carry rights at 47 C.F.R. § 76.55(c)(1) in its 1993 *Implementation of the Cable Television Consumer Protection and Competition Act of 1992, Broadcast Signal Carriage Issues*, MM Docket No. 92-259, *Report and Order*, 8 FCC Rcd. 2965 (1993).

While operating at lower power compared to full-power TV stations licensed under the Table of Allotments, Class A stations are members of a newly created primary station class, they are not members of the secondary "low power TV" station class which was prohibited from asserting cable TV must-carry rights in 1993 by Section 76.55(c)(1) and 47 U.S.C. § 534(h)(1)(B). For many years the Commission's periodic *Broadcast Station Totals* public

---

[1] FCC 23-112 ¶ 53 relies upon statutory silence to deny Class A stations the right to assert must-carry against cable TV stations. That determination directly contravenes the LPPA's explicit requirement that Class A licenses have "the same license terms" as full-power stations licensed under the Table of Allotments "except as otherwise expressly provided in the LPPA." FCC 23-112 ¶ 8; LPPA Section 2(c)(3)(A). As discussed above, neither the LPPA, nor any statute or rule, prohibits Class A stations from asserting must-carry rights on cable TV systems. The Commission's determination based upon statutory "silence" does precisely what Congress ordered it not to do, namely, limit Class A protections absent an "express" statutory direction. The Commission's Class A must-carry prohibition is facially unlawful and subject to injunction or similar relief.

Exhibit 8 Provisional Must-Carry
Page 1 of 2

Petitioner's Third Request For Judicial Notice
Attachment 3 -- No. 24-1004
Page 1 of 2

May 31, 2025

notices and news releases have recognized Class A as a separate station class, completely distinct from "Low Power TV." *See e.g.*, FCC 23-112 n.6 *citing Broadcast Station Totals as of September 30, 2023*, *Public Notice*, DA 23-921 (rel. Oct. 3, 2023); https://docs.fcc.gov/public/attachments/DA-23-921A1.pdf (http://fcc.gov). The Commission has never amended Section 76.55(c)(1) to exclude Primary Class A stations from asserting must-carry on cable TV systems through inclusion of Primary Class A stations in the list of secondary licenses which are denied must-carry rights. Accordingly, Class A stations are "local commercial television stations" able to assert must-carry rights pursuant to Section 76.55(c).

With the exception of "qualified low power stations," secondary signals are not "afforded" must-carry status while primary signals **ARE** "afforded" must-carry status. *Implementation of the 1992 Cable Act*, 8 FCC Rcd at 2967 n.14. Statutorily protected Primary Class A stations are licensed under the full-power TV rules at 47 C.F.R. § 73.6001 *et seq.* Commission created secondary "low power TV" stations classified as "LPTV stations" and are licensed under Rule Part 74. *See* 47 C.F.R. § 74.701(f),(k). The LPPA expressly protects Primary Class A TV stations as full-power stations licensed under the Table of Allotments, except as expressly limited by the LPPA. The LPPA does not "expressly" limit Class A stations from asserting cable TV must-carry rights. Class A stations have never been prohibited from asserting cable TV must-carry by statute or by Commission rule.[2]

RCC hereby gives notice that by filing this application, RCC is asserting its cable TV must-carry right as a Class A upgrade applicant which is required to comply with the full-power rules. RCC is vindicating its must-carry rights to the extent practicable given the Class A must-carry prohibition contained in FCC 23-112. Because RCC is required to assume the burdens associated with full-power operational rules based upon the filing of this Class A application, RCC is entitled to an immediate Commission ruling that RCC may assert must-carry rights against cable TV systems, at least on a provisional basis, pending final resolution of the must-carry issue currently being reviewed in D.C. Circuit Case No. 24-1004. Should RCC prevail on the must-carry issue at any stage of its appellate litigation, RCC intends to assert its must-carry rights, in full, within 30 days after any such relief is granted by final, non-appealable court order in compliance with 47 C.F.R. § 76.64(f)(5).

---

[2] 47 U.S.C. § 338(k)(5) limits Class A must-carry rights on satellite systems. However, that limitation is expressly confined to the "purposes of" satellite carriage; that limitation, by its express terms, does not apply to Class A must-carry on cable TV systems. Moreover, as discussed above, LPPA Class A stations are a different class of TV stations authorized under Part 73, not under Part 74 as required by the express terms of Section 338(k)(5).

Exhibit 8 Provisional Must-Carry
Page 2 of 2